# 25-3017-cv(L), 25-3243-cv(XAP)

## United States Court of Appeals
### *for the*
## Second Circuit

MATTHEW CHANEY, NADINE MILLER and ARTHUR GUSTAFSON,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

– v. –

LINDA JOY SULLIVAN, in her capacity as the Dissolution Receiver for Koffee Kup Bakery, Inc., Vermont Bread Company, Inc. and Superior Bakery, Inc.,

*Intervenor-Defendant-Cross-Claimant-Appellee-Cross-Appellant,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## JOINT APPENDIX
### Volume 3 of 15 (Pages JA-401 to JA-600)

IAN P. CARLETON
KEVIN LUMPKIN
SHEEHEY FURLONG & BEHM P.C.
30 Main Street
P.O. Box 66
Burlington, Vermont 05402
(802) 864-9891

*Attorneys for Intervenor-Defendant-Cross-Claimant-Appellee-Cross-Appellant*

JAY M. LEVIN
FLASTER/GREENBERG
One Tower Bridge
100 Front Street, Suite 100
West Conshohocken,
  Pennsylvania 19428
(215) 576-1730

*Attorneys for Defendants-Cross-Defendants-Appellants-Cross-Appellees*

*(For Continuation of Appearances See Inside Cover)*

COUNSEL PRESS
A ▷ Proceed Service
The Appellate Experts®

(800) 4-APPEAL • (390902)

– v. –

KK BAKERY INVESTMENT COMPANY, LLC, AMERICAN INDUSTRIAL
ACQUISITION CORPORATION,

*Defendants-Cross-Defendants-Appellants-Cross-Appellees,*

KK BAKERY HOLDING ACQUISITION COMPANY,

*Defendant-Cross-Defendant,*

VERMONT BREAD COMPANY, SUPERIOR BAKER, INC., KOFFEE KUP
BAKERY, INC., KOFFEE KUP DISTRIBUTION LLC,

*Defendants.*

MARY E. OLSEN
SAM HELDMAN
THE GARDNER FIRM, P.C.
182 Saint Francis Street, Suite 103
Mobile, Alabama 36602
(251) 433-8100

THOMAS P. AICHER
GFELLER LAURIE LLP
110 Merchants Row, 3rd Floor
Rutland, Vermont 05701
(802) 775-8800

-and-

STUART J. MILLER
LANKENAU & MILLER, LLP
100 Church Street, 8th Floor
New York, New York 10007
(212) 581-5005

*Attorneys for Plaintiffs-Appellees*

i

## TABLE OF CONTENTS

**Page**

U.S. District Court Docket Entries ............................ JA-1

First Amended Class Action Complaint, dated
June 11, 2021 [10] ................................................ JA-41

Class Representatives' Motion for Sanctions, dated
December 19, 2022 [redacted] [158]
(Sealed. See Sealed Vol. at CA-1-CA-16)............. JA-54

Exhibit 1 to Motion -
Declaration of Mary E. Olsen, dated December
19, 2022 [redacted] [158-1]
(Sealed. See Sealed Vol. at CA-17-CA-22)........... JA-70

Annexed to Olsen Declaration -
Composite Email 1 [158-2].............................. JA-76

Annexed to Olsen Declaration -
Composite Email 2 [158-2].............................. JA-82

Annexed to Olsen Declaration -
Composite Email 3 and Attachment [158-2]
(Attachment Sealed. See Sealed Vol. at
CA-23-CA-24) ................................................ JA-91

Annexed to Olsen Declaration -
Composite Email 4............................................ JA-105

Attached to Motion -
Jeffrey Sands Errata Sheet November 11, 2022
Deposition [158-3]................................................ JA-115

ii

**Page**

Attached to Motion -
Excerpts of AIAC 20(b)(6) Deposition of Jeffrey
Sands, dated November 10, 2022 [redacted]
[158-4]
(Sealed. See Sealed Vol. at CA-25-CA-55)........... JA-120

Attached to Motion -
Excerpts of KKBIC's 30(b)(6) Deposition of
Jeffrey Sands, dated November 11, 2022
[158-5] .................................................................. JA-151

Dissolution Receiver Linda Joy Sullivan's Joinder
in Class Representatives' Motion for Sanctions,
dated January 9, 2023 [167].................................. JA-172

Plaintiffs' and Dissolution Receiver's Joint
Supplemental Submission in Support of Their
Sanctions Motion and Joinder against the AIAC
Defendants, dated January 21, 2023 [170] ............ JA-174

Evidentiary Hearing Transcript on Motion for
Sanctions Re 30(b)(6) Deposition of AIAC, dated
February 6, 2023 [179] ......................................... JA-178

Order on Motion for Protective Order, dated
February 27, 2023 [188] ........................................ JA-212

Telephone Conference Transcript, dated
February 17, 2023 [190] ........................................ JA-216

Hearing Transcript on Discovery Issue, dated
March 2, 2023 [191] .............................................. JA-229

Class Representatives and Dissolution Receiver's
Joint Supplemental Filing in Support of Motion
for Sanctions, dated March 15, 2023 [193]
(Omitted Herein):

**iii**

|  | Page |
|---|---|

Attached to Joint Supplemental Filing -
Email, dated March 1, 2023, with Attachment
[179]........................................................................... JA-246

Attached to Joint Supplemental Filing -
Email, dated February 24, 2023 [193-2]................ JA-313

Attached to Joint Supplemental Filing -
Privilege Log, dated March 1, 2023 [193-3] ......... JA-318

Dissolution Receiver's Motion for, and
Memorandum in Support of Summary Judgment
Dismissing The First Amended Complaint or
Granting Alternative Relief, dated
March 31, 2023 [197] ........................................... JA-323

Dissolution Receiver's Statement of Undisputed
Material Facts, in Support of Motion, dated
March 31, 2023 [199] ........................................... JA-352

Defendants' KK Bakery Investment Company
LLC's & American Industrial Acquisition
Company LLC's Motion for Summary Judgment,
dated March 31, 2023 [202].................................... JA-366

Memorandum of Law in Support of Defendants'
KK Bakery Investment Company LLC's &
American Industrial Acquisition Company LLC's
Motion for Summary Judgment, dated
March 31, 2023 [202-1]......................................... JA-369

Defendants' KK Bakery Investment Company
LLC's & American Industrial Acquisition
Company LLC's Statement of Undisputed
Material Facts, dated March 31, 2023 [202-2] ...... JA-391

Certificate of Service [202-3] .................................... JA-400

iv

**Page**

Affidavit of Jeffrey Sands, dated
March 31, 2023 [202-4] ......................................... JA-403

Exhibit A to Sands Affidavit -
Securities Purchase Agreement, dated April 1,
2021, with Attachments [202-5] ............................ JA-416

Exhibit B to Sands Affidavit -
Spreadsheet of 2021 Budget [202-6] ...................... JA-552

Exhibit C to Sands Affidavit -
Email, dated March 19, 2021 [202-7].................... JA-556

Exhibit D to Sands Affidavit -
Email, dated March 30, 2021 [202-8].................... JA-558

Exhibit E to Sands Affidavit -
Email, dated March 31, 2021 [202-9].................... JA-561

Exhibit F to Sands Affidavit -
Memorandum Re KKB Viability Assessment and
Recommendations, dated April 20, 2021
[202-10] ................................................................. JA-563

Exhibit G to Sands Affidavit -
WARN Notice, April 26, 2021 [202-11] ............... JA-568

Exhibit H to Sands Affidavit -
VT DOL Determination Letter [202-12] ............... JA-573

Plaintiffs' Motion for Summary Judgment, dated
March 31, 2023 [203] ........................................... JA-575

Index to Plaintiff's Motion for Summary Judgment
[203-1] ................................................................... JA-577

Plaintiffs' Memorandum in Support of Motion for
Summary Judgment, dated March 31, 2023
[Redacted] [203-2]
(Sealed. See Sealed Vol. at CA-56-CA-81)........... JA-579

v

**Page**

Plaintiffs' Statement of Undisputed Facts dated
March 31, 2023 [Redacted] [203-3]
(Sealed. See Sealed Vol. at CA-82-CA-141).........  JA-605

Exhibit 1 to Plaintiffs' Motion -
Dissolution Receiver's RFA Responses for
Koffee Kup, Excerpt Nos. 24-26; Vermont
Bread, Nos. 24-26; Superior, Nos. 22-24
[203-4] ...................................................................  JA-665

Exhibit 2 to Plaintiffs' Motion -
AIAC's RFA Responses Excerpts [203-5]............  JA-672

Exhibit 3 to Plaintiffs' Motion -
KKBIC's RFA Responses Excerpts [203-6] .........  JA-681

Exhibit 4 to Plaintiffs' Motion -
Stephanie Hanker Deposition Excerpts, dated
August 29, 2022 [203-7].......................................  JA-691

Exhibit 5 to Plaintiffs' Motion -
AIAC and KKBIC Supplemental Responses to
Plaintiffs' Requests For Documents, S-11 (April
2021 Emails) [203-8]............................................  JA-705

Exhibit 6 to Plaintiffs' Motion -
Dissolution Receiver's Objection to Claim and
Complaint in Vermont Superior Court,
Chittenden Unit, dated July 6, 2022 [203-9] .........  JA-711

Exhibit 7 to Plaintiffs' Motion -
Answer of AIAC, KKBIC, Levie and Sands to
Dissolution Receiver's Objection to Claim and
Complaint, dated August 10, 2022 [203-10] .........  JA-730

Exhibit 8 to Plaintiffs' Motion -
Jean-Francois Morin's Deposition Excerpts,
dated November 17, 2022 [203-11].......................  JA-744

vi

**Page**

Exhibit 9 to Plaintiffs' Motion -
Mark Coles' Deposition Excerpts, dated
August 29, 2022 [203-12]..................................... JA-772

Exhibit 10 to Plaintiffs' Motion -
Excerpts of AIAC 30(b)(6) Deposition of Jeffrey
Sands, dated November 10, 2022 [redacted]
[203-13]
(Sealed. See Sealed Vol. at CA-142-CA-179)....... JA-825

Exhibit 11 to Plaintiffs' Motion -
Mark Coles Deposition Select Exhibits
[203-14] ................................................................. JA-864

Exhibit 12 to Plaintiffs' Motion -
Stephanie Hanker Deposition Select Exhibits
[203-15] ................................................................. JA-921

Exhibit 13 to Plaintiffs' Motion -
Lauris Benjamin Richards' Deposition Excerpts,
dated November 17, 2022 [203-16]....................... JA-927

Exhibit 14 to Plaintiffs' Motion -
Susan Leonard's Deposition Excerpts, dated
September 29, 2022 [203-17] ................................ JA-946

Exhibit 15 to Plaintiffs' Motion -
Jeff Sands' Deposition Excerpts, dated May 10,
2022 [redacted] [203-18]
(Sealed. See Sealed Vol. at CA-180-CA-206)....... JA-953

Exhibit 16 to Plaintiffs' Motion -
Leonard Levie Deposition Excerpts, dated
June 9, 2022 [203-19]........................................... JA-980

Exhibit 17 to Plaintiffs' Motion -
Printout of AIAC Website: Jeff Sands Bio
[203-20] ................................................................. JA-997

vii

**Page**

Exhibit 18 to Plaintiffs' Motion -
AIAC 30(b)(6) Deposition (Sands) Select
Exhibits [redacted] [203-21]
(Sealed. See Sealed Vol. at CA-207-CA-237)....... JA-999

Exhibit 19 to Plaintiffs' Motion -
Excerpts of AIAC-KKBIC 30(b)(6) Deposition
of Leonard Levie, dated March 2, 2023
[203-22] .................................................................. JA-1027

Exhibit 20 to Plaintiffs' Motion -
AIAC PowerPoint Presentation [203-23] .............. JA-1043

Exhibit 21 to Plaintiffs' Motion -
Answering Statement in AAA Case 1-21-18-
1379 [redacted] [203-24]
(Sealed. See Sealed Vol. at CA-238-CA-258)....... JA-1060

Exhibit 22 to Plaintiffs' Motion -
KKBIC Formation Letter [203-25]........................ JA-1081

Exhibit 23 to Plaintiffs' Motion -
Excerpts of KKBIC 30(b)(6) Deposition of
Jeffrey Sands, dated November 11, 2022
[redacted] [203-26]
(Sealed. See Sealed Vol. at CA-259-CA-273)....... JA-1087

Exhibit 24 to Plaintiffs' Motion -
Sands Deposition Select Exhibits, 1 and 9
[redacted] [203-27]
(Sealed. See Sealed Vol. at CA-274-CA-381)....... JA-1104

Exhibit 25 to Plaintiffs' Motion -
Sands Email February 16, 2021 (Bates stamped
KKBIC 15) [203-28]............................................ JA-1319

viii

**Page**

Exhibit 27 to Plaintiffs' Motion -
AIAC's March 4, 2021 Indicative Offer or
Letter of Intent [203-30] ....................................... JA-1320

Exhibit 28 to Plaintiffs' Motion -
ATC Group Services LLC Proof of Claim and
Attachments [203-31] ........................................... JA-1343

Exhibit 29 to Plaintiffs' Motion -
Dissolution Receiver's Objection to ATC Group
Services LLC Proof of Claim and Attachments,
dated July 5, 2022 [203-32] ................................... JA-1361

Exhibit 30 to Plaintiffs' Motion -
Selinger Email of April 1, 2021 (Bates stamped
KKBIC 9816) [203-33]......................................... JA-1380

Exhibit 31 to Plaintiffs' Motion -
KKBIC Responses and Objections to Plaintiffs'
Interrogatories, dated April 28, 2022 [203-34]...... JA-1381

Exhibit 32 to Plaintiffs' Motion -
AIAC 30(b)(6) Deposition of Jeffrey Sands
Errata Sheet, dated November 10, 2022
[203-35] ............................................................... JA-1395

Exhibit 33 to Plaintiffs' Motion -
KKBIC 30(b)(6) Deposition of Jeffrey Sands
Errata Sheet, dated November 11, 2022
[203-36] ............................................................... JA-1398

Exhibit 34 to Plaintiffs' Motion -
Richards Deposition Select Exhibits [203-37] ...... JA-1403

Exhibit 35 to Plaintiffs' Motion -
Morin Deposition Select Exhibits [203-38]........... JA-1495

ix

**Page**

Exhibit 36 to Plaintiffs' Motion -
Jeff Sands' Bankruptcy Deposition Excerpts,
dated December 10, 2021 [203-39] ........................ JA-1587

Exhibit 37 to Plaintiffs' Motion -
Levie Responses Following June 9, 2022
Deposition [203-40]............................................... JA-1596

Exhibit 38 to Plaintiffs' Motion -
KKBIC 3901-3999 [203-41]................................. JA-1602

Exhibit 39 to Plaintiffs' Motion -
KKBIC Proof of Claim and Exhibits [203-42]..... JA-1701

Exhibit 41 to Plaintiffs' Motion -
KKBIC 30(b)(6) Deposition of Jeffrey Sands
Select Exhibits [203-44] ........................................ JA-1846

Exhibit 43 to Plaintiffs' Motion -
KeyBank 30(b)(6) Deposition Excerpts of Leslie
Jones, dated July 19, 2022 [203-46] ...................... JA-1848

Exhibit 44 to Plaintiffs' Motion -
Sands April 9, 2021 Email about Teplitsky
(KKBIC 9937-9942) [203-47]............................... JA-1858

Exhibit 45 to Plaintiffs' Motion -
Levie April 12, 2021 Email to K. Mann (Bates
stamped KKBIC 11003-11110) [203-48].............. JA-1864

Exhibit 47 to Plaintiffs' Motion -
AIAC Defendants' Privilege Log, March 1, 2023
[203-50] ................................................................. JA-1872

Exhibit 48 to Plaintiffs' Motion -
Declaration of Mary E. Olsen, in Support of
Plaintiffs' Motion for Summary Judgment, dated
March 31, 2023 [203-51]........................................ JA-1877

x

**Page**

Exhibit A to Declaration -
Census [redacted] [203-52]
(Sealed. See Sealed Vol. at CA-382-
CA-387) .......................................................... JA-1882

Exhibit B to Declaration -
WARN Damage Calculation Spreadsheet
[203-53] .......................................................... JA-1888

Exhibit C to Declaration -
DOL Employer Costs for Employee
Compensation - December 2021 [203-54]........ JA-1894

Dissolution Receiver's Memorandum in Opposition
  to Summary Judgment Motions for the Plaintiffs'
  and of Defendants KKBIA/AIAC and Cross-
  Claim Defendants, dated May 1, 2023 [208]......... JA-1913

Supplemental Declaration of Peter D. Wolfson in
  Opposition to Summary Judgment Motions of the
  Plaintiffs and of Defendants KKBIC/AIAC and
  Cross-Claims Defendants, dated May 1, 2023
  [209]..................................................................... JA-1936

Index of Exhibits to Supplemental Declaration of
  Peter D. Wolfson [209-1] ..................................... JA-1941

Exhibit 1 to Supplemental Declaration -
VBC, KKB, and SBI KeyBank Checking
Account Statements, dated April 16, 2021
[209-2] .................................................................. JA-1943

Exhibit 2 to Supplemental Declaration -
KKB, VBC and SBI Financial Statements for the
period of January 29, 2017 through
February 25, 2017 [209-3].................................... JA-1953

**xi**

**Page**

Exhibit 3 to Supplemental Declaration -
ADP Reports for KKB, VBC, and SBI for the
period ending April 24, 2021 [209-4] .................... JA-1960

Exhibit 4 to Supplemental Declaration -
Excerpts from KKB, SBI, and VBC Employee
Handbooks [209-5] ............................................... JA-1964

Exhibit 5 to Supplemental Declaration -
VBC, KKB, and SBI 941Tax Forms [209-6] ........ JA-1978

Exhibit 6 to Supplemental Declaration -
August 29, 2022 Mark Coles Deposition,
Excerpts [209-7] .................................................... JA-1988

Exhibit 7 to Supplemental Declaration -
August 29, 2022 Stephanie Hanker Deposition,
Excerpts [209-8] .................................................... JA-1996

Exhibit 8 to Supplemental Declaration -
KKB ADP Employee Payroll Excerpts [209-9] .... JA-2003

Exhibit 9 to Supplemental Declaration -
April 27, 2021 Email from J. Selinger to J.
Kennelly, *et al.*, "Re: Koffee Kup Bakery –
Proposed WARN Notice" [209-10] ....................... JA-2013

Exhibit 10 to Supplemental Declaration -
April 27, 2021 KKB Quotes attributable to
Jeffrey Sands of Dorset Partners LLC [203-11] .... JA-2015

Exhibit 11 to Supplemental Declaration -
April 25, 2021 Email from L. Levie to C. Turner
"Re: Bakery, Fields" [209-12] .............................. JA-2017

Exhibit 12 to Supplemental Declaration -
April 26, 2022 Email from L. Levie to L.
Sullivan "Re: Notes" [209-13] .............................. JA-2022

xii

**Page**

Exhibit 13 to Supplemental Declaration -
April 26, 2022 Email from L. Sullivan to L.
Levie "Re: Sociapar SAS Promissory Note"
[209-14] ................................................................ JA-2024

Exhibit 14 to Supplemental Declaration -
June 9, 2022 Leonard Levie Deposition, Excerpts
[209-15] ................................................................ JA-2026

Exhibit 15 to Supplemental Declaration -
March 2, 2023 Leonard Levie Deposition
Excerpts [209-16] ................................................. JA-2030

Exhibit 16 to Supplemental Declaration -
April 2, 2021 Email from J. Sands to L. Jones
"Re: Koffee Kup Close/Update/Next Steps….."
[209-17] ................................................................ JA-2035

Exhibit 17 to Supplemental Declaration -
Redacted Emails detailing AMTC Wires to
Primmer [209-18] ................................................. JA-2039

Exhibit 18 to Supplemental Declaration -
November 23, 2021 Mark Coles Deposition in
Bankruptcy proceeding Excerpts [209-19] ............ JA-2049

Exhibit 19 to Supplemental Declaration -
July 19, 2022 L. Jones Deposition Excerpts
[209-20] ................................................................ JA-2055

Exhibit 20 to Supplemental Declaration -
Confidentiality, Non-Disclosure, and Non-
Solicitation Agreement between AIAC and
Koffee Kup Bakery, Inc., dated
November 23, 2020 [209-21] ................................ JA-2058

**xiii**

**Page**

Exhibit 21 to Supplemental Declaration -
April 1, 2021 Email from L. Morris to J. Morin
and B. Richards "Re: P3 Financials and P&L
Analysis" [209-22].................................................. JA-2065

Exhibit 22 to Supplemental Declaration - April 9,
2021 Email from J. Sands to L. Levie and J.
Selinger "Re: "KKB Going Concern Value"
[209-23] ................................................................. JA-2067

Exhibit 23 to Supplemental Declaration -
KKE Actual and Budgeted Consolidated Results
for the Period 8 (2020) through Period 3 (2021) –
Summary [209-24]................................................. JA-2070

Dissolution Receiver's Response to Plaintiffs'
Statement of Undisputed facts, dated
May 1, 2023 [210] ................................................. JA-2074

Dissolution Receiver's Response to KK Bakery
Investment Company LLC's & American
Industrial Acquisition Company's Statement of
Undisputed Material Facts, dated May 1, 2023
[211]....................................................................... JA-2133

Plaintiffs' Brief in Opposition to the Motion for
Summary Judgment of Defendants AIAC and
KKBIA, dated May 1, 2023 [214] ......................... JA-2153

Plaintiffs' Responses to AIAC Defendants'
Statement of Undisputed Material Facts and
Plaintiffs' Statement of Additional Facts, dated
May 1, 2023 [214-1]............................................. JA-2172

Exhibit 1 to Plaintiffs' Responses -
Leonard Levie's Deposition Excerpts, dated
March 2, 2023 [214-2].......................................... JA-2199

xiv

**Page**

Exhibit 2 to Plaintiffs' Responses -
Printout from Kirwan Law [214-3] ........................ JA-2205

Exhibit 3 to Plaintiffs' Responses -
Jeffrey Sands' Deposition Excerpts, dated
November 10, 2022 [214-4] ................................. JA-2209

Exhibit 4 to Plaintiffs' Responses -
Mark Coles' Deposition Excerpts, dated
August 29, 2022 .................................................... JA-2211

Exhibit 5 to Plaintiffs' Responses -
Jeff Sands' Deposition Excerpts, dated
December 10, 2021 ............................................... JA-2223

Exhibit 6 to Plaintiffs' Responses -
Mark Coles' Deposition Excerpts, dated
June 1, 2022 [214-7] ............................................ JA 2226

Exhibit 7 to Plaintiffs' Responses -
Jeff Sands' Deposition Excerpts, dated
May 10, 2022 [214-8] ........................................... JA 2228

Exhibit 8 to Plaintiffs' Responses -
Affidavit of Jeff Sands, dated May 20, 2021
[214-9] .................................................................. JA-2232

Exhibit 9 to Plaintiffs' Responses -
Declaration of Jeff Sands, in Support of Alleged
Debtor Koffee Kup Bakery, Inc.'s Motion to
Dismiss Involuntary Petition and Request for
Damages, dated September 7, 2021 [214-10] ........ JA-2235

Plaintiffs' Brief in Opposition to the Receiver's
Motion for Summary Judgment, dated
May 1, 2023 [215] ................................................ JA-2238

xv

**Page**

Plaintiff's Responses to the Receiver's Statement of
Undisputed Material Facts and Plaintiff's
Statement of Additional Facts, dated
May 1, 2023 [215-1] ............................................. JA-2284

Deposition Transcript Excerpts of Mark Coles,
dated August 29, 2022 [215-2] .............................. JA-2313

Plaintiffs' Motion to Strike Affidavit of Jeffrey

Sands, dated May 1, 2023 [216] ................................. JA-2321

Memorandum of Law in Opposition to the
Dissolution Receiver's Motion for Summary
Judgment, dated May 1, 2023 [217] ....................... JA-2336

Response to the Dissolution Receiver's Statement
of Undisputed facts, dated May 1, 2023 [217-2] ... JA-2361

Affidavit of Jeffrey Sands, dated May 1, 2023
[217-4] ................................................................. JA-2368

Exhibit A to Sands Affidavit -
Minutes of a Telephonic Board of Directors
Meeting of Kup Co., dated April 7, 2021
[217-5] ................................................................. JA-2377

Exhibit B to Sands Affidavit -
Minutes of a Reconvened Telephonic Meeting of
the Board of Directors Kup Co., dated
April 7, 2021 [217-6] ............................................ JA-2380

Exhibit C to Sands Affidavit -
Minutes of a Telephonic Board of Directors
Meeting of Kup Co. and Subsidiaries , dated
April 19, 2021 [217-7] .......................................... JA-2385

Affidavit of Leonard M. Levie, dated
May 1, 2023 [217-8] ............................................. JA-2400

**xvi**

Page

Exhibit A to Levie Affidavit -
Certificate of Formation of KK Bakery
Investment Company LLC [217-9] ........................ JA-2414

Memorandum of Law in Opposition to Plaintiffs'
Motion for Summary Judgment, dated
May 1, 2023 [219] ................................................ JA-2422

Response to Plaintiffs' Statement of Undisputed
Facts, dated May 1, 2023 [219-1]........................... JA-2450

Affidavit of Jeffrey Sands, dated
May 1, 2023 [219-2]............................................. JA-2477

Exhibit A to Sands Affidavit -
Minutes of a Telephonic Board of Directors
Meeting of Kup Co., dated April 7, 2021
[219-3] .................................................................. JA-2486

Exhibit B to Sands Affidavit -
Minutes of a Reconvened Telephonic Meeting of
the Board of Directors of Kup Co., dated
April 7, 2021 [219-4]............................................ JA-2489

Exhibit C to Sands Affidavit -
Minutes of a Telephonic Board of Directors
Meeting of Kup Co. and Subsidiaries, dated
April 19, 2021 [219-5]........................................... JA-2494

Affidavit of Leaonard M. Levie, dated May 1, 2023
[219-6] .................................................................. JA-2509

Exhibit A to Levie Affidavit -
Certification of Formation of KK Bakery
Investment LLC [219-7]........................................ JA-2523

Dissolution Receiver's Reply Memorandum of Law
in Support of Summary Judgement Motion, dated
May 15, 2023 [223] ............................................... JA-2531

xvii

**Page**

Attached to Reply Memorandum -
Appendix A. The WARN ACT Guidelines
[223-1] ..................................................... JA-2541

Certificate of Service, dated May 15, 2023
[223-2] .................................................... JA-2578

Reply Memorandum of Law by KKBIc/AIAC, in
Further Support of Motion for Summary
Judgment, dated May 15, 2023 [224] .................... JA-2581

Plaintiffs' Reply Brief in Support of Their Motion,
dated May 15, 2023 [226].................................... JA-2589

Plaintiff's Motion to Strike Affidavits of Sands and
Levie and Attachments, dated May 15, 2023
[227]........................................................ JA-2600

Plaintiffs' Reply in Support of Their Motion to
Strike Affidavit of Jeffrey Sands, dated
May 30, 2023 [231] ............................................. JA-2608

Opinion and Order on Motion for Sanctions, dated
August 22, 2023 [236] ......................................... JA-2612

Opinion and Order on Motions to Strike and
Motions for Summary Judgment, dated
August 23, 2023 [237] ......................................... JA-2623

Amended Opinion and Order on Motions to Strike
and Motions for Summary Judgment, dated
August 24, 2023 [238] ......................................... JA-2672

Supplemental Filing in Support of Motion for
Sanctions in Accordance with Opinion and Order
ECF No. 236, dated September 19, 2023 [240]..... JA-2721

**xviii**

**Page**

Exhibit 1 to Supplemental Filing -
Declaration of Mary E. Olsen, dated
September 19, 2023 [240-1] .................................. JA-2724

    Exhibit A to Olsen Declaration -
    TGF Time Records [240-2] ............................. JA-2727

Exhibit 2 to Supplemental Filing -
Declaration of Stuart J. Miller, dated
September 19, 2023 [240-3] .................................. JA-2732

    Exhibit A to Miller Declaration -
    L&M Time Records [240-4]............................. JA-2735

    Exhibit B to Miller Declaration -
    CS&A Redacted Time Records [240-5] ........... JA-2737

Class Representatives' Reply in Support of Fees
    and Expenses As Sanctions in Accordance with
    Opinion and Order ECF No. 236, dated
    November 13, 2023 [253]..................................... JA-2748

Dissolution Receiver's Motion, and Memorandum
    in Support, for Summary Judgment, dated
    December 20, 2023 [255] ..................................... JA-2755

Dissolution Receiver's Statement of Undisputed
    Material Facts, in Support of Motion, dated
    December 20, 2023 [256] ..................................... JA-2770

Declaration of Peter D. Wolfson, in Support of
    Dissolution Receiver's Motion for Summary
    Judgment, dated December 20, 2023 [257] ........... JA-2773

    Exhibit 1 to Wolfson Declaration -
    DR's WARN Act Calculations [257-1]................. JA-2778

xix

**Page**

Defendants American Industrial Acquisition
Corporation and KK Bakery Investment
Company LLC's Response and Memorandum in
Opposition to Dissolution Receiver's Motion for
Partial Summary Judgment, dated
January 19, 2024 [262] ......................................... JA-2791

Defendants American Industrial Acquisition
Corporation and KK Bakery Investment
Company LLC's Statement of Disputed Facts,
dated January 19, 2024 [262-1] ............................ JA-2805

Certificate of Service, dated January 19, 2024
[262-2] .................................................................. JA-2807

Plaintiffs' Response to the Dissolution Receiver's
Motion for Partial Summary Judgment, dated
January 19, 2024 [263] ......................................... JA-2810

Exhibit A to Plaintiffs' Response -
Spreadsheet of Calculations [263-1]...................... JA-2821

Declaration of Kristy Carpenter, dated
January 19, 2024 [263-2]...................................... JA-2822

Declaration of Richard Smith, dated
January 19, 2024 [263-2]...................................... JA-2824

Dissolution Receiver's Reply Memorandum in
Support of Motion for Summary Judgment, dated
February 1, 2024 [265-1]...................................... JA-2826

Exhibit 1 to Dissolution Receiver's Reply
Memorandum -
VT DOL – Who is an Employee vs. Independent
Contractor [265-1] ............................................... JA-2840

**xx**

                                                                          **Page**

Exhibit 2 to Dissolution Receiver's Reply
Memorandum -
Mark Coles' Deposition Excerpts, dated
June 1, 2022 [265-2] ............................................. JA-2844

Exhibit 3 to Dissolution Receiver's Reply
Memorandum -
Declaration of Heber Maughan, in Support of
The Dissolution Receiver's Motion with
Attachment, dated January 29, 2024 [265-3]......... JA-2856

Certificate of Service, dated February 1, 2024
[265-4] .................................................................. JA-2875

Opinion and Order on Fees and Costs, dated
March 26, 2024 [269] ........................................... JA-2878

Revised Statement of Fees and Costs in accordance
with March 2024 Opinion and Order ECF No.
269, dated August 12, 2024 [271] ......................... JA-2893

Declaration of Mary E. Olsen in Support of Revised
Statement of Fees and Costs of The Gardner
Firm, P.C., dated April 12, 2024 [271-1]............... JA-2896

Exhibit A to Olsen Declaration -
Updated TGF Time Records [271-2]...................... JA-2899

Declaration of Stuart J. Miller in Support of
Revised Statement of Fees and Costs of
Lankenau & Miller, LLP, dated
April 12, 2024 [271-3].......................................... JA-2903

Exhibit A to Miller Declaration -
Updated L&M Time Records [271-4] ................... JA-2906

xxi

**Page**

Joint Motion for Order Awarding Sanctions Against
American Industrial Acquisition Corporation and
KK Bakery Investment Company LLC, dated
May 3, 2024 [272] ................................................ JA-2908

[Proposed] Order Awarding Sanctions Against
American Industrial Acquisition Corporation and
KK Bakery Investment Company LLC [272-1] .... JA-2911

Certificate of Service, May 3, 2024 [272-2].............. JA-2913

Opinion and Order on Motions for Summary
Judgment, dated May 17, 2024 [273] .................... JA-2916

Defendants American Industrial Acquisition
Corporation and KK Bakery Investment
Company LLC's Response in Opposition to Joint
Motion for Order Awarding Sanctions, dated
May 17, 2024 [274] ............................................. JA-2937

Certificate of Service dated, May 17, 2024
[274-1] ................................................................. JA-2941

Joint Reply Memorandum in Support of Joint
Motion for Order Awarding Sanctions, dated
May 31, 2024 [275] ............................................. JA-2944

Certificate of Service, dated May 31, 2024 [275-1] .. JA-2952

Opinion and Order on Joint Motion for An Order on
Requiring the Payment on Sanctions, dated
August 5, 2024 [276] ........................................... JA-2954

Plaintiffs' Pre-Trial Brief Regarding the
Inapplicability of The Good Faith Defense in this
Matter, Both in Law and in Fact, dated
April 14, 2025 [296] ............................................ JA-2960

**xxii**

**Page**

Deposition Transcript of Mark Coles, dated
    August 29, 2022 [296-1]........................................ JA-2966

Plaintiffs' Response to the Dissolution Receiver's
    Pre-Trial Brief, dated April 25, 2025 [298]........... JA-2979

Plaintiffs' Post-Trial Brief, dated
    Juned 11, 2025 [306] ............................................ JA-2987

Hearing Transcript on Dissolution Receiver's
    Application of the "Good Faith" Mechanism to
    Reduce Liability, dated May 12, 2025 [306-1]...... JA-3003

Opinion and Order on Dissolution Receiver's
    Assertion of "'Good Faith' Defense", dated
    October 24, 2025 [309]......................................... JA-3052

Defendants' Notice of Appeal, dated
    November 26, 2025 [311]..................................... JA-3062

Judgment, dated November 26, 2025 [312]............... JA-3064

Defendants' Amended Notice of Appeal, dated
    December 17, 2025 [315] ..................................... JA-3066

Dissolution Receiver's Notice of Appeal, dated
    December 22, 2025 [318] ..................................... JA-3068

JA-401

- ***DEFENDANTS, KK BAKERY INVESTMENT COMPANY LLC and AMERICAN INDUSTRIAL ACQUISITION CORPORATION'S AFFIDAVIT OF JEFF SAND'S IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING THE FIRST AMENDED COMPLAINT OR GRANTING ALTERNATIVE RELIEF with Exhibits***

to be served upon the following parties via electronic mail, via ECF:

**THE GARDNER FIRM, P.C.**
Mary E. Olsen
M. Vance McCrary
182 St. Francis Street, Suite 103
Mobile, AL 36602
Tel.: (251) 433-8100
molsen@thegardnerfirm.com
vmccrary@thegardnerfirm.com

**LANKENAU & MILLER, LLP** Stuart J. Miller
Jonathan Miller
100 Church Street
8th Floor
New York, NY 10007
Tel.: (212) 581-5005
sjm@lankmill.com
jon@lankmill.com

**DENTONS US LLP**
Peter D. Wolfson
(admitted pro hac vice)
Arthur H. Ruegger
(admitted pro hac vice)
1221 Avenue of the Americas New York, NY 10021
Tel.: (212) 768-6700
Email: peter.wolfson@dentons.com
arthur.ruegger@dentons.com

**CLEARY SHAHI & AICHER**
Thomas P. Archer, Esq.
110 Merchants Row
Third Floor
Rutland, VT 05701
Tel.: (802) 775-8800
tpa@clearyshahi.com

**PHILLIPS, DUNN, SHRIVER & CARROLL, P.C.**
David Dunn, Esq.
147 Western Avenue
Brattleboro, VT 05301
Tel.: (802) 257-7244, ext. 112
Email: ddunn@pdsclaw.com

SHEEHEY FURLONG & BEHM, P.C.
Ian P. Carleton, Esq.
30 Main Street, 6th floor
P.O. Box 66
Burlington, VT 05402-0066
Tel.: (802) 864-9891
Email: icarleton@sheeheyvt.com

**KIRWAN LAW**
Attorneys for Defendants
By: /s/ Terry J. Kirwan Jr.
Terry J. Kirwan, Jr.
Bar Roll #501821
2401 Burnet Avenue
Syracuse, New York 13206
Tel: (315) 452-2443
Email: tkirwan@kirwanlawpc.com

**MCCORMICK, FITZPATRICK, KASPER & BURCHARD, P.C.**
Daniel L. Burchard , Esq.
40 George Street
P.O. Box 638
Burlington, VT 05402-0638
Tel: (802) 863-3494
Email: dlb@mc-fitz.com

2

JA-402

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MATTHEW CHANEY, NADIE MILLER )
and ARTHUR GUSTAFSON on behalf of )
themselves and all others similarly )
situated, )
                  Plaintiffs, )
  )
     v. )
  )
VERMONT BREAD COMPANY, )
SUPERIOR BAKERY, INC., KOFFEE )
KUP BAKERY, INC., KOFFEE KUP )
DISTRIBUTION, LLC, KK BAKERY )
INVESTMENT COMPANY LLC, KK )
BAKERY HOLDING ACQUISITION )
COMPANY, AND AMERICAN )
INDUSTRIAL ACQUISITION )
CORPORATION, )
                 Defendants. )
  )
_____ )
  )    Docket N. 2:21-cv-120-wks
LINDA JOY SULLIVAN in her capacity )
as the dissolution receiver for Koffee Kuo )
Bakery, Inc., Vermont Bread Company, )
Inc. and Superior Bakery, Inc., )
  )
       Intervenor-Defendant )
       Cross-Claimant, )
  )
     v. )
  )
KK BAKERY INVESTMENT )
COMPANY, LLC KK BAKERY )
HOLDING ACQUISITION COMPANY, )
AND AMERICAN INDUSTRIAL )
ACQUISITION CORPORATION, )
  )
     Crossclaim-Defendants. )

1

## AFFIDAVIT OF JEFFREY SANDS

State of Vermont )

County of _____ ) ss.:

Jeffrey Sands, being duly sworn deposes and states as follows:

1. I am a Senior Advisor to American Industrial Acquisition Corporation ("AIAC"). I own 15% of the shares of KK Bakery Investment Company LLC ("KKBIC"), and am one of two of the defendants in the above-referenced action.

2. I submit this affidavit in support of the motion of AIAC and KKBIC for summary judgment pursuant to F.R.C.P. Rule 56 with respect to both the main claim and the Intervenor's crossclaim. All the facts set forth in this Affidavit are from my personal knowledge, and if called to testify in this matter, I will confidently testify to each of the facts set forth below.

3. KKBIC entered into an agreement to invest in Kup. Co. through the purchase of certain shares of stock ("Agreement"). The counterparties to the Agreement (collectively "Sellers") were Kup Co., its existing shareholders: Bripan SARL, Socipar SAS, and 9249-9557 Quebec Inc.; and the subordinated debt holders: Jose Aubery, Bertrand Aubery, and Hubert Aubery. A copy of the Agreement is attached hereto as **Exhibit "A."**

4. The Sellers' broker was G2 Capital Advisors LLC ("Capital Advisors").

5. Kup Co. owned Koffee Kup Bakery, Inc. ("KKB"), which owned VBC, Inc. and Superior Bakery, Inc. (collectively "Company").

2

6.    Pursuant to the Agreement, on April 1, 2021, KKBIC acquired 992 shares of Kup Co.'s common stock, comprising 80% of Kup Co's outstanding shares. KKBIC also purchased $14,314,000 of Kup Co.'s subordinated debt for $1,000,000 in cash and a $2,000,000 note.

7.    AIAC owned no equity or debt in KKBIC, Kup Co. or in Kup Co.'s subsidiaries. AIAC did not loan any funds to KKBIC for its investment in Kup Co. AIAC was not involved in the ownership, management and/or operation of the Company. In fact, AIAC had absolutely no interest in, or control of, KKBIC or the Company.

8.    Prior to the closing on the Agreement ("Closing"), as a representative of KKBIC, I requested financial information concerning the sales & earnings of the Company for the third financial period of 2021 ("P3"), which ended March 21, 2021. The purpose was to determine if the Company was achieving its projected sales and earnings before interest, taxes, depreciation, and amortization ("EBITDA").

9.    On March 18, 2021, Capital Advisors sent KKBIC copies of the 2021 budget, which still forecasted that the Company would nearly break even for P3. A copy of this budget is attached hereto as **Exhibit "B."**

10.    On March 19, 2021, G2 Capital Advisors declared an information "blackout period" and prohibited KKBIC from contacting Kup Co.'s management directly.

11.    Despite this imposed "blackout period," on March 20, 2021, I requested an indication of the Company's P3 performance from both G2 Capital Advisors and Mark Coles ("Coles"), Kup Co.'s CFO. Such requests went unanswered.

3

12.    On March 21, 2021, Kup Co. finished P3. The following day, on March 22, 2021, I again requested an indication of the Company's P3 performance from both G2 Capital Advisors and Coles. As before, such requests went unanswered.

13.    Yet again, on March 25, 2021, I inquired about the Company's P3 information from both Coles and G2 Capital Advisors. Coles indicated that sales were slightly off for the period while G2 Capital Advisors also indicated that there was no material change.

14.    To clarify the discrepancy, on March 26, 2021, I requested the Company's P3 results and again G2 Capital Advisors indicated that there was no material change from the budgeted projections. This statement proved to be a lie.

15.    On Monday April 5, 2021, finally having access to the Company's true financials, I first learned that the Company's P3 gross sales were $963,693 below budget, and EBITDA was negative $919,649, against a budget of negative $39,192, a variance of 2,247%.

16.    I also subsequently learned that the Sellers had projected a 10% decline in revenue but failed to factor that information into their financial forecasts.

17.    It became apparent that, prior to the Closing, the Sellers and G2 Capital Advisors failed to provide the Company's true financial information, which was that the Company was far from meeting its projected expectations for P3. Instead, the Sellers and their agents repeatedly represented to me and KKBIC that the Company was on target to nearly break even for P3, as budgeted.

18.    After the closing, I discovered that on March 30, 2021, nine days after P3

4

2:21-cv-00120-wks   Document 202-4   Filed 03/31/23   Page 5 of 13

ended and two days before the scheduled Closing, Kup Co.'s Controller, Luke Morris, prepared the P3 financials, showing the deficits, which he emailed to Coles. Coles reviewed and approved the P3 financials that same day. Copies of the pertinent emails showing the same are attached hereto as **Exhibit "C."**

19.   Later, on March 30, 2021 at 3:31 pm, I emailed Coles seeking Kup Co.'s latest balance sheet. Three minutes later at 3:34pm, Coles forwarded my email to Patricia Reinhardt ("Reinhardt") and Michael Williams ("Williams") of G2 Capital Advisors.  In his forwarding email, Coles stated "FYI, I have not responded to him (Sands) yet." At 4:00 pm, Reinhardt emailed Coles "Let's chat first" and requested that her colleagues schedule a call between G2 Capital Advisors and Coles to discuss the issue.  After several scheduling emails, G2 Capital Advisors and Coles agreed to talk at 5:15 pm.  Copies of the pertinent emails showing the same are attached hereto as **Exhibit "D."**

20.   On March 30, 2021 at 5:32 pm, after his conference with Reinhardt and Williams, Coles responded to my 3:31 pm email by lying to me, indicating that he did not yet have the P3 financials.  A copy of the pertinent email is attached hereto as **Exhibit "E."** Moreover, on March 31, 2021, neither G2 Capital Advisors nor Coles indicated any material change in the P3 results. Thus, they continued their plan to conceal materially adverse information in an effort to deceive and defraud KKBIC.

21.   On April 1, 2021, KKBIC closed on the Agreement, believing that the previously provided projections regarding P3 had held true.

22.   On April 2, 2021, KKBIC representatives arrived on site for the first time since the "blackout period." This is when Coles first admitted that the Company's sales

had fallen dramatically short of the false projections supplied to KKBIC. The following workday, April 5, 2021, Coles finally shared the hidden and true P3 financial information with KKBIC.

23. After discovering that the Sellers had withheld materially adverse financial information to induce KKBIC to close on the Agreement, we prepared a revised forecast of EBITDA and cash flow. Our forecast projected substantial, multi-million-dollar losses and a negative cash balance by the end of 2021.

24. These hidden losses and negative cash flow issues revealed that the Company was deeply insolvent and unable to continue its operations or employ a workforce without a massive infusion of external capital.

25. The new forecast, which was based on the actual P3 results, showed that instead of requiring around $1,000,000 in new cash to fix the Company, it actually required closer to $4,000,000 in new cash injections.

26. Prior to the disclosure of the true financials, I believed that the Company could improve its bottom line from 2020 (a loss of approximately $3,600,000 EBITDA on about $70,000,000 in annual revenue). I believed that progress and changes made by the management of Kup Co in 2021 could improve the Company's profit by $5,000,000. However, after the true P3 results were revealed, it became obvious that the Company would lose millions more than the Sellers' false projections indicated.

27. Moreover, keeping the Company operational now required a profit improvement, upwards of Ten Million Dollars ($10,000,000). Such a large internal profit improvement was simply not feasible under any realistically achievable set of

6

assumptions.

28.    On April 6, 2021, KKBIC promptly informed Key Bank, KKB's senior secured lender, of both the Sellers' deception and the deeply insolvent state of the Company. In response, on April 9, 2021, Key Bank issued a default notice and hired an outside advisor who, ultimately, became the Key Bank Receiver.

29.    Key Bank also informed the Company that it would neither extend its forbearance agreement with the Company nor fund the Company's payroll unless the Company cooperated in the assignment of a Key Bank Receiver and the liquidation of the bank's collateral. To ensure that its employees would be paid, Kup Co and its subsidiaries acquiesced.

30.    In response, KKBIC attempted to secure external funding or a new investor to keep the Company operational.  Not being able to raise the necessary infusion of external funds, the only feasible solution was to find a strategic investor with overlapping production, distribution and administrative costs and infrastructure.  Such a strategic investor could potentially reduce or eliminate significant redundancies and achieve the necessary profit improvement.

31.    To save the Company, I, on behalf of Kup Co. immediately reached out to two qualified investors, Gold Coast Bakery ("Gold Coast") and SatisPie Bakery ("SatisPie"). It was realistic to believe either Gold Coast or SatisPie would invest in the Company due to their existing bakery operations and that each had bid against KKBIC in the recent auction process.  If such a transaction occurred, the Company could have

7

remained operational and maintained its going-concern-value.

32. During the week of April 12, 2021 - April 16, 2021, Kup Co. discussed the opportunity to invest in or purchase the Company with both Jeff Black ("Black"), the owner of Gold Coast, and Mile Pinkowski ("Pinkowski"), the owner of SatisPie.

33. Black and Pinkowski knew they needed to negotiate directly with Key Bank on the defaulted debt. Black made early offers while Pinkowski showed interest and promised to meet me on April 17, 2021 to tour the Company's facilities, but he never showed up. Thereafter, on Monday April 19, 2021, Key Bank informed me that it no longer considered Pinkowski a credible party and would not support him in an investment in the Company.

34. This left Black as the only qualified party who could consummate a transaction quickly enough to preserve the going-concern-value of the Company. However, Black never made an offer that was acceptable to Key Bank.

35. On April 20, 2021, I sent a memo titled "KKB Viability Assessment with Recommendation" to Kup Co's stakeholders, the Sellers and Kup Co.'s lenders, Key Bank and Vermont Economic Development Agency, informing each that the Company was out of money and that "without a credible white knight buyer, the company is adrift and on a slow march to liquidation." A copy of such memo is attached to hereto as **Exhibit "F."**

36. In the memo, I pleaded for the stakeholders to "preserve going-concern-value and develop optionality" and suggested this would require an immediate cash infusion of $500,000 to "cover payroll and minimal supply needs."

37. If an investment or sale transaction involving one of the qualified parties

had occurred, KKBIC and I believed that the Company would have remained operational with no need for mass layoffs.

38.    However, on Thursday April 22, 2021, Key Bank issued a formal notice of default, accelerated the amounts due under its Term Loan and Line of Credit, and stated that it intended to exercise its rights under the loan agreements and foreclose.

39.    Immediately thereafter, the Company retained experienced and specialized labor attorneys to guide it through the layoff and Warn process. After a rushed attempt to deliver Warn notices on Friday April, 23, 2021, the Company terminated its operations and employees, issuing a Worker Adjustment and Retraining Notification Act ("WARN Act") notice to its employees, on Monday April 26, 2021. A copy of the WARN notice is attached hereto as **Exhibit "G."**

40.    KKBIC and I believed that filing an earlier WARN notice, would have publicly highlighted the Company's financial difficulties, and risked scaring away critical employees, vendors and customers which would have prevented the sale that was necessary to keep the Company operational. The loss of vendors or customers or employees would have prevented a possible future sale of the Company as a going concern. Going concern status required maintaining the operating mode of the Company, including the employment of its assembled workforce.

41.    Moreover, while customers were shielded from the upheaval, even the whispers of potentially missing deliveries could have cost the Company its valuable shelf space in its customers' stores. The loss of such shelf space would have diminished the Company's going concern value and eliminated any chance to attract qualified strategic

investors or buyers and to keep operations intact.

42.     In my experience, without maintaining a going-concern-value, and an assembled workforce, any potential strategic investors or buyers would lose interest in purchasing the Company, which KKBIC and Kup Co. were attempting to avoid so that the Company would not cease operations.

43.     In fact, the State of Vermont's Labor Department determined that the Company was exempt from the notice requirement of the WARN Act. A copy of such determination is attached hereto as **Exhibit "G."**

44.     The dire financial circumstances of the Company, which the Sellers misrepresented, and hid from, KKBIC, crippled the Company to the extent that it was unable to continue operating. Thus, the Company was forced to lay off all its employees.

45.     Moreover, the deep, intractable insolvency of the Company, particularly its wildly inaccurate budget, ongoing negative cash flow position and deep capital hole, was an unforeseen business circumstance that KKBIC, as an investor, could not have realized prior to the Closing. However, as detailed above, once learning the true extent of the Company's financial despair, KKBIC immediately attempted to remedy the situation by actively seeking a suitable investor or purchaser to keep the Company operational. Such efforts to maintain the going concern status of the Company failed through no fault of KKBIC.

46.     KKBIC could not have expected that the Company was so deeply insolvent, based upon the operating budgets and cash projections presented by the Sellers prior to

the Closing. Frankly, KKBIC would have never closed on the Agreement, if it had known the Company's true financial position and its inability to pay its debts, especially payroll. However, as detailed above, KKBIC used its best efforts to obtain financing and/or sell the Company to a qualified buyer to avoid shutting down the Company's operations.

47.    Kup Co., the entity that made all decisions for the Company, maintained separate and distinct directors and officers from KKBIC. As noted above, AIAC was not involved with either KKBIC, Kup Co., or Kup Co's subsidiaries.

48.    Neither KKBIC nor the Company was dependent upon the other and each operated as a separate and distinct corporate identity.

49.    KKBIC exercised no control over the operations of the Company. In fact, the Company was, unbeknownst to KKBIC, deeply insolvent prior to the Closing.

50.    KKBIC did not participate in the day-to-day operations of the Company nor did it direct any of the Company's corporate policies or practices, particularly prior to Closing. Closing was a product of fraud. Post closing, KKBIC sought to unwind the transaction in which KKBIC became an investor in Kup Co. by initiating arbitration against Sociapar.

51.    The Company's personnel policies were established prior to the Closing, by its directors, and KKBIC, as an additional investor, took no actions to change such policies.

52    KKBIC and the Company did not share employees. Indeed, KKBIC had no employees. It was merely an investment entity. As such, KKBIC had no policies

11

regarding compensation, vacation time and sick time, nor did it have an HR director or policy manual.

53.    The Company hired and fired their own employees and separately maintained the personnel files of their employees. KKBIC and AIAC were uninvolved in these matters.

54.    The Company had independent wage rates, pay scales, salaries and payrolls. KKBIC and AIAC were uninvolved in these matters.

55.    Neither AIAC nor KKBIC provided operational funding to the Company.

56.    Neither AIAC nor KKBIC was involved with the operation of the Company, including the Company's employment actions (e.g. hiring, payroll, promotions, terminations, layoffs).

57.    All the decisions regarding the Company's operations, including the shutdown, were discussed and voted upon by the board of Kup Co., not the KKBIC board. AIAC was separate and uninvolved.

58.    It also came to my attention through my review of the Dissolution Receiver's reports that, prior to Closing, the Sellers of the Company secretly and improperly siphoned off millions of dollars from the Company, impairing it beyond recovery.

**WHEREFORE**, I respectfully request that this Court GRANT the motion of AIAC and KKBIC for summary judgment pursuant to F.R.C.P. Rule 56 with respect to both the main claim and the Intervenor's crossclaim, in its entirety.

12

JA-415

Jeffrey Sands

Sworn to before me this
31st day of March 2023.

Notary Public      Notary Expires 1/31/25

13

JA-416

# EXHIBIT A

EXECUTION COUNTERPART

# SECURITIES PURCHASE AGREEMENT

## BY AND BETWEEN

## KK BAKERY INVESTMENT COMPANY, LLC
### As Purchaser,

## KUP CO.,
### As Company,

## EXISTING SHAREHOLDERS,

### and

## SUBORDINATED DEBT HOLDERS

## APRIL 1, 2021

5AM8297 – 236448

## TABLE OF CONTENTS

                                                                                    Page

ARTICLE I Definitions ........................................................................................................... 1

ARTICLE II General Provisions of Purchase and Sale ........................................................ 7

Section 2.1 - Purchase and Sale of the Common Stock ............................................ 7

Section 2.2 - Payment of Common Stock Purchase Price ......................................... 8

Section 2.3 - New Subordinated Debt........................................................................ 8

Section 2.4 - Assignment of Rights of the Purchaser Nominees ............................... 8

ARTICLE III Warranties and Representations of the Company ........................................... 9

Section 3.1 - Corporate Organization and Authority ................................................ 9

Section 3.2 - Capitalization........................................................................................ 9

Section 3.3 - Group Assets...................................................................................... 10

Section 3.4 - Employees .......................................................................................... 10

Section 3.5 - Compliance with Legal Requirements ............................................... 10

Section 3.6 - Books and Records ............................................................................. 10

Section 3.7 - Litigation; Claims .............................................................................. 10

Section 3.8 - Financial Statements........................................................................... 11

Section 3.9 - Tax Matters ......................................................................................... 11

Section 3.10 - Employee Benefit Plans; ERISA ...................................................... 11

Section 3.11 - Solvency ........................................................................................... 12

Section 3.12 - Indebtedness to and from Officers, Directors and Stockholders ...... 12

Section 3.13 - Owned or Leased Real and Personal Property .................................. 12

Section 3.14 - Absence of Certain Material Adverse Changes or Events ................ 12

ARTICLE IV Warranties, Representations and Covenants of the Purchaser ...................... 14

Section 4.1 - Purchaser Organization and Authority ............................................... 14

Section 4.2 - No Conflicts........................................................................................ 14

Section 4.3 - Investment Purpose............................................................................. 14

Section 4.4 - Restricted Securities ........................................................................... 15

Section 4.5 - Legends............................................................................................... 15

ARTICLE V Covenants of the Parties................................................................................. 15

Section 5.1 - Confidential and Proprietary Information ........................................... 15

Section 5.2 - Restrictive Covenant of Existing Shareholders .................................. 16

Section 5.3 - Publicity.............................................................................................. 17

Section 5.4 - Transfer Fees ...................................................................................... 17

Section 5.5 - Board of Directors ................................................................................. 18
Section 5.6 - Existing Subordinated Debt ................................................................. 18
**ARTICLE VI Closing** .................................................................................................. **18**
Section 6.1 - Closing Date ........................................................................................... 18
Section 6.2 - Deliveries of the Company at Closing ................................................. 18
Section 6.3 - Deliveries of Purchaser at Closing ..................................................... 19
**ARTICLE VII General** .............................................................................................. **19**
Section 7.1 - No Broker ............................................................................................... 19
Section 7.2 - Entire Agreement .................................................................................. 20
Section 7.3 - Binding Effect; Assignment ................................................................. 20
Section 7.4 - Notices .................................................................................................... 20
Section 7.5 - Captions .................................................................................................. 21
Section 7.6 - Joint Effort ............................................................................................. 21
Section 7.7 - Counterparts ........................................................................................... 21
Section 7.8 - Partial Invalidity ................................................................................... 21
Section 7.9 - No Offer .................................................................................................. 21
Section 7.10 - Amendments ........................................................................................ 21
Section 7.11 - Schedules and Exhibits ....................................................................... 21
Section 7.12 - Waivers ................................................................................................. 21
Section 7.13 - Further Assurances .............................................................................. 21
Section 7.14 - Governing Law ..................................................................................... 22
Section 7.15 - Arbitration ............................................................................................ 22
Section 7.16 - Third Parties ......................................................................................... 22
Section 7.17 - Rules of Construction ......................................................................... 22

| SCHEDULE 1.22 | EXISTING SUBORDINATED DEBT |
|---|---|
| SCHEDULE 1.29 | GROUP ASSETS |
| SCHEDULE 1.49 | CONVERTIBLE PREFERRED STOCK PROVISIONS |
| SCHEDULE 2.3(a) | NEW SUBORDINATED DEBT SUMMARY OF TERMS |
| SCHEDULE 2.3(b) | COMPANY EXPENSES |
| SCHEDULE 3.1(a) | CORPORATE ORGANIZATION |
| SCHEDULE 3.2(a) | CAPITALIZATION |
| SCHEDULE 3.3 | GROUP ASSETS |
| SCHEDULE 3.4(a) | EMPLOYEES |

5AM8297 - 236448                                    ii

SCHEDULE 3.4(b)        EMPLOYEE CONTRACTS

SCHEDULE 3.5           COMPLIANCE WITH LEGAL REQUIREMENTS

SCHEDULE 3.7           LITIGATION; CLAIMS

SCHEDULE 3.8           FINANCIAL STATEMENTS

SCHEDULE 3.9           TAX MATTERS

SCHEDULE 3.10          EMPLOYEE BENEFIT PLANS

SCHEDULE 3.12          INDEBTEDNESS TO AND FROM OFFICERS, DIRECTORS AND STOCKHOLDERS

SCHEDULE 3.13(a)       OWNED REAL PROPERTY

SCHEDULE 3.13(b)       LEASED REAL PROPERTY

SCHEDULE 3.14          ABSENCE OF CERTAIN MATERIAL ADVERSE CHANGES OR EVENTS

JA-421

## SECURITIES PURCHASE AGREEMENT

THIS SECURITIES PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 1st day of April, 2021 (the "Effective Date"), by and between **KK BAKERY INVESTMENT COMPANY, LLC**, a Delaware limited liability company (hereinafter referred to as the "Purchaser"); **KUP CO.**, a Delaware corporation (hereinafter referred to as the "Company"), Bripan S.a.r.l., Socipar S.a.s. a Martinique organization, and 9249-9557 Quebec, Inc., a Canadian corporation (hereinafter referred to each individually as an "Existing Shareholder" and collectively as the "Existing Shareholders"), and Hubert Aubery, Jose Aubery and Bertrand Aubery (together with the Existing Shareholders, each a "Subordinated Debt Holder" and collectively the "Subordinated Debt Holders").

## R E C I T A L S

WHEREAS, the Company, through its wholly-owned subsidiaries, Koffee Kup Bakery, Inc. ("KKBI"), a Vermont corporation that owns 100% of VBC, Inc. ("VBC"), a Vermont corporation, and Superior Bakery, Inc. ("SBI"), a Delaware corporation, operates a business that bakes, distributes and wholesales bread and other bakery products (the "Business");

WHEREAS, the Purchaser desires to purchase, and the Company desires to issue and sell, 992 authorized shares of Common Stock (as defined herein) that will constitute 80% of the shares of the Company on a fully diluted basis, as defined herein and set forth below, subject to the terms and conditions of this Agreement.

WHEREAS, the Subordinated Debt Holders hold subordinated debt issued by KKBI, as set forth on Schedule 1.22 (the "Existing Subordinated Debt").

WHEREAS, the Purchaser further desires to purchase, and the Subordinated Debt Holders desire to sell, the Existing Subordinated Debt, as defined herein and set forth below, subject to the terms and conditions of this Agreement.

## W I T N E S S E T H:

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants, conditions, representations and undertakings hereinafter contained, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I

### Definitions

1.1    "Accounts Receivable" shall mean all accounts receivable of the Group that arise from the sale of Inventory in the Ordinary Course of Business.

1.2    "Affiliate", as applied to any Person, shall mean any individual, corporation, partnership or other entity which, directly or indirectly, owns or controls, is controlled by or is under common control by or with such Person.

5AM8297 - 236448                                     1

1.3    "Agreement" shall have the meaning ascribed thereto in the preamble.

1.4    "Ancillary Agreements" means the documents executed and delivered at Closing between Purchaser and the Company as required by this Agreement.

1.5    "Business" shall have the meaning ascribed to it in the Recitals.

1.6    "Business Day" shall mean any day other than Saturday, Sunday or any other day which is a legal holiday in Vermont.

1.7    "Circumstance" means any occurrence, condition, incident, action, failure to act, event, development, change, effect or fact.

1.8    "Claim" means any actual or threatened contest, claim, demand, assessment, action, suit, cause of action, complaint, litigation, proceeding, hearing, arbitration, investigation or notice involving any Person.

1.9    "Closing" shall mean the consummation of the transactions described herein.

1.10   "Closing Date" shall have the meaning ascribed thereto in Section 6.1.

1.11   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, including all regulations promulgated pursuant thereto.

1.12   "Common Stock" refers to the authorized common stock of the Company.

1.13   "Common Stock Purchase Price" shall have the meaning ascribed to it in Section 2.2(a).

1.14   "Company" shall have the meaning ascribed thereto in the Recitals.

1.15   "Company Expenses" shall mean the amount of all fees and expenses payable to any legal counsel, accountants, brokers or other advisors of the Company or Seller Parties in connection with the transactions contemplated by this Agreement or the other Ancillary Agreements, in each case to the extent unpaid as of the Closing Date, including, without limitation, any transfer taxes that are due under state or local law.

1.16   "Contract" or "Contracts" means and includes any and all contracts, subcontracts, agreements, leases, licenses, sublicenses, options, notes, bonds, mortgages, indentures, deeds of trust, collateral assignments, obligations, instruments, concessions, guarantees, franchises, purchase orders, arrangements, commitments, undertakings and understandings of any kind, whether written or oral.

1.17   "Disclosure Schedules" means the disclosure schedules attached hereto and delivered by the Company concurrently with the execution and delivery of this Agreement.

1.18   "Effective Date" shall have the meaning ascribed thereto in the preamble.

1.19   "Employee Benefit Plan" shall mean all health insurance coverage, disability coverage, severance pay, vacation and sick pay, bonuses, commissions, pensions, profit sharing,

stock option or other arrangements or other fringe benefits or other employee benefit plans, practices or arrangements, whether written or oral, covering any present or former employee of the Facility, whether or not yet payable, and whether or not constituting an employee benefit plan as defined in §3(3) of ERISA.

1.20  "ERISA" shall mean the Employee Retirement Security Act of 1974, as amended, including the regulations promulgated pursuant thereto.

1.21  "Excluded Members" shall mean Jean Gadoua and any of his Affiliates through which he provides consulting services.

1.22  "Existing Shareholders" shall have the meaning ascribed thereto in the preamble.

1.23  "Existing Subordinated Debt" shall have the meaning ascribed thereto in the Recitals.

1.24  "Existing Subordinated Debt Documents" mean the documents that evidence or secure the Existing Subordinated Debt.

1.25  "Facilities" means the following manufacturing facilities: one (1) facility owned by VBC in Brattleboro, Vermont; one (1) facility owned by VBC in Burlington, Vermont; and one (1) facility owned by SBI in Grosvenordale, Connecticut.

1.26  "Financial Statements" shall have the meaning ascribed thereto in Section 3.8.

1.27  "GAAP" means United States generally accepted accounting principles, consistently applied.

1.28  "Governmental Authority" shall mean all agencies, authorities, bodies, boards, commissions, institutions, legislatures and offices of any nature whatsoever in any country for any governing unit or political subdivision, whether federal, state, county, district, municipal, city or otherwise, and whether now or hereafter in existence.

1.29  "Group" refers to Kup Co., KKBI, VBC and SBI, collectively, as identified in the Recitals.

1.30  "Group Assets" means all of each Group Member's:

(a)  tangible personal property, including, without limitation, Inventory, machinery, equipment, manufactured and purchased parts, furniture, and the tangible personal property listed on Schedule 1.29 hereto;

(b)  intangible rights and property, including, without limitation, all goodwill of the Business and all Intellectual Property, goodwill associated therewith, licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, domain names used in the Business, and rights to protection of interests therein under the laws of all jurisdictions;

(c)  Accounts Receivable;

5AM8297 - 236448                                      3

(d)    claims, prepayments, prepaid expenses, refunds, causes of action, choses in action, rights of recovery, rights of set off, rights of recoupment (including any such item relating to the payment of Taxes), and Liens imposed by the Company upon third parties;

(e)    escrow accounts, certificates of deposit, letters of credit, and surety bonds related to or necessary for the operation of the Business and to the extent transferrable;

(f)    Permits;

(g)    books, records, financial records, ledgers, files, documents, correspondence, lists, customer lists, customer contact information, prospect lists, e-mail lists, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials;

(h)    insurance benefits relating to indemnification claims and/or claims relating to any of the Group Assets;

(i)    express and implied warranties inuring to the benefit of the Group Members and any and all rights and claims thereunder, in each case related to the ownership or use of any of the Group Assets; and

(j)    real property, including land and improvements.

1.31    "Group Member" means a company within the Group.

1.32    "Indebtedness" shall mean, as applied to any Person, without duplication: (i) indebtedness for borrowed money; (ii) any capitalized lease obligations of the Group Members; (iii) any obligations of the Group Members for deferred purchase price of property and all conditional sale obligations (including all earn-out payments); (iv) all obligations of the Group Members under any interest rate or currency swap transactions or other hedging arrangements (valued at the termination value thereof); (v) the drawn portion of any letters of credit benefiting the Group Members; (vi) unfunded Liabilities of the Group Members under deferred compensation, pension, post-employment welfare benefit and supplemental retirement plans and arrangements; and (vii) any of the foregoing items for which the Group Members are responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise. For purposes of clarity, the undrawn portion of letters of credit shall not constitute Indebtedness hereunder.

1.33    "Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in part, revisions, extensions and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, internet domain names, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrightable works, all

copyrights, and all applications, registrations, and renewals in connection therewith; (d) all mask works and all applications, registrations, and renewals in connection therewith; (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) all computer software (including source code, executable code, data, databases and related documentation); (g) all advertising and promotional materials; (h) all proprietary rights; and (i) all copies and tangible embodiments thereof (in whatever form or medium).

1.34    "Inventory" shall mean all inventory of the Group Members, wherever located, including, without limitation, all raw materials, work in progress, finished goods, products, sundry and services the Group Members intend to sell written down to reflect any obsolete or slow moving inventory.

1.35    "Key Persons" means Hubert Aubery and Jean Gadoua.

1.36    "Knowledge," "awareness" or such other similar term, as it relates to the knowledge or awareness of any Group Member, means the actual knowledge, with reasonable investigation, of Key Persons.

1.37    "Leased Facility" shall mean the offices leased by KKBI in Colchester, Vermont.

1.38    "Legal Requirements" shall mean all statutes, laws, rules, regulations, orders, judgments, decrees, and Permits of any Governmental Authority, including, but not limited to, those relating to employment of labor (for example, ERISA, equal opportunity, occupational safety and health, worker adjustment and retraining, wages, hours, and the payment of Social Security and similar Taxes), protection of the environment (for example, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., the federal Water Pollution Control Act, the federal Clean Air Act, and state equivalents, including M.G.L. c. 21C and 21E), all building, zoning, fire and safety codes, and laws imposing Taxes or other forms of payment to Governmental Authorities.

1.39    "Lender" shall mean KeyBank National Association.

1.40    "Liability" or "Liabilities" means any known liability (whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes, any Claim or any Indebtedness.

1.41    "Lien" shall mean (a) any mortgage, pledge, lien, charge, security interest or other encumbrance or claim of any kind upon or against the Shares of any character, or upon the income or profits therefrom; (b) any acquisition of or agreement to have an option to acquire the Shares upon conditional sale or other title retention agreement, device or arrangement (including a capitalized lease); or (c) any sale, assignment, pledge or other

transfer for security of any accounts, general intangibles or chattel paper, with or without recourse, but shall not mean any inchoate liens.

1.42    "Loss" or "Losses" means any and all judgments, losses, liabilities, amounts paid or costs and expenses incurred to settle, comply or remediate, damages, fees, fines, penalties, deficiencies, costs and expenses (including interest, court costs, reasonable fees and expenses of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any Claim, default or assessment).

1.43    "Material Adverse Effect" or "Material Adverse Change" means, with respect to any Person, any Circumstance that is or could reasonably be expected to be, materially adverse to (a) the financial condition, properties, assets, Liabilities, business, or results of operations of such entity, taken as a whole, or (b) the enforcement of this Agreement and any agreement contemplated herein, or (c) Purchaser's ability to operate the Business immediately after the Closing in the manner operated by the Company immediately prior to the Closing. Notwithstanding the foregoing, the effect of any of the following, either alone or in combination, shall not be deemed to constitute a Material Adverse Effect or Material Adverse Change: (i) changes in general political, economic, or market conditions; (ii) changes in applicable laws, regulations, accounting rules, or regulatory policies (or interpretations thereof); (iii) the public announcement or other disclosure of this Agreement or of the consummation of the transactions contemplated hereby; (iv) acts of war (whether or not declared), sabotage or terrorism, military actions or the escalation thereof or other force majeure events occurring after the date hereof; (v) any adverse Circumstance affecting the industry or markets generally in which the Company operate.

1.44    "New Subordinated Debt" means the subordinated secured term note(s) in the aggregate principal amount of $2 million that will be issued by the Purchaser to the Subordinated Debt Holders at the Closing in consideration for the Existing Subordinated Debt.

1.45    "New Subordinated Debt Documents" mean the documents that evidence or secure the New Subordinated Debt.

1.46    "Ordinary Course of Business" means, when used with respect to any person, the ordinary course of business of such person, consistent with past custom and practice of such person (including with respect to quantity and frequency).

1.47    "Permits" shall mean all licenses, approvals, consents, authorizations, certificates of inspection, certificates of use and occupancy and permits which relate to or affect the Group or the Business.

1.48    "Permitted Encumbrances" shall mean (i) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures, and (ii) liens arising under equipment leases with third parties entered into in the Ordinary Course of Business.

1.49    "Person" shall mean a corporation (including a business trust), association, trust, partnership, joint venture, joint stock company, organization, proprietorship, natural person, government or governmental agency or political subdivision thereof or any other entity of whatever nature.

1.50    "Purchaser" shall have the meaning ascribed thereto in the Recitals.

1.51    "Securities Act" means the Securities Act of 1933, as amended.

1.52    "Seller Party" means each Existing Shareholder and Subordinated Debt Holder.

1.53    "Shares" shall mean the shares of Common Stock.

1.54    "Subordinated Debt Cash Purchase Price" shall have the meaning ascribed to it in Section 2.3(a).

1.55    "Subordinated Debt Holders" shall have the meaning ascribed thereto in the preamble.

1.56    "Subordinated Debt Purchase Price" shall have the meaning ascribed to it in Section 2.3(a).

1.57    "Subordinated Debt Holder Representative" means Hubert Aubery.

1.58    "Tax" or "Taxes" mean, collectively, U.S. and non-U.S. federal, national, state and local income, payroll, withholding, employment, unemployment, disability, excise, sales, use, real and personal property, use and occupancy, business and occupation, gross receipts, mercantile, real estate, license, stamp, premium, windfall profits, environmental (including but not limited to taxes under Section 59A of the Code), social security (or similar) value added, alternative of add-on minimum, transfer, registration, capital stock and franchise or other taxes, customs, duties or assessments of any nature whatsoever, including all penalties, interest or addition thereon and estimated taxes.

## ARTICLE II

### General Provisions of Purchase and Sale

Section 2.1 - Purchase and Sale of the Common Stock.

(a)    Subject to and upon the terms and conditions of this Agreement, including without limitation payment of the Common Stock Purchase Price set forth in Section 2.2 below, at the closing of the transactions contemplated by this Agreement (the "Closing"), the Company shall sell, issue and deliver 992 shares of Common Stock to the Purchaser, and the Purchaser shall purchase, acquire and accept the shares of Common Stock from the Company.

(b)    At the Closing, the Company shall deliver to the Purchaser a stock certificate evidencing the shares of Common Stock against payment of the Purchase Price.

(c)    Further Assurances. At any time and from time to time after the Closing, at the Purchaser's request and without further consideration, the Company shall promptly execute and deliver such instruments of issuance, sale, transfer, conveyance, assignment and confirmation, and take all such other action as the Purchaser may reasonably request, more effectively to issue, transfer and convey to the Purchaser, and to confirm the Purchaser's title to, all of

the shares of Common Stock and to assist the Purchaser to carry out the purpose and intent of this Agreement.

Section 2.2 - Payment of Common Stock Purchase Price.

(a)    The Purchaser shall pay $1 to the Company for the shares of Common Stock by cash, certified check, or wire transfer designated by the applicable party (the "Common Stock Purchase Price").

(b)    Additionally, Purchaser agrees to through one or more of its Affiliates to provide up to $2.5 million of guaranties or other form of credit support required over time in order to refinance existing Indebtedness of the Group, execute the current Company programs in process, or for general working capital purposes.

Section 2.3 - New Subordinated Debt.

(a)    The Existing Subordinated Debt shall be sold for (i) an amount equal to $1,000,000 (the "Subordinated Debt Cash Purchase Price"), less any Company Expenses, to the Subordinated Debt Holders in the pro-rata amounts set forth on Schedule 1.22, each by cash, certified check, or wire transfer designated by such holder; and (ii) the New Subordinated Debt (the Subordinated Debt Cash Purchase Price and New Subordinated Debt collectively referred to as the "Subordinated Debt Purchase Price"). The New Subordinated Debt Documents shall contain the terms and conditions set forth on Schedule 2.3(a) and other customary terms and conditions. This sale has been negotiated at arms-length between the Purchaser and the Subordinated Debt Holders and they agree that such sale reflects and represents full payment for the Existing Subordinated Debt. The New Subordinated Debt Documents shall appoint a Subordinated Debt Holder Representative who is authorized to act on their behalf and provide that no change may be made to the New Subordinated Debt Documents without prior written consent of a majority in amount of the New Subordinated Debt.

(b)    The Purchaser shall cause a portion of the Existing Subordinated Debt Cash Purchase Price to pay the Company Expenses to be paid to the respective third parties as set forth on Schedule 2.3(b).

Section 2.4 - Assignment of Rights of the Purchaser Nominees. It is understood and agreed by the Company that, at or prior to Closing, the Purchaser may assign this Agreement, in whole or in part, to an existing Affiliate or an Affiliate to be formed by a Purchaser; provided that such designee shall assume all of the Purchaser's rights and obligations hereunder and Purchaser shall be and remain liable for its obligations hereunder. The Purchaser, and any such Affiliate, shall have the right to designate nominees to hold title to all or any portion of the Shares provided that such nominees are themselves Affiliates of the Purchaser.

5AM8297 - 236448                                    8

## ARTICLE III

### Warranties and Representations of the Company

To induce the Purchaser to execute and deliver this Agreement and to consummate the transactions contemplated hereby, each Group Member and Existing Shareholder, severally and not jointly, hereby makes each of the representations and warranties set forth in this Agreement, including those set forth in this Article, as of the Effective Date, all of which are material and have been relied upon by the Purchaser and each of which shall be true and correct in all respects as of the Closing Date.

Section 3.1 - Corporate Organization and Authority.

(a)     Each Group Member is a corporation duly organized, validly existing and in good standing as indicated on Schedule 3.1(a) and has all requisite corporate power and authority to own, operate, lease its property and to carry on the Business as now being conducted.

(b)     Each Group Member has the corporate power and authority, and has been duly authorized by such actions of its board of directors and stockholders as may be necessary, to execute and deliver this Agreement and all agreements and instruments required to be delivered in connection herewith, and to perform all of its obligations hereunder and thereunder.

(c)     This Agreement and all instruments and agreements required to be delivered by each Group Member in connection herewith are the valid and binding obligations of the Group Member, enforceable against the Group Member in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

Section 3.2 - Capitalization.

(a)     The Company's authorized capital stock and issued and outstanding stock as of the date hereof and as anticipated immediately after the Closing is set forth on Schedule 3.2(a). Upon and as a result of the Closing in accordance with this Agreement, the Purchaser shall own the shares of Common Stock and the Existing Shareholders shall own the shares of Common Stock, which together shall be the only issued and outstanding securities or shares in the Company of any kind whatsoever. All such issued and outstanding shares of the Company have been and on Closing will be duly and validly issued and are, and will be on the Closing Date, fully paid and non-assessable, including without limitation, the shares of Common Stock. Except as otherwise provided on Schedule 3.2(a), there are not, and at the Closing there will not be, outstanding (i) any options, warrants, rights of first refusal, or other rights to purchase from any Group Member any capital stock of any Group Member; (ii) any securities convertible into or exchangeable for shares of such stock; or (iii) any other commitments of any kind for the issuance of additional shares of capital stock or options, warrants or other securities of any Group Member. None of the issued and outstanding shares of any Group Member are held in the treasury of the Group Member.

5AM8297 - 236448                                              9

(b)    The issuance of the shares of the Common Stock by the Company has been duly authorized and approved by the Board of Directors and shareholders of the Company prior to the Closing in accordance with the certificate of incorporation and bylaws of the Company and applicable law, including, without limitation, state and federal securities laws, so as to be valid, binding and enforceable against the Company and the Existing Shareholders.

Section 3.3 - Group Assets. As shown on, and except as otherwise provided on, Schedule 3.3:

(a)    There are no Claims pending or, to the best of any Group Member's knowledge, threatened, which have or could have a Material Adverse Effect on the Group Member's ownership and title to its Group Assets, and the Company is not aware of any set of facts that could form a legal basis for any such Claim.

(b)    No person or entity has any agreement, option, understanding or commitment, or any right or privilege, for the purchase or transfer of any of the Group Assets, except in the ordinary course of business.

Section 3.4 - Employees.

(a)    Except for the language provided in individual employee agreements, the Group's written policies, or descriptions of any policies in writing, as to vacation, sick leave, and holiday time for employees are identified on Schedule 3.4(a).

(b)    Schedule 3.4(b) lists and the Company has provided Purchaser with true and complete copies or descriptions of any oral or written Contracts of each Group Member with any of its employees which are not part of an Employee Benefit Plan and which contain any terms or conditions of employment. Except pursuant to an Employee Benefit Plan and as provided in existing employment Contracts set forth on Schedule 3.4(b), no Group Member is currently paying or bound to pay any pension, deferred compensation, severance pay, or retirement allowance to anyone.

(c)    No Group Member is, or has been, a party to or bound by any collective bargaining agreement or other contract with a union or similar labor organization.

Section 3.5 - Compliance with Legal Requirements. No notice has been issued by any governmental authority in writing stating that there is any existing violation of any applicable Legal Requirements by a Group Member or the Business in the three (3) years preceding the Effective Date. The Permits applicable to the operation of each Group Member and Business are listed on Schedule 3.5.

Section 3.6 - Books and Records. All of the records and books of account relating to the Group and the Business are either located at the Facilities or Leased Facility. All such records and books are in good order, complete, accurate and up-to-date in all material respects.

Section 3.7 - Litigation; Claims. Except as otherwise provided on Schedule 3.7 hereto by date of filing, name of court or agency and docket number, and names of parties, there is no Claim of any kind pending, or, to the Company's knowledge, threatened, against or relating to the Company, any Group Member or the Business, and there are no unsatisfied or outstanding judgments, orders,

decrees or stipulations affecting the Company, any Group Member or the Business. Neither the Company nor any Group Member is not a party to or bound by any order, judgment, injunction, decree, or settlement agreement under which it may have continuing obligations and which could reasonably be expected to materially restrict or affect the shares of Common Stock or the Business. The Company knows of no basis for any action, proceeding or investigation described in this Section by any Governmental Authority relating to the Company, any Group Member, the shares of Common Stock or the Business.

Section 3.8 - Financial Statements. The Company has furnished to the Purchaser audited, financial statements of the Group for the periods ended December 31, 2018 and December 31, 2019, a copy of which is attached hereto as Schedule 3.8. The Company has also furnished to the Purchaser interim internally prepared, unaudited financial statements for the Group for the periods ended December 31, 2020, copies of which are attached hereto as Schedule 3.8. The financial statements included in Schedule 3.8 hereto are referred to herein as the "Financial Statements." The Financial Statements and the books and records of the Group which gave rise thereto are true, accurate, correct and complete in all material respects, as qualified by the disclosures set forth in the schedules attached to this Agreement. Except for variations, adjustments, conventions or customs set forth on Schedule 3.8, the Financial Statements have been prepared to the best of the Group's ability in accordance with GAAP, and, on that basis, present fairly in all respects the financial condition, results of operations and cash flows of the Group as of the respective dates thereof and except for normally recurring year-end adjustments which are not expected to be material individually or in the aggregate.

Section 3.9 - Tax Matters. Except as otherwise provided on Schedule 3.9, all federal, state and local Tax returns and Tax reports required to be filed by the Group have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns and reports are required to be filed or appropriate extensions have been obtained for such returns; and all of the foregoing have been correct and complete in all material respects. No such returns are under audit and no Group Member has waived or extended any applicable statutes of limitations pertaining to its Taxes. All federal, state and local income, employment, withholding, franchise, sales, use, occupation, property, excise and other Taxes (including interest and penalties) due from the Group have been fully paid.

Section 3.10 - Employee Benefit Plans; ERISA.

(a)     Schedule 3.10 sets forth a complete list of all Employee Benefit Plans sponsored by the Group or to which a Group Member has any obligation. The Company has provided the Purchaser with true and complete copies of each Group Member's currently effective Employee Benefit Plans. Each Group Member owes no currently required contributions, premiums or other required payments to any Employee Benefit Plan.

(b)     Each Group Member has never contributed to a multi-employer plan as defined in Section 3(37) of ERISA, and has never sponsored or participated in any plan subject to Title IV of ERISA. Each Group Member owes no currently required contributions, premiums or other required payments to any Employee Benefit Plan.

5AM8297 - 236448                                11

Section 3.11 - <u>Solvency</u>.   No petition for bankruptcy, insolvency proceeding, or other similar proceeding of a Group Member is pending, nor has been threatened against a Group Member.

Section 3.12 - <u>Indebtedness to and from Officers, Directors and Stockholders</u>. Except as otherwise provided on <u>Schedule 3.12</u>, no Group Member is indebted, directly or indirectly, to any Person who is an officer, director or stockholder of any Group Member or any Affiliate of any such Person.

Section 3.13 - <u>Owned or Leased Real and Personal Property</u>.

(a)     <u>Schedule 3.13(a)</u> lists all real estate previously owned by the Group within the past five (5) years (the "<u>Owned Real Property</u>"), including the legal description, street address, and any tax parcel identification number of each property. The Company has provided copies of all title insurance policies, opinions, abstracts, and surveys in the possession of the Group relating to the Owned Real Property.

(b)     <u>Schedule 3.13(b)</u> lists all real estate and personal property leased or used by the Company as a lessee, sub-lessee, or assignee, including a description of the premises leased. The Company has posted, if any, security deposits for the performance of its obligations under the personal property leases as set forth on <u>Schedule 3.13(b)</u>, and there are no Claims or charges against such security deposits which have been asserted in writing or, to the Company's knowledge, for which there exists a legal basis for such assertion. With respect to such leases, the consent of any of the lessor's and those lenders under the equipment leases or financing documents identified on <u>Schedule 3.13(b)</u> are required for the Company to consummate the transactions required by this Agreement and, subject to the receipt of such consents, the same shall not breach, or constitute a default of, such leases or documents.

(c)     Except for Permitted Encumbrances, the Owned Real Property is free and clear of all Liens, variances, or limitations of any nature. All buildings, plants, and structures lie wholly within the boundaries of the Owned Real Property in question and do not encroach upon the property of, or otherwise conflict with the property rights of, any other Person. There are no buildings, structures, fixtures, or other improvements primarily situated on adjoining property that encroach on any part of the Owned Real Property. Each parcel of Owned Real Property abuts on, and has direct vehicular access to, a public road or has access to a public road via a permanent, irrevocable, appurtenant easement benefiting such Owned Real Property and constituting a part thereof. Certificates of occupancy are in full force and effect for each location of Owned Real Property, and, to the Knowledge of the Company, the uses thereof do not violate any applicable zoning, subdivision, land use, or other legal requirement.

Section 3.14 - <u>Absence of Certain Material Adverse Changes or Events</u>. Except as otherwise provided on <u>Schedule 3.14</u>:

(a)     Since February 28, 2021, no Group Member has entered into any transaction which is not in the ordinary course of business, and, without limiting the generality of the foregoing, no Group Member has:

5AM8297 - 236448                                   12

(i)    incurred any material obligation or liability for borrowed money;

(ii)    mortgaged, pledged or subjected to lien, charge or other encumbrance any of its properties or assets;

(iii)    sold or purchased, assigned or transferred any of its tangible assets or cancelled any debts or claims, except for inventory sold and materials purchased in the ordinary course of business;

(iv)    made any material amendment to or termination of any contract or done any act or omitted to do any act which would cause the breach of any contract;

(v)    suffered any losses of personal property, whether insured or uninsured, and whether or not in the control of the Company, in excess of $25,000 in the aggregate, or waived any rights of any value;

(vi)    authorized any declaration or payment of dividends by the Company, or paid any such dividends, or authorized any transfer of assets of any kind whatsoever to its stockholders with respect to any shares of their capital stock;

(vii)    received written notice or otherwise aware of any litigation, threatened litigation, labor dispute, governmental proceeding or investigation, environmental problem, warranty claim or products liability claims;

(viii)    made any material change in the terms, status or funding condition of any employee benefit plan;

(ix)    made, or committed to make, any changes in the compensation payable to any officer, director, employee or agent of the Group Member, or any bonus payment or similar arrangements made to or with any of such officers, directors, employees or agents;

(x)    incurred any capital expenditure in excess of $25,000 in any instance or $100,000 in the aggregate;

(xi)    made any material alteration in the manner of keeping the books, accounts or records, or in the accounting practices therein reflected;

(xii)    failed to be in compliance with the payment terms and conditions of all of its obligations; nor

(xiii)    suffered any material adverse change in the results of operations, condition (financial or otherwise), assets, liabilities (whether absolute, accrued, contingent or otherwise), business or prospects.

(b)    The Company has no knowledge of any existing or threatened occurrence, event or development which, as far as can be reasonably foreseen, could have a material adverse

5AM8297 - 236448                                13

JA-434

effect on the business, properties, assets, condition (financial or otherwise) or prospects of the Group or Business.

## ARTICLE IV

### Warranties, Representations and Covenants of the Purchaser

To induce the Company to execute and deliver this Agreement and to consummate the transactions contemplated hereby, the Purchaser hereby makes each of the representations and warranties set forth in this Agreement, including those set forth in this Article, as of the Effective Date. Each of the Purchaser's representations and warranties set forth in this Agreement shall survive the execution and delivery hereof, all of which are material and have been relied upon by the Company and each of which shall be true and correct as of the Closing Date.

Section 4.1 - Purchaser Organization and Authority.

(a)     The Purchaser is a corporation duly organized and validly existing under the laws of the State of Delaware and has the power to own its properties and conduct its business as now being conducted.

(b)     The Purchaser has the power and authority (corporate or otherwise) and has been duly authorized by such actions of its board of directors and stockholders as may be necessary to execute and deliver this Agreement and all agreements and instruments delivered in connection herewith and to perform all of its obligations hereunder and thereunder, and this Agreement and all instruments and agreements delivered in connection herewith are the valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its respective terms.

Section 4.2 - No Conflicts. Neither the execution nor the delivery of this Agreement by the Purchaser, nor the consummation of the transactions contemplated by this Agreement, will violate or conflict in any material respect with any applicable Legal Requirement, Certificate of Incorporation or bylaws, or violate or conflict in any material respect with or constitute a default under (or give rise to any right of termination, cancellation or acceleration under) the terms, conditions or provisions of any material Contract of any kind to which the Purchaser is a party or by which the Purchaser is bound.

Section 4.3 - Investment Purpose. Purchaser is acquiring the shares of Common Stock solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Purchaser acknowledges that the shares of Common Stock are not registered under the Securities Act, or any state securities laws, and that the shares of Common Stock may not be transferred or sold except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Purchaser is able to bear the economic risk of holding the shares of Common Stock for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

5AM8297 - 236448                                   14

Section 4.4 - Restricted Securities. The Purchaser understands that the shares of Common Stock have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the shares of Common Stock are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the shares of Common Stock indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the shares of Common Stock. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the shares of Common Stock, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

Section 4.5 - Legends. The Purchaser understands that the shares of Common Stock and any securities issued in respect of or exchange for the shares of Common Stock, may bear one or all of the following legend:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933. FURTHERMORE, SUCH SHARES ARE SUBJECT TO A SHAREHOLDER'S AGREEMENT AND ARE SUBJECT TO RESTRICTIONS ON TRANSFER THEREUNDER."

## ARTICLE V

### Covenants of the Parties

Section 5.1 - Confidential and Proprietary Information.

(a)    As used in this Section 5.1, the term "Confidential Information" includes any of the following information held or used by or relating to the Group:

   (i)    all information that is a trade secret;

   (ii)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing or distribution methods and processes, computer hardware, software and computer software, database technologies, systems, structures and architectures; and

5AM8297 - 236448                    15

(iii)    all information concerning the business and affairs of any Company, including historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current, and projected sales, capital spending budgets and plans, business plans, strategic plans, potential acquisition candidates, marketing and advertising plans, publications, client and customer and prospect lists and files, current and anticipated customer requirements, price lists, market studies, Contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however documented.

(b)    Each Group Member and each Seller Party acknowledges the confidential and proprietary nature of the Confidential Information and agrees that each Group Member and each Seller Party shall, from and after the Closing:  (i) keep the Confidential Information confidential and deliver promptly to Purchaser, or immediately destroy at Purchaser's option, all embodiments and copies of the Confidential Information that are in the Group's and each Seller Party's possession; (ii) not use or take advantage of the Confidential Information for any reason or purpose except to the extent required to carry out the Business; and (iii) without limiting the foregoing, not disclose the Confidential Information to any Person, except with Purchaser's prior written consent or as required by law or court order as set forth in Section 5.1(d) below.

(c)    Confidential Information does not include (and Section 5.1(b) does not apply to) information that: (i) becomes generally available to the public other than as a result of a breach of this Section 5.1; (ii) Purchaser has authorized for disclosure in writing; (iii) is lawfully obtained from any source other than the Group or Purchaser, provided that such source did not acquire or disclose such information by a wrongful or tortious act; or (iv) was independently developed without use of or reference to the Confidential Information. Confidential Information shall not be deemed "generally available to the public" merely because it is included or incorporated in more general information that is publicly available or because it combines features which individually may be publicly available.

(d)    If a Group Member or Seller Party becomes compelled in any proceeding to make any disclosure that is prohibited by this Section 5.1, they shall, to the extent legally permissible, provide Purchaser with prompt notice of such compulsion so that Purchaser may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this Section 5.1.  In the absence of a protective order or other remedy, such Group Member or Seller Party may disclose that portion (and only that portion) of the Confidential Information that, based upon the opinion of such Group Member or Seller Party counsel, such Group Member or Seller Party is legally compelled to disclose.

(e)    Each Group Member and Seller Party agrees that the remedy at law for any breach of this Section 5.1 would be inadequate and that the Purchaser shall be entitled to injunctive relief in addition to any other remedy it may have upon breach of any provision of this Section 5.1.

Section 5.2 - Restrictive Covenant of Existing Shareholders.

(a)    Each Existing Shareholder hereby agrees that for a period of five (5) years from the date of the Closing, he will not, directly or indirectly, own, manage, operate, join control, or participate in the ownership, management, operation or control of, or be connected in any manner (including as a principal, director, employee, salesman or agent) with, any business that competes, directly or indirectly, with the Business; nor during said five (5) year period compete with the Business in any manner either directly or indirectly. Notwithstanding anything to the contrary set forth herein, the Excluded Members shall not be subject to the restrictive covenants set forth in this Section 5.2(a).

(b)    For five (5) years after the date of the Closing, an Existing Shareholder and its Affiliates shall not solicit the business of any person or entity that was a customer of a Group Member during the 12-month period prior to such date. Further, for a period of five (5) years after the date of the Closing, an Existing Shareholder and its Affiliates will not solicit or hire current employees of any Group Member or who worked for a Group Member within the prior twelve months, except solicitations of former employees of a Group Member who were terminated by the Group Member.

Each Existing Shareholder on its own behalf and on behalf of its Affiliates agrees that each of the provisions of this Section 5.2 to which it is bound is reasonable and necessary for the protection of the other party; that each such provision, and the period time, geographic areas and types and scope of restrictions on the activities specified therein, are and are intended to be divisible; that if any provisions thereof (including any sentence, clause or part thereof) shall be deemed contrary to law or invalid or unenforceable in any respect or as to any one or more periods of time, territories or business activities, the remaining provisions shall not be affected but shall remain in full force and effect; and that any invalid or unenforceable provisions shall be deemed, without further action on the part of the parties, modified, amended and limited to the extent necessary to render it valid and enforceable. Each of them further agrees that any violation of any of the agreements contained in this Section by such party will cause such damage or injury to the other as would be irreparable and the exact amount of which would be difficult to ascertain, and that, for such reason, such injured party shall be entitled to an injunction from any court of competent jurisdiction restraining any further violation without posting of a bond. Such right to an injunction shall be cumulative and in addition to any other rights and remedies such party may have.

Section 5.3 - Publicity. All press releases, filings and other publicity concerning the transactions contemplated hereby will be subject to review and approval by both the Company and the Purchaser, such approval not to be unreasonably withheld or delayed. Such approval shall not be required if the person issuing such publicity reasonably believes it to be necessary for compliance with law, but such person shall provide the other party with reasonable notice and an opportunity to review same before release. The Company, Key Persons, the Seller Parties and the Purchaser hereby covenant and agree to keep the terms and conditions of this Agreement confidential except to the extent that disclosure is required by law.

Section 5.4 - Transfer Fees. The Company shall be responsible for all payments of any kind whatsoever required to be made by the Company to Governmental Authorities in connection with the transactions contemplated by this Agreement, including, without limitation, stamp Taxes, document conveyance or controlling interest transfer Taxes, transfer fees or any other payments in the nature of or in lieu of transfer fees.

5AM8297 - 236448                                    17

Section 5.5 - <u>Board of Directors</u>. As of the Closing, the parties will take all necessary actions to ensure that the authorized size of the Company's Board of Directors shall be four (4), and the Board of Directors shall be comprised of Leonard M. Levie, Jeff Sands and Hubert Aubery and a fourth director to be mutually agreed upon by Levie and Sands acting together and Aubery (the "Post-Closing Board of Directors").

Section 5.6 - <u>Existing Subordinated Debt</u>. The Purchaser agrees to hold the Existing Subordinated Debt for a period of at least four (4) years from Closing, and shall not convert, contribute, exchange or forgive such Existing Subordinated Debt prior to such time.

**ARTICLE VI**

**Closing**

Section 6.1 - <u>Closing Date</u>. The Closing of the transactions contemplated by this Agreement shall take place at 2:00 p.m. EST by remote mutual exchange of fully executed documents, on the date of this Agreement or such later date as the parties shall mutually agree (such date of Closing being referred to herein as the "<u>Closing Date</u>").

Section 6.2 - <u>Deliveries of the Company at Closing</u>. At the Closing, the Company shall deliver to the Purchaser the following:

(a)    Secretary's or Assistant Secretary's Certificates of the Company certifying (i) the names and signatures of the officers of the Company authorized to sign this Agreement and the other Ancillary Agreements; (ii) copies of the certificate of incorporation and bylaws of the Corporation, each as in effect at the Closing; (iii) copies of good standing certificates from the Company's jurisdiction of incorporation; and (iv) resolutions of the board of directors of the Company and Existing Shareholders approving the execution, delivery and performance of this Agreement and all other Ancillary Agreements.

(b)    Such discharges, termination statements, releases and the like with respect to the Group Assets as the Purchaser may reasonably request.

(c)    Evidence that an amended and restated Certificate of Incorporation, in form and substance acceptable to the parties, has been filed in the Office of the Secretary of State of the State of Delaware providing for the terms of the Common Stock.

(d)    Resignation of directors and officers of each Group Company. For purposes of clarity, (a) the resignation of the directors and officers of each Group Company shall not affect any employment agreement between each Group Company and such person, which shall remain in full force and effect, and (b) the execution of this Agreement shall not affect any employment agreement between any employee of the Company, which shall remain in full force and effect.

(e)    A Shareholder's Agreement mutually satisfactory to the Purchaser and Existing Shareholders that includes customary terms.

(f)     Certificates of resolutions of the board of directors and shareholders of the Company authorizing the transactions contemplated hereby, appointing the Post-Closing Board of Directors of the Company and naming a Chief Executive Officer and Chief Financial Officer as determined by the parties.

(g)     Releases from the Seller Parties and directors and officers of the Company of any and all Claims or Liabilities against the Group excluding the New Subordinated Debt.

(h)     A third party consent from the Lender consenting to the transactions contemplated by this Agreement and waiving any notice requirements or defaults under, any right to terminate, and any breach of the agreements between the Lender and the Group Members to the extent arising in connection with the transactions contemplated by this Agreement.

(i)     Delivery of all notes evidencing the Existing Subordinated Debt endorsed by the holder thereof to the Purchaser.

Section 6.3 - Deliveries of Purchaser at Closing. At the Closing, the Purchaser shall deliver or caused to be delivered the following:

(a)     Payment of the cash Purchase Price in accordance with Section 2.2 hereof.

(b)     A portion of the cash Purchase Price required to pay the Company Expenses will be paid to the respective third parties.

(c)     The New Subordinated Debt Documents to the Subordinated Debt Holders.

(d)     Officer Certificates of the Purchaser certifying (i) the names and signatures of the officers of the Purchaser authorized to sign this Agreement and the other Ancillary Agreements; (ii) copies of the certificate of incorporation and bylaws of the Purchaser, each as in effect at the Closing; (iii) copies of good standing certificates from the Purchaser's jurisdiction of incorporation; and (iv) resolutions of the board of directors of Purchaser approving the execution, delivery and performance of this Agreement and all other Ancillary Agreements.

## ARTICLE VII

### General

Section 7.1 - No Broker. The Company represents to the Purchaser, and the Purchaser represents to the Company, that no agent, finder or broker other than G2 Capital Advisors which shall be paid by the Company has acted for it or was the producing and effective cause of this Agreement or the transactions contemplated herein, and that no commissions or finder's fees are due to any third parties other than G2 Capital Advisors which shall be paid by the Company. The parties agree to indemnify and hold each other harmless with respect to any and all expenses, obligations, and Liabilities resulting from the Claims relating to any claims made by any person retained or used by the indemnifying party for any agent's, broker's or finder's fees or commissions relating to the transactions contemplated herein.

SAM8297 - 236448                                    19

Section 7.2 - Entire Agreement. This Agreement, together with the Schedules and Exhibits attached hereto and all certificates and documents delivered in connection herewith contain the entire understanding of the parties with respect to the subject matters hereof and supersedes all prior and other contemporaneous oral or written understandings and agreements between the parties hereto.

Section 7.3 - Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, personal representatives and permitted assigns. Neither party may assign this Agreement with the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed.

Section 7.4 - Notices. Any notice, demand, offer or other writing required or permitted pursuant to this Agreement shall be in writing, furnished in duplicate and shall be transmitted by hand delivery, certified mail, return receipt requested, or Federal Express or another nationally recognized overnight courier service, postage prepaid, as follows:

(a)     If to the Company or Seller Parties:

        Hubert Aubery

        _____
        _____
        _____

        With a copy to:

                Josef B. Volman, Esq.
                Burns & Levinson LLP
                125 High Street
                Boston, MA 02110

(b)     If to the Purchaser:

        Leonard M. Levie
        1 Harbor Point Road
        Suite 600
        Stamford, CT 06902

        With a copy to:

                Joseph J. Selinger, Esq.
                Kristin L. Wainright, Esq.
                Tobin, Carberry, O'Malley, Riley & Selinger, P.C.
                43 Broad Street, P. O. Box 58
                New London, CT 06320

Any party shall have the right to change the place to which such notice shall be given by similar notice sent in like manner to all other parties hereto. Any such notice, if sent by private express

5AM8297 - 236448                              20

overnight courier service, shall be deemed delivered on the earlier of the date of actual delivery or the next business day following deposit, postage prepaid, with such private express overnight courier service and if delivered by hand delivery shall be deemed delivered on the date of the actual delivery and if sent by mail, shall be deemed delivered on the earlier of the third day following deposit with the U.S. Postal Service or actual delivery.

Section 7.5 - Captions. The captions of this Agreement are for convenience and reference only, and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provisions hereof.

Section 7.6 - Joint Effort. The preparation of this Agreement has been the joint effort of the parties, and the resulting document shall not be construed more severely against one of the parties than the other by reason of the roles of the parties or their counsel in preparing and drafting this Agreement.

Section 7.7 - Counterparts. This Agreement may be executed by facsimile, .pdf or other electronic signature and in counterparts and each executed copy shall be deemed an original which shall be binding upon all parties hereto.

Section 7.8 - Partial Invalidity. The invalidity of one or more of the phrases, sentences, clauses, sections or articles contained in this Agreement shall not affect the remaining portions so long as the material purposes of this Agreement can be determined and effectuated.

Section 7.9 - No Offer. Neither the negotiations to date nor the preparation of this Agreement shall be deemed an offer by any party to the other. Neither the Company nor Purchaser shall be deemed bound hereto until such party has executed and delivered this Agreement.

Section 7.10 - Amendments. This Agreement may not be amended in any respect whatsoever except by a further agreement, in writing, fully executed by each of the parties.

Section 7.11 - Schedules and Exhibits. All Schedules and Exhibits referred to in this Agreement shall be incorporated into this Agreement by such reference and shall be deemed a part of this Agreement as if fully set forth in this Agreement.

Section 7.12 - Waivers. No terms and provisions hereof, including, without limitation, the terms and provisions contained in this sentence, shall be waived, modified or altered so as to impose any additional obligations or Liability or grant any additional right or remedy, and no custom, payment, act, knowledge, extension of time, favor or indulgence, gratuitous or otherwise, or words or silence at any time, shall impose any additional obligation or Liability or grant any additional right or remedy or be deemed a waiver or release of any obligation, Liability, right or remedy except as set forth in a written instrument properly executed and delivered by the party sought to be charged, expressly stating that it is, and the extent to which it is, intended to be so effective. No assent, express or implied, by either party, or waiver by either party, to or of any breach of any term or provision of this Agreement or of the Schedules or Exhibits shall be deemed to be an assent or waiver to or of such or any succeeding breach of the same or any other such term or provision.

Section 7.13 - Further Assurances. The Company and the Purchaser each agree that they will at any time before and after the Closing execute and deliver all additional documents, and do any other acts or things that may be reasonably requested by the Company and the Purchaser, as the

5AM8297 - 236448                                   21

case may be, in order to further perfect the rights and interests contemplated hereunder. Each of the Company and the Purchaser shall from time to time execute and deliver prior to, at and after the Closing such further instruments and documents and take such other action as may reasonably be required in order to carry out and effectuate this Agreement and the transactions contemplated hereby.

Section 7.14 - <u>Governing Law</u>. This Agreement including the validity thereof and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Delaware (excluding the choice of laws rules thereof).

Section 7.15 - <u>Arbitration</u>. The parties shall attempt to amicably resolve any dispute arising out of or relating to this Agreement. If such disputes, controversies or claims cannot be resolved by good faith negotiation between the parties within a 30 day period, the parties shall next submit the matter to mediation, and if the parties cannot reach an agreement via the mediation process, the parties will then submit to binding arbitration before one (1) arbitrator. Such arbitration shall take place in Stamford, Connecticut and shall proceed in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and the laws of the State of Delaware without regard to the provisions thereof concerning conflict of laws. Within seven (7) calendar days of either party making a demand for arbitration, Purchaser and the Company shall mutually select one (1) arbitrator. The determination of the arbitrator shall be binding regardless of whether one of the parties fails or refuses to participate in the arbitration. The arbitrator shall have no authority to award any damages precluded by this Agreement. Each party shall pay for one-half of the cost of the arbitrator. All other costs shall also be split equally between the parties. Either party may enter any arbitration award in any court having jurisdiction or may make application to any such court for a judicial acceptance of the award and order of enforcement, as the case may be. In addition, either party also may, without waiving any remedy under this Agreement, seek from any court having jurisdiction any injunctive or provisional relief necessary to protect the rights or property of that party pending the arbitration award.

Section 7.16 - <u>Third Parties</u>. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than the parties hereto and their respective legal representatives, successors and permitted assigns. No Person who is not a party to this Agreement may rely hereon or derive any benefit hereby as a third party beneficiary or otherwise.

Section 7.17 - <u>Rules of Construction</u>. References in this Agreement to "herein," "hereof" and "hereunder" shall be deemed to refer to this Agreement and shall not be limited to the particular text of Section in which such words appear. The use of any gender shall include all genders, and the singular number shall include the plural and vice versa as the context may require. In the event of any inconsistency between the terms and provisions of this Agreement and the terms and provisions of any other documents executed in connection herewith, the terms and provisions hereof shall in each instance prevail.

*[Signatures to follow.]*

5AM8297 - 236448                                   22

| P10260 | Box Sealing Tape large | EA | 14.00 |
| P10278 | TJ Soft MultiGrain | EA | 21,250.00 |
| P10280 | TJ Soft Whole Wheat | EA | 17,500.00 |
| P10314 | Potato EM carton | EA | 19,925.00 |
| P10320 | bag - CO Country White Bread, Sliced 30 OZ | EA | 16,650.00 |
| P10321 | bag - CO Country Whole Wheat Bread, Sliced 30 OZ | EA | 32,050.00 |
| P10322 | bag - CO Seeded Rye Bread, Sliced 30 OZ | EA | 43,700.00 |
| P10323 | bag - CO Plain Rye Bread, Sliced 30 OZ | EA | 24,725.00 |
| P10334 | bag - CO Sourdough Sliced 30 oz | EA | 32,300.00 |
| P10339 | bag - CO Italian Plain Bread Thick Sliced 22 Oz | EA | 80,250.00 |
| P10374 | #194038 Corrugated - RSC 21.5 x 16.5 x 8 | EA | 676.00 |
| P10378 | #194035 Corrugated - RSC 16.625 x 10 x 6.75 | EA | 1,793.00 |
| P10409 | Corrugated - RSC 20 oz 10cs w_dimensions | EA | 4,340.00 |
| P10414 | 40 x 48 Pallet Slip Sheet #86547 1000/skid | EA | 1,000.00 |

**Bakery Equipment**

Kemper Mixer #1
Kemper Mixer #2
Water Meter
Bowl Lift
#1 Sifter, Flour on Rounder
Dough Chunker
Rounder
Sifter, Rounder
Conveyor, Incline
Proofer, Overhead
Moulder #1
Moulder #2
Conveyor, Pan
Conveyor, Pan Spacing
Conveyor, Accumulating
Racks, Proof
Proofer, Overhead
Conveyor, 180 Degree
Split Top Spray System
Loader, Oven
Oven, Tunnel
Unloader, Oven
Conveyor
Conveyor, Cross
Conveyor, Metering
Depanner
Incline Conveyor
Conveyor, Accumulator
Conveyor, Cooling Tower
Conveyor, Incline after Tower
Metal Detector
Conveyor, 18" Horizontal Switch
Conveyor, Slicer #1 Infeed
Conveyor, Slicer #2 Infeed
Slicer, Band #1
Slicer, Band #2
Squid Ink Turbo Printer 872 #1
Squid Ink Turbo Printer 872 #2
Bagger #2
Pan Cleaner
Sweet Muffin Mixer
Citric Acid Water Meter
VTB Spare Divider
Rounder #1 Conical
Oven #1 Rack
Cooling Racks
Bagger #3

| | | | |
|---|---|---|---|
| I10222 | Organic Verdi Strech | LB | 629.00 |
| I10232 | Intens Fresh 2-30 | LB | 410.00 |
| I10234 | Super Zyme 138412 enzyme | LB | 100.00 |
| I10238 | 2X Heart of Rye #124585 | LB | 1,150.00 |
| I10244 | Moisturlok (62240) | LB | 81.00 |
| I10245 | Encore 1550 (62741) | LB | 205.00 |
| I10248 | Big 49Er - 124604 | LB | 759.00 |
| I10252 | Pristine 500 #135551 | LB | 1,223.50 |
| Packaging | | | |
| P10045 | Corrugated Liner Bag | EA | 500.00 |
| P10100 | Corrugated Cases Plain BREAD 24 oz | EA | 4,858.00 |
| P10106 | Stretch Film - machine length | EA | 4.00 |
| P10107 | Cinnamon Raisin 20 oz | EA | 20,225.00 |
| P10108 | Whole Wheat Sour Dough 20 oz | EA | 8,250.00 |
| P10109 | Organic Old Fashion White 18 oz | EA | 14,300.00 |
| P10110 | Sodium Free Whole Wheat 20 oz | EA | 6,500.00 |
| P10111 | Old Style Rye 16 oz | EA | 2,000.00 |
| P10112 | Organic Whole Wheat 20 oz | EA | 5,300.00 |
| P10113 | Organic Oat 20 oz | EA | 10,200.00 |
| P10114 | Organic Multigrain 20 oz | EA | 4,750.00 |
| P10115 | Organic Spelt 20 oz | EA | 17,000.00 |
| P10116 | Organic Soft Wheat 24 oz | EA | 46,450.00 |
| P10117 | Organic Soft White 24 oz | EA | 38,545.00 |
| P10118 | Organic Soft Multigrain 24 oz | EA | 44,500.00 |
| P10119 | Organic Honey Cracked Wheat 24 oz | EA | 18,600.00 |
| P10120 | Organic Soft Oatmeal 24 oz | EA | 13,700.00 |
| P10122 | Plain Bag 24 oz | EA | 1,225.00 |
| P10123 | EM Bags Plain | EA | 64,550.00 |
| P10124 | Soft Whole Wheat 24 oz | EA | 43,675.00 |
| P10125 | Soft 10 Grain 24 oz | EA | 39,128.00 |
| P10126 | EM Box VBC Org Honey White | EA | 38,425.00 |
| P10127 | EM Box VBC Org Honey Whole Wheat | EA | 52,525.00 |
| P10128 | EM Box VBC Org Cinn Raisin | EA | 139,200.00 |
| P10129 | EM Box VBC Org Multigrain | EA | 52,775.00 |
| P10130 | EM Box VBC Org Spelt | EA | 15,600.00 |
| P10131 | EM Box VBC Whole Wheat | EA | 43,900.00 |
| P10132 | EM Box VBC White | EA | 210,875.00 |
| P10133 | EM Box VBC Cinn Raisin | EA | 35,400.00 |
| P10134 | EM Box VBC Multigrain | EA | 28,425.00 |
| P10135 | EM bags KK White | EA | 26,875.00 |
| P10136 | EM Box Rudi's Org Spelt | EA | 114,800.00 |
| P10137 | EM Box Rudi's Org Wheat | EA | 19,325.00 |
| P10138 | EM Box Rudis Org Multigrain | EA | 20,500.00 |
| P10139 | EM Box Rudi's Org White | EA | 26,400.00 |
| P10140 | EM Box Plain-Unprinted | EA | 40,890.00 |
| P10141 | Sandwich Club (plain bag) 36 oz Pullman | EA | 1,500.00 |
| P10144 | TJ Canadian White | EA | 12,000.00 |
| P10150 | TJ Organic Soft Wheat 24 oz | EA | 8,000.00 |
| P10151 | TJ Org Soft White 24oz | EA | 23,700.00 |
| P10152 | TJ Org Soft Multigrain 24oz | EA | 18,550.00 |
| P10153 | TJ Old Style Rye | EA | 750.00 |
| P10154 | Milton's 24 oz Multigrain 2 pack (inner) | EA | 40,600.00 |
| P10155 | Milton's Multigrain 2 Pack (outer) | EA | 5,300.00 |
| P10156 | Milton's HWG | EA | 12,000.00 |
| P10158 | Kwik Loc Yellow JM-NRP TGR-4 | EA | 231,000.00 |
| P10159 | Kwik Loc white JM-NRP TGR-4 | EA | 766,000.00 |
| P10160 | Kwik Loc Blue JM-NRP TGR-4 | EA | 118,048.00 |
| P10161 | Kwik Loc Tan JM-NRP TGR-4 | EA | 351,000.00 |
| P10162 | Kwik Loc Red JM-NRP TGR-4 | EA | 232,500.00 |
| P10163 | Kwik Loc Green JM-NRP TGR-4 | EA | 158,000.00 |
| P10165 | Corrugated Cases Rudi's EM 8-pk | EA | 30,030.00 |
| P10166 | Corrugated Cases Plain EM 12-pk | EA | 11,525.00 |
| P10259 | Box Sealing Tape small | EA | 20.00 |

| | | | |
|---|---|---|---|
| I10102 | RYE FLOUR- MEDIUM | LB | 1,600.00 |
| I10112 | BULK WHOLE WHEAT FLOUR | LB | 68,186.00 |
| I10114 | ORGANIC VITAL WHEAT GLUTEN | LB | 5,156.00 |
| I10115 | ORGANIC WHITE FLOUR | LB | 96,641.62 |
| I10116 | ORGANIC WHOLE WHEAT FLOUR | LB | 21,480.00 |
| I10117 | YEAST/AMERICAN REDSTAR | LB | 10,085.20 |
| I10122 | Organic Corn Meal | LB | 2,410.00 |
| I10123 | Organic Corn Flour | LB | 1,650.00 |
| I10124 | Organic Potato Flour | LB | 1,633.00 |
| I10126 | Org. SG Whole Spelt Flour | LB | 15,600.00 |
| I10127 | Org. White Spelt Flour | LB | 7,870.00 |
| I10131 | Nine Grain Base | LB | 3,665.00 |
| I10133 | 10 Grain Base Mix | LB | 12,880.00 |
| I10134 | 7 Grain Mix, Organic | LB | 8,388.00 |
| I10135 | Org. Red Wheat Bran | LB | 1,935.00 |
| I10136 | Canola Oil - totes | LB | 5,262.25 |
| I10137 | Org. Sunflower Oil | LB | 532.74 |
| I10139 | Organic Pan Oil | LB | 1,172.46 |
| I10141 | Organic Cane Sugar | LB | 5,412.00 |
| I10142 | Milton's Brown Rice | LB | 3,738.00 |
| I10145 | Barley Malt Extract | LB | 1,587.12 |
| I10146 | Org. Molasses | LB | 3,928.00 |
| I10147 | Org. Agave Syrup | LB | 1,899.00 |
| I10149 | Org. Rolled Oats | LB | 845.00 |
| I10150 | Org. Cracked Wheat | LB | 2,526.00 |
| I10151 | 21 Grain Blend Org | LB | 1,232.00 |
| I10152 | Milton's Multigrain Blend, Organic | LB | 11,150.00 |
| I10153 | BABY OATS (QUICK) | LB | 2,090.00 |
| I10155 | White Wheat Fiber | LB | 719.00 |
| I10157 | Black Sesame Seeds | LB | 95.00 |
| I10159 | Organic Cinnamon | LB | 156.00 |
| I10160 | Organic Vinegar, 300 grain | LB | 2,865.00 |
| I10163 | Buttermilk Flavor | LB | 1,790.00 |
| I10165 | Org. Wheat Sprouts | LB | 180.00 |
| I10169 | Organic Bred Mate FL | LB | 9,930.00 |
| I10173 | Organic Raisins | LB | 540.00 |
| I10176 | Milton's V Enrichment Blend | LB | 800.00 |
| I10178 | White Hulled SESAME SEEDS Green Farms #47138 | LB | 660.00 |
| I10179 | Ascorbic Acid Tabs - 30 ppm | TAB | 4,476.00 |
| I10180 | SALT | LB | 6,517.69 |
| I10181 | ACTI-FRESH GOLD ENZYME | LB | 220.77 |
| I10182 | WHOLE WHEAT FLOUR - BAG | LB | 5,000.00 |
| I10183 | Potato Flour | LB | 3,160.00 |
| I10185 | Honey | LB | 3,517.75 |
| I10186 | Org. Honey | LB | 4,030.00 |
| I10187 | Wheat Bran | LB | 310.00 |
| I10188 | Caraway Seeds | LB | 460.00 |
| I10189 | #27150 – SAF Pro Relax 100 | LB | 1,997.80 |
| I10190 | Cinnamon | LB | 183.00 |
| I10191 | Sea Salt | LB | 1,650.00 |
| I10192 | Raisins | LB | 10,740.00 |
| I10193 | Citric Acid | LB | 4,327.88 |
| I10197 | Bred Mate 40 | LB | 9,302.50 |
| I10198 | GRANULATED SUGAR | LB | 3,260.00 |
| I10200 | VITAL WHEAT GLUTEN | LB | 20,476.25 |
| I10206 | CALCIUM PROPIONATE | LB | 160.00 |
| I10207 | EMPLEX NON-GMO #137752 | LB | 102.00 |
| I10209 | FUMARIC ACID #47000 | LB | 30.00 |
| I10211 | 4007  Org. Softase Flex | LB | 3,911.40 |
| I10212 | LT BROWN SUGAR | LB | 7,145.00 |
| I10217 | Org. Barley Malt | LB | 260.00 |
| I10218 | Org. Brown Sugar | LB | 300.00 |
| I10219 | Rich-Pak Powder (Enrichment) | LB | 123.00 |

JA-446

VBC, Inc.
Tangible Personal Property
As of 3/20/21

| Computer Equipment | Description | Serial Number |
|---|---|---|
| Firewall | Koffee Kup Bakery / VT / Brattleboro / Firewall / Sophos SG125 (UTM9) | S1601AD58002A30 |
| Firewall | Koffee Kup Bakery / MA/ Woburn / Firewall / Sophos RED 15 | A3501E0FAD4F996 |
| Firewall | Koffee Kup Bakery / MD/ Baltimore / Firewall / Sophos RED 15 | A35019A85F826DD |
| Firewall | Koffee Kup Bakery / NJ / Clifton / Firewall / Sophos RED 15 | A35019A841D7842 |
| Firewall | Koffee Kup Bakery / NJ / Somerset / Firewall / Sophos RED 15 | A3501E0D30AC7AD |
| Firewall | Koffee Kup Bakery / NJ / Toms River / Firewall / Sophos RED 15 | A35019A7647E602 |
| Firewall | Koffee Kup Bakery / NY / Hill Park/ Firewall / Sophos RED 15 | A35019B2F212B78 |
| Firewall | Koffee Kup Bakery / NY / Long Island City / Firewall / Sophos RED 15 | A35019A7F300E2F |
| Firewall | Koffee Kup Bakery / PA / Huntington / Firewall / Sophos RED 15 | A35019A81C74C96 |
| Firewall | Koffee Kup Bakery / VT / Brattleboro Annex / Firewall / Sophos RED 15 | A3501E2AA39712A |
| NAS | Koffee Kup Bakery / VT / Brattleboro / NAS / QNAP | Q178I09656 |
| Power | Koffee Kup Bakery / VT / Brattleboro / Power / APC Smart-Ups 1000 RM1U - 1 | AS0946212266 |
| Power | Koffee Kup Bakery / VT / Brattleboro / Power / APC Smart-Ups 1000 RM1U - 2 | AS0946212285 |
| Power | Koffee Kup Bakery / VT / Brattleboro / Power / APC Smart-Ups 1500 | AS1612230985 |
| Power | Koffee Kup Bakery / VT / Brattleboro / Power / APC Smart-Ups 1500 (2) | 3S1821X05837 |
| Switch | Koffee Kup Bakery / VT / Brattleboro / Switch / Aruba-2540-48G POE | CN6AJYL05F |
| Switch | Koffee Kup Bakery / VT / Brattleboro / Switch / HP 1400G-24 | CN002ZF4PQ |
| Switch | Koffee Kup Bakery / VT / Brattleboro / Switch / HP 1920-48G | CN61GP7030 |
| Switch | Koffee Kup Bakery / VT / Brattleboro / Switch / HP 1920G - 24 | CN61GP4FN4 |
| Virtual Server | kkb-brt-app01.vt-burlington.koffee-kup-bakery | 6050-0757-1791-7024-1981-7573-09 |
| Virtual Server | kkb-brt-bkp01.vt-burlington.koffee-kup-bakery | 5093-3493-8897-3926-7169-4495-95 |
| Virtual Server | kkb-brt-dc01.vt-burlington.koffee-kup-bakery | 8431-0217-4354-5950-0462-4622-93 |
| Virtual Server | kkb-brt-hyp01.vt-burlington.koffee-kup-bakery | MXQ55106Y3 |
| Virtual Server | kkb-brt-mgt01.vt-burlington.koffee-kup-bakery | 2691-0528-7620-6274-3929-5161-07 |
| Virtual Server | kkb-brt-rds01.vt-burlington.koffee-kup-bakery | 4529-5536-8242-1154-7459-0626-40 |
| Virtualization Host | kkb-brt-hyp01 (ProLiant DL380 Gen9) | MXQ55106Y3 |
| Workstation | vbc-jd-lt.vt-burlington.koffee-kup-bakery | 5CD8426VKF |
| Workstation | vbc-maint-flr.vt-burlington.koffee-kup-bakery | 5CG930BH4G |
| Workstation | vbc-prdmgr-lt.vt-burlington.koffee-kup-bakery | 5CG8273G6M |
| Workstation | vbc-shipping-dt.vt-burlington.koffee-kup-bakery | MXL01930S1 |
| Workstation | brattleboro_sal.vt-burlington.koffee-kup-bakery | 5CD6374TWR |
| Workstation | brt-ofc-spare.vt-burlington.koffee-kup-bakery | 2UA516137C |
| Workstation | tom-lt.vt-burlington.koffee-kup-bakery | 5CG6292J7S |
| Workstation | 5cg53009kw.vt-burlington.koffee-kup-bakery | 5CG53009KW |
| Workstation | vbc-lt-hr.vt-burlington.koffee-kup-bakery | 5CG7280862 |
| Workstation | vbc-lt-tmalnati.vt-burlington.koffee-kup-bakery | 5CG7291Z0X |
| Workstation | vbc-maint-lt.vt-burlington.koffee-kup-bakery | 5CD7135M92 |
| Workstation | vbc-mastley-pc.vt-burlington.koffee-kup-bakery | 2UA7122B4N |
| Workstation | vbc-sverrier-hp.vt-burlington.koffee-kup-bakery | 5CD6374V2X |
| Workstation | vbc-tsimon-pc.vt-burlington.koffee-kup-bakery | 2UA6422YL2 |
| Workstation | vbc-ws-julieb.vt-burlington.koffee-kup-bakery | 2UA7261Y5K |
| Workstation | vt-lt-svitelli.vt-burlington.koffee-kup-bakery | 5CG55332HK |

| Ingredients | | Unit | Quantity |
|---|---|---|---|
| I10047 | BULK UNBLEACHED WHITE FLOUR | LB | 93,065.00 |
| I10049 | BAG WHITE FLOUR | LB | 5,100.00 |
| I10052 | POPPY SEEDS | LB | 25.00 |
| I10058 | ANNATTO, LIQUID | LB | 11.00 |
| I10059 | POTATO VERMONT #10 | LB | 2,635.00 |
| I10071 | DOUBLE STRENGTH RYE SOUR | LB | 1,290.00 |
| I10075 | CARAWAY GROUND | LB | 87.00 |
| I10080 | HI-LEC-50 | LB | 70.00 |
| I10081 | ICE | LB | 700.00 |
| I10084 | LONG LIFE PARVE | LB | 33.00 |
| I10085 | MALT SYRUP NON-GMO | LB | 5,200.00 |
| I10086 | MIGHTY STRONG -NON GMO | LB | 45.00 |
| I10096 | ORGANIC SOYBEAN OIL | LB | 4,544.74 |

MAINTENANCE SHOP TOOLS AND SPARE PARTS
FLOUR SIFTER FROM SILO
BREAD BAGGER
UBE 2 LB SLICER
UBE SPLITTER/TURNER
UNLOADER, BREAD OVEN
YEAST COOLER

**Office**

Misc Desks, File Cabinets, Chairs

BREAD OVEN UNLOADER
PROOFER
BREAD INTERMIDIATE PROOFER
BREAD RACK PROOFER
BREAD ROUNDER
BREAD SHEETER AND MOLDER
SLICER, BREAD 1
BETTENDORF, THE BAND SLICE MASTER OF BETTENDORF CO
BREAD BAGGER AND TURNER
BREAD LINE #1
PRODUCTION BUILDING
OFFICE
AIR COMPRESSOR
ROLL DIVIDER
DOMINO PRINTER
DOUGH CHUNCKER ROLL LINE
OLD DOUGH PUMP
BLOWER FOR FLOUR SCALER
FLOUR SIFTER
HOLDING TANK
FREEZER
10K GAL FUEL TANK AND PUMP SKID
GLYCOL CHILLING UNIT
DOUGH HOIST
ROLL LINE INTERMEDIATE PROOFER
KWIK LOK #1
KWIK LOK #2
KONIG ROLL OVEN
KWIK LOK #3
KWIK LOK #4
LEMATIC - TOTAL LINE
RIGHT HAND GROUPER/INDEXER/CONVEYOR MODULE
TOP SLICING CONVEYOR
HINGE/BOTTOM/BAND SLICING CONVEYOR RIGHT HAND
LEMATIC TOP SLICER NE HOT DOGS
HINGE/WEB SLICER
SINGLE BAND SLICER
PRODUCT TURN
STACKER FF-RS RIGHT HAND
RIGHT ANGLE TRANSFER RIGHT HAND
BAGGER
TYING CONVEYOR RIGHT HAND
MANLIFT
BREAD LINE MD #1
BREAD LINE MD #2
ROLL LINE METAL DETECTOR
MIXER 13
MIXER 14
MIXER 16
CHUNKER FOR MIXER UNLOAD
ROLL LINE MOULDER KONIG
PAN GREASING MACHINE
ALL PAN TRUCK
ROLL LINE RECIPROCATOR
ROLL COOLER INFEED TO DISCHARGE
ROLL DEPANNER
ROLL LINE CAROUSEL
ROLL LINE OVEN
LOADER ROLL OVEN
ROLL LINE UNLOADER
ROLL PROOF BOX
ROLL TOPPER SEEDER
PORTABLE SEEDER CONVEYOR
ROLL LINE SHEETER

| | | | |
|---|---|---|---|
| P10264 | #16 RYE corrugated | EA | 2,153.00 |
| P10281 | VERMONT WHEAT BREAD (PS) | EA | 7,500.00 |
| P10282 | VERMONT ITALIAN BREAD (PS) | EA | 28,900.00 |
| P10283 | VERMONT MULTIGRAIN BREAD (PS) | EA | 21,292.00 |
| P10284 | VERMONT MARBLE BREAD (PS) | EA | 38,186.00 |
| P10285 | VERMONT SOURDOUGH BREAD (PS) | EA | 80,250.00 |
| P10286 | VERMONT RYE BREAD (PS) | EA | 21,824.00 |
| P10287 | VERMONT WHITE BREAD (PS) | EA | 27,058.00 |
| P10288 | VERMONT DARK RYE BREAD (PS) | EA | 18,848.00 |
| P10289 | VT 12PK WHEAT BURGER BUNS (PS) | EA | 26,000.00 |
| P10290 | VT 12PK WHOLE GRAIN BURGER BUNS (PS) | EA | 57,600.00 |
| P10291 | VT 12PK WHITE BURGER BUNS (PS) | EA | 72,638.00 |
| P10292 | VT 12PK POTATO BURGER BUNS (PS) | EA | 69,850.00 |
| P10303 | VBC Whole Wheat | EA | 25,400.00 |
| P10304 | VBC Golden White | EA | 12,800.00 |
| P10305 | VBC Multigrain | EA | 16,800.00 |
| P10306 | VBC Italian | EA | 17,000.00 |
| P10307 | Matthews Whole Wheat BREAD (PS) | EA | 31,700.00 |
| P10308 | Matthews Golden White BREAD (PS) | EA | 52,700.00 |
| P10309 | Matthews Honey 12 Grain BREAD (PS) | EA | 57,800.00 |
| P10317 | bag - CO Marble Rye Bread, Sliced, 2 lb | EA | 84,000.00 |
| P10329 | bag - CO Dinner Rolls 12 ct 21 oz | EA | 51,124.00 |
| P10330 | bag - CO Twist Rolls 8 ct 24 oz | EA | 72,304.00 |
| P10331 | bag - CO Seeded Rye Bread, Open faced, Sliced 16oz | EA | 9,800.00 |
| P10332 | bag -CO Seedless Plain Rye Bread 16oz | EA | 43,800.00 |
| P10333 | bag - CO Onion Rolls 8  18.6 oz | EA | 83,725.00 |
| P10344 | bag - CO Seeded Rye 2 lb | EA | 40,000.00 |
| P10345 | bag - CO Plain Rye Unseeded 2 lb | EA | 43,000.00 |
| P10351 | Machine Shrink Wrap 20" x 5000' 63 g | FT | 250,000.00 |
| P10362 | bag - GM supplied  Kayem Ham 6 ct 13.5 oz | EA | 52,076.00 |
| P10373 | #194034 Corrugated - RSC 24.5 x 15.5 x 9.25 | EA | 940.00 |
| P10377 | #194036 Corrugated - RSC 19 x 16.75 x 8.75 | EA | 1,428.00 |
| P10379 | #195055 RSC 18.25 x 12.75 x 7.625 S stk prog | EA | 2,923.00 |
| P10380 | #194083 Corrugated - RSC 16 x 14 x 9 | EA | 415.00 |
| P10383 | #194249 Corrugated - Divider - 24 3/16 x 22.5 | EA | 2,950.00 |
| P10385 | #194251 Corrugated - Divider - 22 13/16  x 15.5 | EA | 1,000.00 |
| P10388 | #194676 Corrugate - RSC 19.5 x 15.25 x 5 | EA | 301.00 |
| P10391 | #19311 Corrugated - RSC 16.25 x 11.75 x 7.75 | EA | 942.00 |
| P10392 | #19312 Corrugated - RSC 14.375 x 14.375 x 8.25 | EA | 432.00 |
| P10400 | GM 365 Org White Hot 8ct 16oz zero value | EA | 41,348.00 |
| P10401 | GM 365 Org White Ham 8ct 16oz zero value | EA | 42,128.00 |
| P10402 | GM 365 Org Whole Wheat Hots 8ct 16oz zero value | EA | 27,001.00 |
| P10403 | GM 365 Org Whole Wheat Ham 8ct 16oz zero value | EA | 22,088.00 |
| P10408 | Plain Bag 11.75 x 17 x 3.5 bg x 1.5 lip 1.5 mil | EA | 16,000.00 |
| P10410 | GM Hot Corrugated - RSC 15.25 x 12.25 x 7.5 | EA | 325.00 |
| P10412 | GM Ham Corrugated - RSC - P9969 | EA | 1,175.00 |
| P10414 | 40 x 48 Pallet Slip Sheet #86547 1000/skid | EA | 1,105.00 |

**Bakery Equipment**

ROLL COOLER
1 POUND SLICER
ROLL LINE BAGGER
DOUGH AND CRIPPLE WASTE AREA
WATER/STEAM
BREAD BAGGER #1
LOAF LINE BAGGER #2
LINE 2 BREAD BAGGER
BREAD COOLER INFEED TO DISCHARGE
DEPANNER BREAD
BREAD DIVIDER
SLICER, BREAD LINE #1
BREAD LOAF OVEN
BREAD OVEN BURNER
BREAD OVEN LOADER

| | | | |
|---|---|---|---|
| I10249 | EL-7 N Corbian dough conditioner | LB | 190.00 |
| I10250 | GMS 540 Corbian hydrated emulsifier #138094 | LB | 522.00 |
| I10252 | Pristine 500 #135551 | LB | 1,790.00 |
| I10262 | Multec Mono - Puratos | LB | 97.20 |
| I10275 | Pristine Concentrate #137729 | LB | 512.48 |
| I10276 | Ultra Fresh 400 #136219 | LB | 1,100.00 |
| I10283 | Organic Canola Oil | LB | 2,632.50 |
| I10284 | Supra 181 | LB | 1,660.00 |
| I10285 | Bulk White Wheat Flour Ardent #5109179 | LB | 64,025.00 |
| I10288 | Italian Seasoning  #10050 | LB | 19.00 |
| I10290 | Verdi Mono 1000 | LB | 400.00 |
| Packaging | | | |
| P10053 | Onion Kaiser Roll Bag #3415 (KKB) (PS) | EA | 16,000.00 |
| P10086 | Hot Dog 16 Ct  Bag #3473 | EA | 6,635.00 |
| P10088 | KK Hot Dog 8 Ct Bag #3475 (PS) | EA | 254,185.00 |
| P10091 | Brioche Bun Bags #3478 | EA | 24,500.00 |
| P10097 | Sub Roll Bags Plain (PS) | EA | 20,800.00 |
| P10100 | Corrugated Cases Plain BREAD 24 oz | EA | 496.00 |
| P10111 | Old Style Rye 16 oz | EA | 12,968.00 |
| P10122 | Plain Bag 24 oz | EA | 20,200.00 |
| P10124 | Soft Whole Wheat 24 oz | EA | 7,200.00 |
| P10141 | Sandwich Club (plain bag) 36 oz Pullman | EA | 53,750.00 |
| P10153 | TJ Old Style Rye | EA | 32,323.00 |
| P10158 | Kwik Loc Yellow JM-NRP TGR-4 | EA | 46,836.00 |
| P10159 | Kwik Loc white JM-NRP TGR-4 | EA | 757,032.00 |
| P10160 | Kwik Loc Blue JM-NRP TGR-4 | EA | 855,024.00 |
| P10161 | Kwik Loc Tan JM-NRP TGR-4 | EA | 628,000.00 |
| P10162 | Kwik Loc Red JM-NRP TGR-4 | EA | 490,826.00 |
| P10163 | Kwik Loc Green JM-NRP TGR-4 | EA | 448,000.00 |
| P10164 | Kwik Loc Orange JM-NRP TGR-4 | EA | 63,000.00 |
| P10184 | KK POTATO HOT 8PK (PS) | EA | 57,600.00 |
| P10185 | KK NEW ENGLAND HOT DOG 8PK (PS) | EA | 62,000.00 |
| P10195 | KKB SPLIT WHEAT BREAD | EA | 15,800.00 |
| P10196 | KKB SPLIT WHITE BREAD | EA | 24,400.00 |
| P10197 | VERMONT ORGANIC HOT DOG BUNS | EA | 18,288.00 |
| P10198 | VERMONT ORGANIC HAMBURGER BUNS | EA | 18,000.00 |
| P10199 | NAT DELI ROLL | EA | 50,130.00 |
| P10200 | NAT ONION ROLL | EA | 69,000.00 |
| P10201 | KAS SOFT BULKIE  6PK | EA | 79,000.00 |
| P10203 | POTATO ROLL | EA | 12,250.00 |
| P10206 | KAS MARBLE RYE 1 LB | EA | 20,487.00 |
| P10207 | KAS SEEDED RYE 1 LB | EA | 20,625.00 |
| P10208 | KAS NON-SEEDED 1 LB | EA | 20,147.00 |
| P10209 | KAS PUMPERNICKEL 1 LB | EA | 22,306.00 |
| P10221 | 12 CT DELI ROLLS 13 1/2 X 18 + 4BG + 1 1/2L | EA | 31,250.00 |
| P10224 | 12 X 19 + 3 BG + 1 1/2 LIP  12-PACK BULKIE ROLL | EA | 6,000.00 |
| P10225 | 9 5/8 X 12 1/4 + 4" BG SHAW'S | EA | 19,800.00 |
| P10227 | TJOE 100% Whole Grn White Printed Bag | EA | 35,800.00 |
| P10230 | BKR YOGA BREAD | EA | 24,300.00 |
| P10231 | BKR WHEAT & FLAX BREAD | EA | 19,200.00 |
| P10233 | BKR 14-GRAIN BREAD | EA | 32,000.00 |
| P10234 | BKR MULTIGRAIN BREAD | EA | 22,500.00 |
| P10235 | BKR  WHOLE GRN RYE BREAD | EA | 25,600.00 |
| P10236 | BKR CIN RAISIN BREAD | EA | 12,000.00 |
| P10239 | VT. NAT POTATO BURGER BUNS (PS) | EA | 91,600.00 |
| P10240 | VT. NAT 100% WHEAT BURGER BUNS (PS) | EA | 74,000.00 |
| P10241 | VT. NAT POTATO HOT DOGS (PS) | EA | 85,732.99 |
| P10242 | VT. NAT 100% WHEAT HOT DOGS (PS) | EA | 25,900.00 |
| P10243 | VT. NAT WHEAT SLIDERS (PS) | EA | 27,000.00 |
| P10244 | VT. NAT POT SLID 10.375 x 16 x 17.5 x 1.50 (PS) | EA | 36,800.00 |
| P10246 | VT. NAT  SOFT WHITE | EA | 79,604.00 |
| P10247 | VT. NAT SOFT POTATO | EA | 24,600.00 |
| P10261 | Shrink Wrap | EA | 72,000.00 |
| P10263 | 606 PLAIN Corrugated | EA | 2,221.00 |

JA-451

| Code | Description | Unit | Amount |
|---|---|---|---|
| I10088 | MOLASSES | LB | 175.00 |
| I10090 | OAT BRAN BLEND | LB | 441.02 |
| I10092 | ONION- CHOPPED | LB | 1,220.00 |
| I10093 | ONION POWDER | LB | 175.00 |
| I10095 | ORGANIC SOFT N' MIGHTY | LB | 3,433.25 |
| I10099 | PEPITAS- PUMPKIN SEEDS | LB | 195.30 |
| I10100 | RESTORE PLUS | LB | 3,176.40 |
| I10101 | RICE FLOUR | LB | 370.00 |
| I10102 | RYE FLOUR- MEDIUM | LB | 4,923.68 |
| I10105 | SUNFLOWER SEEDS | LB | 130.00 |
| I10109 | WHITE WHOLE WHEAT FLOUR - bagged | LB | 12,400.00 |
| I10110 | XANTHAN GUM | LB | 115.45 |
| I10111 | COARSE PUMP FLOUR | LB | 1,951.35 |
| I10114 | ORGANIC VITAL WHEAT GLUTEN | LB | 1,233.00 |
| I10115 | ORGANIC WHITE FLOUR | LB | 38,738.58 |
| I10116 | ORGANIC WHOLE WHEAT FLOUR | LB | 16,421.00 |
| I10117 | YEAST/AMERICAN REDSTAR | LB | 9,319.59 |
| I10139 | Organic Pan Oil | LB | 465.00 |
| I10140 | Org Divider Oil - CP051 | LB | 250.72 |
| I10141 | Organic Cane Sugar | LB | 1,601.00 |
| I10146 | Org. Molasses | LB | 6,065.75 |
| I10158 | Flax Seeds | LB | 150.00 |
| I10160 | Organic Vinegar, 300 grain | LB | 193.63 |
| I10163 | Buttermilk Flavor | LB | 40.00 |
| I10169 | Organic Bred Mate FL | LB | 6,659.00 |
| I10177 | CRACKED WHEAT | LB | 580.00 |
| I10178 | White Hulled SESAME SEEDS Green Farms #47138 | LB | 400.00 |
| I10179 | Ascorbic Acid Tabs - 30 ppm | TAB | 19,817.30 |
| I10180 | SALT | LB | 6,190.45 |
| I10181 | ACTI-FRESH GOLD ENZYME | LB | 1,305.41 |
| I10182 | WHOLE WHEAT FLOUR - BAG | LB | 40,669.96 |
| I10183 | Potato Flour | LB | 2,259.80 |
| I10184 | Canola Oil - conventional BULK | LB | 30,778.62 |
| I10185 | Honey | LB | 8,752.96 |
| I10187 | Wheat Bran | LB | 400.00 |
| I10188 | Caraway Seeds | LB | 651.03 |
| I10189 | #27150 – SAF Pro Relax 100 | LB | 740.94 |
| I10190 | Cinnamon | LB | 35.00 |
| I10191 | Sea Salt | LB | 1,347.48 |
| I10193 | Citric Acid | LB | 2,109.84 |
| I10195 | Organic Mold Inhibitor OWS2 | LB | 1,646.00 |
| I10197 | Bred Mate 40 | LB | 5,866.40 |
| I10198 | GRANULATED SUGAR | LB | 5,348.97 |
| I10200 | VITAL WHEAT GLUTEN | LB | 12,800.48 |
| I10201 | DOUBLE SPICE PLUS #138911 | LB | 1,117.19 |
| I10204 | NON-DIASTATIC MALT | LB | 30.00 |
| I10205 | DRY MOLASSES POWDER | LB | 110.00 |
| I10206 | CALCIUM PROPIONATE | LB | 3,080.93 |
| I10207 | EMPLEX NON-GMO #137752 | LB | 1,614.27 |
| I10208 | BFP 65 PLM #127000 | LB | 820.00 |
| I10209 | FUMARIC ACID #47000 | LB | 1,913.29 |
| I10211 | 4007 Org. Softase Flex | LB | 344.00 |
| I10219 | Rich-Pak Powder (Enrichment) | LB | 225.41 |
| I10226 | Pristine 2100 #139665 | LB | 560.00 |
| I10232 | Intens Fresh 2-30 | LB | 138.00 |
| I10234 | Super Zyme 138412 enzyme | LB | 810.00 |
| I10237 | Vita-Ex EF | LB | 3,935.00 |
| I10238 | 2X Heart of Rye #124585 | LB | 5,707.60 |
| I10239 | Strong-Do 124601 | LB | 330.00 |
| I10240 | Im-Prove 200 No ADA #137364 | LB | 360.00 |
| I10242 | Microsure | LB | 50.00 |
| I10244 | Moisturlok (62240) | LB | 215.00 |
| I10245 | Encore 1550 (62741) | LB | 365.00 |
| I10247 | No. 20 Dinner Roll Base ZTF 127893 | LB | 3,250.00 |

Superior Bakery, Inc.
Tangible Personal Property
As of 3/20/21

| Computer Equipment | Description | Serial Number |
|---|---|---|
| Firewall | KKB CT Sophos SG125 | S1A0CADP2C6V8AE |
| Firewall | Koffee Kup Bakery / CT/ Superior Bakery SG 125 firewall SBC | S1A0CADP2C6V8AE |
| Firewall | KKB Superior | |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch / HP 2530-24G-LAN | CN79FP72ML |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch / HP 2530-24G-PoeP Phones | TW99FP48TV |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch / Copier Room | CN65GP02S8 |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch /SBC Maintenance Office | CN65GP040T |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch /SBC Nancy's Office | CN65GP02T4 |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch /SBC Reception | CN65GP0426 |
| Switch | KKB CT Switch 1 | |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Production Office / Switch / Aruba-2540-48G POE | CN73JYK082 |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Raw Materials Storage / Switch / Aruba-2540-48G PC | CN73JYK06Z |
| Switch | Koffee Kup Bakery / CT / N. Grosvenordale / Switch /SBC Server Room | CN66GP4BG8 |
| Switch | KKB CT Switch 3 | CN89HL3504 |
| Switch | KKB CT swtich 2 | TW99FP48TV |
| Virtual Server | kkb-sbc-fs01.vt-burlington.koffee-kup-bakery | 6419-1195-6585-4982-6788-5100-38 |
| Workstation | sbc-frontdesk.vt-burlington.koffee-kup-bakery | MXL8291GTJ |
| Workstation | sbc-hr-lt.vt-burlington.koffee-kup-bakery | 5CG8042L2P |
| Workstation | sbc-jkores-hpl.vt-burlington.koffee-kup-bakery | 5CG82526PQ |
| Workstation | sbc-prod-01.vt-burlington.koffee-kup-bakery | MXL8291GSX |
| Workstation | sbc-prod-02.vt-burlington.koffee-kup-bakery | MXL8291GSK |
| Workstation | sbc-prod-tab1.vt-burlington.koffee-kup-bakery | 494HTG2 |
| Workstation | sbc-prod-tab2.vt-burlington.koffee-kup-bakery | 394HTG2 |
| Workstation | sbc-ssondak-hpl.vt-burlington.koffee-kup-bakery | 5CG8252690 |
| Workstation | sbc-swoldu-hpl.vt-burlington.koffee-kup-bakery | 5CD8426VGY |
| Workstation | sbc-wlafrance.vt-burlington.koffee-kup-bakery | 5CG8256KD6 |
| Workstation | sb-ws-nchenette.vt-burlington.koffee-kup-bakery | 6XJ41D1 |
| Workstation | sbc-jpitney-hpl.vt-burlington.koffee-kup-bakery | 5CD6374V35 |
| Workstation | sbc-maint1-sn.vt-burlington.koffee-kup-bakery | 5CG6492RPY |
| Workstation | sbc-prod1.vt-burlington.koffee-kup-bakery | 2UA4162D6X |
| Workstation | sbc-prod2.vt-burlington.koffee-kup-bakery | 2UA4162D6N |
| Workstation | sbc-prod-3.vt-burlington.koffee-kup-bakery | 5CD6374V2S |
| Workstation | sb-fs01.vt-burlington.koffee-kup-bakery | DPHNHC1 |

| Ingredients | | Unit | Quantity |
|---|---|---|---|
| I10011 | FERMAID SUPER RELAX | LB | 208.00 |
| I10021 | SUNSET GLAZE | LB | 229.03 |
| I10047 | BULK UNBLEACHED WHITE FLOUR | LB | 44,291.29 |
| I10049 | BAG WHITE FLOUR | LB | 27,500.00 |
| I10052 | POPPY SEEDS | LB | 275.00 |
| I10058 | ANNATTO, LIQUID | LB | 87.05 |
| I10059 | POTATO VERMONT #10 | LB | 12,190.00 |
| I10060 | NB CT-1 #137420 | LB | 589.00 |
| I10067 | CARAMEL COLOR | LB | 251.64 |
| I10069 | STARPLEX #137515 | LB | 100.00 |
| I10070 | OVEN SPRING (975) | LB | 1,953.33 |
| I10071 | DOUBLE STRENGTH RYE SOUR | LB | 5,208.45 |
| I10074 | BUCKWHEAT FLOUR | LB | 82.00 |
| I10075 | CARAWAY GROUND | LB | 427.18 |
| I10076 | CORN MEAL-FINE | LB | 100.00 |
| I10077 | CRAISINS | LB | 1,675.00 |
| I10078 | 14 GRAIN MIX | LB | 3,167.96 |
| I10081 | ICE | LB | 11,520.00 |
| I10082 | JT-SOFT | LB | 647.20 |
| I10083 | LEMON EXTRACT | LB | 14.47 |
| I10084 | LONG LIFE PARVE | LB | 1,924.34 |
| I10085 | MALT SYRUP NON-GMO | LB | 9,696.22 |
| I10087 | MILLET SEED | LB | 110.00 |

Powered Pallet Jack 7A263579
Kettle Exit 90 Conveyor
Scales
Engraving System
Shop Microwave/Fridge
Genie Scissor Lift GS3010A
UBE Back End Auto Load Bagger
SF-01 Conveyor to Bagger Corner 1
SF-02 Conveyor to Bagger Corner Out Feed
Incline Decline after Old Heater Conveyor
Power Pallet Jack 7A306933 - Colchester Warehouse
Ride Along Pallet Jack 10009843 - Colchester Warehouse
Power Pallet Jack 7A306934 - Colchester Warehouse
Squid 905 Printers (2)
Pallet Racking
Chemical Foamer
Roll Pans
Tennant Floor Scrubber
Domino IDW Printer V120i
Forklift 1A187950 - Colchester Warehouse
Bread Catch Pans
Hinge Slicer
Band Slicer
Autoload Backspin
Autoload Infeed
Lock Met 30+ Metal Detector
Autoload Stacker
Hotsy Pressure Washer
Trash Cans
Kettle Fire Suppression System
Autoload Pushers
Donut Test Mixer
Turn Conveyor to Donut Spiral
Conveyor for Waste Trailer
Donut Box Gluer
Portable Box Taper
Sneed Box Printer #1
Sneed Box Printer #2
Box taper #1
Rooftop Shortening Tank

**Vehicles**

2016 Buick Regal ..3573
2010 Ford Fusion ..8143
2012 Ford Fusion ..6052
2014 Toyota Rav 4 ..9094
2013 Ford Flex ..3324
2013 Hyundai Sonata ..3646
2015 Ford Fusion ..9417
2015 Ford Fusion ..6775
2015 Ford Fusion ..2710
2017 Jeep Grand Cherokee ..8346

**Offices**

Misc Desks, File Cabinets, Chairs
Conference Room Table and Chairs
Refrigerators
Microwaves
Paper Shredders

9 Box Maker
6 Box Maker
Pick & Place (2)
Kwik Lok Box Closure
UBE Donut Bagger
Metal Detector
Injector Pump, Jelly Drum #2
Intermediate Proofer
Gemini Line Sheeter
Gemini Divider
Moulder
Kaiser Stamper
Reciprocator
Sprockets & Chain
Glycol System
Tube Ice Machine
Walk-in Cooler
Water Mixing Station
Gemini Panning Lane
Water Mixing Station
Clarke Floor Scrubber
15HP Air Compressor
Step Stools
Box Taper
Digital Scales
Hotsy Pump
Air Dryer
Hot Water Tanks - Shop above sink & Boiler
Walk in Freezer
Lard System
Sump Pump - Bread Mixing area
Fire Extinguishers
Fork Lift 1A421171
60 HP Compressor
20 HP Compressors
Boiler
Thermotron Oven
Gray Roller Conveyor
Domino Box Printer A3201
Glaze Holding Tank
UBE NES Slicer
Gemini
Donut Dept Gear Boxes
Incline Conveyor to Spiral Cooler
Turn Conveyor after Incline
Maintenance Shop Tools and Parts
Box Printer Conveyor
Heat Trace for Kettle
Domino IDW Printer V120I
Cruller Kicker
Miller Mig Welder
Miller Tig Welder
Shop Lathe
Water Chiller
Shipping Dollies
Display Carts
Boiler
Oven Infeed Conveyor
Oven Exit Rollers
Spiral Exit Transfer Conveyor
Blue Belt Product Conveyor over Oven
Kwik Lok Bag Closer and Squid 905 Printer
Yeast Mixer

Dough Pump
Bread Dough Conveyor
Pan Feeder
Pan Stacker
Bread Proof Box
Water Splitter
Oven Load Conveyor
Depanner
Pan Return Conveyor
Product Conveyors over Oven
Bread Pan Racks
Corn Meal Sifter
Spiral Bread Cooler
Diverter Table
Alto Slicer
Bread Pack-off Conveyor
Bread Bagger
Spare Brush Machine
Pro Brush Machine
DPK Brush Machine
Kwik Lok #1
Kwik Lok #2
Metal Detector
Kwik Lok Ink Jet Printer
Kwik Lok Ink Jet Printer
340 Qt Mixer
Yeast Mixer
Pastry Lane
8 Pocket Donut Cutter
Cruller Twister Conveyor
Cruller Twister Sifter
Cruller Twister
Dough Belts
Proofer Feed Conveyor
Proof Box
Transfer Table
Mobil Cake Lift
Mobil Cake Cutter
Kettle
Lard Filter Tank
Glaze Mixing Tank
Glaze Hold Tank Pump
Glaze Falls Conveyor
Glaze Mix Tank Pump
Glaze Falls Pum
Pump, Positive Displacement 340Qt
Pump, Positive Displacement Cruller Twister
Spiral Donut Cooler
Donut Heater Conveyor
Triple Track Conveyor
Gray Platic Sugar Conveyor
Oscillator for Variety Donuts
Conveyor, IDW SS Conveyor Dough Boy
Tumbler, Granulated Sugar
Tumbler, Cinnamon
Tumbler, Powdered Sugar
Conveyor, Donut Pack-off
Conveyor, Auto Feed
Wrap Machine, Individually Wrapped Donuts
Injector Pump, Jelly #1
Injector Pump, Jelly #2
Injector Pump, Jelly Drum #1
Kwik Lok Squid Printer

| P10050 | Wheat Dinner Roll Bags #3402 | EA | 6,872.00 |
|--------|------------------------------|----|----|
| P10051 | KK Kaiser Roll Bags (PS) | EA | 29,354.00 |
| P10052 | Wheat Kaiser Roll Bag #3410 | EA | 15,500.00 |
| P10054 | Seeded Kaiser Bags #3416 | EA | 500.00 |
| P10055 | KK Grinder Roll Bags #3420 (PS) | EA | 3,862.00 |
| P10056 | KK Wheat Grinder Bags #3421 | EA | 5,000.00 |
| P10057 | Big Y White Grinder Bag #3422 | EA | 48,364.00 |
| P10059 | KK Sub Bag #3425 | EA | 11,169.00 |
| P10060 | KK Wheat Sub Roll Bags #3426 | EA | 3,238.00 |
| P10062 | Garlic Stix Bags #3430 | EA | 4,000.00 |
| P10066 | KK Hoagie Roll Bags (PS) | EA | 35,363.00 |
| P10067 | KK Wheat Hoagie Roll Bag #3436 | EA | 20,500.00 |
| P10069 | Sweet Kaiser Roll Bag #3439 | EA | 36,845.00 |
| P10070 | Seeded Potato Ham. Roll Bag (PS) | EA | 42,607.00 |
| P10072 | MB Bulkie ROLLS #3442 | EA | 24,702.00 |
| P10073 | MB Wheat Bulkie Roll #3443 | EA | 20,500.00 |
| P10074 | MB Plain Sub Roll #3446 | EA | 81,408.00 |
| P10075 | Potato Hoagie Roll (PS) | EA | 5,909.00 |
| P10076 | Sour Dough Hoagie #3448 | EA | 4,428.00 |
| P10077 | Plain Potato Ham. Bags #3449 (PS) | EA | 45,083.00 |
| P10083 | Hot Dog 12 ct. Block #3469 | EA | 30,000.00 |
| P10084 | Ham. 12 Count Bag #3470 | EA | 22,938.00 |
| P10085 | Wheat Ham 12 ct. Bag #3471 | EA | 4,500.00 |
| P10087 | Kaiser ROLLS 6 ct #3474 | EA | 8,619.00 |
| P10088 | KK Hot Dog 8 Ct Bag #3475 (PS) | EA | 2,000.00 |
| P10089 | Hamburger 8 Count Bag #3476 (PS) | EA | 70,725.00 |
| P10093 | Big Y Bulky Bag 6 ct. #3480 | EA | 1,003.00 |
| P10097 | Sub Roll Bags Plain (PS) | EA | 10,311.00 |
| P10158 | Kwik Loc Yellow JM-NRP TGR-4 | EA | 8,541.00 |
| P10159 | Kwik Loc white JM-NRP TGR-4 | EA | 12,000.00 |
| P10160 | Kwik Loc Blue JM-NRP TGR-4 | EA | 40,877.00 |
| P10161 | Kwik Loc Tan JM-NRP TGR-4 | EA | 370,000.00 |
| P10162 | Kwik Loc Red JM-NRP TGR-4 | EA | 183,000.00 |
| P10163 | Kwik Loc Green JM-NRP TGR-4 | EA | 11,000.00 |
| P10164 | Kwik Loc Orange JM-NRP TGR-4 | EA | 16,000.00 |
| P10239 | VT. NAT POTATO BURGER BUNS (PS) | EA | 4,000.00 |
| P10268 | Kasanof Kaiser ROLLS | EA | 18,529.00 |
| P10273 | Henkel Technomelt 8370 | LB | 210.06 |
| P10276 | SHAWS WHITE SUB BAGS | EA | 2,800.00 |
| P10311 | Clean Label Potato Sandwich Roll bag | EA | 6,900.00 |
| P10312 | Clean Label White Sandwich Roll bag | EA | 2,929.00 |
| P10313 | Clean Label White Sub bag | EA | 15,500.00 |
| P10325 | bag - CO 12" Wheat Sub 6 ct xx oz 13.5x19.5x1.5x5 | EA | 38,819.00 |
| P10363 | Stewart's Blueberry Donut Box | EA | 6,750.00 |
| P10368 | 9 ct donut box Unprinted, no window S-23528 | EA | 15,500.00 |
| P10369 | Parchment separation paper for frozen donuts | FT | 4,000.00 |
| P10373 | #194034 Corrugated - RSC 24.5 x 15.5 x 9.25 | EA | 250.00 |
| P10374 | #194038 Corrugated - RSC 21.5 x 16.5 x 8 | EA | 906.00 |
| P10375 | #194037 Corrugated - RSC 17 x 12 x 7?? or17x17x8? | EA | 200.00 |
| P10376 | #194033 Corrugated - RSC 30 x 12 x 7 | EA | 314.00 |
| P10377 | #194036 Corrugated - RSC 19 x 16.75 x 8.75 | EA | 300.00 |
| P10382 | #194248 Corrugated - Divider - 24 15/16 x 16.5 | EA | 950.00 |
| P10386 | #194275 Corrugated - Divider - 24 7/16 x 21 | EA | 1,056.00 |
| P10404 | HB Fuller 8290 PE adhesive | LB | 1,178.00 |
| P10405 | Costco Donut Label | EA | 8,000.00 |
| P10406 | KKB Blueberry Donut 6 ct box (SB) | EA | 19,600.00 |

**Bakery Equipment**

Flour Silo
Flour System Blowers
Flour Sifter
Mixing Hopper
Bread Mixer

| Code | Description | Unit | Qty |
|---|---|---|---|
| I10193 | Citric Acid | LB | 50.00 |
| I10197 | Bred Mate 40 | LB | 894.80 |
| I10198 | GRANULATED SUGAR | LB | 8,060.00 |
| I10200 | VITAL WHEAT GLUTEN | LB | 6,627.01 |
| I10201 | DOUBLE SPICE PLUS #138911 | LB | 918.41 |
| I10203 | EXA-LUBE DIVIDER OIL | LB | 1,073.55 |
| I10204 | NON-DIASTATIC MALT | LB | 1,242.25 |
| I10205 | DRY MOLASSES POWDER | LB | 1,087.05 |
| I10206 | CALCIUM PROPIONATE | LB | 3,600.55 |
| I10207 | EMPLEX NON-GMO #137752 | LB | 4,581.69 |
| I10208 | BFP 65 PLM #127000 | LB | 2,212.83 |
| I10209 | FUMARIC ACID #47000 | LB | 1,793.64 |
| I10210 | STAY SOFT-700 ENZYME | LB | 145.85 |
| I10212 | LT BROWN SUGAR | LB | 330.00 |
| I10231 | Actl-Fresh SRB | LB | 600.00 |
| I10232 | Intens Fresh 2-30 | LB | 15.00 |
| I10234 | Super Zyme 138412 enzyme | LB | 1,205.74 |
| I10236 | Blueberry FLAV-R-BITES #6105 | LB | 275.00 |
| I10243 | Long Stick Deluxe 139325 | LB | 4,800.00 |
| I10244 | Moisturiok (62240) | LB | 837.85 |
| I10245 | Encore 1550 (62741) | LB | 1,591.50 |
| I10246 | HI Fibre (63377) | LB | 24.00 |
| I10250 | GMS 540 Corbian hydrated emulsifier #138094 | LB | 1,238.00 |
| I10255 | SAF Pro volume 6.1 | LB | 1,466.16 |
| I10264 | Guar Gum | LB | 55.00 |
| I10275 | Pristine Concentrate #137729 | LB | 300.00 |
| I10276 | Ultra Fresh 400 #136219 | LB | 20.00 |
| I10290 | Verdi Mono 1000 | LB | 200.00 |
| **Packaging** | | | |
| P10001 | Jelly Donut Bags #3305 | EA | 20,200.00 |
| P10002 | Cruller Bags #3310 | EA | 73,000.00 |
| P10005 | MB 12 PK Donut Bag #3316 | EA | 14,050.00 |
| P10006 | Big Y Maple Boxes #3317 | EA | 11,300.00 |
| P10007 | Big Y Apple Cider Boxes #3318 | EA | 16,190.00 |
| P10008 | Big Y 9 ct Variety Boxes #3319 | EA | 16,280.00 |
| P10009 | Big Y 6 Ct. Glaze Box #3320 | EA | 7,250.00 |
| P10010 | Big Y Choc. Glaze Box #3321 | EA | 20,350.00 |
| P10011 | Big Y 6 ct. Powder Box #3322 | EA | 15,800.00 |
| P10012 | Big Y 6 ct. Plain Box #3323 | EA | 5,610.00 |
| P10013 | Stewarts Maple Boxes #3324 | EA | 26,250.00 |
| P10014 | Variety Cake Box 9 #3325 | EA | 20,072.00 |
| P10015 | Stewarts Choc. Box #3326 | EA | 12,250.00 |
| P10016 | Stewarts Variety Box #3327 | EA | 27,000.00 |
| P10020 | Buttermilk Box #3335 | EA | 3,750.00 |
| P10022 | YR Glazed Donut Box #3340 | EA | 21,750.00 |
| P10023 | Maple Glazed Donut #3341 (SB) | EA | 9,500.00 |
| P10024 | OF Glazed Cake Box 3342 | EA | 2,750.00 |
| P10027 | CF Apple Cider Box 6 #3347 | EA | 8,975.00 |
| P10028 | CF Maple Donut Box #3348 | EA | 15,471.00 |
| P10031 | CF Chocolate Box #3352 | EA | 20,750.00 |
| P10032 | CF Glaze Plain Box #3353 | EA | 26,383.00 |
| P10033 | CF Variety Box #3354 | EA | 31,467.00 |
| P10034 | Chocolate Donut Box #3355 (SB) | EA | 20,250.00 |
| P10035 | Orange Donut Boxes #3356 | EA | 11,500.00 |
| P10036 | Apple Cider Boxes #3357 (SB) | EA | 15,484.00 |
| P10037 | GingerBREAD Donut Box #3359 | EA | 500.00 |
| P10040 | Cruller Tray #T-581 | EA | 22,100.00 |
| P10041 | Donut Trays #T-791 | EA | 11,403.00 |
| P10042 | Jelly Trays #8016 | EA | 6,600.00 |
| P10046 | Cruller Donut Film #3375 | LB | 486.00 |
| P10047 | 11" Donut Film #3380 | LB | 913.15 |
| P10048 | Clear Donut Film 12" | LB | 202.75 |
| P10049 | White Dinner Roll Bags #3401 | EA | 1,000.00 |

| | | | |
|---|---|---|---|
| I10002 | O.F. CHOC. CAKE MIX #2617 | LB | 7,500.00 |
| I10003 | B. MILK DONUT MIX #2614 | LB | 2,200.00 |
| I10004 | CRULLER DONUT MIX #2615 | LB | 17,200.00 |
| I10005 | SUGARLESS CAKE MIX #2613 | LB | 6,950.00 |
| I10006 | PUMPKIN PIE SPICE #D504 | LB | 80.00 |
| I10007 | CANNED PUMPKIN | LB | 2,176.00 |
| I10008 | UNSWEETENED APPLE SAUCE | LB | 1,424.50 |
| I10009 | LIQUID APPLE FLAVOR #L123 | LB | 50.50 |
| I10010 | APPLE PIE SPICE #D507 | LB | 106.75 |
| I10011 | FERMAID SUPER RELAX | LB | 738.44 |
| I10012 | WHITE DONUT SUGAR #2700 | LB | 4,753.24 |
| I10013 | YEAST R. DONUT MIX #2616 | LB | 3,850.00 |
| I10014 | CINN. DONUT SUGAR #2701 | LB | 4,438.33 |
| I10015 | 10X CONFECTION SUGAR | LB | 7,800.00 |
| I10016 | BAKERS SPECIAL SUGAR | LB | 2,500.46 |
| I10017 | RASPBERRY FILLING | LB | 4,485.00 |
| I10018 | BLUEBERRY FLAVOR | LB | 30.00 |
| I10021 | SUNSET GLAZE | LB | 11.30 |
| I10023 | ORANGE FLAVOR #L915 | LB | 12.50 |
| I10024 | PANETTONE SPICE #L393 | LB | 34.00 |
| I10025 | LEMON OIL #L440 | LB | 54.00 |
| I10026 | LIQUID MOLASSES #L912 | LB | 64.00 |
| I10027 | GINGERBREAD SPICE #D506 | LB | 61.00 |
| I10028 | LIQUID VANILLA #L741 | LB | 52.00 |
| I10029 | LIQUID CHOCOLATE #L188 | LB | 54.00 |
| I10031 | LIQUID MAPLE FLAVOR #L827 | LB | 73.00 |
| I10032 | HARD FAT FLAKES | LB | 1,700.00 |
| I10035 | LIQUID GINGER #L471 | LB | 22.50 |
| I10036 | LIQUID SUNSET ORANGE | LB | 34.50 |
| I10037 | FLUID FLEX CAKE SHORTENING | LB | 2,731.00 |
| I10038 | MAPLE SYRUP | LB | 2,028.50 |
| I10039 | SPICED CIDER CONCENTRATE | LB | 800.00 |
| I10040 | EGG WHITE SOLIDS | LB | 80.00 |
| I10041 | BRIOCHE FLAVORING #D966 | LB | 50.00 |
| I10042 | TRUE BUTTER EMULSION #L724 | LB | 63.00 |
| I10043 | BULK DONUT FRYING SHORTENING - EIE from May 2020 | LB | 30,870.43 |
| I10044 | CUBE FRYING SHORT. | LB | 22,100.00 |
| I10046 | F-5 STABILIZER #125521 | LB | 2,100.00 |
| I10047 | BULK UNBLEACHED WHITE FLOUR | LB | 88,218.22 |
| I10048 | WHITE RYE FLOUR | LB | 250.00 |
| I10049 | BAG WHITE FLOUR | LB | 11,300.00 |
| I10052 | POPPY SEEDS | LB | 70.00 |
| I10053 | CORN MEAL | LB | 1,000.00 |
| I10058 | ANNATTO, LIQUID | LB | 24.00 |
| I10059 | POTATO VERMONT #10 | LB | 1,780.60 |
| I10060 | NB CT-1 #137420 | LB | 4,642.45 |
| I10061 | ESL-3 #138871 | LB | 1,215.00 |
| I10062 | SOYBEAN OIL | LB | 1,589.01 |
| I10064 | VINEGAR, 200 GRAIN | LB | 200.00 |
| I10067 | CARAMEL COLOR | LB | 50.00 |
| I10069 | STARPLEX #137515 | LB | 160.00 |
| I10071 | DOUBLE STRENGTH RYE SOUR | LB | 1,401.15 |
| I10081 | ICE | LB | 3,960.00 |
| I10100 | RESTORE PLUS | LB | 70.00 |
| I10117 | YEAST/AMERICAN REDSTAR | LB | 7,180.19 |
| I10136 | Canola Oil - totes | LB | 2,100.00 |
| I10153 | BABY OATS (QUICK) | LB | 425.00 |
| I10178 | White Hulled SESAME SEEDS Green Farms #47138 | LB | 2,350.82 |
| I10179 | Ascorbic Acid Tabs - 30 ppm | TAB | 1,200.00 |
| I10180 | SALT | LB | 3,955.13 |
| I10181 | ACTI-FRESH GOLD ENZYME | LB | 1,819.64 |
| I10182 | WHOLE WHEAT FLOUR - BAG | LB | 990.70 |
| I10189 | #27150 – SAF Pro Relax 100 | LB | 35.00 |

| | | |
|---|---|---|
| Workstation | kkblt-3.vt-burlington.koffee-kup-bakery | 5CD010DQP2 |
| Workstation | kkblt-4.vt-burlington.koffee-kup-bakery | 5CD010DQQ7 |
| Workstation | kkblt-5.vt-burlington.koffee-kup-bakery | 5CD010DQG2 |
| Workstation | kkblt-6.vt-burlington.koffee-kup-bakery | 5CD010DQD2 |
| Workstation | kkblt-7.vt-burlington.koffee-kup-bakery | 5CD010DQQ5 |
| Workstation | kkblt-8.vt-burlington.koffee-kup-bakery | 5CD0109YWZ |
| Workstation | kkblt-9.vt-burlington.koffee-kup-bakery | 5CD010DQPQ |
| Workstation | kkb-maint01.vt-burlington.koffee-kup-bakery | MXL8141VZZ |
| Workstation | kkb-maint02.vt-burlington.koffee-kup-bakery | MXL8141VW9 |
| Workstation | kkb-maint03.vt-burlington.koffee-kup-bakery | 5CD9289KFB |
| Workstation | kkb-maint10.vt-burlington.koffee-kup-bakery | CND6452154 |
| Workstation | kkb-maintmgr.vt-burlington.koffee-kup-bakery | 5CG728078Q |
| Workstation | kkbmaint-spare.vt-burlington.koffee-kup-bakery | 2H5M142 |
| Workstation | kkb-maintsuper.vt-burlington.koffee-kup-bakery | MXL8141W25 |
| Workstation | kkborder-home2.vt-burlington.koffee-kup-bakery | CND44274CV |
| Workstation | kkb-orders02.vt-burlington.koffee-kup-bakery | MXL8141VY6 |
| Workstation | kkb-plantmanage.vt-burlington.koffee-kup-bakery | 5CD8293DMB |
| Workstation | kkb-prod1.vt-burlington.koffee-kup-bakery | 8CC6360CQM |
| Workstation | kkb-vpsales.vt-burlington.koffee-kup-bakery | 5CD8426VLH |
| Workstation | kkb-whsecoord01.vt-burlington.koffee-kup-bakery | MXL93226NK |
| Workstation | kkb-whsecoord02.vt-burlington.koffee-kup-bakery | MXL93226NQ |
| Workstation | lt-5cg752103f.vt-burlington.koffee-kup-bakery | 5CG752103F |
| Workstation | mx1l1w50-hp.vt-burlington.koffee-kup-bakery | MXL8141W50 |
| Workstation | user.vt-burlington.koffee-kup-bakery | D8N0CY35406134H |
| Workstation | 2ce4230t0z.vt-burlington.koffee-kup-bakery | 2CE4230T0Z |
| Workstation | 2ce4240d5w.vt-burlington.koffee-kup-bakery | 2CE4240D5W |
| Workstation | 2ua3321k74.vt-burlington.koffee-kup-bakery | 2UA3321K74 |
| Workstation | 2ua5032581.vt-burlington.koffee-kup-bakery | 2UA5032581 |
| Workstation | 5cg51620zk-pc.vt-burlington.koffee-kup-bakery | 5CG51620ZK |
| Workstation | 5cg516220x-hp.vt-burlington.koffee-kup-bakery | 5CG516220X |
| Workstation | 5cg5242tv2.vt-burlington.koffee-kup-bakery | 5CG5242TV2 |
| Workstation | 5cg5295391-hp.vt-burlington.koffee-kup-bakery | 5CG5295391 |
| Workstation | 5cg529539c-hp.vt-burlington.koffee-kup-bakery | 5CG529539C |
| Workstation | 5cg55332mt.vt-burlington.koffee-kup-bakery | 5CG55332MT |
| Workstation | 8cg4240sz3.vt-burlington.koffee-kup-bakery | 8CG4240SZ3 |
| Workstation | bvtplantmanager.vt-burlington.koffee-kup-bakery | 5CG70425WQ |
| Workstation | bvtpurchasing01.vt-burlington.koffee-kup-bakery | MXL71216SZ |
| Workstation | col-shipping01.vt-burlington.koffee-kup-bakery | 2UA7351YFR |
| Workstation | desktop-14ieh69.vt-burlington.koffee-kup-bakery | 2UA7282RSY |
| Workstation | desktop-17cdm49.vt-burlington.koffee-kup-bakery | |
| Workstation | desktop-5blv8di.vt-burlington.koffee-kup-bakery | 2UA7282RSP |
| Workstation | desktop-5l8l0ne.vt-burlington.koffee-kup-bakery | 2UA7282RSZ |
| Workstation | desktop-9243nes.vt-burlington.koffee-kup-bakery | 2UA7282RTY |
| Workstation | desktop-9irh7qv.vt-burlington.koffee-kup-bakery | |
| Workstation | desktop-dd7i7u5.vt-burlington.koffee-kup-bakery | 2UA7282RSJ |
| Workstation | desktop-ftjqrsb.vt-burlington.koffee-kup-bakery | |
| Workstation | desktop-k0je8st.vt-burlington.koffee-kup-bakery | 2UA7282RS5 |
| Workstation | desktop-ua2lnds.vt-burlington.koffee-kup-bakery | 5CD7295609 |
| Workstation | dianne-lt.vt-burlington.koffee-kup-bakery | 5CG6292H65 |
| Workstation | glensfallsales.vt-burlington.koffee-kup-bakery | 5CD7126DC1 |
| Workstation | hp-2ce3481m77.vt-burlington.koffee-kup-bakery | 2CE3481M77 |
| Workstation | hppro-controlle.vt-burlington.koffee-kup-bakery | 2CE3321G2D |
| Workstation | k1l01ut.vt-burlington.koffee-kup-bakery | 2UA516136Z |
| Workstation | kkb-brt-prod1.vt-burlington.koffee-kup-bakery | 2UA7122B5Z |
| Workstation | kkb-hr.vt-burlington.koffee-kup-bakery | 5CG704260X |
| Workstation | kkbhr-lt.vt-burlington.koffee-kup-bakery | 5CG6492RT6 |
| Workstation | KKB-SANITATION.vt-burlington.koffee-kup-bakery | 5CD7292DT7 |
| Workstation | lindatimman-hp.vt-burlington.koffee-kup-bakery | 5CG5300CHL |
| Workstation | maintenancelt-1.vt-burlington.koffee-kup-bakery | 5CD737BWX3 |
| Workstation | riv-reception.vt-burlington.koffee-kup-bakery | 2UA735210S |

| Ingredients | | Unit | Quantity |
|---|---|---|---|
| I10001 | VARIETY CAKE #2612 | LB | 39,550.00 |

Koffee Kup Bakery, Inc.
Tangible Personal Property
As of 3/20/21

| Computer Equipment | Description | Serial Number |
|---|---|---|
| Firewall | Koffee Kup Bakery / VT / Burlington / Riverside / Sophos XG-210 (50.220.28.110) | C23076P8FF2TGF7 |
| Firewall | KKB/VT/Rathe/Sophos SG210 | S220423B5A10CDA |
| Firewall | Koffee Kup Bakery / VT / Colchester / Warehouse / Sophos RED 15 (10.0.20.1) | A3501C710E3A3G1 |
| NAS | KKB-QNAP | Q177I176368 |
| Switch | Koffee Kup Bakery / VT / Colchester / Warehouse / Switch1 / HP 1920 - 24G | CN68GP411J |
| Switch | Koffee Kup Bakery / VT / Colchester / Warehouse / Switch2 / HP 1920 - 24G POE | CNG8GPG0JD |
| Switch | Koffee Kup Bakery / VT / Colchester / Offices / Switch2 / Aruba 2930 F | CN84HL104S |
| Switch | Koffee Kup Bakery / VT / Burlington / Riverside / Switch / Cisco SG300-52MP | PSZ170905A5 |
| Switch | Koffee Kup Bakery / VT / Burlington / Riverside / Switch / HP Aruba 2540 | CNGBJYL037 |
| Virtual Server | kkb2016dc01.vt-burlington.koffee-kup-bakery | /Mware-56 4d b5 ee 07 b9 ec Gd-5b 9a da f6 07 ef ee e8 |
| Virtual Server | kkb2016dc02.vt-burlington.koffee-kup-bakery | VMware-42 09 df 12 5e a7 a6 b5-c9 c5 d9 12 b9 f1 76 e8 |
| Virtual Server | kkb2016veeam.vt-burlington.koffee-kup-bakery | /Mware-42 09 f4 1a a6 21 4a 59-bd be 35 85 a4 8c 5a 85 |
| Virtual Server | kkbfs01.vt-burlington.koffee-kup-bakery | /Mware-42 09 01 e0 51 2b 10 24-5f 92 99 47 3e 1f 60 d4 |
| Virtual Server | kkbsql.vt-burlington.koffee-kup-bakery | 7409-9873-3385-1224-1781-5442-47 |
| Virtual Server | kkbapp.vt-burlington.koffee-kup-bakery | 0081-2182-5446-7876-3301-7820-98 |
| Virtual Server | kkbdc.vt-burlington.koffee-kup-bakery | 4428-5861-0446-4648-1365-5380-54 |
| Virtual Server | kkbhhapp.vt-burlington.koffee-kup-bakery | 5423-9688-5347-7185-5957-3048-71 |
| Virtual Server | kkbts.vt-burlington.koffee-kup-bakery | 7734-2676-7807-3622-3273-4032-85 |
| Virtual Server | kkbts01.vt-burlington.koffee-kup-bakery | 7058-3659-3487-6408-5358-1420-13 |
| Virtual Server | vermontsql.vt-burlington.koffee-kup-bakery | 6018-0304-7585-1197-9432-2543-97 |
| Virtual Server | vt-dc-d1950-01.vt-burlington.koffee-kup-bakery | 591G-1428-1121-0844-4781-3293-81 |
| Virtualization Host | KKB-Host4 | MXQ7280DQ6 |
| Virtualization Host | KKB-Host5 | MXQ7280DQ9 |
| VM | KKB-vCenter | |
| Workstation | 040132494953.vt-burlington.koffee-kup-bakery | 40132494953 |
| Workstation | 050494694953.vt-burlington.koffee-kup-bakery | 50494694953 |
| Workstation | 5cg52953bm-hp.vt-burlington.koffee-kup-bakery | 5CG52953BM |
| Workstation | 5cg7291vss.vt-burlington.koffee-kup-bakery | 5CG7291VSS |
| Workstation | 5cg7520zz8-a.vt-burlington.koffee-kup-bakery | 5CG7520ZZ8 |
| Workstation | 5cg752106n.vt-burlington.koffee-kup-bakery | 5CG752106N |
| Workstation | 5cg82032wb.vt-burlington.koffee-kup-bakery | 5CG82032WB |
| Workstation | 5cg82527bw.vt-burlington.koffee-kup-bakery | 5CG82527BW |
| Workstation | 5cg8295msn.vt-burlington.koffee-kup-bakery | 5CG8295MSN |
| Workstation | 5cg9525gh5.vt-burlington.koffee-kup-bakery | 5CG9525GH5 |
| Workstation | 5cg9525mzm.vt-burlington.koffee-kup-bakery | 5CG9525MZM |
| Workstation | 5cg9525nm4.vt-burlington.koffee-kup-bakery | 5CG9525NM4 |
| Workstation | barre_sales.vt-burlington.koffee-kup-bakery | 5CD6374V0Z |
| Workstation | ccarpentier.vt-burlington.koffee-kup-bakery | 5CD8426VJF |
| Workstation | desktop-8cg8152.vt-burlington.koffee-kup-bakery | 8CG8152CJV |
| Workstation | desktop-f26mkmp.vt-burlington.koffee-kup-bakery | 5CD8243VZG |
| Workstation | desktop-ftjqrsb.vt-burlington.koffee-kup-bakery | 2UA7282RSM |
| Workstation | desktop-rmf7q5t.vt-burlington.koffee-kup-bakery | 5CD81GGZMF |
| Workstation | desktop-v7u191j.vt-burlington.koffee-kup-bakery | 5CD7126DC0 |
| Workstation | elecdiagit.vt-burlington.koffee-kup-bakery | 2HBS6R1 |
| Workstation | kkb-ar.vt-burlington.koffee-kup-bakery | 8CG8152CK5 |
| Workstation | kkb-foodsafety.vt-burlington.koffee-kup-bakery | 5CD7034QZ8 |
| Workstation | kkb-hr-pt.vt-burlington.koffee-kup-bakery | 5CD6374V3F |
| Workstation | kkb-lt1.vt-burlington.koffee-kup-bakery | 5CD010DQQH |
| Workstation | kkblt-10.vt-burlington.koffee-kup-bakery | 5CD010DQ9H |
| Workstation | kkb-lt2.vt-burlington.koffee-kup-bakery | 5CD010DQLF |
| Workstation | kkb-lt20.vt-burlington.koffee-kup-bakery | 5CG9381PTR |
| Workstation | kkb-lt21.vt-burlington.koffee-kup-bakery | 5CG9381QG5 |
| Workstation | kkb-lt22.vt-burlington.koffee-kup-bakery | 5CG9381Q3N |
| Workstation | kkb-lt23.vt-burlington.koffee-kup-bakery | 5CG9381Q3K |
| Workstation | kkb-lt24.vt-burlington.koffee-kup-bakery | 5CG9381Q3H |
| Workstation | kkb-lt25.vt-burlington.koffee-kup-bakery | 5CD048HBKD |
| Workstation | kkb-lt26.vt-burlington.koffee-kup-bakery | 5CD048HBPD |
| Workstation | kkb-lt27.vt-burlington.koffee-kup-bakery | 5CD048HBK1 |

Kup Co, Inc.
Tangible Personal Property
As of 3/20/21


None

JA-462

**SCHEDULE 1.29**

**GROUP ASSETS**

1.  See attached.

JA-463

2:21-cv-00120-wks    Document 202-5    Filed 03/31/23    Page 48 of 136

## SCHEDULE 1.22

## EXISTING SUBORDINATED DEBT

| Subordinated Debt Holder | Borrower | Classification | Amount | Date | Pro Rata % |
|---|---|---|---|---|---|
| 9249-9557 Quebec Inc. | KKB | Note | $ 150,000.00 | 5/11/2018 | 1.048% |
| 9249-9557 Quebec Inc. | KKB | Note | $ 94,000.00 | 8/31/2018 | 0.657% |
| 9249-9557 Quebec Inc. | KKB | Note | $ 200,000.00 | 4/26/2018 | 1.397% |
| 9249-9557 Quebec Inc. | KKB | Note | $ 200,000.00 | 5/3/2018 | 1.397% |
| Socipar SAS | KKB | Note | $ 1,000,000.00 | 12/15/2017 | 6.986% |
| Socipar SAS | KKB | Note | $ 1,000,000.00 | 2/16/2018 | 6.986% |
| Socipar SAS | KKB | Note | $ 500,000.00 | 11/5/2018 | 3.493% |
| Socipar SAS | KKB | Note | $ 750,000.00 | 4/25/2018 | 5.240% |
| Socipar SAS | KKB | Note | $ 1,000,000.00 | 2/13/2018 | 6.986% |
| Socipar SAS | KKB | Advance | $ 853,886.00 | 12/31/2019 | 5.965% |
| Socipar SAS | KKB | Advance | $ 652,995.00 | 12/31/2020 | 4.562% |
| Socipar SAS | KKB | Advance | $ 103,627.00 | 3/26/2021 | 0.724% |
| Jose and Bertrand Aubery | KKB | Advance | $ 1,100,000.00 | 12/3/2019 | 7.685% |
| Hubert Aubery | KKB | Advance | $ 550,000.00 | 4/10/2019 | 3.842% |
| Bripan SARL | KKB | Advance | $ 3,266,114.00 | 12/31/2019 | 22.818% |
| Bripan SARL | KKB | Advance | $ 2,497,005.00 | 12/31/2020 | 17.444% |
| Bripan SARL | KKB | Advance | $ 396,373.00 | 3/26/2021 | 2.769% |
| **TOTAL:** | | | **$ 14,314,000.00** | | **100.000%** |

| Subordinated Debt Holder | Total Outstanding Loan Amount | Loan Allocation | Cash Payment Allocation | Seller Note Allocation |
|---|---|---|---|---|
| 9249-9557 Quebec Inc. | $ 644,000.00 | 4.499% | 22.340% | 22.340% |
| Socipar SAS | $ 5,860,508.00 | 40.942% | 15.940% | 15.940% |
| Bripan SARL | $ 6,159,492.00 | 43.031% | 61.720% | 61.720% |
| Jose and Bertrand Aubery | $ 1,100,000.00 | 7.685% | 0.000% | 0.000% |
| Hubert Aubery | $ 550,000.00 | 3.842% | 0.000% | 0.000% |
| **TOTAL:** | **$ 14,314,000.00** | **100.000%** | **100.000%** | **100.000%** |

4828-6760-9826.6

JA-464

DocuSign Envelope ID: B5F0E7E5-D928-4F99-A0C7-7B1A28BB4E21

SUBORDINATED DEBT HOLDERS:

Bripan S.a.r.l.

By:_____
     Hubert Aubery, President


Socipar S.a.s.

By:_____
     Hubert Aubery, President


9247-9557 Quebec, Inc.

By:_____
     Jean Gadoua, President


_____
     Hubert Aubery


_____
     Jose Aubery

DocuSigned by:

*Bertrand Aubery*
_____
BE8C390D4B76494...
     Bertrand Aubery


**[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]**

DocuSign Envelope ID: 01FFBB6D-74F0-4C05-AE2F-2DB7F740B580

**SUBORDINATED DEBT HOLDERS:**

Bripan S.a.r.l.

By:_____
    Hubert Aubery, President


Socipar S.a.s.

By:_____
    Hubert Aubery, President


9247-9557 Quebec, Inc.

By:_____
    Jean Gadoua, President


_____
    Hubert Aubery

_____
    Jose Aubery


_____
    Bertrand Aubery


[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

**SUBORDINATED DEBT HOLDERS:**

Bripan S.a.r.l.

By:_____
    Hubert Aubery, President


Socipar S.a.s.

By:_____
    Hubert Aubery, President


9247-9557 Quebec, Inc.

By:_____
    Jean Gadoua, President


_____
    Hubert Aubery


_____
    Jose Aubery


_____
    Bertrand Aubery


**[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]**

JA-467

DocuSign Envelope ID: 9458124F-206F-42F9-89B8-3F9558841226

SUBORDINATED DEBT HOLDERS:

Bripan S.a.r.l.

By: _____
Hubert Aubery, President

Socipar S.a.s.

By: _____
Hubert Aubery, President

9247-9557 Quebec, Inc.

By: _____
Jean Gadoua, President

_____
Hubert Aubery

_____
Jose Aubery

_____
Bertrand Aubery

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

JA-468

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the date first above appearing.

**PURCHASER:**

KK Bakery Investment Company, LLC


By:_____

Its _____


**COMPANY:**

Kup Co.

By:_____
    Hubert Aubery, President


**EXISTING SHAREHOLDERS:**

Bripan S.a.r.l.

By:_____
    Hubert Aubery, President


Socipar S.a.s.

By:_____
    Hubert Aubery, President


9247-9557 Quebec, Inc.

By:_____
    Jean Gadoua, President


**[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]**

DocuSign Envelope ID: 9458124F-206F-42F9-89B8-3F9558841226

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the date first above appearing.

PURCHASER:

KK Bakery Investment Company, LLC

By:_____

Its _____

COMPANY:

Kup Co.

By:_____
Hubert Aubery, President

EXISTING SHAREHOLDERS:

Bripan S.a.r.l.

By:_____
Hubert Aubery, President

Socipar S.a.s.

By:_____
Hubert Aubery, President

9247-9557 Quebec, Inc.

By:_____
Jean Gadoua, President

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the date first above appearing.

PURCHASER:

KK Bakery Investment Company, LLC

By:_____

L. M. LEVIE

Its___CHAIRMAN, MANAGING MEMBER___

COMPANY:

Kup Co.

By:_____
　　　Hubert Aubery, President

EXISTING SHAREHOLDERS:

Bripan S.a.r.l.

By:_____
　　　Hubert Aubery, President

Socipar S.a.s.

By:_____
　　　Hubert Aubery, President

9247-9557 Quebec, Inc.

By:_____
　　　Jean Gadoua, President

[SIGNATURE PAGE TO SECURITIES PURCHASE AGREEMENT]

Squid Ink Auto Printer #3
Horizontal Meter
Water Meter 505
Dough Pump
K-Head
Vacuum Pump
Rounder
Flour Sifter
Overhead Proofer
Griddle
Blower
Conveyor Infeed
Poly Bagger
Kwikloc Closer/Printer
Metal Detector
Pan Oiler
Air Compressor Spare 40 HP
Seeder
Propane Gas Storage Tank
Fans, in 10 locations
Silos
Air Compressor #2 10 HP
Steam Boiler
Hot Water Boiler
Oven Racks
Race Track Conveyor 500mm
Pan Return System
Box Machine
Label Machine
E.M. Cooling Conveyor
Water Chiller
Hyster Hand Pallet Jack (not electric)
Hyster Pallet Jack (Annex) W40XT
Slicer #3
Eye Wash Station
Scorer/Splitter
Dump Cart
Air Handler #1 (Shipping Area)
Scales
Kemper Mixer #3
Air Compressor #3 10 HP
VTB Divider
Ice Machine #1 Left
Ice Machine #2 Right
Yeast Cooler
E.M. Sprayer
Proof Box Humidity Chamber
Air Handler #2 (Wash Area)
Oven Rack #2
Winner Oven
Granola Mixer
Freezer
Little David Box Taper
Auto Pilot Carton Printer
Granola Scaling
Pan Carts
Spare Metal Detector
Generator
Pressure Washer
Hyster Pallet Jack (Bakery ) W50Z
Crown Pallet Jack #38 (Bakery) 40GPW-4-14
Liquid Dispenser
Walk High Lift (Bakery) W30XTR

Skyjack Scissors High Lift #1 19714
Skyjack Scissors High Lift #2 19715
Minuteman Floor Scrubber
Crown Hand Pallet Jack (not electric)
Ladders
Fast Belt
Parts Trailer
Shed
Sifter Bulk Flour System
Vac Lift
Hand Wash Sink Employee Entrance
Steam Cleaner
Camera
Little David Box Taper
Porta-Sifter
Windsor Saver Compact Floor Scrubber
Compactor - Trash
Compactor - Cardboard/Bags
Dry Ingredients Rack/Dollies
Hand Trucks (Dollies)
Sweet Muffin Set Up Table
Pan Storage Trailer
Floor Fans
Little David Tape Machine 501
Tape Machine Conveyor 501 Carton
Autopilot Carton Printer
Pallet Wrapper
Blue Giant Hand Jack West Brattleboro
Pup Trailer
Allis Chalmer Propane Forklift West Brattleboro
2008 Ford Bread Delivery Route Truck
Hand Taping Machine
Supersealer (newer)
Supersealer (older)
Hyster W40Z Pallet Jack
Hyster Pallet Jack N35ZR-14.5(AX)
Raymond Ride on Lift Truck
Band Saw
Sander
Bridgeport
Pedestal Grinder
Shop Tool Cabinets
Propane Fork Lift (yard)
Toyota Pallet Jack
Hand Wash Sink by Spiral Cooler
40 HP Compressor
3 Water Coolers (Dispensers)
Hot Water Storage Tank
Snowblower
Pallet Racking
Douglas Rack Washer
Utility Room Air Conditioner
Welders
Hose Reels
EM Table
VBC Auto Pilot Toush Screen #1
VBC Auto Pilot Toush Screen #2
VBC Auto Pilot Toush Screen #3
VBC Auto Pilot Toush Screen #4
VBC Auto Pilot Toush Screen #5
Centaur Plus Refrigerator
VBC Black Box Controller #1
VBC Black Box Controller #2

VBC Black Box Controller #3
VBC Black Box Controller #4
VBC Black Box Controller #5
VBC Black Box Controller #6
VBC Black Box Controller #7
VBC Black Box Controller #8
Kwik Lok Bag Closer #1
Kwik Lok Bag Closer #2
Kwik Lok Bag Closer #3
Kwik Lok Bag Closer #4
Kwik Lok Bag Closer #SL
Kwik Lok Bag Closer #1-EM-S
Squid Ink Turbo Printer 872 #EM
Squid Ink Auto Printer #SL
Squid Ink Turbo Printer 872 #SL
Hand Double Bagger
Air Compressor Dryer
Autopilot Solvent Printhead (3)
Equipment Trailer (Green Doors)
Portable Yeast Trailer
Z Board
Transpositor (Green) Cups
Sneed Meenjet MX1 Printer
Shop Vacs
26D Convertamatic Floor Scrubber
Bagger #1
Maintenance Shop Tools and Spare Parts

**Vehicles**

2013 Ford Fusion ..3646
2014 Hyundai Santa Fe ..7425
2014 Hyundai Santa Fe ..1430
2017 Nissan Rogue ..4484
2004 Honda Odyssey ..4445

**Office**

Misc Desks, File Cabinets, Chairs

JA-474

<u>SCHEDULE 2.3(a)</u>

<u>NEW SUBORDINATED DEBT</u>
<u>SUMMARY OF TERMS</u>

| | |
|---|---|
| Issuer: | Purchaser |
| Holder: | Subordinated Debt Holders, their affiliates, or assignees |
| Principal: | $2,000,000 |
| Security: | Upon approval by existing lenders, UCC-1 perfected lien on all assets of each Group Member, subordinated to the senior secured credit facilities. |
| Amortization: | Interest only for 18 months. 7 Years amortization thereafter, payable every 6 months. |
| Maturity: | 2 Years (note converts to cash) |
| Interest: | 30-day Libor (or appropriate surrogate) + 150 basis points; 2.50% cap; 2.00% floor. |
| Call option: | Upon 14-day notice, the Issuer shall have the right to call (i.e. prepay) the Secured Term Note at par. |
| Reporting Requirements: | Monthly unaudited reports and annual audited reports. |
| Transfer: | Issuer shall assist Subordinated Debt Holders to place the note with lenders, credit funds, and other institutions. |
| Remarketing: | Upon the election of the Subordinated Debt Holders, on a best efforts basis, the Issuer will endeavor to place this instrument with banks, regional development funds, Small Business Investment Corporations, credit funds, insurance companies, hedge funds, family offices, and other institutional investors. To facilitate this effort, the Issuer shall prepare and selectively distribute a confidential memorandum describing the Company's operational and financial condition, and the value of the collateral supporting the Secured Term Note. The Company shall also prepare and distribute a video tour of the Company. The Issuer will not charge for this placement service. |

JA-475

## SCHEDULE 2.3(b)

## COMPANY EXPENSES

1. G2 Capital Advisors LLC - $534,052.70

2. Burns & Levinson LLP - $105,000.00

JA-476

## SCHEDULE 3.1(a)

## CORPORATE ORGANIZATION

| GROUP MEMBER | JURISDICTION | AUTHORIZED SHARES | OUTSTANDING CAPITAL |
|---|---|---|---|
| Kup Co. | Delaware | 10,000 common | *See Schedule 3.2(a) |
| Koffee Kup Bakery, Inc. | Vermont | 2,000 voting common; 2,000 non-voting common | 297 voting shares held by Kup Co. (100% owner) |
| VBC, Inc. | Vermont | 5,000 common | 1,103 shares held by Koffee Kup Bakery, Inc. (100% owner) |
| Superior Bakery, Inc. | Delaware | 1,000 common | 100 shares held by Koffee Kup Bakery, Inc. (100% owner) |

JA-477

## SCHEDULE 3.2(a)

## CAPITALIZATION

### Capitalization immediately preceding the Closing:

Authorized Capital Stock:    10,000 shares of common stock, par value $0.001 per share.

Issued and Outstanding:

| Shareholder | Class of Stock | Number of Shares |
|---|---|---|
| Bripan S.a.r.l. | Common | 153 |
| Socipar S.a.s. | Common | 40 |
| 9249-9557 Quebec, Inc. | Common | 55 |

### Capitalization immediately after the Closing:

Authorized Capital Stock:    10,000 shares of common stock, par value $0.001 per share.

Issued and Outstanding:

| Shareholder | Class of Stock | Number of Shares |
|---|---|---|
| KK Bakery Investment Company, LLC | Common | 992 |
| Bripan S.a.r.l. | Common | 153 |
| Socipar S.a.s. | Common | 40 |
| 9249-9557 Quebec, Inc. | Common | 55 |

JA-478

## SCHEDULE 3.3

## GROUP ASSETS

None.

## SCHEDULE 3.4(a)

## EMPLOYEES

1. See Employee Handbook of Koffee Kup Bakery, Inc.

2. See Employee Handbook of VBC, Inc.

3. See Employee Handbook of Superior Bakery, Inc.

JA-480

## SCHEDULE 3.4(b)

### EMPLOYEE CONTRACTS

1.  Offer Letter, dated October 30, 2018, between KKBI and Jean-Francois Morin.

2.  Offer Letter, dated July 26, 2019, between KKBI and Benjamin Richard.

3.  Confidential Separation Agreement and Release of Claims, dated March 1, 2021, between KKBI and Joseph Melillo.

JA-481

## SCHEDULE 3.5

### COMPLIANCE WITH LEGAL REQUIREMENTS

**Permits**:

**Vermont Department of Health**
Koffee Kup Bakery – 436 Riverside Ave, Burlington
Koffee Kup Bakery – 784 Hercules Drive, Colchester
Vermont Bread – 80 Cotton Mill Hill, Brattleboro

**Brattleboro, VT General Business License**
Vermont Bread – Brattleboro Bakery

**State of Connecticut Department of Consumer Protection**
Koffee Kup Bakery, Inc.
Vermont Bread Company
Superior Bakery, Inc.

**New Jersey Department of Health**
Vermont Bread Company

Project Jam - Schedules to SPA (BL 3-30-21) 4828-6760-9826 v.6 - 236448

JA-482

## SCHEDULE 3.7

### LITIGATION; CLAIMS

1. The Company was recently informed that one of its drivers was in an automobile accident which resulted in injuries to the drive and the fatality of a third-party. The Company and its insurance carrier are in the process of collecting all relevant information. The Company believes its insurance coverage is sufficient to cover any applicable claims and expenses, without a deductible (the "Personal Injury Claim").

2. In October 2020, the Company received a complaint alleging an adverse property possession claim for one of four small parcels of land surrounding the Superior Bakery property in North Grosvenordale, CT. The neighbor has historically used a small portion of land to park their car and is now claiming adverse possession in connection with the sale of their house. The parcel in question is located on the property line and has never been used by the Company in its business or otherwise. The Company deems this immaterial but has retained legal counsel and is currently in negotiations to either sell the parcel in question or reach an agreement on an easement. The Company has offered to sell the parcel for $20,000 and the complainant has counter-offered to purchase for $13,000 (the "Adverse Possession Claim").

## SCHEDULE 3.8

## FINANCIAL STATEMENTS

1. See attached

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**

Consolidated Financial Statements
(With Independent Auditors' Report)

For the Fiscal Years Ended December 28, 2019 and December 29, 2018



CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jam
3/28/2021 9:58:16 PM EDT

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

TABLE OF CONTENTS

|  | Page(s) |
|---|---|
| Independent Auditors' Report | |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Consolidated Statements of Stockholders' Equity (Deficit) | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 - 18 |

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jam
3/28/2021 9:58:16 PM EDT

**McSOLEY McCOY** & CO.

Certified Public Accountants and Business Advisors

CELEBRATING
——30 YEARS——
*Established in 1990*

## INDEPENDENT AUDITORS' REPORT

To the Stockholders of
Koffee Kup Bakery, Inc. and Subsidiaries
Burlington, Vermont

We have audited the accompanying consolidated financial statements of Koffee Kup Bakery, Inc. and Subsidiaries (the "Company"), which comprise the consolidated balance sheets as of December 28, 2019 and December 29, 2018, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for the fiscal years then ended, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



**BDO**
ALLIANCE USA

118 TILLEY DRIVE, SUITE 202, SOUTH BURLINGTON, VERMONT 054·
PHONE 802.658.1808  FAX 802.658.1779  WEB WWW.CPAVT.COM

# McSOLEY McCOY & CO.

Certified Public Accountants and Business Advisors

## Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 28, 2019 and December 29, 2018, and the results of its operations and its cash flows for the fiscal years then ended in accordance with accounting principles generally accepted in the United States of America.

## Substantial Doubt about the Company's Ability to Continue as a Going Concern

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company's significant operating losses raise substantial doubt about its ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding those matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

*McSoley McCoy & Co.*

South Burlington, Vermont
April 8, 2020
Vermont Reg. No. 92-349

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jam
3/28/2021 9:58:16 PM EDT

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Consolidated Balance Sheets
December 28, 2019 and December 29, 2018

|  | 12/28/2019 | 12/29/2018 |
|---|---|---|
| **Assets:** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 322,496 | $ 627,999 |
| Accounts receivable, less allowance for doubtful accounts of $78,709 in 2019 and $341,158 in 2018 | 3,680,200 | 4,064,502 |
| Other receivables | 135,388 | 3,989 |
| Inventories | 1,606,866 | 1,855,752 |
| Interest rate swap at fair value | 19,481 | 115,927 |
| Income tax receivable | 86,151 | 68,640 |
| Prepaid expenses | 287,883 | 148,880 |
| Total current assets | 6,138,465 | 6,885,689 |
| Property, plant, and equipment, net | 8,920,680 | 10,017,224 |
| Deferred tax asset | - | 42,000 |
| Restricted cash | 201,372 | 201,174 |
| Deposits | 70,244 | 76,945 |
| Total assets | $ 15,330,761 | $ 17,223,032 |
| **Liabilities and stockholders' equity:** | | |
| **Current liabilities:** | | |
| Current portion of long-term debt | $ 4,451,813 | $ 4,900,682 |
| Current portion of notes payable - related party | 10,644,000 | 4,894,000 |
| Accounts payable and accrued liabilities | 6,479,189 | 5,253,554 |
| Income tax payable | 32,048 | - |
| Line of credit | 3,401,621 | 3,608,108 |
| Total current liabilities | 25,008,671 | 18,656,344 |
| **Stockholder's equity (deficit):** | | |
| Common stock, $100 par value. Authorized 200,000 shares, 765.5 issued, and 298.5 outstanding in 2019 and 2018, respectively | 76,550 | 76,550 |
| Contributed capital in excess of par | 1,722,172 | 1,722,172 |
| Accumulated other comprehensive income | 13,839 | 83,461 |
| Retained earnings (deficit) | (5,681,382) | 2,493,594 |
|  | (3,868,821) | 4,375,777 |
| Less: treasury stock, 467 shares in 2019 and 2018, respectively, at cost | (5,809,089) | (5,809,089) |
| Total stockholders' deficit | (9,677,910) | (1,433,312) |
| Total liabilities and stockholders' equity (deficit) | $ 15,330,761 | $ 17,223,032 |

See accompanying notes to the consolidated financial statements.

3

CONFIDENTIAL Downloaded by: Michael Andreasen Burns & Levinson LLP Project Jam 3/28/2021 9:58:16 PM EDT

JA-489

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Consolidated Statements of Operations
December 28, 2019 and December 29, 2018

|  | 12/28/2019 | 12/29/2018 |
|---|---|---|
| Net sales | $ 64,736,832 | $ 77,287,738 |
| **Direct costs:** | | |
| Raw materials | 14,650,642 | 17,065,642 |
| Packaging | 2,712,542 | 2,607,573 |
| Purchased product | 4,627,440 | 9,000,868 |
| Manufacturing salaries and benefits | 13,351,555 | 13,451,850 |
| Utilities | 1,649,451 | 1,835,650 |
| Sales commissions and benefits | 9,828,589 | 10,097,468 |
| Depreciation | 1,476,952 | 1,453,342 |
| Total direct costs | 48,297,171 | 55,512,393 |
| **Indirect costs:** | | |
| Transportation costs | 7,867,500 | 8,509,411 |
| Rent indirect | 1,442,838 | 1,506,486 |
| Vehicle maintenance and repairs | 274,527 | 233,180 |
| Diesel fuel | 1,038,703 | 1,277,663 |
| Maintenance and repairs, excluding salaries | 1,018,687 | 1,375,419 |
| Maintenance and sanitation salaries and benefits | 2,314,205 | 2,841,406 |
| Shipping salaries and benefits | 1,150,202 | 1,058,950 |
| Uniforms | 311,196 | 252,912 |
| Depreciation | 212,922 | 244,845 |
| Other indirect costs | 1,588,340 | 2,072,774 |
| Total indirect costs | 17,219,120 | 19,373,046 |
| Gross profit (loss) | (779,459) | 2,402,299 |
| General and administrative expenses | 6,042,722 | 7,245,112 |
| Operating loss | (6,822,181) | (4,842,813) |
| **Other expense** | | |
| Miscellaneous | 656,835 | 23,469 |
| Interest, net | 562,859 | 471,777 |
| Total other expense | 1,219,694 | 495,246 |
| Loss before income taxes | (8,041,875) | (5,338,059) |
| Income tax (benefit) | 133,101 | (693,256) |
| Net loss | (8,174,976) | (4,644,803) |
| **Other comprehensive income (loss):** | | |
| Unrealized gain (loss) on interest rate swap, net of tax | (69,622) | 12,028 |
| Total comprehensive loss | $ (8,244,598) | $ (4,632,775) |

See accompanying notes to the consolidated financial statements.
4

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jam
3/28/2021 9:58:16 PM EDT

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Consolidated Statements of Stockholders' Equity (Deficit)
December 28, 2019 and December 29, 2018

| | Common Stock Amount | Contributed Capital | Accumulated Other Comprehensive Income | Retained Earnings(Deficit) | Treasury Stock | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| Balance at December 30, 2017 | $ 76,550 | $ 1,722,172 | $ 71,433 | $ 7,138,397 | $ (5,559,089) | $ 3,449,463 |
| Purchase of common stock | - | | - | - | (250,000) | (250,000) |
| Other comprehensive income | - | | 12,028 | - | - | 12,028 |
| Net loss | - | | - | (4,644,803) | - | (4,644,803) |
| Balance at December 29, 2018 | $ 76,550 | $ 1,722,172 | $ 83,461 | $ 2,493,594 | $ (5,809,089) | $ (1,433,312) |
| Other comprehensive income | - | | (69,622) | - | - | (69,622) |
| Net loss | - | | - | (8,174,976) | - | (8,174,976) |
| Balance at December 28, 2019 | $ 76,550 | $ 1,722,172 | $ 13,839 | $ (5,681,382) | $ (5,809,089) | $ (9,677,910) |

See accompanying notes to the consolidated financial statements.

5

CONFIDENTIAL Downloaded by: Michael Andreasen Burns & Levinson LLP Project Jain 3/28/2021 9:58:46 PM EDT

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
December 28, 2019 and December 29, 2018

|  | 12/28/2019 | 12/29/2018 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (8,174,976) | $ (4,644,803) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 2,170,978 | 2,095,657 |
| Allowance for doubtful accounts | (262,449) | 188,290 |
| Deferred income taxes | 42,000 | (755,000) |
| (Increase) decrease in: | | |
| Accounts receivable | 646,751 | 354,279 |
| Other receivables | (131,399) | (3,180) |
| Inventories | 248,886 | 323,162 |
| Income taxes receivable | (17,511) | 1,740,348 |
| Fair value of interest rate swap at fair value | 26,824 | - |
| Prepaid expenses | (139,003) | 78,755 |
| Deposits | 6,701 | (17,477) |
| Increase (decrease) in: | | |
| Bank overdraft | - | (1,370,663) |
| Accounts payable and accrued liabilities | 1,225,635 | 608,808 |
| Income taxes payable | 32,048 | (12,428) |
| Net cash used in operating activities | (4,325,515) | (1,414,252) |
| Cash flows from investing activities: | | |
| Decrease in restricted cash | (198) | (199) |
| Proceeds on disposal of property and equipment | 12,199 | - |
| Purchase of property and equipment | (1,086,633) | (1,053,118) |
| Net cash used in investing activities | (1,074,632) | (1,053,317) |
| Cash flows from financing activities: | | |
| Proceeds from line of credit | - | 945,000 |
| Repayments on line of credit | (206,487) | (336,892) |
| Proceeds on related party debt | 5,750,000 | 4,394,000 |
| Principal payments on related party debt | - | (500,000) |
| Principal payments on long-term debt | (448,869) | (1,159,722) |
| Purchase of common stock | - | (250,000) |
| Net cash provided (used) by financing activities | 5,094,644 | (3,092,386) |
| Net increase (decrease) in cash and cash equivalents | (305,503) | 624,817 |
| Cash and cash equivalents, beginning of period | 627,999 | 3,182 |
| Cash and cash equivalents, end of period | $ 322,496 | $ 627,999 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the periods for: | | |
| Interest | $ 562,859 | $ 471,777 |
| Income tax | $ 49,740 | $ 28,248 |

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jam
3/28/2021 9:58:16 PM EDT

See accompanying notes to the consolidated
financial statements.
6

JA-492

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

## (1)   Nature of Business

Koffee Kup Bakery, Inc. (the "Company") is a Vermont corporation which manufactures and distributes bakery products throughout Vermont, Connecticut, New Hampshire, New York, New Jersey, Massachusetts, Maryland, and Pennsylvania. The Company sells bakery products predominantly under its own brand names (Koffee Kup, Vermont Bread, Matthews, Kasanoff, The Baker) and also packages product for other companies. The Company operates under a 52/53 week fiscal year generally consisting of thirteen 4-week periods.

The Company is subject to a number of risks associated with a manufacturing operation. Those risks include: uncertainty of market, competition from substitute offerings, product quality issues, maintaining adequate working capital, achieving profitable operations, and dependence on key individuals. During fiscal year 2019, the Company experienced a significant net operating loss before taxes totaling $8,041,875. To address these losses from operations, management developed a multi-pronged strategy which included restructuring of key manufacturing leadership and staff positions. During 2020, the Company will focus on increasing gross sales and gross margin and monitor budget to actual expenses to generate ir nprovedprofitability.

The Company is operating under a forbearance agreement with Key Bank which is set to expire in May 2020. See Note 5 for more information on this agreement.

While the accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern, the matters discussed above raise substantial doubt about its ability to continue as a going concern at December 28, 2019.

## (2)   Summary of Significant Accounting Policies

### (a)  Basis of Accounting

The consolidated financial statements are prepared on an accrual basis, which recognizes all revenue as earned, and costs of goods sold and operating expenses as incurred.

### (b)  Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries: VBC, Inc. (Vermont Bread Company) and Superior Bakery, Inc. All material intercompany accounts and transactions have been eliminated.

7

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Summary of Significant Accounting Policies (continued)**

*(c) Use of Estimates*

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could vary from the estimates that were used. Significant items subject to such estimates and assumptions include the useful lives of fixed assets, allowances for doubtful accounts and sales returns, the valuation of deferred tax assets, inventory, and other contingencies.

*(d) Cash and Cash Equivalents*

The Company considers amounts with maturity dates of less than 90 days to be cash equivalents. The Company uses financial institutions which it maintains cash balances, which at times may exceed federally insured limits. The Company has not experienced any losses in such accounts and management believes it is not exposed to any significant credit risk on cash.

*(e) Restricted Cash*

The Company has set aside amounts in restricted cash to meet specific collateral requirements on outstanding debt. See further discussion in Note 5.

*(f) Accounts Receivable*

Accounts receivable are stated at the amount management expects to collect from balances outstanding at the end of the period. Management believes the accounts receivable are fairly stated with a reserve for doubtful accounts of $78,709 and $341,158 as December 28, 2019 and December 29, 2018, respectively.

*(g) Revenue Recognition*

Net revenue consists primarily of sales of packaged food products. The Company recognizes revenue when the obligations under the terms of its agreements with customers have been satisfied. The Company's obligation is satisfied when control of the product is transferred to its customers along with the title, risk of loss and rewards of ownership. Depending on the arrangement with the customer, these criteria are met either at the time the product is shipped or when the product is received by such customer.

8

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Summary of Significant Accounting Policies (continued)**

Prior to 2019, the Company recognized revenue when persuasive evidence of an arrangement existed, product had shipped and the risks and rewards of ownership had transferred or services had been rendered, the price to the customer was fixed or determinable, and collectability was reasonably assured, which generally occurred at the time of product shipment. Effective December 30, 2018, the Company adopted ASU 2014-09, Revenue from Contracts with Customers (Topic 606) under the modified retrospective method. Under the modified retrospective method of adoption, prior periods are not restated and the new guidance is applied prospectively to revenue transactions completed on or after December 30, 2018. Given the nature of the Company's revenue transactions, the new guidance had an immaterial impact on the Company's operating revenue, results of operations and financial position for the fiscal year ended December 28, 2019. The Company updated its revenue recognition policy to reflect the requirements of the new guidance.

Under this new guidance, operating revenue is recognized at the time a good or service is transferred to a customer and the customer obtains control of that good or service performed. The Company's sales arrangements with customers are predominantly short-term in nature involving a single performance obligation related to the delivery of products and generally provide for transfer of control at the time of shipment.

*(h) Inventories*

Inventories are stated at the lower of cost or market. Cost is determined using the first-in, first-out (FIFO) method.

*(i) Property, Plant, Equipment and Depreciation*

Acquisitions of property and equipment in excess of $2,000 are capitalized. Depreciation and amortization are provided for amounts sufficient to relate the cost of depreciable assets to operations over their estimated service lives. Leasehold improvements are amortized over the lives of the respective leases of the service lives of the improvements, whichever is shorter. The straight-line method of depreciation is followed for substantially all assets for financial reporting purposes, but accelerated methods are used for tax purposes. The estimated useful lives of the assets range from two to thirty years.

Long-lived assets, such as property, plant and equipment are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In the event that facts and circumstances indicate that the cost of any long-lived assets may be impaired, an evaluation of the recoverability would be performed.

9

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Summary of Significant Accounting Policies (continued)**

*(j) Income Taxes*

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are determined for the future tax consequences attributable to differences between the carrying values of assets and liabilities for financial and tax reporting purposes. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities as a change in tax rates is recognized in income in the period that includes the enactment date.

The Company recognizes the effects of income tax positions only if those positions are more-likely-than-not of being sustained. Recognized income tax positions are measured at the largest amount that is greater than 50% likely of being realized. Changes in recognition or measurement are reflected in the period in which the change in judgment occurs. If necessary, the Company would accrue interest and penalties on uncertain tax positions as a component of the provision for income taxes. The Company did not record any unrecognized tax benefits as of December 28, 2019 and December 29, 2018. The Company is not subject to federal and state income tax examinations by tax authorities for years before 2016.

*(k) Advertising*

The Company expenses all advertising costs as they are incurred. Advertising costs charged to expense for the fiscal years ended December 28, 2019 and December 29, 2018 were $37,927 and $141,530, respectively.

*(l) Derivative Financial Instruments*

The Company recognizes all derivative instruments as either assets or liabilities in the accompanying consolidated balance sheets at their respective fair values. The Company records the derivative designated as a cash flow hedge under the simplified approach in accordance with ASU 2014-03 at its settlement value with changes in settlement values recorded in accumulated other comprehensive income until the hedged item affects earnings.

The fair market value of the hedge was $19,481 and $115,927 at December 28, 2019 and December 29, 2018 respectively, and is included in the accompanying consolidated balance sheets as interest rate swap.

*(m) Recently Issued Accounting Standards*

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*, which requires lessees to recognize leases on-balance sheet and disclose key information about leasing arrangements. The new standard establishes a right of use (ROU) model that requires a lessee to recognize a ROU asset and lease liability on the balance sheet for all leases with a term longer than 12 months. Leases will be classified as finance or operating, with classification affecting the pattern and classification of expense recognition in the income statement.

The new standard is effective for the Company on January 1, 2021, with early adoption permitted.

10

JA-496

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Summary of Significant Accounting Policies (continued)**

*(n) Subsequent Events*

The Company evaluated subsequent events through April 8, 2020, the date the Company's consolidated financial statements were available to be used.

**(3) Inventory**

Inventory consists of the following at:

|  | December 28, 2019 | December 29, 2018 |
|---|---|---|
| Raw materials | $ 971,512 | $ 1,006,485 |
| Packaging | 523,693 | 651,402 |
| Finished and purchased goods | 111,661 | 197,865 |
|  | 1,606,866 | $ 1,855,752 |

**(4) Property, Plant, and Equipment**

Property, plant, and equipment consist of the following at:

|  | December 28, 2019 | December 29, 2018 |
|---|---|---|
| Land | 499,530 | $ 499,530 |
| Buildings and leasehold improvements | 3,957,081 | 3,908,666 |
| Machinery and equipment | 16,513,326 | 15,619,550 |
| Office equipment | 2,664,063 | 2,535,785 |
| Vehicles | 1,823,915 | 1,855,096 |
| Distribution rights | 11,200 | 11,200 |
|  | 25,469,115 | 24,429,827 |
| Less accumulated depreciation and amortization | (16,548,435) | (14,412,603) |
|  | $ 8,920,680 | $ 10,017,224 |

Depreciation and amortization expense for the fiscal years ended December 28, 2019 and December 29, 2018 amounted to $2,170,978 and $2,095,657, respectively.

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jam
3/28/2021 8:58:16 PM EDT

11

JA-497

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

### (5) Long-Term Debt

Long-term debt consisted of the following at:

| | December 28, 2019 | December 29, 2018 |
|---|---|---|
| **Key Bank** | | |
| $6,900,000; Payable in monthly installments, including interest of LIBOR plus 1.50% (4.5% as of December 28, 2019. Loan is amortized over a 7-year period and matures on May 9, 2023. Collateralized by substantially all assets of the Company. (a) | $ 3,860,714 | $ 4,271,428 |
| **Vermont Economic Development Authority:** | | |
| Payable in monthly installments of $4,396, including interest at 2.00%, through January 2015, then the VEDA prime rate of 5%. Loan is amortized over a fifteen year period, with a seven year term due January 2020. Collateralized by land and buildings. | 449,586 | 464,932 |
| Payable in monthly installments of $4,359, including interest at 4.5%, through October 2021. Collateralized by substantially machinery and equipment. | 141,513 | 164,322 |
| **Socipar SAS - Related Party** | | |
| Principal balance and accrued interest due August 11, 2023. Interest accrues at 1.00%. | 1,000,000 | 1,000,000 |
| Principal balance due February 13, 2021. Interest accrues at 1.81%. | 1,000,000 | 1,000,000 |
| Principal balance due February 16, 2021. Interest accrues at 1.81%. | 1,000,000 | 1,000,000 |
| Principal balance due April 25, 2021. Interest accrues at 2.12%. | 750,000 | 750,000 |

CONFIDENTIAL
Downloaded from Michael A. Levinson LLP
(Project Jam)
3/28/2021 5:58:16 PM EDT

12

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Long-Term Debt (continued)**

|  | December 28, 2019 | December 29, 2018 |
|---|---|---|
| Socipar SAS - Related Party | | |
| Principal balance due November 5, 2021. Interest accrues at 2.70%. | 6,250,000 | 500,000 |
| Jean Gadoua - Related Party | | |
| Principal balance due April 20, 2021. Interest accrues at 2.12%. | 200,000 | 200,000 |
| Principal balance due May 3, 2021. Interest accrues at 2.18%. | 200,000 | 200,000 |
| Principal balance due May 11, 2021. Interest accrues at 2.18%. | 150,000 | 150,000 |
| Principal balance due May 11, 2021. Interest accrues at 2.42%. | 94,000 | 94,000 |
| Total - current portion of long-term debt | $ 15,095,813 | $ 9,794,682 |

(a) The Company is currently in default of their obligations under the Amended and Restated Loan and Security Agreement, and the First and Second Forbearance Agreements (the "Credit Agreement") with KeyBank (the "Lender"). A third Forbearance Agreement that will be in effect through May 31, 2020, dated May 19, 2019 has been received from KeyBank which provides the Company to come into compliance with the terms of the Credit Agreement. During the Forbearance Period, the interest rates on the revolver loan is LIBOR plus 2.75%, and on the term loan LIBOR plus 2.80%. Interest only shall be payable on the Term Note. During the Forbearance Period, the Lender will forbear from pursuing its remedies against continuing, existing defaults of the Credit Agreement and will suspend the Company's obligation to comply with the financial covenants of the Credit Agreement as amended by the Second Forbearance Agreement. The financial covenants of the Credit Agreement resume upon termination of the Third Forbearance Period, May 31, 2020. During the Forbearance period, interest only shall be payable on the VEDA loans, according with the waiver dated May 29, 2019. The Forbearance Agreement expires May 31, 2020, therefore, the long-term debt has been presented as a current liability at December 28, 2019.

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns Levinson LLP
SUED PROJECT Jan
@ 9:59:16 PM EDT

13

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Long-Term Debt (continued)**

In connection with the loans from VEDA, the Company is subject to various financial covenants. As of December 28, 2019, the Company did not meet all the covenants and has obtained a bank waiver.

The VEDA loans required the shareholders to set up a collateral account. This account is presented as restricted cash on the consolidated balance sheets.

**(6)  Line of Credit**

On May 9, 2016, the Company amended and restated the loan and security agreement agented by KeyBank which included a revolving facility line of credit of up to $4,000,000. Interest on the revolving loan is payable at a rate of LIBOR plus 2.75%. As of December 28, 2019, this rate was 4.3125%. As of December 28, 2019, there was $3,401,621 in borrowings on the line of credit and is reported as a current liability on the consolidated balance sheets. The revolving loan matures May 31, 2020.

**(7)  Interest Rate Swap**

The Company entered into an interest rate swap contract that effectively fixes the interest rate on the KeyBank $6,900,000 term loan at 1.19%. As of December 28, 2019, the interest rate on the swap was 4.5%. The notional amount under the swap decreases as principal payments are made on the note so that the notional amount equals the principal outstanding on the note. The swap is designed to hedge the risk of changes in interest payments on the note caused by changes in LIBOR.

The swap was issued at market terms so that it had no fair value at its inception. The carrying amount of the swap has been adjusted to its settlement value at the end of the year, which because of changes in forecasted levels of LIBOR resulted in reporting an asset as the fair value of the future net payments totaled less than the swap. The asset is classified as current consistent with the presentation of debt at December 28, 2019 and December 29, 2018. Since the critical terms of the swap and the note are the same, the swap is assumed to be completely effective as a hedge, and none of the change in its fair value is included in income. Accordingly, all of the adjustment of the swap's carrying amount is reported under comprehensive income. As of December 28, 2019 and December 29, 2018, the fair value of the interest rate swap was $19,481 and $115,927, respectively.

14

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

## (8)  Provision for Income Taxes

The income tax provision in the consolidated statements of operations is as follows as of:

|  | December 28, 2019 | December 29, 2018 |
|---|---|---|
| Federal Tax |  |  |
| Current | $  (41,783) | $  (41,783) |
| Deferred | 20,254 | (751,700) |
| Total federal tax | (21,529) | (793,483) |
|  |  |  |
| State Tax |  |  |
| Current | 148,060 | 103,527 |
| Deferred | 6,570 | (3,300) |
| Total state tax | 154,630 | 100,227 |
|  |  |  |
| Total income taxes (benefit) | $  133,101 | $  (693,256) |

Net deferred tax assets and liabilities include the following components as of:

|  | December 28, 2019 | December 29, 2018 |
|---|---|---|
| Deferred tax assets: |  |  |
| Accrued vacation | $  93,600 | $  141,000 |
| Section 163(j) interest limitation | 281,600 | 128,000 |
| Tax credit carryforwards | 363,800 | 246,600 |
| Net operating loss carryforward | 3,666,400 | 1,577,000 |
| Allowance for doubtful accounts | - | 67,000 |
|  |  |  |
| Total gross deferred tax assets | 4,405,400 | 2,159,600 |
| Less valuation allowance | (3,061,800) | (893,600) |
| Net deferred tax assets | 1,343,600 | 1,266,000 |
| Deferred tax liabilities: |  |  |
| Property, plant and equipment | (1,338,400) | (1,192,000) |
| Interest rate swap | (5,200) | (32,000) |
| Total gross deferred tax liabilities | (1,343,600) | (1,224,000) |
|  |  |  |
| Net deferred tax asset | $  - | $  42,000 |

CONFIDENTIAL
Downloaded by:
Michael Andreasen
Burns & Levinson LLP
Project Jan
3/28/2021 9:30:16 PM EDT

The valuation allowance for deferred tax assets as of December 28, 2019 and December 29, 2018 was $3,061,800 and $893,600, respectively. The valuation allowance at December 28, 2019 was primarily related to net operating loss carryforwards and tax credit carryforwards that, in the judgment of management, are not more likely-than-not to be realized.

15

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Provision for Income Taxes (continued)**

In assessing the realization of deferred tax assets, management considers whether it is more-likely-than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Based upon the level of historical taxable income and projections for future taxable income over the periods in which the deferred tax assets are deductible, management believes it is more-likely-than-not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowances at December 28, 2019. Included in the December 28, 2019 and December 29, 2018 deferred tax assets is a $0 and $42,000 refundable alternative minimum tax credit, respectively.

The Company has approximately $12.6 million in Federal tax loss carryovers of which $1.1 million expires in 2037. The remaining $11.5 million carryover has no expiration and is subject to a limitation on utilization based upon 80% of taxable income.

The Company has approximately $12.5 million in state tax loss carryovers which expire in years 2027-2038, with the majority expiring in years 2027-2029. State tax credits of $361,000 are also available which have various expiration dates starting in 2021.

The amount of net operating loss carryforward that may be utilized annually to offset future taxable income and tax liability may be limited if there is a change in stock ownership pursuant to Section 382 of the Internal Revenue Code.

The Tax Cuts and Jobs Act limits deductibility of interest expense resulting in $563,000 and $472,000 interest expense incurred during 2018 and 2019, respectively, being deferred indefinitely with no expiration period.

**(9)  Related Party Transactions**

The Company obtained additional notes of $5,750,000 from shareholders during fiscal year 2019. The notes accrue interest at rates between 1.81% and 2.70% and the accrued interest attributable to the related party notes was $233,976 and $163,663 at December 28, 2019 and December 29, 2018, respectively. The Company had $10,644,000 and $4,894,000 of notes payable due to related parties as of December 28, 2019 and December 29, 2018, respectively.

**(10)  Retirement Plan**

The Company sponsors a 401(k) plan that covers substantially all of the Company's employees. Under the plan, the employees may elect to have between 2% and 15% of salary contributed to the plan. The Company contributes a match of 50% of the first 6% that an employee contributes. Company contributions to the plan for the fiscal years ended December 28, 2019 and December 29, 2018 totaled $126,606 and $156,154, respectively.

16

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

### (11) Operating Lease Commitments

The Company is obligated under ninety-one non-cancelable operating leases for transportation equipment. In addition, the Company is obligated under several operating leases for depot sites in Vermont, Connecticut, New Hampshire, New York, New Jersey, Maryland, Massachusetts, and Pennsylvania.

Approximate annual minimum lease payments under non-cancelable operating leases as of December 28, 2019 are:

| | |
|---|---|
| 2020 | $  1,619,801 |
| 2021 | 1,446,446 |
| 2022 | 758,888 |
| 2023 | 519,808 |
| 2024 | 517,315 |
| Thereafter | 1,225,429 |
| | $  6,087,687 |

Under the terms of the leases, the Company must pay minimum lease payments as noted above plus a charge of 8.0 – 9.0 cents/mile for each mile driven. Rent expense including the mileage charge for all operating leases for the fiscal years ended December 28, 2019 and December 29, 2018 amounted to $2,923,074 and $3,004,556, respectively.

### (12) Commitments

The Company holds several contracts with vendors committing to buy a fixed quantity of commodities in the future at a set price. The terms of the contracts range from three to nine months. As of December 28, 2019, the total amount of future committed commodity purchases was $1,377,698.

Additionally, the Company has several employment contracts that guarantee a base salary plus commission based on certain performance conditions being met.

### (13) Litigation

From time to time, the Company is party to various lawsuits arising out of the normal course of business. In the opinion of management, based on advice from legal counsel, there are currently no lawsuits that will have a significant adverse impact on the Company's consolidated financial position as of December 28, 2019.

### (14) Subsequent Events

In March 2020, a worldwide pandemic was declared due to the spread of COVID-19. The ultimate impact of this event on the Company's operations and consolidated financial statements is unknown as of the date of the auditors' report.

17

JA-503

**KOFFEE KUP BAKERY, INC. AND SUBSIDIARIES**
Notes to Consolidated Financial Statements
For the Fiscal Years Ended December 28, 2019 and December 29, 2018

**Subsequent Events (continued)**

On March 27, 2020 President Trump signed into law the Coronavirus Aid, Relief, and Economic Security Act ("CARES ACT") which allows federal net operating losses arising in tax years beginning after December 31, 2017 to be carried back to the previous 5 years. The Company anticipates receiving approximately $752,000 cash refund resulting from carryback of its 2019 federal tax loss.



18

Project Jam - Total Company
2020 Income Statement



Currency    USD

| | This YTD |
|---|---|
| **REVENUE** | |
| Gross Sales | |
| Mfg-Bread / Rolls / EM | 67,581,358 |
| Mfg-Donut | 7,507,553 |
| Purchased-Interco | . |
| 1 Purchased-Other | 9,449,565 |
| 10 Total Gross Sales | 84,538,496 |
| | |
| Sales Deductions | |
| 2 Mfg-Bread / Rolls / EM | (9,677,619) |
| 2 Mfg-Donut | (935,022) |
| 2 Purchased-Interco | . |
| 2 Purchased-Other | (1,359,374) |
| 20 Total Sales Deductions | (11,972,015) |
| | |
| Delivered Net Sales | |
| 3 Mfg-Bread | 57,903,699 |
| 3 Mfg-Donut | 6,572,551 |
| 3 Purchased-Interco | . |
| 3 Purchased-Other | 8,090,190 |
| 30 Total NET Delivered SALES | 72,566,421 |
| | |
| 4 Plus Other Sales | 359 |
| 4 Less Discounts | (1,161,475) |
| 4 Less Interco Discount | (637,753) |
| 40 TOTAL Net Sales | 70,767,552 |
| | |
| **COST OF GOODS** | |
| Direct Costs | |
| 5 RM Bread / Rolls / EM | 15,078,078 |
| 5 RM Donut | 2,270,318 |
| 5 Inventory Shrink/Variances | 108,549 |
| 5 Purchased | 5,433,228 |
| 5 Interco Purchase Cost | 637,753 |
| 5 Delivery | 1,698,796 |
| 5 RM Rolls | 10,513,604 |
| 5 RM Sales | 10,843,125 |
| 5 Distribution Commissions | 3,015,821 |
| 5 Depreciation | 1,478,027 |
| 50 Total Direct Costs | 51,077,285 |
| | |
| Indirect Costs | |
| 6 Freight In/Out | 233,772 |
| 6 Transports | 6,293,481 |
| 6 Vehicle Leases | 1,870,437 |
| 6 Rent-Equipment | 88,665 |
| 6 Rent-Freezer | 115,842 |
| 6 Rent-Building | 1,299,921 |
| 6 Vehicle Repairs | 202,272 |
| 6 Vehicle Fuel | 774,071 |
| 6 M & R Machinery | 1,194,765 |
| 6 Leasing | 1,364,566 |
| 6 Pre Signature | 884,167 |
| 6 Benefits | 1,553,804 |
| 6 Operating Salaries | 68,755 |
| 6 Uniforms-Etc | 134,741 |
| 6 O/S Short Settlement | 16,969 |
| 6 T & E Expense-Indirect | 228,707 |
| 6 Other Indirect Expense | 902,438 |
| 6 Depreciation | 200,476 |
| 60 Total Indirect | 17,428,847 |
| | |
| 65 TOTAL Cost of Goods | 68,505,331 |
| | |
| 70 Gross Margin Contribution | 2,262,220 |
| | |
| G & A Expense | |
| 8 Personal | 2,566,918 |
| 8 40 IK Emply Cont & Admin Exp | 156,028 |
| 8 General & Other Insurance | 2,317,827 |
| 8 Employing EE & Testing | 5,963 |
| 8 Mortgage Exp - Interco & Kup | . |
| 8 Telephone | 185,341 |
| 8 Heat & Util-G&A | 233 |
| 8 Supplies & Postage | 26,506 |
| 8 Professional Fees | 165,640 |
| 8 A/R Payment Adj. | 4,142 |
| 8 Contributions | . |
| 8 Property Maintenance | 176,862 |
| 8 Property Taxes | 114,045 |
| 8 T & E Expense-Admin | 24,358 |
| 8 Advertising | 50,941 |
| 8 Computer Expenses | 546,280 |
| 8 Depreciation / Amort Expense | 529,461 |
| 8 Other G & A Expenses | 214,476 |
| 80 Total G&A | 7,194,673 |
| | |
| 85 Operating Income / (Loss) | (4,932,453) |
| | |
| 9 Interest Inc / (Exp) | 359 |
| 9 Interest Inc / (Exp)-Notes | (687,452) |
| 9 Other Inc / (Exp) | (875,505) |
| 90 Income / (Loss) before Taxes | (6,495,010) |
| 10 Provision for Inc Tax (Exp) | 752,659 |
| 100 Net Income / (Loss) | (5,742,351) |
| | |
| 110 EBITDA | (3,599,393) |
| | |
| ========================== | 0 |
| 110 Depreciation | 2,207,964 |
| 110 Interest | 687,053 |
| 110 Taxes | |
| ========================== | |

Project Jam - KKB
2020 Income Statement

Currency  USD

|  | This YTD |
|---|---|
| REVENUE | |
| Gross Sales | |
| 1 Mfg-Bread / Rolls / EM | 33,194,595 |
| 1 Mfg-Donut | 7,392,225 |
| 1 Purchased-Interco | |
| 1 Purchased-Other | 6,606,506 |
| 10 Total Gross Sales | 47,193,126 |
| | |
| Sales Deductions | |
| 2 Mfg-Bread / Rolls / EM | (4,038,308) |
| 2 Mfg-Donut | (912,257) |
| 2 Purchased-Interco | |
| 2 Purchased-Other | (784,247) |
| 20 Total Sales Deductions | (5,734,811) |
| | |
| Delivered Net Sales | |
| 3 Mfg-Bread | 29,156,077 |
| 3 Mfg-Donut | 6,479,972 |
| 3 Purchased-Interco | |
| 3 Purchased-Other | 5,822,860 |
| 30 Total NET Delivered SALES | 41,458,149 |
| | |
| 4 Plus: Other Sales | 555 |
| 4 Less: Discounts | (376,219) |
| 4 Less: Interco Discount | |
| 40 TOTAL Net Sales | 41,082,445 |
| | |
| COST OF GOODS | |
| Direct Costs | |
| 5 RM Bread / Rolls / EM | 3,554,864 |
| 5 RM Donut | 2,269,793 |
| 5 Inventory Shrink/Variances | 69,385 |
| 5 Purchases | 5,826,056 |
| 5 Intercos Purchase Cost | 289,462 |
| 6 Baking | 475,705 |
| 6 PR-Salary | 3,463,052 |
| 6 PR-Sales | 2,229,911 |
| 6 Distributor Commissions | 76,034 |
| 6 Depreciation | 466,492 |
| 50 Total Direct Costs | 27,925,674 |
| | |
| Indirect Costs | |
| 6 Freight In/Out | 75,470 |
| 6 Transports | 2,869,765 |
| 6 Vehicle Leases | 1,458,384 |
| 6 Rent-Equipment | 40,149 |
| 6 Rent-Freezer | 66 |
| 6 Rent-Building | 584,236 |
| 6 Vehicle Repairs | 161,659 |
| 6 Vehicle-Fuel | 585,322 |
| 6 M & R-Machinery/Bldg | 531,627 |
| 6 PR-Plant | 551,252 |
| 6 PR-Plant Mtg | 335,835 |
| 6 PR-Supplies | 882,844 |
| 6 Uniforms-Sales | 56,932 |
| 6 Uniforms-Plant | 46,519 |
| 6 Over/Short Settlement | 16,685 |
| 6 T & E Expense-Indirect | 89,005 |
| 6 Other Indirect Expense | 315,783 |
| 6 Depreciation | 133,897 |
| 60 Total Indirect | 8,783,029 |
| | |
| 65 TOTAL Cost of Goods | 31,356,793 |
| | |
| 70 Gross Margin Contribution | 9,725,747 |
| | |
| G & A Expense | |
| 8 PR-Admin | 2,397,629 |
| 8 401(k) Expense (Mfg & Admin Exp | 325,705 |
| 8 Benefits & Other Insurance | 1,899,827 |
| 8 Employers Liab-Health | 5,500 |
| 8 Bad Debt (write off) Exp - Interco & Kupco | (981,086) |
| 8 Telephone | 108,279 |
| 8 Taxes & Other ERA | 18 |
| 8 Supplies & Postage | 19,216 |
| 8 Professional Fees | 84,330 |
| 8 A/R Payment Adj. | 2,378 |
| 8 Contributions | |
| 8 Property Maintenance | 112,434 |
| 8 Property Taxes | 39,810 |
| 8 T & E Expense-Admin | 23,383 |
| 8 Advertising | 38,000 |
| 8 Computer Expenses | 432,618 |
| 8 Depreciation / Amort Expense | 469,041 |
| 8 Other G & A Expenses | 177,817 |
| 80 Total G&A | 4,451,033 |
| | |
| 85 Operating Income / (Loss) | 3,274,694 |
| | |
| 9 Interest Inc / (Exp) | 393 |
| 9 Interest Inc / (Exp)-Notes | (677,464) |
| 9 Other Inc / (Exp) | (335,557) |
| 95 Income / (Loss) before Taxes | 4,262,051 |
| 10 Provision for Inc Tax (Exp) | 752,659 |
| 100 Net Income / (Loss) | 4,554,710 |
| | |
| 110 EBITDA | 5,946,572 |
| | |
| =========================== | |
| 110 Depreciation | 1,069,435 |
| 110 Interest | 677,686 |
| 110 Taxes | (752,659) |
| =========================== | |

Project Jam - SBC
2020 Income Statement

Currency USD

|  | This YTD |
|---|---|
| REVENUE |  |
| Gross Sales |  |
| 1 Mfg-Bread / Rolls / EM | 1,509,675 |
| 1 Mfg-Donut |  |
| 1 Purchased-Interco |  |
| 1 Purchased-Other |  |
| 10 Total Gross Sales | 1,509,675 |
|  |  |
| Sales Deductions |  |
| 2 Mfg-Bread / Rolls / EM |  |
| 2 Mfg-Donut |  |
| 2 Purchased-Interco |  |
| 2 Purchased-Other |  |
| 20 Total Sales Deductions |  |
|  |  |
| Delivered Net Sales |  |
| 3 Mfg-Bread | 1,509,675 |
| 3 Mfg-Donut |  |
| 3 Purchased-Interco |  |
| 3 Purchased-Other |  |
| 30 Total NET Delivered SALES | 1,509,675 |
|  |  |
| 4 Plus: Other Sales |  |
| 4 Less: Discounts | (4,328) |
| 4 Less: Interco Discount | (637,753) |
| 40 TOTAL Net Sales | 867,593 |
|  |  |
| COST OF GOODS |  |
| Direct Costs |  |
| 5 RM Bread / Rolls / EM | 3,740,044 |
| 5 RM Donut |  |
| 5 Inventory Shrink/Variances | 34,820 |
| 5 Purchased |  |
| 5 Interco Purchase Cost |  |
| 5 Utilities | 597,831 |
| 5 PR-Bakery | 3,682,568 |
| 5 R-Sales | 241 |
| 5 Distributor Commissions | 2,580 |
| 5 Depreciation | 768,106 |
| 50 Total Direct Costs | 8,826,190 |
|  |  |
| Indirect Costs |  |
| 6 Freight In/Out | 31,373 |
| 6 Transports | 894,254 |
| 6 Vehicle Leases |  |
| 6 Rent-Equipment | 43,561 |
| 6 Rent-Freezer |  |
| 6 Rent-Building |  |
| 6 Vehicle Repairs |  |
| 6 Vehicle Fuel | 128 |
| 6 M & R Mach/Bldg | 386,231 |
| 6 PR-Maint | 450,961 |
| 6 PR-Sanitation | 251,105 |
| 6 PR-Shipping | 342,404 |
| 6 Uniform Sales |  |
| 6 Uniform-Mfg | 46,568 |
| 6 Over/Short Settlement |  |
| 6 T & E Expense-Indirect | 18,623 |
| 6 Other Indirect Expense | 187,288 |
| 6 Depreciation | 2,583 |
| 60 Total Indirect | 2,655,078 |
|  |  |
| 65 TOTAL Cost of Goods | 11,481,268 |
|  |  |
| 70 Gross Margin Contribution | (10,613,675) |
|  |  |
| G & A Expense |  |
| 8 PR-Admin | 47,799 |
| 8 401k Emply Cost & Admin Exp | 14,441 |
| 8 General & Other Insurance | 305,500 |
| 8 Employee Educ Training | 400 |
| 8 Management Fees - Interco & Kuf | 403,552 |
| 8 Telephones | 17,292 |
| 8 Heat & Other G&A |  |
| 8 Supplies & Postage | 994 |
| 8 Professional Fees | 29,310 |
| 8 A/R Payment Adj. | 5 |
| 8 Contributions |  |
| 8 Property Maintenance | 33,913 |

| | | |
|---|---|---|
| 8 Property Taxes | | 31,200 |
| 8 T & E Expense-Admin | | 970 |
| 8 Advertising | | |
| 8 Computer Expenses | | 63,313 |
| 8 Depreciation / Amort Expense | | 54,370 |
| 8 Other G & A Expenses | | 12,988 |
| 80 Total G & A | | 1,016,047 |
| 85 Operating Income / (Loss) | | (11,629,722) |
| 9 (Interest Income/(Exp) | | |
| 9 Interest Inc / (Exp)-Notes | | (3,565) |
| 9 Other Inc / (Exp) | | (362,012) |
| 90 Income / (Loss) before Taxes | | (11,995,299) |
| 10 Provision for Inc Tax (Exp) | | |
| 100 Net Income / (Loss) | | (11,995,299) |
| 110 EBITDA | | (11,166,675) |
| ========================= | | |
| 110 Depreciation | | 825,059 |
| 110 Interest | | 3,565 |
| 110 Taxes | | |
| ========================= | | |

Project Jam - VBC
2020 Income Statement

Currency USD

|  | This YTD |
|---|---|
| REVENUE |  |
| Gross Sales |  |
| 1 Mfg-Bread/Rolls / EM | 32,877,259 |
| 1 Mfg-Donut | 115,324 |
| 1 Purchased-Interco |  |
| 1 Purchased-Other | 2,843,058 |
| 10 Total Gross Sales | 35,835,641 |
|  |  |
| Sales Deductions |  |
| 2 Mfg-Bread / Rolls / EM | (5,639,311) |
| 2 Mfg-Donut | (22,765) |
| 2 Purchased-Interco |  |
| 2 Purchased-Other | (575,127) |
| 20 Total Sales Deductions | (6,237,204) |
|  |  |
| Delivered Net Sales |  |
| 3 Mfg-Bread | 27,237,947 |
| 3 Mfg-Donut | 92,559 |
| 3 Purchased-Interco |  |
| 3 Purchased-Other | 2,267,931 |
| 30 Total NET Delivered SALES | 29,598,437 |
|  |  |
| Plus: Other Sales |  |
| 4 Less Discounts | (780,928) |
| 4 Less Interco Discount |  |
| 40 TOTAL Net Sales | 28,817,509 |
|  |  |
| COST OF GOODS |  |
| Direct Costs |  |
| 5 RM Bread / Rolls / EM | 7,983,170 |
| 5 RM Donut | 525 |
| 5 Inventory Shrink/Variances | 4,335 |
| 5 Purchased | 1,504,372 |
| 5 Interco Purchase Cost | 348,271 |
| 6 Utilities | 625,255 |
| 6 Packaging | 3,367,979 |
| 6 Salaries | 2,612,903 |
| 6 Distributor Commissions | 2,937,187 |
| 6 Depreciation | 243,425 |
| 50 Total Direct Costs | 19,627,421 |
|  |  |
| Indirect Costs |  |
| 6 Freight In/Out | 126,929 |
| 6 Transports | 2,529,459 |
| 6 Vehicle Leases | 412,253 |
| 6 Rent-Equipment | 5,155 |
| 6 Rent-Freezer | 115,776 |
| 6 Rent-Building | 715,684 |
| 6 Vehicle Repairs | 40,619 |
| 6 Vehicle Fuel | 184,620 |
| 6 M & R Mach/Bldg | 276,907 |
| 6 PR-Maint | 362,353 |
| 6 PR-Sanitation | 297,227 |
| 6 PR-Shipping | 328,556 |
| 6 Uniforms-Sales | 12,023 |
| 6 Uniforms-Mfg | 41,658 |
| 6 Over/Short Settlement | 6,280 |
| 6 T & E Expense-Indirect | 121,079 |
| 6 Other Indirect Expense | 399,366 |
| 6 Depreciation | 63,996 |
| 60 Total Indirect | 6,039,940 |
|  |  |
| 65 TOTAL Cost of Goods | 25,667,360 |
|  |  |
| 70 Gross Margin Contribution | 3,150,149 |
|  |  |
| G & A Expense |  |
| 8 PR-Admin | 121,490 |
| 8 401K Employer Cont & Admin Exp | 16,732 |
| 8 General & Other-Insurance | 682,500 |
| 8 Employee EE & Training | 63 |
| 8 Management Fees-Interco & Kui | 577,514 |
| 8 Telephone | 58,422 |
| 8 Rent & Utils-G&A | 46 |
| 8 Supplies & Postage | 10,276 |
| 8 Professional Fees | 52,000 |
| 8 A/R Payment Adj. | 1,767 |

| | |
|---|---|
| 8 Contributions | |
| 8 Property Maintenance | 30,515 |
| 8 Property Taxes | 43,036 |
| 8 T & E Expense-Admin | |
| 8 Advertising | 12,941 |
| 8 Computer Expenses | 90,349 |
| 8 Depreciation / Amort Expense | 6,050 |
| 8 Other G & A Expenses | 23,872 |
| 80 Total G&A | 1,727,573 |
| 85 Operating Income / (Loss) | 1,422,575 |
| 9 Interest Inc/ (Exp) | |
| 90 Interest Inc / (Exp)-Notes | (6,402) |
| 9 Other Inc/ (Exp) | (117,936) |
| 90 Income / (Loss) before Taxes | 1,298,238 |
| 10 Provision for Inc Tax (Exp) | |
| 100 Net Income / (Loss) | 1,298,238 |
| | |
| 110 EBITDA | 1,618,110 |
| | |
| ========================= | |
| 110 Depreciation | 313,470 |
| 110 Interest | 6,402 |
| 110 Taxes | |
| ========================= | |

Consolidated Balance Sheet
Kuffee_Kup_Inc

Kuffee Kup Bakery and Subsidiaries
Consolidated Balance Sheets
P1-P13 2020

| | 12/23/19 1/25/20 P1-20 | 2/23/20 3/22/20 P3-20 | 3/22/20 4/18/20 P4-20 | 5/17/20 6/13/20 P6-20 | 6/14/20 7/11/20 P7-20 | 7/12/20 8/12/20 | 9/6/20 10/3/20 P10-20 | 10/4/20 10/31/20 P11-20 | 11/24/20 12/20/20 P13-20 |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| 11000 Cash | 236,283.49 | 925,220.23 | 574,729.50 | 3,486,327.64 | 1,658,605.74 | 374,356.24 | 592,731.24 | 560,243.37 | 330,177.29 |
| 12000 Trade Receivables | 5,116,727.03 | 6,486,266.69 | 7,363,489.76 | 6,899,111.74 | 7,678,828.63 | 6,532,058.67 | 6,423,031.90 | 5,898,033.72 | 6,330,037.91 |
| 12020 Less Reserves | (69,422.58) | (76,297.58) | (106,424.31) | (136,266.95) | (161,766.95) | (149,352.05) | (148,961.50) | (97,723.34) | (113,192.05) |
| 12050 Net Trade Receivables | 5,117,305.05 | 6,409,969.11 | 7,257,065.45 | 6,762,844.79 | 7,517,061.68 | 6,383,506.62 | 6,274,060.40 | 5,800,970.38 | 6,226,845.06 |
| 12199 Misc Receivables | (284,656.19) | (342,078.45) | (467,352.94) | (5,952.43 | 50,913.71 | 200,384.94 | 142,377.59 | 126,082.93 | 317,812.26 |
| 12990 Interco Receivables | | | | | | | | | |
| 12999 Total Receivables | 4,832,648.86 | 6,067,890.66 | 6,788,712.51 | 6,574,145.43 | 7,567,975.39 | 6,583,891.56 | 6,416,437.99 | 5,927,053.37 | 6,547,657.32 |
| 13999 Inventory | 1,784,897.55 | 1,851,379.83 | 2,171,256.38 | 2,272,605.75 | 2,298,830.71 | 2,006,332.18 | 2,930,616.51 | 2,907,943.11 | 2,211,865.63 |
| 14999 Prepaid Expense | 1,433,356.74 | 1,759,356.68 | 2,030,684.06 | 2,714,851.82 | 3,459,997.11 | 3,473,359.55 | 3,142,370.88 | 3,013,452.73 | 1,956,358.61 |
| 1 Total Current Assets | 8,257,186.64 | 10,603,847.40 | 13,566,392.39 | 15,126,177.34 | 14,325,158.55 | 13,837,939.63 | 13,132,156.62 | 13,003,846.18 | 11,081,058.35 |
| **Fixed Assets** | | | | | | | | | |
| 15100 Land | 499,530.00 | 499,530.00 | 499,530.00 | 499,530.00 | 499,530.00 | 499,530.00 | 499,530.00 | 499,530.00 | 499,530.00 |
| 15110 Buildings | 2,749,844.46 | 2,758,328.00 | 2,758,328.00 | 3,758,328.00 | 2,758,328.00 | 2,758,328.00 | 2,758,328.00 | 2,766,928.00 | 2,768,928.00 |
| 15220 Bldg & Land Improvements | 949,608.47 | 1,065,028.47 | 1,065,028.47 | 1,065,028.47 | 1,065,028.47 | 1,065,028.47 | 1,065,028.47 | 1,065,028.47 | 1,065,028.47 |
| 15410 Leasehold Improvements | 257,627.58 | 264,347.58 | 264,347.58 | 264,347.58 | 264,347.58 | 329,337.58 | 329,337.58 | 329,337.58 | 329,337.58 |
| 15560 Machinery & Equipment | 15,117,378.13 | 15,331,708.48 | 15,466,834.04 | 15,846,906.82 | 15,741,598.53 | 16,015,550.55 | 16,227,952.05 | 16,251,181.14 | 16,321,148.09 |
| 15570 Delivery Mixer | 234,876.79 | 234,876.79 | 234,876.79 | 234,876.79 | 234,876.79 | 234,876.79 | 234,876.79 | 234,876.79 | 234,876.79 |
| 15700 Auto Delivery Equipment | 3,381,920.35 | 1,310,920.35 | 1,317,177.85 | 1,365,066.95 | 1,365,066.95 | 1,365,066.95 | 1,305,066.95 | 1,365,066.95 | 1,365,066.95 |
| 15170 Vehicle | 1,823,915.15 | 1,823,915.15 | 1,823,915.15 | 1,823,915.15 | 1,823,915.15 | 1,823,915.15 | 1,823,915.15 | 1,843,398.32 | 1,643,398.32 |
| 15100 Office Equipment | 2,664,063.48 | 2,670,498.48 | 2,600,385.98 | 2,711,938.48 | 2,722,277.73 | 2,727,615.10 | 2,734,737.60 | 2,769,228.94 | 2,793,242.12 |
| 15210 Intangible Assets | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 | 11,200.00 |
| 15999 Total Fixed Assets | 25,609,961.61 | 25,970,353.30 | 26,121,633.66 | 26,391,138.24 | 26,486,159.20 | 26,676,338.30 | 27,049,082.59 | 27,143,786.49 | 27,231,757.12 |
| 16999 Total Accumulated Depreciation | (16,712,209.76) | (17,044,621.06) | (17,214,457.38) | (17,560,859.26) | (17,731,793.61) | (18,064,748.47) | (18,235,959.73) | (18,583,000.46) | (18,756,400.26) |
| 2 Total Net Fixed Assets | 8,897,751.85 | 8,925,732.24 | 8,907,176.28 | 8,820,278.98 | 8,754,365.59 | 8,778,632.20 | 8,815,122.86 | 8,754,725.23 | 8,475,356.86 |
| 19239 Other Assets | 89,725.28 | 89,725.28 | 89,725.28 | 89,725.28 | 89,725.28 | 89,725.28 | 90,573.28 | 90,573.28 | 107,421.28 |
| 9 Total Assets | 17,274,663.77 | 19,619,304.92 | 20,563,293.95 | 24,036,181.60 | 23,169,249.45 | 23,328,411.07 | 22,692,971.03 | 22,035,852.76 | 19,663,836.99 |
| **Liabilities** | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | |
| 21199 Accounts Payable | 5,507,971.33 | 6,869,525.51 | 6,090,918.92 | 5,515,697.26 | 4,993,710.06 | 5,515,344.45 | 5,037,013.86 | 5,292,011.08 | 5,785,590.10 |
| 21190 Accrued Liabilities | 186,603.67 | 515,742.09 | 457,838.23 | 448,152.20 | 365,020.92 | 296,300.00 | 249,983.90 | 377,472.05 | 326,239.98 |
| 10000 Other Current Liabilities | 1,028,298.89 | 967,575.50 | 974,187.44 | 821,786.27 | 980,769.82 | 591,717.73 | 939,424.64 | 982,520.20 | 889,293.67 |
| 11 Total Accounts & Payables | 6,722,933.57 | 1,342,883.18 | 7,522,944.59 | 975,721.23 | 6,339,500.80 | 319,188.45 | 6,226,422.40 | 638,512.46 | 7,001,123.75 |
| 24010 Current Portion NP-Banks | 657,142.89 | 821,428.60 | 963,571.45 | 985,714.32 | 985,714.32 | 985,714.32 | 985,714.32 | 985,714.32 | 985,714.32 |
| 24141 Current Portion NP-VEDA | 61,516.28 | 76,245.95 | 84,008.69 | 133,839.03 | 135,012.26 | 139,246.66 | 139,729.66 | 139,476.90 | 512,047.82 |
| 12 Total Current Liabilities | 7,441,592.68 | 8,240,557.65 | 8,518,524.94 | 8,095,274.58 | 7,460,227.38 | 7,964,250.24 | 7,351,866.38 | 7,777,692.76 | 8,498,885.89 |
| 12 Note Payable LT-Banks | 6,905,192.40 | 6,440,906.69 | 6,957,142.72 | 13,141,715.12 | 13,141,715.12 | 11,741,715.12 | 10,977,429.40 | 10,977,429.40 | 10,813,143.68 |
| 12 Notes Payable LT-VEDA | 528,582.87 | 514,053.20 | 507,090.26 | 449,284.80 | 436,807.00 | 410,228.74 | 398,305.96 | 385,079.56 | |
| 12 Notes Payable LT-Shareholders | 11,594,300.64 | 14,188,655.89 | 14,212,639.97 | 14,200,608.13 | 14,284,592.21 | 14,332,503.37 | 14,356,544.45 | 14,380,528.53 | 14,428,496.69 |
| 25100 Deferred Taxes | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 | 1,343,576.00 |
| 19 Total Liabilities | 27,514,250.78 | 30,728,549.42 | 31,530,973.89 | 35,290,459.63 | 34,656,977.71 | 35,110,187.61 | 34,427,802.19 | 34,874,276.21 | 34,757,001.46 |
| **Stockholders Equity** | | | | | | | | | |
| 31110 Contributed Capital Excess Par | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 | 1,722,172.22 |
| 31210 Common Stock | 76,550.00 | 76,550.00 | 76,550.00 | 76,550.00 | 76,550.00 | 76,550.00 | 76,550.00 | 76,550.00 | 76,550.00 |
| 31220 Treasury Stock | (5,809,089.00) | (5,809,089.00) | (5,809,089.00) | (5,809,089.00) | (5,809,089.00) | (5,809,089.00) | (5,809,089.00) | (5,809,089.00) | (5,009,089.00) |
| 31230 Withdrawals | (804,329.00) | (804,329.00) | (804,329.00) | (804,329.00) | (804,329.00) | (804,329.00) | (804,329.00) | (804,329.00) | (804,329.00) |
| 31240 Paid in Capital | 13,839.00 | 13,839.00 | 13,839.00 | 13,839.00 | 13,839.00 | 13,839.00 | 13,839.00 | 13,839.00 | 13,839.00 |
| 34000 Other Adjustments | | | | | | | | | |
| 35000 Total Retained Earnings | (4,877,057.18) | (6,877,057.18) | (4,877,057.18) | (4,877,057.18) | (4,877,057.18) | (4,877,057.18) | (4,877,057.18) | (4,877,057.18) | (4,877,057.18) |
| Current Net Income / (Loss) | (561,673.04) | (1,431,330.54) | (1,269,765.98) | (3,576,303.07) | (1,819,814.30) | (2,714,035.47) | (2,714,035.47) | (3,802,479.50) | (5,742,351.31) |
| 33 Total Equity | (18,239,587.01) | (11,109,244.50) | (10,367,679.94) | (11,254,277.03) | (11,497,728.26) | (12,391,949.43) | (12,391,949.43) | (13,045,191.51) | (15,420,265.27) |
| 43 Total Liabilities & Equity | 17,274,663.77 | 19,619,304.92 | 20,563,293.95 | 24,036,181.60 | 23,169,249.45 | 23,212,411.07 | 22,692,971.03 | 21,829,344.48 | 19,663,836.99 |
| Balance Sheet Recon | | | | | | | | | |

Consolidated Balance Sheet
Koffee_Kup_Inc

## SCHEDULE 3.9

## TAX MATTERS

None.

## SCHEDULE 3.10

## EMPLOYEE BENEFIT PLANS

1. 401(k) Retirement Savings Plan

2. Cigna Dental

3. Cigna Vision

4. Cigna Medical

5. Cigna HRA Plan

6. Cigna Basic Life/AD&D

7. Cigna Voluntary Life/AD&D

8. Cigna Short Term Disability

9. Cigna Long Term Disability

10. Flexible Spending Account

11. Sick Pay

12. Vacation Pay

13. Holiday Pay

14. Bereavement Leave

15. Family Medical Leave

JA-515

## SCHEDULE 3.12

## INDEBTEDNESS TO AND FROM OFFICERS, DIRECTORS AND STOCKHOLDERS

| Subordinated Debt Holder | Borrower | Classification | Amount | Date | Pro Rata % |
|---|---|---|---|---|---|
| 9249-9557 Quebec Inc. | KKB | Note | $ 150,000.00 | 5/11/2018 | 1.048% |
| 9249-9557 Quebec Inc. | KKB | Note | $ 94,000.00 | 8/31/2018 | 0.657% |
| 9249-9557 Quebec Inc. | KKB | Note | $ 200,000.00 | 4/26/2018 | 1.397% |
| 9249-9557 Quebec Inc. | KKB | Note | $ 200,000.00 | 5/3/2018 | 1.397% |
| Socipar SAS | KKB | Note | $ 1,000,000.00 | 12/15/2017 | 6.986% |
| Socipar SAS | KKB | Note | $ 1,000,000.00 | 2/16/2018 | 6.986% |
| Socipar SAS | KKB | Note | $ 500,000.00 | 11/5/2018 | 3.493% |
| Socipar SAS | KKB | Note | $ 750,000.00 | 4/25/2018 | 5.240% |
| Socipar SAS | KKB | Note | $ 1,000,000.00 | 2/13/2018 | 6.986% |
| Socipar SAS | KKB | Advance | $ 853,886.00 | 12/31/2019 | 5.965% |
| Socipar SAS | KKB | Advance | $ 652,995.00 | 12/31/2020 | 4.562% |
| Socipar SAS | KKB | Advance | $ 103,627.00 | 3/26/2021 | 0.724% |
| Jose and Bertrand Aubery | KKB | Advance | $ 1,100,000.00 | 12/3/2019 | 7.685% |
| Hubert Aubery | KKB | Advance | $ 550,000.00 | 4/10/2019 | 3.842% |
| Bripan SARL | KKB | Advance | $ 3,266,114.00 | 12/31/2019 | 22.818% |
| Bripan SARL | KKB | Advance | $ 2,497,005.00 | 12/31/2020 | 17.444% |
| Bripan SARL | KKB | Advance | $ 396,373.00 | 3/26/2021 | 2.769% |
| **TOTAL:** | | | **$ 14,314,000.00** | | **100.000%** |

**SCHEDULE 3.13(a)**

**OWNED REAL PROPERTY**

1.  436 Riverside Ave., Burlington, VT

2.  80 Cotton Mill Hill, Brattleboro, VT

3.  66 & 72 Main Street, North Grosvenordale, CT

## SCHEDULE 3.13(b)

## LEASED REAL PROPERTY

None.

JA-518

## SCHEDULE 3.14

### ABSENCE OF CERTAIN MATERIAL ADVERSE CHANGES OR EVENTS

1. The Personal Injury Claim.

2. Confidential Separation Agreement and Release of Claims, dated March 1, 2021, between KKBI and Joseph Melillo.

# Exhibit B

## PROMISSORY NOTE

$1,000,000.00                                                  Colchester, Vermont
                                                              December 2̲9̲, 2017

FOR VALUE RECEIVED, Koffee Kup Bakery, Inc., a Vermont corporation (the "Borrower"), promise(s) to pay to the order of Socipar SAS, a Société par actions simplifiée organized under the laws of Martinique (together with any successors or assigns, the "Lender"), the principal amount of One Million Dollars (USD$1,000,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise), together with interest thereon at a fixed rate of ten percent (10%) per annum.

This Note shall mature on August 11, 2023 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted under the Subordination Agreement (as defined below) make prepayments of principal and/or interest without penalty of up to $250,000 in each fiscal quarter of the Borrower. On the Maturity Date, any unpaid principal balance of the Loan, together with all accrued and deferred interest, shall be paid in one lump-sum.

The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness to KeyBank National Association (and its successors and assigns, the "Senior Lender") of the Borrower to the extent provided in that certain Subordination Agreement dated on or about the date hereof by and between the Lender and KeyBank National Association (as amended, supplemented or otherwise modified, the "Subordination Agreement"). This Note constitutes the Subordinated Loan under the Subordination Agreement, and the rights of any holder or transferee of this Note, including the rights to take any action or pursue any remedies against the Borrower, are expressly subject to and limited by the terms of the Subordination Agreement.

EVENTS OF DEFAULT: The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any

1

7197305.3
7197305_5:01438-00127

provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note,

Thereupon or at any time thereafter, at the option of the Lender, but subject to the Subordination Agreement, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the Subordination Agreement, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. Lender agrees that the proceeds of the Loan may be used by the Borrower and its subsidiaries VBC, Inc., a Vermont corporation, and Superior Bakery, Inc., a Delaware corporation, for working capital and other commercial purposes. The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its

2

7197305_5:01438-00127

## PROMISSORY NOTE

$150,000.00                                          Colchester, Vermont
                                                        May 11, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **9249-9557 Québec Inc.**, a Canadian corporation (together with any successors or assigns, the "Lender"), the principal amount of One Hundred Fifty Thousand Dollars (USD$150,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 2.18% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on May 11, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

PROMISSORY NOTE - $150M FROM QUEBEC INC. TO KKB 5.11.18 (0034047,DOCX    2

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

_____          By:          _____
Print Name: _____                   Hubert Aubery, President

## PROMISSORY NOTE

$94,000.00

Colchester, Vermont
August 31, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **9249-9557 Québec Inc.**, a Canadian corporation (together with any successors or assigns, the "Lender"), the principal amount of Ninety Four Thousand Dollars (USD$94,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 2.42% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on August 31, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)     If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)     If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)     If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

By:

_____         _____
Print Name: _____        Hubert Aubery, President

JA-529

## PROMISSORY NOTE

$200,000.00                                                        Colchester, Vermont
                                                                    May 3, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **9249-9557 Québec Inc.**, a Canadian corporation (together with any successors or assigns, the "Lender"), the principal amount of Two Hundred Thousand Dollars (USD$200,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 2.18% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on May 3, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

(d)     Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

PROMISSORY NOTE - $200M FROM QUEBEC INC. TO KKB 5.3.18 (00340475.DOCX          2

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

_____    By: _____

Print Name: _____    Hubert Aubery, President

## PROMISSORY NOTE

$1,000,000.00

Colchester, Vermont
February 16, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **Socipar SAS**, a Société par actions simplifiée organized under the laws of Martinique (together with any successors or assigns, the "Lender"), the principal amount of One Million Dollars (USD$1,000,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 1.81% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on February 16, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

    (a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

    (b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

    (c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

PROMISSORY NOTE - $1MM FROM SOCIPAR TO KKB 2.16.18 (0034046EXA9S.DOCX                    2

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

_____      By:      _____

Print Name: _____            Hubert Aubery, President

PROMISSORY NOTE - $1MM FROM SOCIPAR TO KKB 2.16.18 (00340468XA95.DOCX            3

## PROMISSORY NOTE

$200,000.00                                                    Colchester, Vermont
                                                              April 26, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **9249-9557 Québec Inc.**, a Canadian corporation (together with any successors or assigns, the "Lender"), the principal amount of Two Hundred Thousand Dollars (USD$200,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 2.12% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on April 26, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

PROMISSORY NOTE - $200M FROM QUEBEC INC. TO KKB 4.26.18 (0034047.DOCX                1

(d)     Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

PROMISSORY NOTE - $200M FROM QUEBEC INC. TO KKB 4.26.18 {00340047.DOCX        2

JA-537

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

By: _____

Print Name: _____          Hubert Aubery, President

JA-538

## PROMISSORY NOTE

$500,000.00                                                    Colchester, Vermont
                                                              November 5, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **Socipar SAS**, a Société par actions simplifiée organized under the laws of Martinique (together with any successors or assigns, the "Lender"), the principal amount of Five Hundred Thousand Dollars (USD$500,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 2.70% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on November 5, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by

Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not

JA-540

only to the particular provision in which the term is used.

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

By: _____

Print Name: _____     Hubert Aubery, President

## PROMISSORY NOTE

$750,000.00                                              Colchester, Vermont
                                                         April 25, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.**, a Vermont corporation (the "<u>Borrower</u>"), promise(s) to pay to the order of **Socipar SAS**, a Société par actions simplifiée organized under the laws of Martinique (together with any successors or assigns, the "<u>Lender</u>"), the principal amount of Seven Hundred Fifty Thousand Dollars (USD$750,000.00) (the "<u>Loan</u>") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 2.12% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on April 25, 2021 (the "<u>Maturity Date</u>"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

<u>EVENTS OF DEFAULT</u>. The events specified in (a) through (d) shall constitute "<u>Events of Default</u>" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

(a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

(b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

(c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by

Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not

JA-543

only to the particular provision in which the term is used.

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

_____    By:    _____
Print Name: _____           Hubert Aubery, President

JA-544

## PROMISSORY NOTE

$1,000,000.00

Colchester, Vermont
February 13, 2018

**FOR VALUE RECEIVED, Koffee Kup Bakery, Inc.,** a Vermont corporation (the "Borrower"), promise(s) to pay to the order of **Socipar SAS,** a Société par actions simplifiée organized under the laws of Martinique (together with any successors or assigns, the "Lender"), the principal amount of One Million Dollars (USD$1,000,000.00) (the "Loan") or, if less, the aggregate principal amount unpaid on the date of maturity (whether by acceleration or otherwise). The Loan shall accrue interest at the short term Applicable Federal Rate per annum established by the Internal Revenue Service; specifically, the Loan shall accrue interest at the rate of 1.81% per annum.

**The holder of this Note acknowledges and agrees that the obligations of the Borrower evidenced by this Note, and the rights of the registered owners of the Note to receive any payments described herein, including payment of principal and interest, are expressly JUNIOR AND SUBORDINATE to the prior payment of indebtedness of the Borrower to KeyBank National Association (the "Senior Lender").**

The Borrower shall annually pay the Lender all accrued interest on the anniversary of this Note. This Note shall mature on February 13, 2021 (the "Maturity Date"); provided, however, that the Borrower may, to the extent permitted by the Senior Lender, make prepayments of the Loan without penalty. On the Maturity Date, any unpaid principal balance of the Loan together with all accrued and unpaid interest shall be paid in one lump-sum.

EVENTS OF DEFAULT. The events specified in (a) through (d) shall constitute "Events of Default" hereunder if left uncured beyond the applicable grace period after Borrower has received written notice thereof from Lender. The applicable grace period for item (a) shall be five (5) days. The applicable grace period for items (b) through (d) shall be thirty (30) days, however, if the nature of the cure is such that it takes longer than thirty (30) days to effect a cure, Borrower shall have such longer period as is reasonably necessary to effect the cure as long as Borrower promptly commences such cure and diligently prosecutes the cure to its completion:

    (a)    If the Borrower shall fail to make any payment in compliance with the terms of this Note.

    (b)    If Borrower shall request that a receiver be appointed (or if any creditors of any of the Borrower shall request appointment of a receiver), become insolvent, make an assignment for the benefit of creditors, call a meeting of its creditors to obtain any general financing accommodation, suspend business or if any case under any provision of the Bankruptcy Code including provisions for reorganization shall be commenced by or against Borrower, whether voluntarily or involuntarily.

    (c)    If Borrower shall fail to materially comply with any other terms, covenants and conditions contained in this Note, or in any of the other documents executed by Borrower in connection with the Loan.

(d)    Upon the occurrence of an Event of Default under any other obligations, direct or indirect, now or hereafter due the Lender by Borrower under this Note.

Thereupon or at any time thereafter, at the option of the Lender, but subject to the rights of the Senior Lender, all Obligations of the undersigned shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought, all rights and remedies available at law or in equity.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right shall be effective unless in writing and signed by the Lender nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any future occasion.

Each Obligor waives presentment, demand, notice protest, and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note or of any collateral, and assents to any extension or postponement of the time of payment or any other indulgence under this Note or with respect to any collateral, to any substitution, exchange or release of any collateral, and/or to the addition or release of any other party or person primarily or secondarily liable hereunder. If there is more than one maker of this Note, the obligations of each maker shall be joint and several.

Subject to the rights of the Senior Lender, the undersigned will pay on demand all costs of collection and attorneys' fees paid or incurred by the Lender in enforcing the Obligations of any Obligor. **Lender agrees that the proceeds of the Loan shall be used by the Borrower solely for working capital.** The Borrower represents and warrants that (a) this Note is used to finance income-producing business or activity, (b) has been duly authorized by all required corporate action, and (c) is the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower acknowledges and agrees that the Lender is not engaged in the business of making loans, and therefore the Loan, and this Note evidencing the Borrower's repayment obligations, is not subject to Vermont's Licensed Lender law, and each Obligor waives any rights to claim that the repayment of the Loan or this Note is limited, unenforceable or otherwise subject to any provisions of Vermont's Licensed Lender law or any similar consumer protection statute, that would limit the Lender's rights to collection of the Note.

As used in this Note: "Obligor" means the Borrower and any other person primarily or secondarily liable hereunder or in respect hereto; "Obligation(s)" means any obligation(s) hereunder or otherwise of any Obligor to the Lender whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and "Lender" means the Lender identified above, its successors and assigns, and any endorsee of this Note who is in possession of it, or the bearer hereof if this Note is at the time payable to the bearer.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

PROMISSORY NOTE - SIMM FROM SOCIPAR TO KKB 2.13.18 (00340466XA95.DOCX          2

This Note shall take effect as a sealed instrument and shall be governed by and construed in accordance with the laws of the State of Vermont.

**In the Presence of:**
**(as to all)**

MAKER:

**Koffee Kup Bakery, Inc.**

_____    By:    _____
Print Name: _____           Hubert Aubery, President

JA-547

# Exhibit C

**KOFFEE KUP BAKERY, INC.**
**AFFIDAVIT OF LOST NOTES**

_April 1_____, 2021

1.    The undersigned, 9249-9557 Quebec Inc. (the "**Note Holder**"), states, under the pains and penalties of perjury, as follows:

    (a)    That (i) the Promissory Note, dated April 26, 2018, issued by Koffee Kup Bakery, Inc. (the "**Issuer**") in favor of the Note Holder, for the principal amount of $200,000; (ii) the Promissory Note, dated May 3, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $200,000; (iii) the Promissory Note, dated May 11, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $150,000; and (iv) the Promissory Note, dated August 31, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $94,000 (collectively, the "**Notes**"), have been lost, mutilated, stolen or destroyed.

    (b)    That the undersigned is entitled to the possession, and is the legal, record owner, of the Notes.

    (c)    That after diligent search, the undersigned has been unable to locate the Notes.

    (d)    That the Notes have not been endorsed, pledged, sold, delivered, transferred or assigned.

2.    The undersigned hereby requests the Issuer to refuse to recognize any other person other than the undersigned as the owner of the Notes.

3.    The undersigned hereby agrees that, in the event of the recovery of the Notes, at any time in the future, the undersigned will, without consideration, cause the same to be returned to the Issuer.

4.    The undersigned hereby further agrees to indemnify and hold harmless the Issuer and any present or future transfer agent from and against any liability, cost or expense arising out of compliance with the request of the undersigned herein or any claims or demands brought with respect to the lost Notes.

5.    This Affidavit shall be binding upon the undersigned, his assigns, heirs and legal representatives, and shall inure to the benefit of the Issuer and its successors and assigns.

4842-6841-0083.1

IN WITNESS WHEREOF, the undersigned has executed this Affidavit of Lost Notes as of the date first written above.

9429-9557 QUEBEC INC.

By: _____
Jean Gadoua, President

**KOFFEE KUP BAKERY, INC.**
**AFFIDAVIT OF LOST NOTES**

<u>April 1</u>_____, 2021

1.    The undersigned, Socipar S.A.S. (the "**Note Holder**"), states, under the pains and penalties of perjury, as follows:

(a)    That (i) the Promissory Note, dated December 15, 2017, issued by Koffee Kup Bakery, Inc. (the "**Issuer**") in favor of the Note Holder, for the principal amount of $1,000,000; (ii) the Promissory Note, dated February 13, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $1,000,000; (iii) the Promissory Note, dated February 16, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $1,000,000; (iv) the Promissory Note, dated April 25, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $750,000; and (v) the Promissory Note, dated November 5, 2018, issued by Issuer in favor of the Note Holder, for the principal amount of $500,000 (collectively, the "**Notes**"), have been lost, mutilated, stolen or destroyed.

(b)    That the undersigned is entitled to the possession, and is the legal, record owner, of the Notes.

(c)    That after diligent search, the undersigned has been unable to locate the Notes.

(d)    That the Notes have not been endorsed, pledged, sold, delivered, transferred or assigned.

2.    The undersigned hereby requests the Issuer to refuse to recognize any other person other than the undersigned as the owner of the Notes.

3.    The undersigned hereby agrees that, in the event of the recovery of the Notes, at any time in the future, the undersigned will, without consideration, cause the same to be returned to the Issuer.

4.    The undersigned hereby further agrees to indemnify and hold harmless the Issuer and any present or future transfer agent from and against any liability, cost or expense arising out of compliance with the request of the undersigned herein or any claims or demands brought with respect to the lost Notes.

5.    This Affidavit shall be binding upon the undersigned, his assigns, heirs and legal representatives, and shall inure to the benefit of the Issuer and its successors and assigns.

4843-5229-6163.1

DocuSign Envelope ID: 9458124F-206F-42F9-89B8-3F9558841226

IN WITNESS WHEREOF, the undersigned has executed this Affidavit of Lost Notes as of the date first written above.

SOCIPAR S.A.S.

By: _____
Hubert Aubery, President

JA-552

# EXHIBIT B

Case: 25-3017, 06/30/2026, DktEntry: 73.1, Page 177 of 224

JA-553

**Koffee Kup Bakery & Subsidiaries**
**Summary**
**2021 Budget by Period**

| Description | Budget 1/23/21 | Budget 2/20/21 | Budget 3/20/21 | Budget 4/17/21 | Budget 5/15/21 | Budget 6/12/21 | Budget 7/10/21 | Budget 8/7/21 | Budget 9/4/21 | Budget 10/2/21 | Budget 10/30/21 | Budget 11/27/21 | Budget 1/1/22 | Budget 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | | | |
| **Gross Sales** | | | | | | | | | | | | | | | |
| Mfg-Bread / Rolls / EM | 4,212,642 | 4,453,422 | 4,816,746 | 4,973,760 | 5,210,818 | 5,335,202 | 5,438,027 | 5,503,872 | 5,369,667 | 4,938,825 | 5,024,114 | 4,724,014 | 4,813,259 | 64,814,369 | |
| Mfg-Donut | 434,170 | 495,608 | 483,844 | 522,936 | 572,807 | 472,326 | 469,372 | 552,725 | 512,440 | 603,506 | 647,817 | 552,798 | 525,232 | 6,845,582 | |
| Purchased-Interco | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Purchased-Other | 597,333 | 613,993 | 689,653 | 668,514 | 666,360 | 655,110 | 634,208 | 589,700 | 693,626 | 654,234 | 701,439 | 629,562 | 645,501 | 8,439,234 | |
| **Total Gross Sales** | 5,244,144 | 5,563,023 | 5,990,243 | 6,165,210 | 6,449,985 | 6,462,638 | 6,541,607 | 6,646,298 | 6,575,734 | 6,196,565 | 6,373,371 | 5,906,374 | 5,983,993 | 80,099,185 | |
| **Sales Deductions** | | | | | | | | | | | | | | | |
| Mfg-Bread / Rolls / EM | (309,694) | (340,844) | (237,931) | (144,122) | (187,534) | (235,556) | (240,969) | (230,839) | (245,851) | (286,478) | (266,801) | (277,794) | (275,676) | (3,280,088) | |
| Mfg-Donut | (50,369) | (43,411) | (28,245) | (23,854) | (27,481) | (27,843) | (17,176) | (28,179) | (26,189) | (22,969) | (20,429) | (43,504) | (35,320) | (394,969) | |
| Purchased-Interco | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Purchased-Other | (84,067) | (90,662) | (59,657) | (79,759) | (56,581) | (67,014) | (68,589) | (44,249) | (54,485) | (58,977) | (79,401) | (63,497) | (67,898) | (874,835) | |
| **Total Sales Deductions** | (444,129) | (474,916) | (325,833) | (247,735) | (271,595) | (330,413) | (326,735) | (303,267) | (326,525) | (368,425) | (366,631) | (384,795) | (378,894) | (4,549,892) | |
| **Delivered Net Sales** | | | | | | | | | | | | | | | |
| Mfg-Bread | 3,902,948 | 4,112,578 | 4,578,815 | 4,829,638 | 5,023,284 | 5,099,646 | 5,197,058 | 5,273,034 | 5,123,816 | 4,652,347 | 4,757,313 | 4,446,220 | 4,537,583 | 61,534,281 | |
| Mfg-Donut | 383,801 | 452,197 | 455,600 | 499,082 | 545,326 | 444,483 | 452,196 | 524,546 | 486,251 | 580,537 | 627,388 | 509,294 | 489,912 | 6,450,614 | |
| Purchased-Interco | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Purchased-Other | 513,266 | 523,332 | 629,996 | 588,755 | 609,779 | 588,096 | 565,618 | 545,451 | 639,142 | 595,257 | 622,038 | 566,065 | 577,604 | 7,564,398 | |
| **Total NET Delivered SALES** | 4,800,016 | 5,088,107 | 5,664,410 | 5,917,476 | 6,178,390 | 6,132,225 | 6,214,872 | 6,343,030 | 6,249,209 | 5,828,141 | 6,006,739 | 5,521,579 | 5,605,099 | 75,549,293 | |
| Plus: Other Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Less Discounts | (83,092) | (80,069) | (90,227) | (94,782) | (93,023) | (89,160) | (91,202) | (92,238) | (88,673) | (88,296) | (88,007) | (75,611) | (85,685) | (1,140,064) | |
| Less Interco Discount | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **TOTAL Net Sales** | 4,716,924 | 5,008,038 | 5,574,183 | 5,822,693 | 6,085,366 | 6,043,065 | 6,123,671 | 6,250,792 | 6,160,536 | 5,739,845 | 5,918,733 | 5,445,968 | 5,519,414 | 74,409,228 | |
| **COST OF GOODS** | | | | | | | | | | | | | | | |
| Direct Costs | 25.6% | 25.2% | 25.5% | 25.5% | 25.7% | 25.7% | 24.9% | 24.6% | 25.7% | 25.5% | 25.1% | 25.9% | 24.8% | 25.4% | |
| RM Bread / Rolls / EM | 1,076,740 | 1,120,050 | 1,228,648 | 1,268,663 | 1,339,899 | 1,370,254 | 1,351,509 | 1,356,055 | 1,380,050 | 1,257,596 | 1,261,970 | 1,224,849 | 1,195,635 | 16,431,918 | 357,687 |
| RM Donut | 149,364 | 153,594 | 153,475 | 171,005 | 186,651 | 151,360 | 137,429 | 170,570 | 160,641 | 182,897 | 199,591 | 182,037 | 169,194 | 2,167,809 | |
| Inventory Shrink | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 1,923 | 25,000 | |
| Purchased | 359,678 | 366,510 | 441,460 | 413,332 | 428,093 | 412,144 | 396,228 | 380,997 | 447,693 | 427,418 | 435,546 | 396,633 | 404,611 | 5,310,342 | 102,122 |
| Interco Purchase Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Utilities | 136,681 | 134,456 | 133,717 | 131,853 | 130,307 | 128,158 | 127,976 | 125,561 | 125,793 | 126,469 | 127,226 | 128,642 | 130,642 | 1,687,480 | |
| PR-Bakery | 776,012 | 816,194 | 845,136 | 834,793 | 948,257 | 915,599 | 868,812 | 866,018 | 885,212 | 803,954 | 799,686 | 780,045 | 759,911 | 10,899,628 | |
| PR-Sales | 777,465 | 767,883 | 758,139 | 742,077 | 735,139 | 732,694 | 723,469 | 720,089 | 703,199 | 652,098 | 687,012 | 651,771 | 791,474 | 9,442,510 | |
| Distributor Commissions | 228,601 | 222,421 | 265,027 | 283,241 | 277,973 | 258,249 | 247,366 | 226,353 | 232,233 | 219,014 | 219,993 | 206,916 | 224,408 | 3,111,793 | |
| Depreciation | 113,265 | 130,188 | 121,726 | 121,726 | 121,726 | 121,726 | 141,815 | 141,815 | 141,815 | 141,815 | 141,815 | 141,815 | 141,815 | 1,723,062 | |
| **Total Direct Costs** | 3,619,728 | 3,713,218 | 3,949,251 | 3,968,612 | 4,169,970 | 4,092,108 | 3,996,527 | 3,989,381 | 4,078,560 | 3,813,184 | 3,874,762 | 3,714,630 | 3,819,613 | 50,799,543 | |
| | | | | | | | | | | | | | | 68.3% | |
| **Indirect Costs** | | | | | | | | | | | | | | | |
| Freight In/Out | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 20,266 | 263,462 | |
| Transports | 463,135 | 470,097 | 485,322 | 492,252 | 498,981 | 501,105 | 519,274 | 525,818 | 522,937 | 520,285 | 503,520 | 492,381 | 480,395 | 6,475,503 | |
| Vehicle Leases | 119,347 | 114,697 | 114,697 | 113,485 | 112,630 | 112,630 | 112,630 | 111,418 | 110,207 | 110,207 | 110,207 | 110,207 | 110,207 | 1,462,569 | |
| Rent-Equipment | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 6,326 | 82,235 | |
| Rent-Freezer | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 9,675 | 125,776 | |
| Rent-Building | 89,039 | 89,039 | 89,039 | 89,039 | 89,039 | 86,329 | 86,329 | 86,329 | 86,329 | 86,329 | 86,329 | 86,329 | 86,329 | 1,135,825 | |
| Vehicle Repairs | 17,274 | 15,424 | 14,589 | 14,438 | 14,638 | 14,160 | 14,160 | 14,009 | 14,058 | 13,858 | 13,858 | 14,058 | 13,858 | 188,381 | |
| Vehicle Fuel | 60,222 | 56,158 | 56,158 | 55,605 | 54,250 | 54,250 | 54,250 | 53,698 | 53,145 | 53,145 | 53,145 | 53,145 | 53,145 | 710,318 | |
| M & R Mach/Bldg | 91,519 | 86,519 | 86,519 | 81,519 | 81,519 | 81,519 | 81,519 | 81,519 | 81,519 | 76,519 | 76,519 | 76,519 | 76,519 | 1,059,742 | |
| PR-Maint | 117,873 | 113,636 | 113,337 | 112,684 | 113,710 | 111,442 | 111,746 | 111,746 | 111,746 | 111,746 | 111,746 | 111,746 | 111,746 | 1,464,903 | 20,380 |
| PR-Sanitation | 72,576 | 70,079 | 69,903 | 69,427 | 70,158 | 70,014 | 69,730 | 69,730 | 69,730 | 69,730 | 69,641 | 69,641 | 69,641 | 909,999 | |
| PR-Shipping | 121,455 | 122,561 | 120,142 | 106,858 | 105,184 | 105,156 | 105,182 | 103,224 | 102,938 | 104,725 | 104,156 | 105,586 | 103,798 | 1,410,963 | |
| Uniforms-Sales | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 5,289 | 925 | 64,393 | |
| Uniforms-Mfg | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 10,365 | 134,741 | |
| Over/Short Settlement | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 1,283 | 483 | 15,879 | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T & E Expense-Indirect | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 16,894 | 219,627 |
| Other Indirect Expense | 62,693 | 62,693 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 62,159 | 809,132 |
| Depreciation | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 13,755 | 178,811 |
| Total Indirect | 1,298,985 | 1,284,755 | 1,295,716 | 1,281,318 | 1,286,121 | 1,282,616 | 1,300,832 | 1,303,502 | 1,298,620 | 1,292,555 | 1,275,131 | 1,265,623 | 1,246,485 | 16,712,260 |
| | | | | | | | | | | | | | | 0 |
| TOTAL Cost of Goods | 4,918,713 | 4,997,972 | 5,244,967 | 5,249,930 | 5,456,091 | 5,374,724 | 5,297,359 | 5,292,883 | 5,377,180 | 5,105,738 | 5,149,893 | 4,980,253 | 5,066,099 | 67,511,803 |
| Gross Margin Contribution | (201,789) | 10,065 | 329,216 | 572,763 | 629,275 | 668,341 | 826,311 | 957,909 | 783,356 | 634,107 | 768,839 | 465,715 | 453,316 | 6,897,426 |
| | | | | | | | | | | | | | | 0 |
| G & A Expense | | | | | | | | | | | | | | |
| PR-Admin | 199,497 | 202,468 | 197,692 | 195,313 | 195,400 | 194,719 | 197,242 | 198,430 | 198,957 | 202,469 | 203,235 | 203,111 | 202,048 | 2,590,581 |
| 401K Emplyr Cont & Admin Exp | 12,895 | 12,895 | 12,689 | 12,253 | 12,087 | 12,087 | 12,087 | 12,087 | 12,087 | 12,087 | 12,087 | 12,087 | 12,087 | 159,517 |
| General & Other Insurance | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 2,210,000 |
| Employee Ed & Training | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 400 |
| Mgmt Fees - Interco & Kupco | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 11,971 | 159,666 |
| Heat & Util - G&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Supplies & Postage | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 2,277 | 29,600 |
| Professional Fees | 12,308 | 14,808 | 14,808 | 14,808 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 12,308 | 167,500 |
| A/R Payment Adj. | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,500 |
| Contributions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Maintenance | 17,984 | 16,984 | 14,984 | 12,199 | 11,699 | 11,199 | 11,199 | 11,199 | 11,199 | 13,199 | 13,199 | 15,984 | 16,335 | 177,362 |
| Property Taxes | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 8,870 | 115,316 |
| T & E Expense-Admin | 2,130 | 2,130 | 2,130 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 2,156 | 27,953 |
| Advertising | 3,895 | 3,895 | 3,895 | 3,895 | 23,895 | 23,895 | 23,895 | 23,895 | 23,895 | 3,895 | 3,895 | 3,895 | 3,895 | 150,635 |
| Computer Expenses | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 29,993 | 389,903 |
| Depreciation / Amort Expense | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 45,545 | 44,258 | 590,793 |
| Other G & A Expenses | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 20,216 | 22,716 | 265,308 |
| Total G&A | 538,417 | 542,888 | 535,906 | 530,532 | 547,254 | 546,072 | 548,595 | 549,784 | 550,510 | 535,823 | 536,588 | 539,250 | 539,415 | 7,041,033 |
| Operating Income / (Loss) | (740,206) | (532,823) | (206,690) | 42,231 | 82,022 | 122,269 | 277,716 | 408,125 | 232,846 | 98,284 | 232,251 | (73,535) | (86,099) | (143,607) |
| Interest Inc / (Exp) | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 0 | 8 | 8 | 99 |
| Interest Inc / (Exp)-Notes | (44,230) | (44,230) | (44,230) | (30,003) | (30,003) | (30,003) | (30,003) | (30,003) | (30,003) | (30,003) | (30,003) | (30,003) | (30,003) | (432,718) |
| Other Inc / (Exp) - G2 | (32,000) | (20,000) | (20,000) | (20,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (92,000) |
| Other Inc / (Exp) | (13,278) | (13,278) | (13,528) | (27,330) | (26,330) | (26,330) | (26,580) | (26,330) | (26,330) | (26,580) | (26,330) | (26,330) | (26,580) | (305,128) |
| Income / (Loss) before Taxes | (829,705) | (610,323) | (284,439) | (35,093) | 25,698 | 65,945 | 221,142 | 351,801 | 176,522 | 41,710 | 175,919 | (129,859) | (142,673) | (973,354) |
| Provision for Inc Tax (Exp) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income / (Loss) | (829,705) | (610,323) | (284,439) | (35,093) | 25,698 | 65,945 | 221,142 | 351,801 | 176,522 | 41,710 | 175,919 | (129,859) | (142,673) | (973,354) |
| EBITDA | (612,920) | (376,614) | (59,192) | 175,927 | 236,718 | 276,965 | 452,251 | 582,910 | 407,631 | 272,819 | 407,036 | 101,250 | 87,150 | 1,951,930 |

JA-554

Case: 25-3017, 06/30/2026, DktEntry: 73.1, Page 179 of 224

JA-555

**Koffee Kup Bakery & Subsidiaries**
**Forecast P3 - P13**
**Summary - Consolidated Balance Sheet**
**Prepared : 3-13-21**

| | | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 11% | 4% | 5% | -1% | 1% | 2% | -1% | -7% | 3% | -8% | 1% |
| | Net Sales | 5008 | 5574 | 5823 | 6085 | 6043 | 6124 | 6251 | 6161 | 5740 | 5919 | 5446 | 5519 |
| (( Draft 3 )) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | 2/28/21 | 3/20/21 | 4/17/21 | 5/15/21 | 6/12/21 | 7/10/21 | 8/7/21 | 9/4/21 | 10/2/21 | 10/30/21 | 11/27/21 | 1/1/22 |
| **Assets** | | | | | | | | | | | | | |
| Cash | | 299 | (236) | (957) | (1,234) | (1,415) | (1,350) | (1,695) | (1,504) | (1,600) | (907) | (1,151) | (790) |
| Accounts Receivable Trade | | 4,698 | 5,008 | 5,574 | 5,823 | 6,085 | 6,043 | 6,124 | 6,251 | 6,161 | 5,740 | 5,919 | 5,446 |
| AR Carryforward | | 941 | 641 | 441 | 241 | 91 | - | - | - | - | - | - | - |
| Allowance for Bad Debt | | (126) | (126) | (126) | (126) | (126) | (126) | (126) | (126) | (126) | (126) | (126) | (126) |
| Other Accounts Receivable | | 280 | 272 | 264 | 256 | 248 | 240 | 232 | 224 | 216 | 208 | 200 | 192 |
| Inventory | | 2,282 | 2,319 | 2,446 | 2,420 | 2,359 | 2,387 | 2,488 | 2,337 | 2,374 | 2,257 | 2,214 | 2,200 |
| Prepaid | | 1,173 | 1,148 | 1,123 | 1,098 | 1,073 | 1,048 | 1,023 | 998 | 973 | 948 | 923 | 898 |
| **Total Current Assets** | | **9,547** | **9,026** | **8,765** | **8,477** | **8,315** | **8,242** | **8,046** | **8,180** | **7,997** | **8,120** | **7,979** | **7,820** |
| Property, Plant, Equipment | | 27,750 | 27,861 | 28,092 | 28,259 | 28,386 | 28,534 | 28,948 | 29,257 | 29,590 | 29,757 | 29,880 | 29,953 |
| Accumulated Depreciation | | (19,110) | (19,291) | (19,472) | (19,653) | (19,834) | (20,035) | (20,236) | (20,437) | (20,639) | (20,840) | (21,041) | (21,241) |
| **Net PPE** | | **8,640** | **8,570** | **8,619** | **8,606** | **8,552** | **8,499** | **8,712** | **8,820** | **8,952** | **8,917** | **8,839** | **8,712** |
| **Total Assets** | | **18,187** | **17,596** | **17,384** | **17,083** | **16,867** | **16,741** | **16,757** | **17,000** | **16,949** | **17,037** | **16,818** | **16,532** |
| **Liabilities & Owners Equity** | | | | | | | | | | | | | |
| Accounts Payable | | 4,278 | 4,489 | 4,625 | 4,744 | 4,770 | 4,727 | 4,737 | 4,825 | 4,718 | 4,658 | 4,564 | 4,466 |
| AP Carryforward | | 2,531 | 1,631 | 1,331 | 931 | 631 | 331 | - | - | - | - | - | - |
| Accrued Liabilities | | 307 | 293 | 300 | 274 | 289 | 305 | 312 | 310 | 345 | 337 | 354 | 320 |
| Other Current Liabilities | | 965 | 965 | 965 | 965 | 965 | 965 | 965 | 965 | 965 | 965 | 965 | 965 |
| Line of Credit | | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Notes Payable - ST | Bank | 986 | 986 | 986 | 986 | 986 | 986 | 986 | 986 | 986 | 986 | 986 | 986 |
| Notes Payable - ST | Veda | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 |
| **Total Current Liabilities** | | **13,556** | **12,854** | **12,695** | **12,390** | **12,130** | **11,803** | **11,489** | **11,575** | **11,503** | **11,435** | **11,358** | **11,226** |
| Notes Payable - LT | Bank | 2,382 | 2,288 | 2,280 | 2,268 | 2,256 | 2,245 | 2,233 | 2,221 | 2,209 | 2,197 | 2,194 | 2,190 |
| Notes Payable - LT | Owner | 14,478 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 | 14,978 |
| Capital Lease | | 376 | 366 | 355 | 346 | 336 | 327 | 318 | 309 | 300 | 292 | 284 | 276 |
| **Total Liabilities** | | **30,792** | **30,485** | **30,309** | **29,981** | **29,700** | **29,353** | **29,017** | **29,083** | **28,990** | **28,902** | **28,814** | **28,671** |
| Shareholder Equity | | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) |
| Retained (Deficit) | | (7,805) | (8,089) | (8,125) | (8,099) | (8,033) | (7,812) | (7,460) | (7,283) | (7,242) | (7,066) | (7,196) | (7,338) |
| **Total Liabilities & Equity** | | **18,187** | **17,596** | **17,384** | **17,083** | **16,867** | **16,741** | **16,757** | **17,000** | **16,949** | **17,037** | **16,818** | **16,532** |

| Net Working Capital | 2/28/21 | 3/20/21 | 4/17/21 | 5/15/21 | 6/12/21 | 7/10/21 | 8/7/21 | 9/4/21 | 10/2/21 | 10/30/21 | 11/27/21 | 1/1/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NWC as Herve calculates | 1,167 | 1,883 | 2,501 | 2,797 | 3,075 | 3,264 | 3,727 | 3,584 | 3,569 | 3,066 | 3,247 | 2,859 |
| NWC as G2 calculates | 1,112 | 1,848 | 2,505 | 2,808 | 3,134 | 3,372 | 3,875 | 3,763 | 3,816 | 3,338 | 3,569 | 3,180 |
| AR | | 3,890,306 | 4,366,212 | 4,754,571 | 5,131,553 | 5,162,921 | 4,926,233 | 4,773,570 | 4,774,195 | ######## | 4,897,182 | 4,636,106 |
| INV | | 1,541,534 | 1,651,125 | 1,721,485 | 1,644,269 | 1,511,569 | 1,485,004 | 1,634,938 | 1,657,314 | ######## | 1,630,442 | 1,234,402 |
| Prepaid | | 1,148,000 | 1,123,000 | 1,098,000 | 1,073,000 | 1,048,000 | 1,023,000 | 998,000 | 973,000 | 948,000 | 923,000 | 898,000 |
| AP | | 3,845,331 | 3,837,927 | 4,380,069 | 4,472,945 | 4,411,835 | 4,262,269 | 4,435,763 | 5,013,334 | ######## | 3,990,720 | 4,002,591 |
| Accrued Liab | | 1,258,467 | 1,264,712 | 1,239,355 | 1,253,842 | 1,269,924 | 1,276,913 | 1,274,807 | 1,309,876 | ######## | 1,318,607 | 1,285,054 |
| NWC | | 1,476,041 | 2,037,697 | 1,954,633 | 2,122,035 | 2,040,730 | 1,895,055 | 1,695,937 | 1,081,299 | ######## | 2,141,298 | 1,480,864 |

**Metrics (2019)**

| | 2/28/21 | 3/20/21 | 4/17/21 | 5/15/21 | 6/12/21 | 7/10/21 | 8/7/21 | 9/4/21 | 10/2/21 | 10/30/21 | 11/27/21 | 1/1/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days Receivable (3 month average) | 22.83 | 22.83 | 23.90 | 24.43 | 25.69 | 25.43 | 24.05 | 23.16 | 23.65 | 23.63 | 25.75 | 24.69 |
| Days Inventory (3 month average) | 12.47 | 12.47 | 12.95 | 13.00 | 12.27 | 11.25 | 11.22 | 12.37 | 12.73 | 12.47 | 13.05 | 9.87 |
| Days Payable (3 month average) | 31.10 | 31.10 | 30.11 | 33.06 | 33.37 | 32.84 | 32.20 | 33.55 | 38.50 | 34.69 | 31.94 | 32.01 |

JA-556

# EXHIBIT C

FYI when the 2 week blackout period started.

---

**From:** Jeff Sands <jeff@dorsetpartners.com>
**Date:** Friday, March 19, 2021 at 5:15 PM
**To:** Mark Gauthier <mark@gauthierconsultingus.com>
**Subject:** Mark, G2 wants us to stay away until closing

Yes.  It's petty bullshit which we discussed at great length but at the end of the day, we can't really go against their request.
Enjoy your crawfish and give me a call when you can.  It's a blessing in some ways so we can enjoy our families a bit more.

Jeff

JA-558

# EXHIBIT D

Let's all chat first...Evan or Will please set up a call for shortly.



**Patricia M. Reinhardt | Managing Director**
**G2 Capital Advisors LLC**
Mobile 508.287.7065
420 Boylston Street, Suite 302 | Boston, MA 02116
preinhardt@g2cap.com | www.g2cap.com

in   Click to Follow G2 on LinkedIn!

---

**From:** Mark Coles <mcoles@koffeekupbakery.biz>
**Sent:** Tuesday, March 30, 2021 3:34 PM
**To:** Pat Reinhardt <PReinhardt@g2cap.com>; Michael Williams <MWilliams@g2cap.com>
**Subject:** FW: Mark, can you send me whatever the latest balance sheet is? Thanks

EXTERNAL

FYI, I have not responded to him yet.


Mark R. Coles
Chief Financial Officer
Koffee Kup Bakery & Subsidiaries
59 Rathe Rd, Suite 100, Colchester, VT 05446
Office: 802.495.0121
Cell: 802.734.7665
mcoles@koffeekupbakery.biz

    

---

**From:** Jeff Sands <jeff@dorsetpartners.com>
**Sent:** Tuesday, March 30, 2021 3:31 PM
**To:** Mark Coles <mcoles@koffeekupbakery.biz>
**Subject:** Mark, can you send me whatever the latest balance sheet is? Thanks


*************DISCLAIMER***************
This communication is for informational purposes only. It is not intended as an offer or solicitation for the purchase or sale of any security or as an official confirmation of any transaction. All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice. Any comments or statements made herein do not necessarily reflect those of G2 Capital Advisors, LLC or Hollister Associates, LLC. The information contained in this e-mail is intended only for the use of the individual person or entity to which it is addressed, and may contain information that is confidential, privileged, and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any review, use, disclosure, distribution, or copying of this communication is prohibited. If you received this transmission in error, please contact the sender by e-mail and destroy all copies of the original e-mail. Thank you.


Securities offered through Hollister Associates, LLC, Member FINRA & SIPC.
G2 Capital Advisors, LLC and Hollister Associates, LLC are separate and unaffiliated entities.

CONFIDENTIAL                                                                      G2030645

**From:** Mark Coles <mcoles@koffeekupbakery.biz>
**Sent:** Tuesday, March 30, 2021 5:05 PM
**To:** Evan Carlson <ECarlson@g2cap.com>
**Cc:** Pat Reinhardt <PReinhardt@g2cap.com>; Michael Williams <MWilliams@g2cap.com>; William Luetmer <WLuetmer@g2cap.com>
**Subject:** RE: Mark, can you send me whatever the latest balance sheet is? Thanks

EXTERNAL

Sorry, I've been in a meeting since 3:45, just got out.

Mark R. Coles
Chief Financial Officer
Koffee Kup Bakery & Subsidiaries
59 Rathe Rd, Suite 100, Colchester, VT 05446
Office: 802.495.0121
Cell: 802.734.7665
mcoles@koffeekupbakery.biz

    

**From:** Evan Carlson <ECarlson@g2cap.com>
**Sent:** Tuesday, March 30, 2021 4:02 PM
**To:** Mark Coles <mcoles@koffeekupbakery.biz>
**Cc:** Pat Reinhardt <PReinhardt@g2cap.com>; Michael Williams <MWilliams@g2cap.com>; William Luetmer <WLuetmer@g2cap.com>
**Subject:** RE: Mark, can you send me whatever the latest balance sheet is? Thanks

Mark –

Are you available at 4:30 for a call to discuss the balance sheet?

Best,
Evan

**Evan Carlson | Senior Analyst**
**G2 Capital Advisors LLC**
Mobile 775.445.0677
420 Boylston Street, Suite 302 | Boston, MA 02116
ecarlson@g2cap.com | www.g2cap.com

 Click to Follow G2 on LinkedIn!

**From:** Pat Reinhardt <PReinhardt@g2cap.com>
**Sent:** Tuesday, March 30, 2021 4:00 PM
**To:** Mark Coles <mcoles@koffeekupbakery.biz>; Michael Williams <MWilliams@g2cap.com>
**Cc:** Evan Carlson <ECarlson@g2cap.com>; William Luetmer <WLuetmer@g2cap.com>
**Subject:** RE: Mark, can you send me whatever the latest balance sheet is? Thanks

CONFIDENTIAL

G2030644

# EXHIBIT E

JA-562

## Aaliyah Rolfe

| | |
|---|---|
| **From:** | Melissa Rosado |
| **Sent:** | Friday, March 31, 2023 3:16 PM |
| **To:** | Aaliyah Rolfe |
| **Subject:** | FW: Exhibit E : Mark, can you send me whatever the latest balance sheet is? Thanks |

**From:** Jeff Sands <jeff@dorsetpartners.com>
**Date:** March 31, 2023 at 3:06:16 PM EDT
**To:** Terry Kirwan <tkirwan@kirwanlawpc.com>
**Subject: Exhibit E : Mark, can you send me whatever the latest balance sheet is? Thanks**

On Mar 30, 2021, at 5:32 PM, Mark Coles <mcoles@koffeekupbakery.biz> wrote:

Hi Jeff,

Sorry I was stuck in a meeting. The last final Balance Sheet is from P2, we're close on P3 but not quite there yet.

What figures do you need and what time frame? I can get you pieces of info as needed, I just don't have everything reconciled yet.

Thanks,
Mark

Mark R. Coles
Chief Financial Officer
Koffee Kup Bakery & Subsidiaries
59 Rathe Rd, Suite 100, Colchester, VT 05446
Office: 802.495.0121
Cell: 802.734.7665
mcoles@koffeekupbakery.biz

<image001.png>

**From:** Jeff Sands <jeff@dorsetpartners.com>
**Sent:** Tuesday, March 30, 2021 3:31 PM
**To:** Mark Coles <mcoles@koffeekupbakery.biz>
**Subject:** Mark, can you send me whatever the latest balance sheet is? Thanks

# EXHIBIT F



**Dorset Partners** LLC

April 20, 2021

**TO:**  Key Bank – Leslie Jones & Todd Messick
VEDA – Sam Buckley Peter Samson, Peter Fitzgerald
AIAC - Leonard Levie
SocioPar – Hubert Aubrey & Jean Gadoua

**FROM:**  Jeff Sands, CTP – Dorset Partners LLC

**RE:**  KKB Viability Assessment and Recommendations

---

Dear All,

I am writing you as a Certified Turnaround Professional and the Founder and Managing Member of Dorset Partners LLC, not as a Board Member of Cup Co and Subsidiaries ("Koffee Kup", "KKB", the "Company")

Without rehashing the events that got us here, I believe KKB is now without a new buyer in either Jeff Black or Mike Pinkowski as they both fell through recently.  That leaves the Company somewhere in limbo between the Sellers (Hubert and Jean) and Buyer (AIAC/KK Investment Company LLC) in a recent change of control transaction that was not approved by the senior secured lender.  Additionally, both Key Bank and VEDA have issued recent default notices.  Key Bank has paid for a liquidation analysis which I believe is north of $4 million net, presuming that the company accomplishes it out of court.  Additionally, JF Morin recently resigned as CEO, which should not impede a turnaround.

The company will again require cash tomorrow or the day after and is expected to need $500,000 in new cash this week to cover payroll and minimal supply needs.

I still believe Koffee Kup can be fixed and run longterm as a sustainably profitable business.   The plan had been to acquire the Company just as it was reaching breakeven and then to restructure it operationally during the summer, under the cover of high volumes and profitability and then be able to carry that new low-cost structure into the lean winter months and stay profitable into the future.  With an uncapped revolver the company would have been largely self-sufficient on cash, although that needs to be re-assessed.

Without a credible white-knight strategic buyer, the company is adrift and on a slow march to liquidation.  I believe the stakeholder's options are the following:

1. <u>Quick liquidation</u>.  This path has pluses and minuses.  It would stop the bleeding and provide some certainty.   As noted above, I believe $4M is a fair estimate of net orderly liquidation value.   However, it

JA-565

would also wipe out all creditors below Key plus about 440 jobs in three communities and be a big headline story.

2.  Stay adrift. This route has no upside. Without a plan the Company will irreparably lose the better employees, better customers and critical vendors over the next 2 weeks.

3.  Emergency Sale to a qualified strategic investor. Pinkowski is clearly not as advertised, and Jeff Black still is still sending mixed signals and a low purchase price. Another party I approached resisted the deal. I don't think we have a qualified strategic investor in sight. We can hire Ken Mann of Equity Partners to run a going-concern auction process as he is a specialist in selling insolvent and troubled companies like KKB. Ken believes he can have offers in 30 days and close 30 days later. My estimate for a successful outside sale to a strategic might include $1 - 2 million in cash and another $3 – 5 million in debt, netting a total recovery in range of $4 - $7 million.

4.  Turnaround Plan. The Business can be saved and restructured to transform the balance sheet and also deliver a positive EBITDA basis sufficient to allow the Company to eventually refinance out of Key Bank. The Company's brand names, core products and customers are superb and its shelf space at major retailers is enviable. Revenues are substantial, which provides a strong critical mass. With a new focus on profitability and cash flow, this Company can be saved. However, **this will require shared sacrifice by all parties.** This does not mean 4 months of daily cash crisis but a genuine plan to stabilize supply, employees and customers. With a plan backed by all parties, we can get a real turnaround done.

    a.  **Management.** A CEO or CRO needs to be appointed immediately. I can do it, and if it is viewed by the Board or Key Bank as a conflict, I am willing to retire from the Board. Another alternative is for the Company to hire another turnaround manager approved by the bank and let them get up to speed. In addition, a cost accountant is needed to tighten up the cost of goods sold accounting. Timing is of the essence on this.

    b.  **Projections** – These need to be rebuilt. An intensive 1-week financial modeling effort with Mark Coles and Dave Cryer can accomplish this. Mark Coles can be helpful here if he is not consumed with ongoing cash crisis. The Company should be profitable by June and stay that way, if, we act quickly and reverse the damage being caused currently from lack of cash and stability.

    c.  **Strategic Retreat back to core business.** This means the continued spin-off of southern delivery routes and fixing the 40% unprofitable SKUS and 20% unprofitable customers through price increases or departures.

    d.  **Cost Cutting Actions** – In 30 days I am confident we can cut $75,000 monthly ($900,000 annually) out of payroll and benefits.

e. **Price Increases** – the current 3% increase is just now being implemented.   We will raise another 2% by September.  Combined these equal $3.7 million on an annualized basis.

| Targetted Cost Cuts and Price Increases | Annualized Impact |
|---|---|
| Total Benefits - DL | 668,567 |
| Total Benefits - ID | 186,806 |
| Total Benefits - GA | 127,814 |
| HR (Head Count 2) | 216,671 |
| Price Increase Q3'21  (2%) | 1,378,000 |
| Price Increase Q1 '22 (1%) | 689,000 |
| Reduce 8 Indirect Staff | 455,000 |
| More G&A Reductions | 520,000 |
| Reduce Direct Labor (1% / 2%) | 284,393 |
| Reduce waste with small batches (3-4%) | 400,000 |
| Eliminate Unprofitable SKU's | 260,000 |
| Re-arrange Routes | 130,000 |
| Fuel Surcharge | 65,000 |
| **Total** | **5,381,251** |

f. **Sale of Connecticut bakery to Gold Medal with supply agreement.** They have expressed interest as recently as two weeks ago. I am prepared to engage in an immediate dialogue with them. It could produce immediate proceeds of $1 – 2 million and another $1 – 2 million in annualized savings. Some portion of such a sale should go to Key Bank and some portion should be used to fund the turnaround, working capital, and urgent capex.

g. **Revitalize the balance sheet.** The Company has a negative net worth of over $14 million. If KK Investment Company swaps its $14 million note (plus $1 million accrued interest to common stock, it will bring the net worth positive. This has been a bone of contention with the Sellers who may lose a personal tax benefit if the note is exchanged for equity, but this will be necessary. If we can get the trade to accept a long term subordinated PIK note at a haircut, then we can build back even more equity. Showing a much stronger balance sheet will allow us to attract new vendors with normal trade terms. If done now, this debt relief can be done without the Company having to pay debt forgiveness income tax because of the restructuring in insolvency exception in the tax code.

h. **Targeted refi to new lender H2'21** – with profitability and a restructured balance sheet the company will find interest from new lenders.

i. **Possible enterprise-wide sale post-stability in 2022.**

JA-567

j.  **Key Bank and VEDA Loans**. These will require extension of forbearance and interest only periods.

k.  **Reporting**. We would supply daily borrowing base certificates and weekly updated 13-week cashflow forecasts. The loan facility should be a monitored, asset-based facility.

Time and uncertainty are our shared enemies here. We can capture some value moving swiftly to liquidation. Or we can accomplish a full recovery by moving swiftly based on a real turnaround plan. The options in between seem certain to deliver less.

Week 1 Steps – with reliable funding.
1. Stabilize the supply base, shift to COD and freeze all past dues
2. Visit Gold Meadow and discuss selling CT Bakery with supply agreement back to KKB
3. Eliminate the 40% of SKUs which are unprofitable.
4. Raise prices, review the current 3% increase and fill any gaps or shortfalls.
5. Begin the 30-day costs cutting exercise
6. Stabilize the employees
7. 13-week cash flow forecast
8. Daily borrowing base certificates.

Week 2 Steps – with reliable funding.
1. Develop a customer-by-customer plan to eliminate the 20% of unprofitable customers.
2. Meet with any upset customers who were upset through this transition.
3. Meet with employees and get them focused.
4. Commit to goals and timeline for delivery route retraction.
5. Focus in on the basics
6. 13-week cash flow forecast
7. Daily borrowing base certificates.

**Recommendation** – I recommend that the business is funded for the next 30 days to preserve going concern value and develop optionality.

Sincerely,

Jeff Sands
Dorset Partners LLC

JA-568

# EXHIBIT G



**VIA OVERNIGHT MAIL AND EMAIL**

April 26, 2021

Amy St. Onge
First Selectman
Town of Thompson
815 Riverside Drive
P.O. Box 899
North Grosvenordale, CT 06255
firstselectman@thompsonct.org; astonge@thompsonct.org

Susan Fracasso
Rapid Response Coordinator
Connecticut Department of Labor
200 Folly Brook Blvd
Wethersfield, CT 06109
dol.rapidresponse@ct.gov

   Re:  Notice of Layoff / WARN Act Notification

Dear Ms. St. Onge and Ms. Fracasso:

In accordance with any obligations under the federal Worker Adjustment and Retraining Notification Act ("WARN"), this letter is to inform you that Koffee Kup Bakery, Inc. and its subsidiary Superior Bakery Company ("Koffee Cup"), 66-78 Main Street, North Grosvenor Dale, Connecticut 06255, has announced that it will be terminating all operations, effective April 26, 2021. This action is expected to affect 91 employees who will be permanently terminated effective April 26, 2021 at this location.

All affected employees have individually been provided required notice of this action via hand delivery and/or regular mail.

Koffee Kup has been operating at a loss for some time. It has been in default of certain terms and conditions of its outstanding loans with its senior lender. This lender had allowed the company to continue operating pursuant to a forbearance agreement that has expired.

In light of that, and as you may know, Koffee Kup had undertaken very substantial efforts to obtain additional financing or investors. We have had many discussions and negotiations with our senior lender aimed at sustaining operations and we have introduced the bank to additional potential investors. However, the lender has not approved new investors, declined to further

extend the forbearance agreement, and declined to loan any additional funds to the company. Because of this, continuing operations is no longer commercially reasonable or prudent.

Just yesterday, our lender sent a default notice to the company demanding immediate payment of outstanding loans, asserting its rights to take possession of our assets and confirming that it would no longer extend credit to cover operating costs of the company including payroll.

Therefore, although many promising avenues were explored that we were cautiously optimistic would have allowed Koffee Kup to survive, those efforts have now been exhausted without success and Koffee Kup no longer has sufficient capital to continue operations. We were unable to provide you with this notice any earlier as we were uncertain of the success of the efforts that we have been making to continue operating. Earlier notice of this unfortunate outcome would have been premature and would have jeopardized those very efforts.

None of the affected employees are represented by a union, and none are entitled to bumping rights pursuant to a collective bargaining agreement or otherwise.

A listing of the job titles of the positions to be affected, and the number of affected employees in each job classification at this facility is attached to this letter.

For further information, please feel free to contact me at Jeff @Dorsetpartners.com or at 802-688-3419

Sincerely,

Dorset Partners, LLC, agent for Koffee Kup Bakery
By: Jeff Sands, Managing Member

2



LIST OF JOB TITLES OF POSITIONS AFFECTED, AND THE NUMBER OF AFFECTED EMPLOYEES IN EACH JOB CLASSIFICATION.

| Job Title | Number of Affected Employees |
|---|---|
| Administrative Assistant | 1 |
| Bread Floater | 1 |
| Bread Floor Runner | 1 |
| Bread Floor Runner Production | 1 |
| Bread Mixer | 2 |
| Bread Packer | 12 |
| Bread Producer | 4 |
| Bread Divider | 2 |
| Bread Relief | 3 |
| Facilities Maintenance Technician | 1 |
| Food Safety Manager | 1 |
| Human Resources Generalist | 1 |
| KONIG Machine Operator | 2 |
| Lead Person | 5 |
| Material Handler | 1 |
| Maintenance Manager | 1 |
| Maintenance Technician | 6 |
| Oven Depanner | 3 |
| Oven Operator | 4 |
| Order Processing Specialist | 1 |
| Plant Manager | 1 |
| Production Manager | 1 |
| Production Supervisor | 4 |
| Roll Floor Runner Production | 2 |
| Roll Mixer | 1 |
| Rolls Packer | 7 |
| Roll Producer | 10 |

JA-572

| | |
|---|---|
| Sanitation Worker | 6 |
| Shipping Specialist | 4 |
| Shipping Manager | 1 |
| Shipping Lead | 1 |

JA-573

# EXHIBIT H

 .VERMONT

**State of Vermont**
**Department of Labor**
P.O. Box 488
Montpelier, VT 05601-0488
**www.labor.vermont.gov**

[telephone]    802-828-4000
[fax]          802-828-4022

Linda Joy Sullivan

lsullivan@ljsreceiver.com

*Via email*

Re:    Closure of the Koffee Kup/Vermont Bread Company facilities in Burlington and
       Brattleboro, Vermont

Dear Ms. Sullivan:

I am writing to you in your capacity as receiver for Koffee Kup Bakery, Inc. and Vermont Bread
Company. Earlier today, you inquired into the status of any pending action by the Vermont
Department of Labor against Koffee Kup for potential violations of Vermont's Notice of
Potential Layoffs Act, 21 V.S.A. §§ 411-418.

On May 6, 2021, Commissioner Harrington wrote to Jeff Sands of Dorset Partners, requesting an
explanation as to why notice of closure had not been given to its employees in accordance with
the Act. On May 19, 2021, the Commissioner received a reply from Attorney Deborah
Cannavino with Epstein Becker Green, P.C., a copy of which is attached. In her letter, Attorney
Cannavino invoked two exceptions to the notice requirement, that of Faltering Business (21
V.S.A. § 414(a)(2)) and Unforseen Business Circumstances (21 V.S.A. § 414(a)(3)).

In my judgment as General Counsel, Koffee Kup's invocation of the two exemptions was
sufficiently justified, and no further action was taken by this Department. Accordingly, I
consider this matter closed.

Please let me know if there is anything else you require of me.

Sincerely,

Dirk Anderson
General Counsel

Cc:    Michael Harrington, Commissioner

*Working Together for Vermont*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MATTHEW CHANEY, NADINE          )
MILLER, AND ARTHUR GUSTAFSON,   )
on behalf of himself and all others )
similarly situated,             )
                                )
Plaintiffs,                     )          Civil Action No. 2:21-cv-120-wks
           v.                   )
                                )
VERMONT BREAD COMPANY,          )
SUPERIOR BAKERY, INC.,          )
KOFFEE KUP BAKERY, INC.,        )
KOFFEE KUP DISTRIBUTION, LLC,   )
KK BAKERY INVESTMENT COMPANY    )
LLC, KK BAKERY HOLDING          )
ACQUISITION COMPANY,            )
and AMERICAN INDUSTRIAL         )
ACQUISITION CORPORATION,        )
                                )
Defendants.                     )
                                )
and                             )
                                )
LINDA JOY SULLIVAN, in her      )
capacity as the                 )
Dissolution Receiver for Koffee Kup )
Bakery, Inc., Vermont Bread     )
Company, Inc. and Superior      )
Bakery, Inc.,                   )
                                )
Intervenor-Defendant.           )

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The named plaintiffs, Matthew Chaney, Nadine Miller and Arthur Gustafson, on behalf

of themselves and the Class they represent, respectfully move for summary judgment against

American Industrial Acquisition Company ("AIAC"), Koffee Kup Bakery Investment Company

("KKBIC"), Koffee Kup Bakery, Inc. ("Koffee Kup"), Vermont Bread Company ("Vermont

Bread"), and Superior Bakery, Inc. ("Superior").  Judgment should be entered against AIAC,

1

KKBIC, Koffee Kup, Vermont Bread and Superior, jointly and severally, in the amount of Three

Million Five Hundred Ninety-One Thousand Five Hundred Forty-Eight Dollars and Ninety-

Seven Cents ($3,591,548.97), as they all constituted part of a "single employer" that violated the

WARN Act.

This motion is supported by the accompanying Statement of Undisputed Facts and

Exhibits thereto, as well as Plaintiffs' supporting brief.

Respectfully submitted this 31st day of March, 2023.

By:    /s/    Mary E. Olsen
THE GARDNER FIRM
Mary E. Olsen (OLSEM4818)
M. Vance McCrary (MCCRM4402)
182 St. Francis Street
Suite 103
Mobile, Alabama 36602
P: (251) 433-8100
F: (251) 433-8181

LANKENAU & MILLER, LLP
Stuart J. Miller (SJM 4276)
Johnathan Miller
100 Church Street, 8th FL
New York, NY 10007
P: (212) 581-5005
F: (212) 581-2122

CLEARY SHAHI & AICHER P.C.
Thomas P. Aicher, Esq.
110 Merchants Row, Third Floor
Rutland, VT 05701
(802) 775-8800
tpa@clearyshahi.com

*Counsel for the Class*

2

JA-577

## INDEX

Plaintiffs' Memorandum In Support of Motion for Summary Judgment (Redacted)

Plaintiffs' Statement of Undisputed Facts (Redacted)

Exhibit 1 - Dissolution Receiver's RFA Responses for Koffee Kup, Excerpt Nos. 24-26; Vermont Bread, Nos. 24-26; Superior, Nos. 22-24

Exhibit 2 - AIAC's RFA Responses Excerpts

Exhibit 3 - KKBIC's RFA Responses Excerpts

Exhibit 4 - Hanker Deposition Excerpts

Exhibit 5 - AIAC and KKBIC Supplemental Responses to Plaintiffs' Requests For Documents, S-11

Exhibit 6 - Dissolution Receiver's Objection to Claim and Complaint in Vermont Superior Court, Chittendon Unit

Exhibit 7 - Answer of AIAC, KKBIC, Levie and Sands to Dissolution Receiver's Objection to Claim and Complaint

Exhibit 8 - Morin Deposition Excerpts

Exhibit 9 - Coles Deposition Excerpts

Exhibit 10 - AIAC 30(b)(6) Deposition (Sands) Excerpts (Redacted)

Exhibit 11 - Coles Deposition Select Exhibits

Exhibit 12 - Hanker Deposition Select Exhibits

Exhibit 13 - Richards Deposition Excerpts

Exhibit 14 - Leonard Deposition Excerpts

Exhibit 15 - Sands Deposition Excerpts (Redacted)

Exhibit 16 - Levie Deposition Excerpts

Exhibit 17 - AIAC Website Sands Bio

Exhibit 18 - AIAC 30(b)(6) Deposition (Sands) Select Exhibits (Redacted)

Exhibit 19 - AIAC-KKBIC 30(b)(6) Deposition (Levie) Excerpts

Exhibit 20 - AIAC PowerPoint Presentation

Exhibit 21 - Answering Statement in AAA Case 1-21-18-1379 (Redacted)

Exhibit 22 - KKBIC Formation Letter

Exhibit 23 - KKBIC 30(b)(6) Deposition (Sands) Excerpts (Redacted)

Exhibit 24 - Sands Deposition Select Exhibits, 1 and 9 (Redacted)

Exhibit 25 - Sands Email February 16, 2021, (Bates stamped KKBIC 15)

JA-578

## INDEX

Exhibit 26 - AIAC-KKBIC 30(b)(6) Deposition (Levie) Select Exhibits (Redacted)

Exhibit 27 - AIAC's March 4, 2021 indicative offer or LOI

Exhibit 28 - ATC Group Services LLC Proof of Claim and attachments

Exhibit 29 - Dissolution Receiver's objection to ATC Group Services LLC Proof of Claim and attachments

Exhibit 30 - Selinger Email of 4-1-2021 (Bates stamped KKBIC 9816)

Exhibit 31 - KKBIC Responses to Plaintiffs' Interrogatories

Exhibit 32 - AIAC 30(b)(6) Deposition (Sands) Errata Sheet

Exhibit 33 - KKBIC 30(b)(6) Deposition (Sands) Errata Sheet

Exhibit 34 - Richards Deposition Select Exhibits

Exhibit 35 - Morin Deposition Select Exhibits

Exhibit 36 - Sands Bankruptcy Deposition Excerpts

Exhibit 37 - Levie Responses Following June 9, 2022 Deposition

Exhibit 38 - pp. 1-6 (KKBIC 3901- 3999)

Exhibit 39 - KKBIC Proof of Claim and Exhibits

Exhibit 40 - Levie Deposition Select Exhibits (Redacted)

Exhibit 41 - KKBIC 30(b)(6) Deposition (Sands) Select Exhibits

Exhibit 42 - Invoice (Bates stamped KKBIC 14171-14172) (Redacted)

Exhibit 43 - KeyBank 30(b)(6) Deposition Excerpts, p. 100, Line 16-21

Exhibit 44 - Sands 4-9-21 email about Teplitsky (KKBIC 9937-9942)

Exhibit 45 - Levie email to K. Mann (Bates stamped KKBIC 11003-11110)

Exhibit 46 - KeyBank 30(b)(6) Deposition Select Exhibits (Redacted)

Exhibit 47 - AIAC Defendants' Privilege Log 3-1-2023

Exhibit 48 - Olsen Declaration in Support of Damages

Olsen Dec Ex A - Census  (Redacted)

Olsen Dec Ex B - WARN Damage Calculation Spreadsheet

Olsen Dec Ex C - DOL Employer Costs for Employee Compensation - December 2021

JA-579

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | | |
|---|---|---|
| MATTHEW CHANEY, et al. | ) | |
| on behalf of himself and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2:21-cv-120-wks |
| v. | ) | |
| | ) | |
| VERMONT BREAD COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LINDA JOY SULLIVAN, in her | ) | |
| capacity as the Dissolution Receiver | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The named plaintiffs, Matthew Chaney, Nadine Miller and Arthur Gustafson, on behalf of themselves and the Class they represent, respectfully submit this brief in support of their motion for summary judgment. The Class suffered a violation of their rights under the WARN Act, 29 U.S.C. § 2101 *et seq*, and should be awarded the statutory remedy, as set forth herein. Judgment should be entered against defendants American Industrial Acquisition Company ("AIAC"), Koffee Kup Bakery Investment Company ("KKBIC"), Koffee Kup Bakery, Inc. ("Koffee Kup"), Vermont Bread Company ("Vermont Bread"), and Superior Bakery, Inc. ("Superior"), jointly and severally, as they all constituted part of a "single employer" that violated the WARN Act.

This Court correctly summarized the WARN Act as follows in the order granting class certification:

The WARN Act prohibits employers of 100 or more employees from ordering "a plant closing or mass layoff until the end of a 60–day period after the employer

1

serves written notice of such an order." 29 U.S.C. § 2102(a); see also Cashman v. Dolce Int'l/Hartford, Inc., 225 F.R.D. 73, 78 (D. Conn. 2004). This advance notice aims to "provide[] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a); see also Guippone v. BH S&B Holdings LLC, 737 F.3d 221, 225 (2d Cir. 2013). Failure to provide a WARN Act notice may subject an employer to civil liability in the form of back pay and benefits for the period of the WARN Act violation up to a maximum of 60 days. See 29 U.S.C. § 2104(a)(1).

[Opinion and Order, August 17, 2022, Doc. 129 pp. 4-5].

The following is an introduction to the facts, with other facts to be discussed as relevant in later parts of this brief.

This case involves three bakeries: defendants Koffee Kup, Vermont Bread, and Superior.[1] All three ceased operations on April 26, 2021, leaving more than 400 people – Plaintiffs and the Class – out of work. All three were wholly owned by Kup Co. [Statement of Undisputed Facts ("Facts"), ¶¶ 1, 2, 13, 35].

Prior to the shutdown, the bakeries were in very poor financial condition, and were in default to their lender, Key Bank. The forbearance agreement with Key Bank had lapsed and not been renewed. The business was insolvent. [Facts, ¶¶ 49, 50, 95, 134].

Less than four weeks before the abrupt shutdown of the bakeries, 80 percent of the equity in Kup Co. had been purchased for the nominal sum of a single dollar by AIAC, acting through a newly-formed entity, KKBIC. [Facts, ¶ 133]. AIAC, through KKBIC, also paid the sellers pennies on the dollar for debt owed by Kup Co. to the sellers: $1 million to purchase $14 million of that "insider debt." [Id., ¶ 133]. AIAC used its affiliate AMTC to fund the $1 million dollars paid for

---

[1] They are represented in this litigation, as a practical matter, by the state-court-appointed Dissolution Receiver of their assets, who intervened.

the Koffee Kup acquisition. [*Id.*, ¶¶ 85, 87]. In general, as stated in the most recent Rule 30(b)(6) deposition of AIAC, "AIAC operates through affiliates." [*Id.*, ¶ 65].

In connection with the acquisition agreement, AIAC, through KKBIC, promised to put $2.5 million into the bakeries in cash, credit, and "cushion" to get the bakeries on their feet and on a sustainable path forward. [Facts, ¶ 71, 119, 133]. That money – like the money used to purchase the insider debt – would necessarily be coming from AIAC (using one or more of its affiliates as the piggybank), because KKBIC simply had no money of its own to promise. [*Id.*, ¶¶ 144, 145, 80].

AIAC bought a controlling interest in the bakeries, using KKBIC as the vehicle, in order to perform what it was in the business of doing: buying troubled businesses and "turning them around" into profitability through active managerial control. [Facts, ¶ 70-71; 53; 82; 114]. AIAC emphasized to Koffee Kup, its former owners, KeyBank and suppliers that it would do what it always does with businesses in the AIAC "portfolio": actively manage the business, investing capital as needed without looking to outside sources, making the business decisions (including, specifically, human-resource decisions), and remaking the business under the hands of AIAC's "turnaround specialist" Jeff Sands and others on the AIAC team. [*Id.*, ¶¶ 53, 55--57, 69-70; 78; 82; 109-110; 114].

But AIAC and KKBIC quickly decided instead – within days after the purchase – not to make the promised capital investment. [Facts, ¶¶ 118-122]. They deemed the bakeries to be "dead." [*Id.*, ¶¶ 118-122]. AIAC tried, in the weeks after that, to find a purchaser who would buy the bakeries "fast," even if for practically nothing – a "trivial, fire sale" price. [*Id.*, ¶¶ 121-122; 124-129; 131-132; 158]. In its sale materials, AIAC highlighted that there was a "common

3

stakeholder" and described the ownership structure of Kup Co. as follows: "affiliate of AIAC owns 80%, individuals own 20%; **AIAC controls board**." (emphasis added). (*Id.* at ¶ 132).

By April 26, AIAC had been unable to unload the bakeries through a "fire sale", so they ordered that the business should be shutdown and that the employees should be fired,-- without any advance or even contemporaneous WARN Act notice. [Facts, ¶¶ 4, 132; 140-168].

1.     **AIAC, KKBIC, and the three bakeries constituted a "single employer" for purposes of the WARN Act.**

Beyond any genuine issue of material fact, defendants AIAC and KKBIC, along with the three bakeries, constituted a "single employer" for purposes of the WARN Act; all of them are liable for the violation. A "single employer" finding, of course, does not insulate the direct employers – Koffee Kup, Vermont Bread, and Superior – from liability. Instead, under the WARN Act, a "single employer" finding results in joint and several liability among the various entities that, together, make up the "single employer." *See*, *e.g.*, *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 381-82 (S.D.N.Y. 2017) (discussing WARN Act "single employer" doctrine as involving joint and several liability).

A.     **The "single employer" doctrine under the WARN Act.**

This Court has discussed the WARN Act's "single employer" doctrine in the class-certification order in this case, stating:

> In *Guippone [v. BH S&B Holdings LLC]*, 737 F.3d 221 (2d Cir. 2013), the Second Circuit adopted a five-factor test set forth in the Department of Labor ("DOL") regulations to determine if related entities constitute a single employer. 737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)(3)). The relevant DOL regulation provides that
>
>> independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of independence from the parent. Some of the factors to be considered in making this determination are

4

(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). As noted by the Third Circuit, these factors are useful in determining "whether the nominally separate corporations actually functioned as a single entity." *Pearson v. Component Tech. Corp*., 247 F.3d 471, 503-04 (3d Cir. 2001). "As in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." Guippone, 737 F.3d at 226.

[Opinion and Order, August 17, 2022, Doc. 129, pp. 7-8].

In many cases, and in this case, the "de facto exercise of control" factor is a particularly important factor which Courts consider in applying the single employer analysis.

The factor is appropriately utilized, however, if the parent or lender  was the decisionmaker responsible for the employment practice giving rise to the litigation. Further, because the balancing of the factors is not a mechanical exercise, if the de facto exercise of control was particularly striking -- for instance, were it effectuated by "disregarding the separate legal personality of its subsidiary," Esmark, Inc. v. NLRB, 887 F.2d 739, 757 (7th Cir. 1989) -- then liability might be warranted even in the absence of the other factors.

*Pearson*, 247 F.3d at 503-04.

As noted in the regulation itself, as quoted by this Court, the five DOL factors are not exclusive; they are "[s]ome of the factors." *Id.* In determining the "single employer" question, the ultimate question is to determine whether nominally separate entities were actually operating at arm's length. If an entity other than the nominal employer exercised sufficient control over or was sufficiently entangled with the nominal employer, then that other entity is also liable for the WARN Act violation.

As an initial matter, we think it important to consider the policy considerations that animate the WARN Act. The purpose of the Act is to penalize those employers that close a plant and fail to comply with the notice requirements of the statute. Thus, the question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that

5

two entities should be considered jointly liable for the closing and the subsequent lack of notice. ... Accordingly, the goal of the five-factor test here is to determine whether APA Truck Leasing had become "so entangled with [APA Transport's] affairs so as to engender WARN Act liability," or whether the two continued to function at arm's length as separate entities.

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244 (3d Cir. 2008), quoting and citing *Pearson*.

The "single employer" doctrine, utilizing the DOL factors and looking at the realities of entanglement and control, applies not only to "independent contractors, subsidiaries," and "parent[s]" (20 C.F.R. § 639.3(a)(2)) but to others such as equity investors, *Guippone*, 737 F.3d at 226, and lenders, *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 496 (3d Cir. 2001). It is therefore the test to apply to all Defendants here—the bakeries, KKBIC (which owned 80 percent of Kup Co., which owned the three bakeries) and also to AIAC, where the real de facto power (financial and operational) lay.

**B.      On undisputed facts, all Defendants constituted part of a "single employer" with WARN Act liability in this case.**

The *Guippone* factors from the DOL regulation, along with the overall thrust of the inquiry into control, entanglement, and the absence of arms-length dealing, all point towards single-employer liability on the facts in this case.

\* (i) common ownership.  AIAC is solely owned by Leonard Levie. Leonard Levie is the chairman of AIAC, there are no other officers, directors or board members.  Leonard Levie owns 85 percent of KKBIC, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the Koffee Kup acquisition.  Jeff Sands has held the following titles at AIAC--"senior vice president," "managing director," "special advisor," "senior advisor" and "SVP".  Leonard Levie and Sands were the sole members of KKBIC—Leonard Levie is the managing member and Jeff Sands is a "member".  AIAC, through KKBIC, which it formed

6

for this purpose on March 29, 2021, owned 80 percent of Kup Co., a holding company which owned 100 percent of the bakeries themselves. [Facts, ¶¶ 54-58; 71-72; 74-75; 92-94; 133; 15].

* (ii) common directors and/or officers. Levie and Sands' roles at AIAC and KKBIC have been noted above. They also constituted two of the three members of the Board of Kup Co. The bakeries had no boards of directors of their own. [Facts, ¶¶ 14, 16, 169]. Sands also referred to himself as "CRO," or "Chief Restructuring Officer," over the bakeries, stating as early as December 2020 (months before KKBIC had even been formed) that he would be filling that role and would be reporting "to Leonard at AIAC headquarters," along with the rest of his "new team", which included Mark Gautier, who would "act as CEO" [*id.*, ¶ 78, 114]. The power that Sands had did not come from any  contractual relationship with Kup Co. or with the bakeries. [*Id.*, ¶ 96-97]. His power came from AIAC, as discussed in more detail below.

* (iii) de facto exercise of control. This discussion will be more lengthy, because it is the heart of this case. Still, this brief will not directly repeat everything in the lengthy Statement of Undisputed Facts, but will summarize and refer to that document.

AIAC's very essence is that it acquires "underperforming" companies and makes the changes needed in them to turn them profitable. [Facts, ¶ 53; 69; 82; 114]. As an example of what AIAC does, AIAC touts in a "case study" that it acquired Vermont-based Champlain Cable and took it from staggering losses into profitability.  In this "case study," to exemplify its approach to acquired companies, AIAC describes what it did at Champlain Cable: "The first year turnaround action steps included a headcount reduction of 16 persons, along with reductions in labor hours, materials, selling, general, and administrative costs. …" [*Id.*, ¶ 82; 114].

Jeff Sands, senior advisor with AIAC, is the "turnaround specialist" and author of Corporate Turnaround Artistry, Fix Any Business in 100 Days. [Facts, ¶ 55; 109-110; 113].

7

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ [Facts, ¶ 59-63; 68; 92-93].

As Levie testified as Rule 30(b)(6) representative for AIAC, "AIAC operates through affiliates." [Facts, ¶ 65]. When he uses the term "affiliates" he means "a corporate entity with common ownership." [*Id.*, ¶ 66]. Given the present focus on "de facto control," the crucial part is that <u>AIAC</u> "operates." For instance, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ [Facts, ¶ 78; 80-81; 87; 141; 148; 170].

In offering itself as prospective purchaser of Kup Co., AIAC emphasized to the sellers how engaged it would be in the make-over of the then-insolvent business. In the powerpoint presentation titled "Why AIAC is the Best Future Owner of Koffee Kup Bakery," AIAC told the sellers, "AIAC currently owns and operates 78 factories in 24 countries." "AIAC is an active owner. … We manage professionally and conservatively to build strong businesses." "AIAC has over 8,500 employees with deep pools of talent to solve complex operational and financial problems." [Facts, ¶¶ 69-70]. The powerpoint noted that "AIAC Executive Leadership for Koffee Kup" would involve Mark Gauthier as CEO, and Sands. [Facts, ¶ 114].

During negotiations, AIAC's Sands communicated to the sellers' agent about the "New Team" that would lead the operations after a sale. The description of the "New Team" included "Jeff Sands, Vermont resident who will lead transition through 2021 as CRO"; Mark Gauthier who "will act as CEO"; David Cryer "AIAC CFO"; Thea Kelly "able to fill a role as Controller or

8

similar as needed"; and Rhonda Halladay "will lead our HR, insurance, safety and regulatory diligence." Upon concluding the list of the "New Team," Sands wrote: "We will all report to Leonard [Levie] at AIAC headquarters." [Facts, ¶ 78].

AIAC's March 4, 2021, indicative offer was to purchase a majority interest in the Koffee Kup Entities, through its "affiliate-in-formation KK Bakery Holding Company, Inc." It stated that Mr. Levie and Mr. Sands – as "Chairman AIAC" and "Senior Advisor AIAC," respectively – would be the "Ultimate Shareholders." AIAC detailed its financial and management strategies for the Koffee Kup Entities after the sale, and emphasized that AIAC itself had any needed capital to support the acquired bakeries. The only authorized contact persons for the transaction were Mr. Sands and Mr. Levie ("Llevie@aiacgroup.com"); The offer was signed "Leonard M. Levie, Chairman." It then attached appendices providing additional information on AIAC's operations, including its "financial policy" and "management methods," which specified AIAC's management practices in global procurement, lean production, marketing and sales, internet, human resources, information technology, insurance, and accounting. [Facts, ¶ 82].

As noted earlier in this brief, the acquisition closed on April 1, 2021. [Facts, ¶ 114]

AIAC replaced the Koffee Kup CEO, J.F. Morin, (who acted as CEO for all of three bakeries [Facts, ¶ 23-25; 112-113]. Sands informed Morin of his removal and of his replacement by Mark Gauthier. [Facts, ¶ 112]. ███████████████████████████████████ ███████████████████████████████████████████████ ████ ██████████████████████████████████████ and slated him to become the CEO post acquisition. [Facts, ¶ 101-102; 69; 78; 114].

Sands and Gauthier met with then-CFO and Controller Mark Coles [who occupied that role as to all three bakeries [Facts, ¶ 113; 18; 23], at which time Coles was told that Sands and Gauthier

9

were on the AIAC Turnaround team--Sands would be the "chief restructuring officer" and "Gauthier was going to replace J.F. Morin as the CEO."[Facts, ¶ 113].

The day after the purchase closing, Sands emailed to Morin and Gauthier a powerpoint that he was sending to the bakeries' vendors. The presentation begins with an AIAC cover graphic and on the next page includes the statement "On April 1, 2021, AIAC made a control investment in Koffee Kup Bakery." Sands and Gauthier are again described as "AIAC Executive Leadership for Koffee Kup" and David Cryer, Rhonda Hollady and Brian Shiau are all described as "Additional AIAC Leadership for Koffee Kup." That powerpoint included the same representations about AIAC, and its planned involvement in the bakeries, as had been included in the "Best New Owner" powerpoint send to the prospective sellers some time earlier. [Facts, ¶ 114].

Sands provided to Ben Richards, VP of manufacturing for Koffee Kup, a proposed AIAC employment agreement, despite the fact that Richards already had an employment agreement with Koffee Kup. The AIAC employment agreement was provided to Richards during an in-person meeting with Sands and Gauthier in a conference room at one of the bakeries. [Facts, ¶ 106]. The AIAC Employment Agreement, directed to Ben Richards and signed "Sincerely, Mark Gauthier AIAC" is on AIAC letterhead and begins, "Dear Ben, It is our pleasure to have you as part of the Koffee Kup team going forward and we wish to solidify your employment with a new agreement." [Facts, ¶ 107].

On the day the purchase closed, Sands sent an email to Koffee Kup managerial employees Morin, Coles, Susan Leonard, Ben Richards and Leo De Serres, with copies to Mark Gauthier and Rhonda Hollady, attaching an "FAQ's" document. [Facts, ¶ 108]. The "FAQ" stated that:

> AIAC specializes in purchasing and turning around manufacturing businesses that are not performing to their potential. AIAC currently owns and manages 79 factories around the world, all of which were formerly distressed. … AIAC has brought in their inhouse turnaround team to restructure the business, manage it

10

JA-589

through a transition and then establish a long-term strategic plan to guide the business in the decades which follow. … We embrace lean thinking which means trimming unnecessary costs, tidier work areas and less production shortfalls.

[Facts, ¶ 109].

On April 5, Sands emailed Key Bank – the lender to whom the bakeries were in default – seeking the bank's agreement to a proposed course of action. To persuade the bank, Sands included what he referred to as "the framework budget we walked in the door with on Friday." This budget included a heading, "EBITDA Bridge-AIAC Turnaround Plan." It promised future savings resulting from changes in employment terms and conditions: a "Reverse of 2 new days of vacation" and other benefits savings. The AIAC Turnaround Plan included a total for "AIAC Net New Profitability." [Facts, ¶ 117]. AIAC was telling the bakeries' lender that it had a plan to try to make changes, to increase profitability under AIAC's control, in order to induce the lender to do what AIAC asked.

The day after that, on April 6 – as will be further described in a later part of this brief – Levie and Sands had a change of heart and decided that the bakeries were "dead" and that AIAC could not revive them. [Facts, ¶120-122]. AIAC then turned its efforts towards trying to get rid of the bakeries. Though the purchase agreement had promised that AIAC/KKBIC would inject needed capital into the bakeries to see them through the "turnaround," Levie decided not to make good on that commitment. [Facts, ¶¶ 120-122; 151-153].

As Levie stated later, "AIAC professionals swiftly developed a vigorous national sales process." [Facts, ¶ 134]. ███████████████████████████████ ███████ [Facts, ¶ 127;129].

On April 8, Levie emailed Sands, "JS Please serve as monitor to Cup Co [sic] (the "Business") on behalf of KK Investment Company [sic] and its Board of Directors. Your duties

11

would include monitoring the Business and its executives and reporting back observations and recommendations to the Board of Directors with regard to financial and operational strategies. …" Levie testified that the reference to "KK Investment Company" was meant to be a reference to KKBIC. Levie testified he did not know what Board of Directors he was referring to in the email (stating "that might have been a reference to the board of Kup Co. or the board of KK Bakery Investment Company." He wasn't sure). In follow-up emails, Sands and Levie negotiated Sands' pay for that assignment, to be paid by "AIAC or its affiliates." [Facts, ¶ 141].

Among the work that Sands did in that regard – in the course of work for which Levie had retained him on behalf of AIAC– was his work on the shutdown and preparation of WARN Act notices. [Facts, ¶ 141-150]. AIAC paid him for that work, using the same AMTC piggybank from which it had paid for the purchase of the bakeries along with the insider debt. [Facts, ¶ 141-150].

Even though Levie and Sands constituted a majority of the board of Kup Co. (the bakeries' parent) – even though Sands testified as Rule 30(b)(6) representative that KKBIC (owned by himself and Levie) *controlled* the board of Kup Co, the parent of the bakeries [Facts, ¶ 161], they did not bother to adopt a resolution as the Kup Co. board that the bakeries should cease operations. [Facts, ¶ 160; 169]. (They did adopt a resolution that they try to negotiate a turnover to Key Bank on certain conditions; but that is not a decision to close the bakeries.) This striking fact shows that the corporate separateness of the bakeries, and their parent Kup Co., was completely disregarded; the decisionmakers did not even bother with a corporate formality that might have given them a figleaf of a claim that it was Kup Co. that made the decision to shut down. Further, there was not a single reference to Kup Co. or its board of directors-- as the purported decision-maker, or otherwise--in the too-late and inadequate WARN Act letters. [Facts, ¶ 6]

12

No officer or board of the bakeries made the decision to shut down. (Recall that the CEO had been ousted, as described above; and the new AIAC-appointed CEO, Gauthier, had left the scene.)

What happened instead is that <u>Sands</u> came in on April 26 and told CFO Coles, and Human Resources, that it was time to terminate all of the employees. [*Id.*, ¶ 165-167]. This had been preceded three days earlier by a teleconference involving Sands, "Rhonda" (Ms. Halladay, whom AIAC had picked to "lead … HR" as described earlier) and "AIAC lawyers" regarding drafting WARN Act notices in anticipation of firing all employees. [Facts, ¶ 165].

Sands did not have an engagement agreement with Kup Co., Koffee Kup, Vermont Baking, or Superior Baking. [Facts, ¶ 96-97]. Thus those entities had not authorized him to take any action as part of any "turnaround," much less any decision to shut down the bakeries. And, as noted above, Kup Co. had taken no board action directing its subsidiary bakeries to shut down. Sands, did, however, have ███████████████████████████ during the relevant period through and including the date of the shutdown. [Facts, ¶ 98-99; 141-150].

It was Sands – who had no agreement with any of the bakeries or even with Kup Co., as noted above – who signed the too-late WARN Act notices that he assisted with and sent out. [Facts, ¶¶ 4; 9; 150 ]. He signed not as a board member of Kup Co., but putatively as an agent of Koffee Kup [Facts, ¶ 9] – which, as has been explained above, he was not.

Both before and after the shutdown of the bakeries on April 26, 2021, AIAC provided prospective buyers of Koffee Kup with Levie's "Executive Summary" dated April 24, 2021. [Facts, ¶ 132]. The "Executive Summary" begins: "Profile: Distressed, regional commercial Bakery with brands … <u>WARN Act notices printed but not yet distributed yet, motivated</u>

13

stakeholders, … Common Stakeholder: affiliate of AIAC owns 80%, individuals own 20%; AIAC controls board. …" [*Id*., ¶ 132].

AIAC retained legal counsel (Epstein Becker) to deal with the plant closings, including the drafting of WARN Act notice. [Facts, ¶ 170]. And AIAC treats itself, in this litigation, as being among that counsel's clients in that regard – by claiming entitlement to attorney-client privilege for such communications.[Facts ¶ 170]

In summary, AIAC – in its own name and operating through its affiliate KKBIC – exercised complete *de facto* control over the bakeries during its period of ownership, up to and including the decision to shutter the bakeries. AIAC's vision from the outset was that it would be the "active owner," managing the business. It would impose its "New Team," ousting the existing CEO and placing its own man in the position. It would empower its "turnaround specialist" and its human resources specialist to change what they thought should be changed. It would change the terms and conditions of employment of employees at the bakeries, to save money. It made sure that it controlled the Kup Co. Board. It looked for buyers once it had given up on the bakeries. It ordered the Koffee Kup executives to fire the employees and shutdown the business. It prepared and signed the too-late WARN Act notices. It used its affiliates to pay for Koffee Kup related expenditures.

On this factor, this case is reminiscent of – yet even more extreme than – the conclusion reached in *D'Amico v. Tweeter Opco, LLC*, 453 B.R. 534, 545 (Bankr. D. Del. 2011)

> The Court finds that the Plaintiff has established de facto control by [Schultze Asset Management, or "SAM"] of [Debtor Tweeter's] employment practice. The Granoff [former CEO of Debtor] termination letter evidences SAM's control over the Debtor, especially the portion that states, "we felt we needed tighter control of Tweeter within our own organization." [SAM's CEO] George Schultze repeatedly called for reductions in payroll to increase profits. Further, George Schultze ordered Kelerchian to terminate employees of the Debtor in 2007, demonstrating his control over the Debtor's employment practice. With SAM employees on the Debtor's board, SAM's inside counsel supervising their actions, and SAM employees directly involved with terminating employees of the Debtor, the Court

14

finds that SAM's exercise of de facto control over the Debtor on the WARN Act issue was particularly egregious. See Pearson, 247 F.3d at 504 (concluding that if the de facto exercise of control is "particularly egregious," then liability is warranted).

Even if it stood alone, this extreme degree of de facto control and complete entanglement would suffice to show "single employer" status.

* (iv) unity of personnel policies emanating from a common source. As discussed above regarding "de facto exercise of control," the control by AIAC as part of its "turnaround plan" specifically included assertion of the power to change personnel policies – for instance, reducing vacation days for all bakery employees, benefit reductions, staff reductions and rearranging routes as a way of boosting the corporate bottom line. [Facts, ¶ 114; 117]. And AIAC emphasized that its turnaround team, and turnaround plan, would include Human Resources matters. [*Id.*, ¶¶ 114; 117].

* (v) the dependency of operations.  As discussed above, following the purchase agreement, the bakeries were dependent on AIAC and KKBIC for the capital that they would need in order to survive long enough to "turn around." That capital was promised, in the purchase agreement. That capital could not have come from KKBIC, which had no funds of its own. That capital would have come from AIAC, which had declared to the sellers and then to the bank that it had sufficient capital that it would not need to go to any lenders, for the needs of its "portfolio companies."

For all these reasons, the undisputed facts show that AIAC and KKBIC did not allow the bakeries to operate as independent legal entities in any sense. They did not operate at arms' length or even at fingers' length. They had, and exercised, complete control over every aspect of the bakeries' business, up to and including the decision to shut down without advance WARN Act notice. This makes them liable as part of the "single employer" with the bakeries under *Guippone* and other cases cited above.

15

II.     **The Class suffered violations of the WARN Act.**

Beyond any genuine issue of material fact, the Class suffered violations of the WARN Act, when the bakeries shut down – leaving the Class out of work – without the notice required by the WARN Act.

The basic rule of the WARN Act is that no employer may order a "plant closing" without providing sixty days' advance written notice to employees as well as to state and local government. *See* 29 U.S.C. §§ 2104(a)(1), (2).

A "plant closing" is "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." *See* 29 U.S.C. § 2101(a)(2).

It is undisputed that there was a "plant closing" at each of the bakeries. [Facts, ¶ 3].

And it is undisputed that <u>no</u> advance or even contemporaneous written warning of the plant closings was provided by Defendants to the employees. [Facts, ¶ 4].

Therefore, there is no genuine issue of material fact. As a matter of law, the class suffered a violation of the WARN Act, absent some defense; and as shown in the next section, there is no available defense to the Defendants.

It is conceivable that defendants will contend that one or two of the bakeries was too small in its employment rolls to constitute a covered "employer" on its own. *See* 29 U.S.C. § 2104(a)(1) ("the term 'employer' means any business enterprise that employs — (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."

16

JA-595

If there is any such argument, then the answer – beyond any genuine issue of fact – is that the three bakeries meet the WARN Act's test to constitute a "single employer." Thus their employment rolls are aggregated to meet the 100-person "employer" threshold. *See*, *e.g.*, *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1005-07 (9th Cir. 2004) (applying "single employer" doctrine to aggregate employees at two facilities, thus reaching WARN Act coverage threshold); *United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F. Supp. 426 (D. Mass. 1995) (same).

Plaintiffs have already shown, above, that the entire "business enterprise," 29 U.S.C. § 2101(a)(1), encompassing AIAC, KKBIC, Kup Co., and the bakeries were one "single employer." But it is also true, beyond any genuine issue of fact, that the three bakeries and Kup Co. would constitute a "single employer" even if considered on their own – and that for this reason, too, they would all meet the numerical threshold for "employer" coverage.

All of the *Guippone* factors demonstrate that the bakeries were a single employer among themselves. They were highly integrated with each other, operationally, financially, and in terms of human resources. Even the former CFO and the original Receiver recognize that they were, functionally, a single entity. The Chief Human Resources Officer understood "it was one company serving with three different locations." There was a concerted effort to *make them* functionally a single entity in terms of personnel policies, sales, cash flow, information technology, and the like. They had, together, a single CEO and a single CFO. Salesmen nominally working for one bakery would take orders to be fulfilled by another. One of the bakeries, Superior, existed only to bake the products that the other bakeries had promised to customers but could not fulfill on their own; it did not even receive any revenue in its own name. The bakeries had no directors of their own, and were wholly owned by Kup Co. (which owned Koffee Kup, which in turn owned Superior and

17

JA-596

Vermont). Top executives nominally employed by Koffee Kup made decisions for *all* the bakeries. Further, the WARN letters all similarly state that "'Koffee Kup'. . . has announced it will be terminating all operations, effective April 26, 2021." Facts and evidence supporting all of this are contained in the Statement of Undisputed Facts, ¶¶ 10-12; 14; 17-19; 22-48.

These facts meet *Guippone* the factors. And these facts show without question that the three bakeries were not operated as separate entities at arms-length from each other. They were a single "business enterprise," the phrase used in the WARN Act's definition of "employer," 29 U.S.C. § 2101(a)(1), and were a single employer under *Guippone*.

### III.    No defenses or WARN Act "exceptions" are available.

The WARN Act does allow less than sixty days' advance notice of a plant closing under limited circumstances. *See* 29 U.S.C. § 2102(b)(1) (sometimes termed the "faltering company" exception)[2]; 29 U.S.C. § 2012(b)(2)(A) (sometimes termed the "unforeseeable business circumstance" exception).[3] But those exceptions are inapplicable here.

First, Defendants are precluded from invoking these exceptions because, beyond genuine dispute, they did not do what the statute requires. An employer relying on these exceptions "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3). Here, it is undisputed that defendants

---

[2] "An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business."

[3] "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."

18

gave no advance or even contemporaneous WARN Act notice. They terminated employees without giving WARN Act notice, and (at best) mailed putative WARN Act notices at least the next day after that. [Facts, ¶ 4]. Thus employees would not have received any putative WARN Act notice until, at best, days *after* the plant closing; and the date of "receipt of notice" is the legal operative question. 20 C.F.R. § 639.8. There is, in this case, absolutely no reason why WARN Act notice could not have been given before the closure, or at least contemporaneous with it. (AIAC's privilege log, ECF No. 193-3, reflects that WARN Act notice was being drafted as early as April 23, but was not mailed until the evening of April 27, the day after the closing. Further, Sands testified the decision to shut down was made prior to April 23, 2021. [Facts, ¶ 123].)

Therefore, defendants are precluded from invoking the exceptions. *See*, *e.g.*, *Torres v. Niche, Inc.*, No. 12-12059-RGS, 2013 U.S. Dist. LEXIS 177228 (D. Mass. Dec. 18, 2013) (explaining that employer that gave written notice only after the fact was precluded from relying on exception, and further explaining very limited circumstances, not present here, in which after-the-fact notice is permitted).[4]

But even if Defendants here were able to *try* to invoke these exceptions, still the exceptions are inapplicable on the undisputed facts. The burden of proof, on these exceptions and therefore on summary judgment, is on the employer. 20 C.F.R. § 639.9. "Because the WARN Act is remedial legislation, its exceptions are construed narrowly. Moreover, an employer relying on an exception

---

[4] "After the fact" notice is permissible in some rare cases where the facility is literally shut down by forces outside the employer's control, with no possibility of advance notice. This would include truly government-ordered shutdowns (as discussed in *Torres*, *supra*) and some shutdowns caused by natural disasters, 20 C.F.R. § 639.9(c)(4). Aside from such situations, an employer simply does not have the right, under the WARN Act, to *decide* to shut down a facility without advance or even contemporaneous WARN Act notice.

19

bears the burden of persuasion." *Local Union 7107, UMW v. Clinchfield Coal Co.*, 124 F.3d 639, 640-41 (4th Cir. 1997).

### A.    The "faltering company" exception is inapplicable.

The § 2102(b)(1) "faltering company" exception is inapplicable here for several reasons. That exception covers (under some defined circumstances) employers who were, "as of the time that notice would have been required" (i.e., sixty days before the plant closing) "actively seeking capital or business" that would avoid the necessity of a plant closing. *Id.*

The belated, after-closure putative WARN Act letters said nothing about any such efforts happening in February, sixty days before the April 26 closing. [Facts, ¶ 8]. In fact, there were no such efforts because Koffee Kup hired G2 in late 2021 to assist it in finding a buyer and upon deciding to go this route, stopped looking for another lender. [Facts, ¶ 51].  Accordingly, defendants may not rely on any contention that they were "actively seeking capital" as of that snapshot date. The statutory requirement of a "brief statement" of the reasons for reduced notice, 29 U.S.C. § 2102(b)(3), requires that the employer actually put the reasons in writing. It cannot, then in litigation, offer other reasons that it did not put in the notice.

> As the district court aptly pointed out, Congress included the brief statement requirement not only to provide affected employees with notice of "the basis for reducing the notification period," 29 U.S.C. § 2102(b)(3), but also "to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation-convenient but factually post hoc justifications for their actions." Weekes-Walker, 877 F. Supp. 2d at 1207; see also *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994) (finding that a formal notice statement may be brief, but must contain sufficient specificity and detail and give some indication of the factual circumstances that made the statutory exception applicable).

*Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1285-86 (11th Cir. 2013). And without anything meeting the "actively seeking capital" exception as of that snapshot date, this exception is inapplicable by its plain terms.

20

But even if one was permitted to look not at the snapshot date but at things that happened after April 1 purchase agreement, still this exception would be inapplicable.

Here, the decision to shut down the bakeries at the end of April came after AIAC itself decided *not* to put in the capital that AIAC/KKBIC had *promised* in the purchase agreement, and after AIAC had failed to quickly find a new purchaser, not a lender. Sands testified that "other than rescinding the sale, the only other possibility for the company to survive was to find a strategic buyer who could get enough synergies out of it to make the business work as it was." [Facts, ¶ 122]. The exception on its own terms is inapplicable to that effort. Looking for a purchaser does not come within this exception. *Reed v. Alecto Healthcare Servs*, No. 5:19-CV-263, 2022 U.S. Dist. LEXIS 164438, at *39-40 (N.D.W. Va. Aug. 2, 2022) (collecting cases).

Furthermore, AIAC had plenty of capital and did not need to rely on outside sources; AIAC had made a point of making this known to the sellers. [Facts, ¶82]. The piggy-bank of AMTC, which AIAC used for the purchase and various other purposes related to the bakeries, held around 100 million dollars. [Facts, ¶¶ 80; 86-87]. Even if for this reason alone, the § 2102(b)(1) exception is inapplicable. 20 C.F.R. § 639.9(a)(4) ("The actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.").

Moreover, the defendant invoking the § 2102(b)(1) exception must prove that there was "a realistic opportunity to obtain the financing or business sought." 20 C.F.R.¶ 639.9(a)(2). With the bakeries already long in default to their existing lender, Key Bank – and with its forbearance agreement having expired and the fraud that AIAC alleged [Facts, ¶¶ 95; 129-130; 139] – there

21

will be no way to prove a realistic prospect that someone else would provide new capital for the

bakeries *when AIAC itself had decided not to*.

The § 2102(b)(1) exception also requires proof that the faltering company, seeking capital,

actually <u>and</u> reasonably thought that giving WARN Act notice would scare off potential capital

sources.

> The employer reasonably and in good faith must have believed that giving the required notice would have precluded the employer from obtaining the needed capital or business. The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close.

20 C.F.R. § 639(a)(4). There will be no evidence, here, to support such a showing. AIAC was, by

Levie's own admission, seeking a "fire sale" with a purchaser willing to pay a pittance. [Facts, ¶

126]. The bakeries were, "dead." [*Id.*, ¶ 121]. Giving WARN Act notice would not have scared

off any potential deal partner who, for some reason, was willing to deal with dead bakeries. (Note

that when the bakeries were eventually sold through receivership, the purchaser was a competitor

who bought the bakeries and gave them a proper burial, reducing competition. [*Id.*, ¶ 131].)

**B.      The "unforeseeable business circumstance" exception is inapplicable.**

The § 2012(b)(2)(A) "unforeseeable business circumstance" exception is also inapplicable

here.

First, even the putative WARN Act notices mailed *after* the shutdown did not mention any

unforeseeable business circumstance. Instead, to the extent that the letter discussed the reasons for

the shutdown, it focused on the failed attempt to find new "investors" (i.e., purchasers) and on the

long-existing default to Key Bank. [Facts, ¶ 7].