# 25-3017-cv(L), 25-3243-cv(XAP)

# United States Court of Appeals

*for the*

## Second Circuit

MATTHEW CHANEY, NADINE MILLER and ARTHUR GUSTAFSON,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

– v. –

LINDA JOY SULLIVAN, in her capacity as the Dissolution Receiver for Koffee
Kup Bakery, Inc., Vermont Bread Company, Inc. and Superior Bakery, Inc.,

*Intervenor-Defendant-Cross-Claimant-Appellee-Cross-Appellant,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT (BURLINGTON)

## SPECIAL APPENDIX

IAN P. CARLETON
KEVIN LUMPKIN
SHEEHEY FURLONG & BEHM P.C.
30 Main Street
P.O. Box 66
Burlington, Vermont 05402
(802) 864-9891

*Attorneys for Intervenor-Defendant-
Cross-Claimant-Appellee-Cross-
Appellant*

JAY M. LEVIN
FLASTER/GREENBERG
One Tower Bridge
100 Front Street, Suite 100
West Conshohocken,
  Pennsylvania 19428
(215) 576-1730

*Attorneys for Defendants-Cross-
Defendants-Appellants-Cross-
Appellees*

*(For Continuation of Appearances See Inside Cover)*

COUNSEL PRESS
A ▶ Proceed Service
The Appellate Experts®

(800) 4-APPEAL • (390902)

– v. –

KK BAKERY INVESTMENT COMPANY, LLC, AMERICAN INDUSTRIAL
ACQUISITION CORPORATION,

*Defendants-Cross-Defendants-Appellants-Cross-Appellees,*

KK BAKERY HOLDING ACQUISITION COMPANY,

*Defendant-Cross-Defendant,*

VERMONT BREAD COMPANY, SUPERIOR BAKER, INC., KOFFEE KUP
BAKERY, INC., KOFFEE KUP DISTRIBUTION LLC,

*Defendants.*

MARY E. OLSEN
SAM HELDMAN
THE GARDNER FIRM, P.C.
182 Saint Francis Street, Suite 103
Mobile, Alabama 36602
(251) 433-8100

THOMAS P. AICHER
GFELLER LAURIE LLP
110 Merchants Row, 3rd Floor
Rutland, Vermont 05701
(802) 775-8800

-and-

STUART J. MILLER
LANKENAU & MILLER, LLP
100 Church Street, 8th Floor
New York, New York 10007
(212) 581-5005

*Attorneys for Plaintiffs-Appellees*

i

**SPECIAL APPENDIX TABLE OF CONTENTS**

**Page**

Opinion and Order on motion for Sanctions, dated
August 22, 2023 [236] ........................................... SPA-1

Opinion and Order on Motions to Strike and
Motions for summary Judgment, dated August
23, 2023 [237] ....................................................... SPA-12

Amended Opinion and Order on Motions to Strick
and Motions for Summary Judgment, dated
August 24, 2023 [238] ........................................... SPA-61

Opinion and Order on Motions for Summary
Judgment, dated May 17, 2024 [273] .................... SPA-110

Opinion and Order on Joint Motion for An Order on
Requiring Payment on Sanctions, dated August 5,
2024 [276] .............................................................. SPA-131

Opinion and Order on Dissolution Receiver's
Assertion of "Good Faith Defense", dated
October 24, 2025, Appealed From [309] ............... SPA-137

Judgment, dated November 26, 2025, Appealed
From [312] ............................................................. SPA-147

29 USCS § 2101, *et seq.* ........................................... SPA-149

SPA-1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Matthew Chaney, Nadine Miller and Arthur Gustafson, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-120 |
| Vermont Bread Company, Superior Bakery, Inc., Koffee Kup Bakery, Inc., Koffee Kup Distribution LLC, KK Bakery Investment Company LLC, KK Bakery Holding Acquisition Company, and American Industrial Acquisition Corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| Linda Joy Sullivan, in her capacity as the Dissolution Receiver for Koffee Kup Bakery, Inc., Vermont Bread Company, Inc. and Superior Bakery, Inc., | ) ) ) ) ) ) | |
| Intervenor-Defendant-Crossclaimant, | ) ) ) | |
| v. | ) ) | |
| KK Bakery Investment Company, LLC, KK Bakery Holding Acquisition Company, and American Industrial Acquisition Corporation, | ) ) ) ) ) | |
| Crossclaim Defendants. | ) | |

SPA-2

## OPINION AND ORDER

Pending before the Court is Plaintiffs' motion for sanctions against Defendants American Industrial Acquisition Corporation ("AIAC") and KK Bakery Investment Company LLC ("KKBIC") (collectively the "AIAC Defendants").  The motion initially pertained to issues surrounding the depositions of AIAC and KKBIC Rule 30(b)(6) designees, and was subsequently extended by the Court to encompass other discovery disputes.  Those disputes included efforts to depose Leonard Levie and Plaintiffs' allegations of incomplete document production.  For the reasons set forth below, the motion for sanctions is granted.

## Factual Background

This class action alleges violations of federal labor law in connection with the closure of a group of bakery facilities. The bakeries were owned by Kup Co., in which defendant KKBIC held an 80% interest.  KKBIC is an affiliate of AIAC.  AIAC is owned and managed by Leonard Levie.

On July 25, 2022, Plaintiffs noticed the Rule 30(b)(6) depositions of the AIAC Defendants.  The AIAC Defendants identified Mr. Levie as their Rule 30(b)(6) designee.  Although Mr. Levie was deposed previously, Plaintiffs report that the deposition was marred by his long pauses, his over 100 requests for counsel to repeat, restate, or rephrase questions, and the

2

over 50 occasions on which he claimed he could not respond without performing additional research.  Supplemental written responses were provided, but Plaintiffs' counsel deemed them largely unsatisfactory and planned to obtain more complete answers from Mr. Levie during the Rule 30(b)(6) depositions.

Efforts to schedule the Rule 30(b)(6) depositions were complicated by the AIAC Defendants' representation that Mr. Levie would only be available months later, on November 10-11, 2022, and their alleged insistence that no person other than Mr. Levie could serve as the designee.  The parties agreed to take the depositions on those dates.  The AIAC Defendants moved for a protective order regarding the scope of the proposed questioning of Mr. Levie, and the Court granted the motion in part.  ECF No. 153.

On Monday, November 7, 2022, AIAC Defendants' counsel informed the parties that Mr. Levie would be unable to attend the scheduled depositions because he was required to appear in a legal proceeding in the Midwest.  Opposing counsel subsequently investigated Mr. Levie's alleged conflict and reportedly learned that not only had the Midwest matter been noticed in September 2022, several weeks before they were informed of the conflict, but also that Mr. Levie was never required to appear, and did not ultimately appear, in that proceeding.

3

SPA-4

The Rule 30(b)(6) depositions took place as scheduled but, due to his alleged unavailability, Mr. Levie did not testify. Instead, on the first day of the deposition the AIAC Defendants designated Jeffrey Sands as the AIAC representative. Plaintiffs submit that Mr. Sands was unable to answer critical questions about the case, including questions about certain financial transactions and arrangements surrounding the purchase of the subject bakeries. Specifically, Mr. Sands was unable to answer questions about the role of AIAC in purchasing the bakeries; the details or payment terms of a $1 million loan to KKBIC to effectuate the purchase; the role of AIAC in retaining attorneys to provide WARN Act advice; and the identity of the party to whom Mr. Sands submitted an invoice for his services.

Plaintiffs also inform the Court that certain documentation, despite being requested far in advance, was not produced until after the Rule 30(b)(6) depositions. That documentation reportedly included the Sands invoice, which invoice contained entries related to plant closures and WARN Act issues. With respect to Sands' testimony about the $1 million loan to KKBIC, he submitted a post-deposition errata sheet explaining that, in fact, there was "no formal loan." Accordingly, no loan documentation was ever produced. Plaintiffs' motion for sanctions followed.

4

The Court held a hearing on the motion for sanctions on February 6, 2023.  The AIAC Defendants filed no written opposition to the motion, their counsel at the time of the Rule 30(b)(6) depositions had since moved to withdraw, and new counsel had entered appearances.  At the hearing, the Court granted Plaintiffs' request for Mr. Levie to be deposed in person at the federal courthouse in Burlington, Vermont, and declined to issue a final ruling on sanctions.

On February 17, 2023, the Court ordered that Mr. Levie's deposition take place on March 2, 2023, and that all requested documents be turned over by noon on February 24, 2023.  During a February 27, 2023 status conference, Plaintiffs reported that the AIAC Defendants' document production was deficient, and to the extent that attorney-client privilege was a basis for withholding documents, no privilege log had been produced.  The Court ordered that the items specified by the Plaintiffs be produced together with a privilege log, and that such production occur by 9:00 a.m. on March 1, 2023.  The Court's written order specified that "[f]ailure to comply with this Order in good faith will be considered in the context of the Court's ultimate ruling on the pending motion for sanctions (ECF No. 158)."  ECF No. 188.

On the date of the March 2, 2023 deposition, the parties appeared before the Court after counsel asserted that Mr. Levie

5

SPA-6

was not answering questions either fully or truthfully.  The Court warned the deponent of possible contempt, and that a contempt hearing would be held if necessary.  The deposition resumed and no such hearing was held.

On March 15, 2023, Plaintiffs filed a supplement to their motion for sanctions, arguing that several categories of documents remained outstanding.  One such category, related to a payment chart that was apparently created for the purpose of this litigation, pertains to the alleged lack of documentation underlying the data in the chart.  Specifically, Plaintiffs are seeking proof of payments, invoices, and other information that would allow them to identify the roles of various individuals and entities in the purchase, operation, and closure of the bakeries.  They submit that out of the 21 payments indicated on the chart, additional documentation has been produced with respect to only two of those payments.  Also, payments of which Plaintiffs are aware through other production are reportedly missing from the chart.  Plaintiffs further submit that they have not been provided documentation of assets held by AIAC and KKBIC.

The AIAC Defendants object to several production requests on the basis of attorney-client privilege.  As noted above, the Court ordered the production of a privilege log.  The AIAC Defendants contend that 41 documents are protected by the

6

privilege.  Plaintiffs question the validity of the log that was produced, noting that no client is ever identified and that the communications in question often appear to include numerous parties.  Finally, Plaintiffs' supplemental filing in support of their motion for sanctions submits that promises of additional discovery production remain unfulfilled.

Plaintiffs contend that the AIAC Defendants' conduct, both with respect to the Rule 30(b)(6) depositions and document production, has "made a mockery" of the discovery process and that severe sanctions are warranted.  They request numerous categories of relief, including costs and fees relative to the motion for sanctions, as well as costs and fees related to the Rule 30(b)(6) depositions.  Plaintiffs also ask the Court to: preclude evidence related to any fact that the Rule 30(b)(6) witness was unable to answer or refused to answer; preclude evidence related to documents the AIAC Defendants failed to produce in advance of the Rule 30(b)(6) depositions; find as established fact that numerous entities and individuals, including Sands, those who worked with Sands after the purchase of the bakeries, and various attorneys, were agents of AIAC during the time period in question; order that documents stamped "KKBIC" were actually in AIAC's possession, custody, and control; find that there was no $1 million loan agreement; and

order that, to the extent any WARN Act notices were mailed, the mailings occurred after April 26, 2021.

In addition to the motion for sanctions, three cross-motions for summary judgment are pending before the Court. Any ruling on evidence at this time could impact the facts presented in support of those motions.

## Discussion

The primary issues underlying the motion for sanctions pertain to the Rule 30(b)(6) depositions and document production. Pursuant to Rule 30(b)(6), "when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject." *Reilly v. NatWest Markets Grp., Inc.*, 181 F.3d 253, 268 (2d Cir. 1999). The corporation must designate a representative to testify on its behalf, and that representative "must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). The corporation "must make a conscientious good faith endeavor to designate the persons having knowledge of the matters [identified] ... and to prepare those persons in order that they can answer fully, completely, [and] unevasively, the questions posed ... as to the relevant subject matters." *Eid v. Koninklijke Luchtvaart Maatschappij N.V.*, 310 F.R.D. 226, 228 (S.D.N.Y. 2015) (internal citation omitted).

"When a party fails to comply with Rule 30(b)(6), Rule 37 allows courts to impose various sanctions...." *Reilly*, 181 F.3d at 268. In determining whether to award sanctions, "courts treat the production of an unprepared [Rule 30(b)(6)] witness as 'tantamount to a failure to appear.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 39 (S.D.N.Y. 2009) (quoting *Kyoei Fire & Marine Ins. Co. v. M/V Maritime Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007)). For the Court to impose sanctions for non-compliance with Rule 30(b)(6), "the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas." *Kyoei Fire*, 248 F.R.D. at 152.

A party's failure to provide written discovery in compliance with a court order may also be met with sanctions under Rule 37. *See Lockette v. Am. Broadcasting Cos., Inc.*, 118 F.R.D. 88, 90 (N.D. Ill. 1987) ("Rule 37(d) enables a court to impose sanctions against a party for a culpable failure to produce documents in response to a request to produce."). "Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002).

SPA-10

2:21-cv-00120-wks    Document 236    Filed 08/22/23    Page 10 of 11

"Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999). In exercising discretion with respect to a sanction under Rule 37, "courts consider the following factors: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party has been warned of the consequences of noncompliance." *Ramgoolie v. Ramgoolie*, 333 F.R.D. 30, 34 (S.D.N.Y. 2019). "These factors are not exclusive, and it is not an abuse of discretion to impose sanctions where only some of the factors have been implicated." *Id.* at 35. "Any decision under Rule 37 should be made in light of the full record in the case." *Id.* (citing *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)).

Here, the record strongly suggests willful and repeated violations of the discovery rules and this Court's orders. Events prior to the Rule 30(b)(6) depositions displayed a lack of honest communication among the parties and an eleventh-hour witness substitution that resulted in a deponent who was ill-prepared to answer fundamental questions about the case. During depositions, and despite a warning from the Court that sanctions

10

continued to be considered, Plaintiffs' counsel was reportedly met with obfuscation and delay.  Document production, whether requested by Plaintiffs or ordered by the Court, was often both delayed and inadequate.  These events, viewed in the aggregate, occurred over a period of several months and prejudiced the opposing parties.  The Court therefore finds that sanctions are warranted.

## Conclusion

The motion for sanctions (ECF No. 158) is granted. Defendants AIAC and KKBIC shall pay the movants' fees and costs relative to: the November 10 and 11, 2022 and March 2, 2023 depositions; the hearings held on February 6, 2023, February 27, 2023, and March 2, 2023; and the filings submitted in support of the motions for sanctions and/or joinder.  With respect to any evidentiary or factual issues, the Court withholds ruling on those issues at this time, and reserves the right to impose additional sanctions as the case proceeds, including prior to trial.  Counsel shall submit their fees and costs for the Court's approval within 30 days of this Opinion and Order.

DATED at Burlington, in the District of Vermont, this 21st day of August, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Matthew Chaney, Nadine          )
Miller and Arthur Gustafson,    )
on behalf of themselves and     )
all others similarly            )
situated,                       )
                                )
        Plaintiffs,             )
                                )
        v.                      )    Case No. 2:21-cv-120
                                )
Vermont Bread Company,          )
Superior Bakery, Inc., Koffee   )
Kup Bakery, Inc., Koffee Kup    )
Distribution LLC, KK Bakery     )
Investment Company LLC, KK      )
Bakery Holding Acquisition      )
Company, and American           )
Industrial Acquisition          )
Corporation,                    )
                                )
        Defendants,             )
                                )
and                             )
                                )
Linda Joy Sullivan, in her      )
capacity as the Dissolution     )
Receiver for Koffee Kup         )
Bakery, Inc., Vermont Bread     )
Company, Inc. and Superior      )
Bakery, Inc.,                   )
                                )
        Intervenor-Defendant-   )
        Crossclaimant,          )
                                )
        v.                      )
                                )
KK Bakery Investment Company,   )
LLC, KK Bakery Holding          )
Acquisition Company, and        )
American Industrial             )
Acquisition Corporation,        )
                                )
        Crossclaim Defendants.  )

**OPINION AND ORDER**

Plaintiffs Matthew Chaney, Nadine Miller, and Arthur Gustafson, on behalf of themselves and a class of similarly-situated persons, bring this action alleging violations of the Worker Adjustment and Retraining Notification ("WARN") Act of 1988, 29 U.S.C. §§ 2101-2109, *et seq*.  Plaintiffs and other class members are former employees of Koffee Kup Bakery, Inc. ("Koffee Kup"), Vermont Bread Company, Inc. ("Vermont Bread"), and/or Superior Bakery, Inc. ("Superior") (collectively the "Koffee Kup Entities").  Those Koffee Kup Entities appear in this case through the intervening, state-court-appointed Dissolution Receiver of their assets, Linda Joy Sullivan (the "DR").  Other defendants include the alleged purchasers of the Koffee Kup Entities, American Industrial Acquisition Corporation ("AIAC") and Koffee Kup Bakery Investment Company, Inc. ("KKBIC").[1]  The DR has asserted a crossclaim against AIAC and KKBIC seeking indemnification.

Several motions are pending before the Court, including motions for summary judgment filed by Plaintiffs, the DR, and AIAC/KKBIC, respectively, and Plaintiffs' two motions to strike

---

[1] The case caption includes two additional parties.  The Court has granted Plaintiffs' motion to dismiss their claims against KK Bakery Holding Acquisition Company without prejudice.  ECF No. 232.  Crossclaims against that entity are still pending. Koffee Kup Distribution LLC had not appeared in the case.

certain affidavits.  For the reasons set forth below, Plaintiffs' motions to strike are denied without prejudice; their motion for summary judgment is granted in part and denied in part; the DR's motion for summary judgment is granted in part and denied in part; and AIAC/KKBIC's motion for summary judgment is denied.

### Factual Background

On or about April 26, 2021, three bakeries – Koffee Kup, Vermont Bread, and Superior - ceased operations.  As a result, hundreds of people lost their jobs.  Plaintiffs, representing a class of those former bakery employees, allege that they were not provided advance notice of their terminations as required by the WARN Act.  If Plaintiffs succeed on their claims, including the allegation that all three bakeries were owned and operated by a single employer, the employer may be subject to civil liability in the form of back pay and benefits for up to a maximum of 60 days for each of the over 400 members of the class.  *See* 29 U.S.C. § 2104(a)(1).

The three bakeries were owned by Kup Co., a holding company.  More specifically, Vermont Bread and Superior were subsidiaries of Koffee Kup, and Koffee Kup was wholly owned by Kup Co.  ECF No. 87-8.  None of the three bakeries had their own board of directors.  ECF No. 203-11 at 27.  Kup Co. had a board of directors, and during the period in question the bakeries

3

shared the same upper management, including a single Chief Executive Officer ("CEO").

Prior to April 2021, Kup Co. was in poor financial condition and was in default to its primary lender, Key Bank. The company's forbearance agreement with Key Bank had lapsed and was not renewed. In late 2020 and the first quarter of 2021, Koffee Kup hired G2 Capital Advisors, LLC ("G2 Capital Advisors") to search for a purchaser or partner to provide the company with working capital. ECF No. 203-11 at 26. In the course of that effort, G2 Capital Advisors provided financial information to Jeffrey Sands. Sands was working with Leonard Levie and Levie's company, AIAC. ECF No. 203-18 at 2-4. Sands' company, Dorset Partners, LLC, had an engagement agreement with AIAC. ECF No. 203-5 at 3. It was Sands who brought Koffee Kup to AIAC's attention. ECF No. 203-13 at 9.

AIAC specializes in purchasing underperforming companies and working to make them profitable. ECF No. 203-23 at 3. Sands pitched AIAC as the best potential buyer for Kup Co., describing AIAC as

> a family office with no limited partners. They invest their own funds to build strong companies which they hold for the long term. AIAC is an active owner. Our Chairman receives daily cash, working capital and loan data from each company. We manage professionally and conservatively to build strong businesses. AIAC has over 8,500 employees with deep pools of talent to solve complex operational and financial problems.

4

*Id.* An email sent by Sands to G2 Capital Advisors dated December 31, 2020 outlined a new Koffee Kup management team that would "report to Leonard [Levie] at AIAC headquarters.... Leonard is the founder and sole shareholder of AIAC. He wants to buy KK, has owned other commercial bakeries and two of his most successful companies are in Vermont." ECF No. 203-27. A PowerPoint presentation offered by Sands identified "AIAC Executive Leadership for Koffee Kup" as Sands and new CEO Mark Gauthier. ECF 203-23.

Prior to the purchase of Kup Co., Sands reportedly requested financial information about Kup Co.'s sales and earnings for the third financial period of 2021 ("P3"), ending March 21, 2021. ECF No. 202-4 at 3-4. On March 18, 2021, G2 Capital Advisors sent Sands copies of Kup Co.'s 2021 budget. *Id.* at 3. Sands' affidavit attests that when he inquired in late March 2021 about the company's performance during P3, Koffee Kup's Mark Coles reported that sales "were slightly off for the period while G2 Capital Advisors also indicated that there was no material change [from the budgeted projections]." *Id.* at 4.

Evidence submitted by the DR suggests that AIAC representatives were given full access to the bakeries' sales data. ECF No. 214-5 at 5. According to the testimony of Koffee Kup's Coles, on March 12, 2021, Koffee Kup gave AIAC access to

5

SPA-17

and training on the company's "BIRST" system, which tracked sales. *Id.* Coles testified that information from the BIRST system would have allowed AIAC to predict any net revenue shortfall in the P3 financials. *Id.* at 8-9.

The offer to purchase Kup Co. was submitted on AIAC letterhead signed by Levie as "Chairman AIAC." ECF No. 203-30. Levie authorized the formation of KKBIC on March 29, 2021. ECF No. 203-25. Levie ultimately owned 85% of KKBIC and Sands the other 15%. Pursuant to a Stock Purchase Agreement ("SPA") dated April 1, 2021, KKBIC purchased 80% of the stock of Kup Co. for a price of $1.00. ECF No. 198-10 at 6, 13. KKBIC also purchased $14,314,000 of Kup Co.'s subordinated debt for $1,000,000. *Id.* at 13, 35.[2] After KKBIC purchased the majority of Kup Co.'s shares, Levie and Sands occupied two of the three seats on Kup Co.'s board of directors.

The $1,000,000 for the purchase was provided by Alliance Manufacturing and Trading Company ("AMTC"), an AIAC affiliate. ECF No. 203-13 at 16-17. Although AIAC and KKBIC initially testified through their designated deponents that AMTC loaned the funds to KKBIC for the acquisition, each entity stated in subsequent errata sheets that no formal loan existed. ECF Nos. 203-35, 203-36. As part of the purchase agreement, KKBIC also

---

[2] Sands attests in his affidavit that the $1 million payment was accompanied by a $2 million note. ECF No. 202-4 at 3.

6

agreed to contribute up to $2.5 million as needed.  ECF Nos. 198-10 at 13, 203-30 at 3-4.  It is unclear where that money would come from, since KKBIC had no bank account and is insolvent.  ECF Nos. 203-26 at 2, 203-6 at 10.

On April 1, 2021, Sands sent an email to Koffee Kup managerial employees stating that "AIAC has brought in their inhouse turnaround team to restructure the business, manage it through a transition and then establish a long-term strategic plan to guide the business in the decades which follow."  ECF No. 203-38 at 58.  Sands also sent employees a PowerPoint presentation that included the statement: "On April 1, 2021, AIAC made a control investment in Koffee Kup Bakery."  ECF No. 203-38 at 64.

Sands attests that within days of the purchase, he discovered Kup Co.'s financial situation was much worse than previously disclosed.  Sands' affidavit states that on April 5, 2021, he learned that the company's P3 gross sales were $963,693 below budget.  ECF No. 202-4 at 4.  He further contends that the P3 financials were prepared prior the SPA closing, and were wrongfully withheld until after the sale was finalized.  *Id.* at 5.  According to Sands, a new "forecast based upon the true financials projected substantial, multi-million-dollar losses and a negative cash balance by the end of 2021."  *Id.* at 6.

7

The DR contests Sands' accusations, asserting that Sands and CEO Gauthier had access to all of the company's financials, including access to the BIRST system, prior to the SPA closing. ECF No. 198-23 at 2 (Coles Timeline, to which Coles attested in his deposition at ECF No. 203-12 at 25). Those financials reportedly showed significant losses through 2021 P2, requiring the former shareholders to advance over $14 million to keep the company operating. When asked for the P3 financials in late March 2021, Coles responded to Sands that the company did not have complete sales data at that time, and that the information would not be final until April 1. ECF No. 198-23 at 2.

The P3 financials were emailed to Coles at 4:29 p.m. on April 1. ECF No. 209-22 at 2. The DR submits that there is no evidentiary support, aside from Sands' own statement, for the claim that G2 Capital Advisors delayed those financials or misled anyone about the strength of the company. The DR further contends that if access to the P3 financials was critical for closing, the buyer could have waited a few more days before completing the deal.

In his deposition, Sands recalled that in light of the P3 data he received "a call from [newly-appointed CFO] Dave Cryer and Leonard [Levie] saying, '[t]here's no way this company is saveable.'" ECF. No. 203-18 at 25-26. Sands has also testified:

8

> [O]nce the Period 3 was revealed and how bad the company truly was, we realized somebody would need to . . . bring in $10 million worth of improvements to make the company viable; and the only one that could possibly do that would be a strategic buyer, another bakery.
>
> So basically, that evening we told Key our opinion's changed on this, the business is -- is dead.  It's not something we think we can be successful with, but somebody can be.
>
> And pretty much from the 7th to whenever it was, the 26th, I was killing myself trying to find a strategic buyer, talking to every other bakery I could think of to try to get somebody to come in and – and take it off our hands.

ECF No. 203-39 at 7.

Indeed, on April 6, 2021 KKBIC informed Key Bank of what it had allegedly learned about the company's financial situation. ECF No. 202-4 at 7.  On April 9, 2021, Key Bank issued a default notice and hired an outside advisor to serve as the bank's receiver.  *Id.*  Key Bank also reportedly informed the company that it would not extend the forbearance agreement or fund the company's payroll unless the company cooperated with the appointment of a receiver and with the liquidation of the bank's collateral.  *Id.*  The DR asserts that the notice of default was sent after Sands told Key Bank that Levie would not be meeting his agreed-upon obligation to provide $2.5 million in funds to the company.  ECF No. 209-23 at 2.

In his efforts to sell the company, Sands reached out to potential buyers.  ECF Nos. 202-4 at 7, 203-39 at 7.  Related

9

sales materials characterized AIAC's involvement in Kup Co. as: "affiliate of AIAC owns 80%, individuals own 20%; AIAC controls board." ECF No. 203-41 at 6. Sands attests that while two interested parties were identified, one was rejected by Key Bank and the other failed to make an offer the bank found acceptable. ECF No. 202-4 at 8.

On April 22, 2021, Key Bank issued a formal notice of default and communicated its intent to foreclose. On Friday, April 23, 2021, Sands told Coles to inform workers that the bakeries were closing and they should not continue coming to work. ECF No. 203-12 at 41. Coles, the only upper management person remaining from the pre-sale Koffee Kup team, refused to sign the proposed notice of closure. ECF No. 198-5 at 17.

Notices of the layoff were dated April 26, 2021 and signed by Sands on behalf of "Dorset Partners, LLC, agent for Koffee Kup Bakery By: Jeffrey Sands, Member." ECF No. 198-31.[3] The letters stated that Koffee Kup Bakery, Inc., and its respective subsidiaries (Vermont Bread in Vermont, and Superior in Connecticut) would be terminating all operations effective that date. The notice of layoff letters also explained:

> although many promising avenues were explored that we
> were cautiously optimistic would have allowed Koffee
> Kup to survive, those efforts have now been exhausted

---

[3] Plaintiffs assert that Sands had no engagement agreement with any of the Koffee Kup Entities, and thus was not an "agent for Koffee Kup Bakery." ECF No. 203-2 at 13.

without success and Koffee Kup no longer has
sufficient capital to continue operations.  We were
unable to provide you with this notice any earlier as
we were uncertain of the success of the efforts that
we have been making to continue operating.  Earlier
notice of this unfortunate outcome would have been
premature and would have jeopardized those very
efforts.

ECF Nos. 198-31 at 2, 202-11 at 3.  The notices were handed out to some employees on April 27, 2021, and mailed to all employees between April 27 and April 29, 2021.  ECF Nos. 198-26 at 20; 203-8 at 3, 5; 217-7 at 12 (Kup Co. board minutes stating that notices were sent on "Tuesday," April 27, 2021).

On May 6, 2021, the Commissioner of the Vermont Department of Labor wrote to Sands and requested an explanation as to why notice was not given in accordance with Vermont's Notice of Potential Layoffs Act, 21 V.S.A. §§ 414(a)(3).  Based upon a letter received from the company's counsel, the Department of Labor's General Counsel subsequently concluded that the company's invocation of the "faltering business" and "unforeseen business circumstance" exceptions to the notice requirement were each "sufficiently justified," and no further action was taken by the State of Vermont.  ECF No. 198-33.  Plaintiffs and the DR disagree with that conclusion, noting that the Department of Labor relied solely on corporate counsel's representations and did not conduct its own investigation.  ECF No. 223 at 9.

11

Plaintiffs filed their Class Action Complaint on April 29, 2021, and their First Amended Class Action Complaint on June 15, 2021, alleging violations of the WARN Act.  On March 17, 2022, Linda Joy Sullivan moved to intervene as the DR for the Koffee Kup Entities.  The Court granted her unopposed motion on March 30, 2022.  The Court granted Plaintiffs' motion to certify the class on August 17, 2022.

In addition to Plaintiffs' claims, pending before the Court is the DR's crossclaim against AIAC and KKBIC for indemnification.

**Discussion**

**I.    Plaintiffs' Motions to Strike**

Among the motions now before the Court are Plaintiffs' motions to strike each of two Sands affidavits, submitted in support of the motion for summary judgment filed by AIAC and KKBIC.  As discussed more fully below, Plaintiffs contend that the affidavits include self-serving statements of fact that are belied by the record and are not credible.  AIAC and KKBIC argue that Sands' sworn affidavits merely offer disputes of fact that prevent Plaintiffs from obtaining summary judgment, and that credibility determinations are inappropriate at this stage in the case.

"Because 'a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment,' it is

12

appropriate to consider a motion to strike prior to a motion for summary judgment." *Pugliese v. Verizon New York, Inc.*, No. 05-CV-4005, 2008 WL 2882092, *5 (S.D.N.Y. July 9, 2008) (quoting *Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, No. 00-CV-6041, 2003 WL 22327162, *2 (S.D.N.Y. Oct. 10, 2003)).  That said, the Court may choose to review the Sands affidavits solely in the context of the summary judgment motions, addressing each statement individually.  *See Coolidge v. United States*, No. 10-CV-363S, 2015 WL 5714237, at *3 (W.D.N.Y. Sept. 29, 2015) ("Rather than strike a declaration because it contains hearsay, argument, or statements unsupported by citations to the record, courts considering a motion for summary judgment are free to disregard the improper portions, independently review the record, and consider only that which is admissible.").

The most controversial statements in the Sands affidavits pertain to the roles of AIAC and KKBIC in the purchase and subsequent management of Kup Co. and the Koffee Kup Entities. Sands attests that AIAC was not involved with KKBIC, Kup Co., or Kup Co.'s subsidiaries.  Sands Aff. ¶ 49.  Sands further states that KKBIC exercised no control over, and was not involved with, the operations of the company.  Sands Aff. ¶ 51.  According to AIAC and KKBIC's statement of facts, "[a]ll decisions regarding the Company's operations, including the shutdown, were exclusively discussed and voted upon by the board of Kup Co."

13

ECF No. 202-2 at 8 (citing Sands Aff. ¶ 62).  Sands also accuses certain persons and entities of lying and committing fraud. Other statements in the Sands affidavits are not specifically disputed.

Because the Sands affidavits contain a mix of disputed and undisputed statements, only some of which are challenged in the motions to strike, the Court declines to strike the affidavits entirely and will instead review them in the context of the entire summary judgment record.  *See, e.g., Kozak v. CSX Transportation, Inc*., No. 20-CV-184S, 2023 WL 2955851, at *7 (W.D.N.Y. Apr. 14, 2023) ("rather than strike these submissions in whole, this Court will independently assess their admissibility and consider only admissible evidence in resolving CSX's motion for summary judgment"); *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 231 (D. Conn. 2008) ("in the context of summary judgment, motions to strike are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion") (cleaned up).  Plaintiffs' motions to strike (ECF Nos. 216, 227) are denied without prejudice.

## II.  Plaintiffs' Motion for Summary Judgment

### A.   Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The Court's job is not to "weigh the evidence or resolve issues of fact."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

When, as in this case, parties file cross-motions for summary judgment, the Court analyzes the motions separately "in each case construing the evidence in the light most favorable to the non-moving party." *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011).

**B.    The WARN Act**

The WARN Act prohibits employers of 100 or more employees from ordering "a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). WARN Act notice aims to "provide[ ] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a); *see also Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013). Failure to provide a WARN Act notice may subject an employer to civil liability in the form of back pay and benefits for the period of the WARN Act violation up to a maximum of 60 days. *See* 29 U.S.C. § 2104(a)(1).

**C.    Was There a Single Employer?**

A threshold question is whether the three bakeries were owned and operated by a single employer. The issue is material because the WARN Act applies only to employers of 100 or more

16

employees, and two of the three bakeries reportedly employed fewer than 100 employees at the time of the closures. When considered together, however, the Koffee Kup Entities employed over 300 persons.

Plaintiffs argue that Kup Co.'s ownership of Koffee Kup and its subsidiaries, shared upper management, shared operations, and a single Kup Co. board of directors demonstrate that the three bakeries were owned and operated by a single entity. Plaintiffs also highlight the control that Sands and the AIAC team exerted over the three bakeries around the time of the closures. The DR's motion for summary judgment initially contests the single employer characterization, but alternatively endorses the theory to the extent that the Court finds the single employer was AIAC/KKBIC. AIAC and KKBIC argue that there was no single employer, and that in any event the layoffs were driven by Kup Co. and not AIAC/KKBIC.

In *Guippone*, the Second Circuit adopted a five-factor test set forth in federal Department of Labor ("DOL") regulations to determine if related entities constitute a single employer. 737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)(3)). The DOL regulations provide that

> independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of independence from the parent. Some of the factors to

17

be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2).  "As in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach."  *Guippone*, 737 F.3d at 226.  The Second Circuit has noted that "[t]hese factors are also sensibly applied to determine whether WARN liability is to be imposed on an equity investor, who may similarly exercise control over the termination decision."  *Id.*

Prior to the purchase of Kup Co. by KKBIC, the Koffee Kup Entities operated largely as a single organization with a sole CEO overseeing operations.  Although the bakeries kept separate accounting records, financial records, and payrolls, Koffee Kup CEO Morin testified that he was hired to integrate operations, and that the company was in the process of creating an integrated IT system for all accounting, sales, manufacturing, and supply chain.  ECF No. 203-11 at 5-7.  Morin's duties also included managing staff at the three bakeries.  *Id.* at 3-4.  Coles viewed the three entities as a single enterprise.  ECF No. 203-12 at 5.  That view was echoed by the Key Bank receiver, who testified that "the companies were generally operated as a

18

single enterprise, with substantial comingling of assets, liabilities and financial transactions." ECF No. 76-5 at 1.

At the corporate level, Vermont Bread and Superior were subsidiaries of Koffee Kup, which was wholly owned by Kup Co. After the sale to KKBIC, the three entities had a single board of directors. Two of those three board members were Levie and Sands, who were also the sole owners of KKBIC. After KKBIC's purchase of a controlling share of Kup Co., the company was again run by a single CEO and CFO, together with Sands as the Chief Restructuring Officer. Those officers were identified as part of the AIAC team, all of whom reported to Levie.

Other factors further support a single employer theory. Although the record shows that the three bakeries had their own personnel policies, it is clear that the post-sale executive team had plans to uniformly alter those policies by, for example, reducing benefits and staff numbers. ECF No. 203-38 at 69. Moreover, the decision to shut down the bakeries came from a single source and impacted all employees. This latter fact weighs heavily in favor of finding *de facto* control by a single employer, since "[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy." *Garner v. Berhman Brothers IV, LLC*, 260 F. Supp. 3d 369, 377 (S.D.N.Y. 2017) (quoting *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004)).

19

As to the final factor – dependency of operations – the record shows the bakeries needed a single influx of capital to continue operations.  Moreover, bakery operations were interwoven as, for example, Superior would bake product for the distribution networks of the two others.  ECF No. 203-12 at 5-6. The Court therefore finds that, even when viewing the facts in the light most favorable to the non-moving parties, the undisputed record establishes that there was a single employer in this case.

D.    **Who Was the Employer at the Time of the Closure?**

Also material is the identity of the single employer. Plaintiffs argue that at the time of the layoffs, AIAC and KKBIC, through Levie and others, held controlling ownership and exercised *de facto* control over the company.  Plaintiffs also contend that the Koffee Kup Entities share liability jointly and severally with AIAC and KKBIC, as they were the direct employers.  The DR argues that the closure was controlled exclusively by Sands, Levie, and the AIAC team, and that the Koffee Kup Entities bear no liability.

AIAC submits that it was not involved in either the financial investment or management of the bakeries.  As Levie testified: "AIAC is a brand.  AIAC is a group.  AIAC operates through affiliates."  ECF No. 203-22 at 16.  AIAC concedes that communications from Sands promoted AIAC as being "in the best

20

position to support" revitalization of the business, but argues that "support" is not the same as managing or executing a takeover plan.  ECF No. 217-2 at 3.  AIAC also argues that it had nothing to do with KKBIC.

The assertions and characterizations by AIAC/KKBIC about its role in the business, including its involvement in Kup Co., are inconsistent with undisputed portions of the summary judgment record.  That record includes evidence of communications, including emails and presentations by Sands himself, demonstrating the significant roles that AIAC, KKBIC, Levie, and Sands played in the ownership and operation of the Koffee Kup Entities after April 1, 2021.

As noted above, AIAC is owned exclusively by Levie and "operates through affiliates."  ECF No. 203-22 at 16.  When Levie uses the term "affiliates," he means "a corporate entity with common ownership."  *Id.* at 15.  One AIAC affiliate, KKBIC, purchased 80% of Kup Co.  Another AIAC affiliate, AMTC, funded the purchase.

Kup Co. wholly owned the three bakeries.  After April 1, 2021, Levie and Sands held two of the three positions on the Kup Co. board.  On April 8, 2021, Levie emailed Sands and directed him to "serve as monitor to [K]up Co on behalf of KK Investment Company and its Board of Directors."  ECF No. 203-38 at 87.  Sands was to receive payment for that assignment from AIAC.  ECF

21

No. 203-43 at 1.  The record shows that Sands was paid by AIAC affiliate AMTC.  ECF No. 203-59 at 18.[4]

AIAC ultimately replaced Morin with Gauthier as the new CEO.  Sands and Gauthier were described as "AIAC Executive Leadership for Koffee Kup," with others from AIAC listed as "Additional AIAC Leadership for Koffee Kup."  ECF 203-38 at 67-68.  AIAC offered a new employment agreement to Koffee Kup Vice President of Manufacturing Ben Richards, which agreement was signed "Sincerely, Mark Gauthier AIAC" and was presented on AIAC letterhead.  ECF 203-38 at 92.

With respect to the closures, the undisputed record shows that it was Sands who, on April 26, 2021, told Coles and human resources personnel that it was time to fire all employees.  ECF No. 203-12 at 41.  Sands also signed the WARN Act letters.  ECF No. 198-31 at 3.  With Levie signing on behalf of AIAC and as a Kup Co. board member, AIAC retained the attorneys who provided counsel regarding plant closures and WARN Act notices.  ECF No. 203-29 at 50-69.  Payments for lawyers working on matters related to KKBIC were wired from an AMTC account.  ECF No. 203-29 at 70.  In the course of this litigation, AIAC has asserted

_____

[4] The Court cites to sealed portions of the record where it finds no "compelling reason" barring it from doing so.  *See Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

attorney-client privilege with regard to its communications with those attorneys.  ECF No. 210 at 54-55.

Plaintiffs highlight the fact that there was never a formal resolution adopted by the Kup Co. board to cease bakery operations.  When asked in written discovery about such board action, Levie, through counsel, answered only that a resolution was adopted to try to negotiate a voluntary foreclosure or turnover of assets to Key Bank.  ECF No. 203-40 at 5. Plaintiffs submit that such a resolution is not the same as a formal board decision on closure.  Nor was there any reference to Kup Co. or its board in the WARN Act letters.  ECF Nos. 198-31.  Plaintiffs contend that this failure to adhere to corporate formalities supports their claim that the AIAC team, including Sands, was in *de facto* control of operations.

In *Guippone*, the Second Circuit noted that the "core" of the *de facto* control factor is "whether one company was the decision-maker responsible for the employment practice giving rise to the litigation."  737 F.3d at 227 (quoting *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008)). Here, that decision-maker was the AIAC team, led by Levie and Sands as owners of KKBIC and controlling board members of Kup Co.  Consequently, AIAC and KKBIC bear responsibility for any WARN Act violations.

In making these determinations, the Court is not directly challenging the credibility of the Sands affidavits despite their inconsistencies with other evidence.  Several of Sands' statements assert conclusions about corporate relationships, taking a narrow view of those relationships based upon equity investments.  The undisputed evidence, however, shows that those relationships must be viewed in the larger context of the people involved and their various roles.  In some instances, detailed above, Sands' conclusions contradict his own prior communications, as when he denies AIAC's involvement in the operation of Kup Co. or the Koffee Kup Entities.  Given the undisputed documentary evidence, the Court finds that no jury could reasonably credit those conclusions.  *See, e.g., Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (holding that summary judgment was properly granted to defendants where plaintiff relied almost entirely on her own testimony, which was contradicted by contemporaneous letters and meeting notes).

Plaintiffs submit that the inquiry does not stop at AIAC/KKBIC, and that the Koffee Kup Entities share liability as the direct employers.  Indeed, the Koffee Kup Entities played a significant role in the closure, as their employees informed workers of the layoffs, stopped assigning shifts, and stopped payroll.  Liability of the Koffee Kup Entities is addressed more

fully below in the Court's discussion of the exceptions to WARN Act liability.  Briefly stated, the Court finds that the Koffee Kup Entities, as the direct employers, share joint and several liability with AIAC and KKBIC since a direct employer may not simply avoid all liability by passing it to a corporate parent. Nonetheless, those Entities' lack of control over the plant closures entitles them to relief on their crossclaim.

### E.    Application of WARN Act Exceptions

The WARN Act requires an employer to provide 60 days' advance written notice of a plant closing to employees, as well as notice to state and local governments.  29 U.S.C. § 2104(a)(1), (2).  There is no dispute that the closures in this case constituted a plant closing within the meaning of the statute.  Furthermore, with the single employer issue having been resolved, the number of employees impacted by the plant closures triggered WARN Act obligations.  29 U.S.C. § 2104(a)(1).

The WARN Act offers exceptions to the 60-day notice rule. Those exceptions include the "faltering company" exception, *see* 29 U.S.C. § 2102(b)(1), and the "unforeseen business circumstance" exception, *see id.* § 2102(b)(2)(A).  The "unforeseen business circumstance" exception provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is

25

caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(a). The "faltering company" exception applies if "as of the time that notice would have been required the employer was actively seeking capital or business, which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." *Id.* § 2102(b)(1). AIAC and KKBIC argue that they are entitled to application of both exceptions.

The DR contends that the Koffee Kup Entities are entitled to application of the "unforeseen business circumstance" exception because they were surprised by the closure announcement. She also claims protection under the statute's "sale-of-business" exception. The latter exception places responsibility for WARN Act compliance upon the buyer of the business if the plant closing or mass layoff took place after the effective date of the sale. 20 C.F.R. § 639.4(c). An employer relying on a WARN Act exception bears the burden of persuasion. 20 C.F.R. § 639.9.

Plaintiffs submit that no defendant is entitled to an exception because there was no advance notice of the closings. The WARN Act letters were dated April 26, 2021 – the effective

date of the closure – and Plaintiffs contend that they were not mailed or handed out until, at the earliest, the next day. Courts have held that although an exception may apply, at least some notice must be provided. *See, e.g., Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("it is manifest that a WARN Act employer attempting to circumvent the 60-day notice requirement must still give some notice in accord with 29 U.S.C. § 2102(b)(3). The unforeseeable business circumstances defense does not jettison this absolute requirement under the WARN Act; even where the defense is properly invoked, some notice must be given.").

The timing of a WARN Act notice must be "as much . . . as is practicable." 29 U.S.C. § 2102(b)(3). The Department of Labor regulations have interpreted that provision to include "notice after the fact." 20 C.F.R. § 639.9. Consistent with that interpretation, the Third Circuit noted in dicta that "[i]n the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated." *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999). Accordingly, there is authority for the proposition that while an employer must provide WARN Act notice, exceptional circumstances may allow for such notice to occur after a plant closure or mass layoff.

AIAC and KKBIC claim that this case presents such exceptional circumstances in the form of fraud by the selling party.  As a result of that alleged fraud, AIAC and KKBIC were reportedly surprised by the gravity of the company's financial situation.  Plaintiffs counter, in part, that this defense is unavailable because the alleged fraud was not mentioned in the WARN Act notices.  Plaintiffs further argue that the alleged fraud is unsupported by admissible evidence, and that any alleged surprise was not an "unforeseen circumstance" under the statute because it was not beyond the employer's control.

As to the substance of the notice, the WARN Act requires "a brief statement of the basis for reducing the notification period."  29 U.S.C. § 2102(b)(3).  Here, the WARN Act letters did not mention any unforeseen fraud.  The letters instead explained that Koffee Kup had been operating at a loss for some time, was in default on outstanding loans including those with its senior lender, and that the senior lender had allowed the company to continue operations pursuant to a forbearance agreement that had expired.  ECF No. 198-31 at 2.  The letters also referenced failed efforts to obtain additional financing or investors.  *Id.*  There was no reference to insufficient financial information at the time of the sale, or to any fraud by the selling party.

The Ninth Circuit has opined that "Congress' purpose in requiring a brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened." *Alarcon v. Keller Industries, Inc.*, 27 F.3d 386, 389 (9th Cir. 1994). The statement therefore "must give some indication of the factual circumstances that made an exception to the statutory notice requirement applicable, providing an adequate specific explanation to affected workers." *Id.* at 390; *see, e.g., Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1318 (D. Mont. 2001) (holding that notice was inadequate since it only stated that the company had "sustained tremendous losses" and was forced to make "some serious decisions"). The requirement also exists "to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation-convenient but factually *post hoc* justifications for their actions." *Sides*, 725 F.3d at 1285-86.

Here, with no mention of fraud or surprise in the notices of closure, employees had no opportunity to determine whether, on that basis, the absence of prior notice was reasonable. Consequently, the employer's failure to set forth the statutorily-required "brief statement of [that] basis for reducing the notification period," 29 U.S.C. § 2102(b)(3), disqualifies it from protection under the "unforeseen business

circumstance" exception.  *See In re Dewey & LeBoeuf LLP*, 507 B.R. 522, 533 (Bankr. S.D.N.Y. 2014) ("even under dire circumstances, employers must deliver written WARN notices containing the necessary brief statements to qualify for the WARN Exceptions").

Furthermore, the regulations make clear that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."  20 C.F.R. § 639.9(b)(1).

> A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable.  A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

*Id.*  Here, the allegedly "unforeseeable" event occurred entirely within the company, involving communications between the seller and the buyer.  There was no outside circumstance or event that could not have been foreseen.  There is no dispute that AIAC/KKBIC was given access to sales data, was told that P3 results would be "soft," and knew that it was buying a failing business.  Financial distress in excess of what was previously estimated or expected by the buyer, despite the opportunity for a due diligence review, is not the equivalent of a sudden

30

contract loss, government closure, or unexpected economic downturn.  Moreover, the company met its demise in part because AIAC/KKBIC decided not to contribute additional money, including the funds it pledged at the outset, to keep the business operating.  *See, e.g.*, ECF No. 219-5 (Kup Co. board minutes reflecting Levie's instruction to "inform the bank that neither the Company nor its shareholders had interest in providing further funding").

Also without merit is the claim that Key Bank calling its loan constituted an unforeseen circumstance.  The loan with Key Bank had been in default prior to the sale of the company, continued forbearance was in no way guaranteed, and the April 1, 2021 sale was finalized without Key Bank's approval.  ECF No. 210 at 50.  Accordingly, AIAC and KKBIC are not entitled to protection under the "unforeseen business circumstance" exception.

Given the Court's conclusion that the "unforeseen business circumstance" exception is not available to AIAC or KKBIC, it need not fully assess their factual assertions underlying the claims of fraud.  Nor does the Court need to review whether those parties exercised "commercially reasonable business judgment" in failing to accurately assess the company's financial situation.  20 C.F.R. § 639.9(2).  The Court does note, however, that KKBIC allegedly entered into the purchase

31

agreement knowing that the final P3 financials were outstanding, and closed the deal nonetheless.

AIAC and KKBIC also call for application of the "faltering company" exception. The federal regulations set forth four elements for this exception: (1) the employer must have been actively seeking capital or business at the time the 60-day notice would have been required; (2) there must have been a realistic opportunity to obtain the desired financing or business; (3) the financing or business would have been sufficient to either avoid or postpone the shutdown; and (4) as set forth in the statute, the employer reasonably and in good faith believed that giving the required notice would have precluded it from obtaining the necessary capital or business. 20 C.F.R. § 639.9(a).

AIAC and KKBIC argue that a public WARN Act notice prior to the closure would have prohibited the sale of Kup Co. as a going concern. Specifically, they argue that such a notice would have scared suppliers into restricting sales, frightened employees into leaving their jobs, and caused customers to reduce shelf space for Kup Co. products, thereby further damaging the company and making it unattractive to a potential buyer. Plaintiffs note that AIAC and Sands sought a new buyer for the company only after declining to infuse the bakeries with the promised $2.5 million investment. Plaintiffs also submit that Levie and AIAC

32

had significant funds at their disposal and, consistent with their own attestations prior to the sale, did not need to look to other sources for investment. ECF No. 203-18 at 16 (Sands deposition); ECF No. 203-30 at 8.

As stated in the federal regulations, "[t]he actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed." 20 C.F.R. § 639.9(a)(4). Because AIAC, through its affiliates, reportedly had access to significant additional capital, its efforts to find another party to make the necessary investment do not qualify it for the faltering business exception. ECF No. 203-30 at 8 ("AIAC invests its own financial resources and does not require financing from third parties.").

Moreover, the faltering business exception applies to efforts to obtain either capital or new business, and not to efforts to sell the company. The regulations limit the exception to instances where the employer was "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially

33

reasonable method."  20 C.F.R. § 639.9.  Efforts to sell the business do not qualify.  *See, e.g., Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-CV-263, 2022 WL 4119367, at *15 (N.D.W. Va. Aug. 2, 2022) ("Case law makes clear that a sale of the business does not meet this definition."); *Law v. Am. Capital Strategies, Ltd*., 3:05-0836, 2007 WL 221671 at *10 (M.D. Tenn. 2007) ("This Court concludes that [the faltering company] exception is inapplicable where, as here, the closings and/or layoffs occur as a result of a failed business sale.").

The Sands affidavit states that KKBIC tried to "secure external funding or a new investor to keep the Company operational," but identifies no such investors other than the parties to whom he reached out in an effort to sell the company. ECF No. 202-4 at 7.  Nor is there record evidence that the owners of Kup Co. were actively seeking capital, rather than a new owner, 60 days prior to the closure.  AIAC/KKBIC's briefing concedes that "not being able to raise the necessary infusion of funds, the only feasible solution was to find a buyer with overlapping production, distribution and administrative costs." ECF No. 217 at 10.  And Sands' own testimony, quoted above, makes clear that once Levie and Cryer notified him the business was not "saveable," he focused on selling the company.  ECF No. 203-39 at 7.

Furthermore, in order to meet its burden, a defendant invoking the faltering business exception must show that there was "a realistic opportunity to obtain the financing or business sought."  20 C.F.R. § 639.9(a)(2).  The Sands affidavit offers no evidence of a "realistic opportunity," explaining only that one potential buyer failed to show up to a planned meeting and the other was rejected by Key Bank.  ECF No. 202-4 at 8.  AIAC and KKBIC have therefore failed to meet their burden with respect to this exception.

The DR contends that the Koffee Kup Entities have no liability exposure pursuant to the "sale-of-business" exception set forth at 29 U.S.C. § 2101(b)(1), since the business had been sold to AIAC/KKBIC.  As explained in the federal regulations:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale.  After the effective date of the sale of all or part of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title.

20 C.F.R. § 639.4(c).

This issue invites a closer look at the "sale-of-business" exception in the context of the sale in this case.  Both before and after the sale, Kup Co. existed as the holding company for the Koffee Kup Entities.  KKBIC took an 80% stake in Kup Co.

35

The sellers in the transaction were those parties who sold their debt and their Kup Co. shares.[5]  It is those selling parties, none of whom are named in this lawsuit, who could most clearly avail themselves of a "sale-of-business" exception.  Kup Co., and thus the Koffee Kup Entities, were not the sellers.

Plaintiffs further argue that control by a corporate entity such as Kup Co., or AIAC/KKBIC, does not insulate the Koffee Kup Entities as the direct employers.  They contend that such insulation would allow actual employers to avoid liability by pointing to ownership by a shell corporation with few or no assets.  Plaintiffs' position is facially supported by the regulations, which treat direct employers/subsidiaries "as part of the parent or contracting company depending upon the degree of independence from the parent."  *Id.* at § 639.3(a)(2); *see also Garner*, 260 F. Supp. 3d at 381 ("A direct employer, in the context of a WARN Act claim brought under a single employer theory, is such a joint tortfeasor.").

The DR also seeks application of the "unforeseeable business circumstance" exception, arguing that the plant closures came as a complete surprise.  When KKBIC took control of Kup Co., the expectation was that Levie and/or AIAC would

---

[5]  Those sellers reportedly included Bripan SRL, Socipar SAS, and 9249-9557.  Subordinated debt holders included those parties as well as Jose Aubery, Bertrand Aubery, and Hubert Aubery.  ECF No. 202-1 at 4.

infuse the business with up to $2.5 million.  The Sands PowerPoint slides also suggested plans for improving business operations in order to return the Koffee Kup Entities to profitability.  The DR submits that after receiving these assurances of investments and operational changes, notice of the plant closings on April 23, 2021 constituted the sort of "sudden, dramatic, and unexpected action or conditions outside the employer's control" that is protected by the statute.  20 C.F.R. § 639.9(b)(1).

Application of this exception would again require a "brief statement" of the reason for the closure.  Here, there was no discussion in the WARN Act letters of a surprising decision to close.  Furthermore, as discussed above with respect to AIAC/KKBIC, the circumstances cited by the DR were not the sort of external events – such as the loss of a major contract or an economic downturn – that qualify for the exception.  Accordingly, the "unforeseeable business circumstance" exception does not apply to the Koffee Kup Entities, and Plaintiffs are entitled to judgment as a matter of law against all Defendants.

**F.   Back Pay and Benefits**

Plaintiffs also move the Court to award damages, which they set at nearly $3.6 million.  Under the WARN Act, an employer that violates the notice requirement

shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for —

(A) back pay for each day of violation at a rate of compensation not less than the higher of —

(i) the average regular rate received by such employee during the last 3 years of the employee's employment;

or

(ii) the final regular rate received by such employee[.]

29 U.S.C. § 2104(a)(1).  According to an affidavit submitted by class counsel, back pay was calculated based on employee census data as of May 7, 2021, which was provided to Plaintiffs by Coles in response to a subpoena.  ECF No. 203-51 at 4.  From that census data, class counsel developed a spreadsheet that included each employee's name, hire date, employment site, and annual salary.  ECF No. 203-53.  The spreadsheet does not include the nine employees who opted out of the class action. Using the annual salary figure for each employee, counsel then calculated the wages due for the 60-day period, with reductions for those who were employed for fewer than 120 days.  *See* 29 U.S.C. § 2104(a)(1) (limiting WARN Act liability to no more than one-half the number of days the employee was employed).

The DR objects to the back pay calculation as unsupported by admissible evidence and insufficiently individualized.  As to the question of admissibility, the DR does not dispute that the

data upon which the calculations are based were produced by Coles and constitute business records.  *See* Fed. R. Evid. 803(6).  The DR also cites no authority for its argument that Plaintiffs may not use the average rate of earnings for each employee.  In fact, such averaging is what the statute appears to allow in developing a "rate" of compensation.  29 U.S.C. § 2104(a)(1)(A)(i).

AIAC and KKBIC assert that they undertook significant efforts to try to help employees find new jobs within the 60-day period.  Plaintiffs' damages do not appear to address or incorporate those mitigative efforts, and the parties have not fully briefed whether incorporation of such mitigation is appropriate under the WARN Act.[6]

The DR also contests Plaintiffs' calculation of benefits. To calculate benefits, class counsel used DOL statistics for "production" workers' average insurance and retirements benefits.  ECF No. 203-51 at 4.  The DR submits that national averages are not acceptable, and that payroll records show most of the bakery workers received no such benefits.  Plaintiffs respond only that their efforts were reasonable, and that any shortcomings in their approach are due to inadequate discovery

---

[6]    In their second motion to strike, Plaintiffs contend that the question of mitigation is irrelevant to WARN Act liability and is not supported by admissible evidence.  ECF No. 227 at 2.

responses by defendants.  Plaintiffs have not moved to compel
that additional discovery, and have failed to show that the
benefits calculations were individualized.  *See* 29 U.S.C. §
2104(a)(2) (providing for individualized reductions related to
health and pension benefits).

The DR's final damages defense asks the Court to apply the
good faith exception set forth at 29 U.S.C. § 2104(a)(4).  That
exception provides:

> If an employer which has violated this chapter proves
> to the satisfaction of the court that the act or
> omission that violated this chapter was in good faith
> and that the employer had reasonable grounds for
> believing that the act or omission was not a violation
> of this chapter the court may, in its discretion,
> reduce the amount of the liability or penalty provided
> for in this section.

29 U.S.C. § 2104(a)(4).  The DR submits that the Koffee Kup
Entities qualify for a reduction of liability under this
exception because (1) they played no role in the decision to
shut down the facilities, and (2) the WARN Act notices were
provided almost immediately thereafter.  The DR further argues
that, at the very least, the good faith of the Koffee Kup
Entities is a disputed question of material fact precluding
summary judgment on the amount of liability.

The Court agrees that, assuming the facts set forth by the
DR fit within the exception, and although resolution of the DR's
crossclaim may render the issue moot as a practical matter,

questions of subjective and objective belief raised by the good faith defense are not sufficiently established to rule out disputed issues of fact.  Accordingly, and for the several reasons set forth above, the Court cannot grant Plaintiffs' motion for summary judgment with respect to damages.

**III. The Dissolution Receiver's Motion for Summary Judgment**

The DR also moves for summary judgment, based upon many of the same undisputed facts cited by Plaintiffs.  In its motion, the DR reiterates her arguments for application of the "sale-of-business" exception and the "unforeseeable business circumstance" exception.  The Court has rejected application of those exceptions for reasons set forth above.  The DR also submits that the Koffee Kup Entities have no liability because they were not involved in the decision to close the plants.

The DR cites case law for the proposition that a direct employer is, at most, a joint tortfeasor and not a necessary party.  As discussed previously, the controlling role of the corporate parents, in this case Kup Co. and KKBIC, does not necessarily relieve the direct employer from joint liability.  Indeed, under the single employer doctrine, subsidiaries are treated "as part of the parent."  *Guippone*, 737 F.3d at 226.

The DR cites *Guippone* and the Third Circuit's decision in *Pearson*, which was quoted at length in *Guippone*, for the proposition that a corporate parent in *de facto* control of the

41

company relieves the direct employer from liability.  Neither case supports that proposition.  Both *Guippone* and *Pearson* focused on the liability of the parent, and said nothing about releasing the subsidiary from joint liability.  *See, e.g., Guippone*, 73 F.3d at 227 (holding that the *de facto* prong "allows the factfinder to consider whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for the litigation"); *Pearson*, 247 F.3d at 487 ("if the parent has sufficiently overwhelmed its subsidiary in taking the challenged action, such a showing is sufficient to create liability").

Turning to the DR's crossclaim, however, the Court considers the relative roles of the parent and its subsidiaries.  There is no question that the Koffee Kup Entities had little control over the events that give rise to WARN Act liability.  At the time of the plant closures, those entities had no directors and almost no upper management aside from the AIAC team.  With the exceptions of Coles and CEO Morin, all officers of the Koffee Kup Entities resigned as of the sale of the company.  Morin ceased being the Koffee Kup CEO in mid-April 2021.  ECF 203-38 at 82-83.  The only holdover director of Kup Co., Hubert Aubery, objected to the plant closures.  ECF No. 198-16 at 3.  Coles refused to sign the WARN Act notices.  And on Friday, April 23, 2021, it was Sands who told Coles to inform

42

workers that the bakeries were closing and they should not
continue coming to work.

The DR alleges the Koffee Kup Entities' lack of control
over the company entitles them to indemnification.  As this
Court has held previously, under Vermont law "[a] right of
indemnity will be afforded a party who, without active fault,
has been compelled, by reason of some legal obligation to pay
damages caused by the negligence of another."  *Loli of Vermont,
Inc. v. Stefandl*, 968 F. Supp. 158, 161 (D. Vt. 1997) (citing
*Viens v. Anthony Co.*, 282 F. Supp. 983, 986 (D. Vt. 1968)).
Furthermore, "the WARN Act creates a system that allocates
notice responsibility between the seller of the business and the
buyer of the business, and only the party actually causing
employment loss due to a plant closing is required to provide
WARN Act notice."  *Wilson v. Airtherm Prod., Inc.*, 436 F.3d 906,
909 (8th Cir. 2006).  Indeed, "the WARN Act takes a 'functional,
common sense approach,' attempting to determine who actually
effects the plant closing."  *Id.* at 912 (quoting *Smullin v. Mity
Enter., Inc.*, 420 F.3d 836, 837 (8th Cir. 2005)).  Here, that
party was clearly AIAC/KKBIC through Sands and the management
team reporting to Levie.

AIAC and KKBIC oppose the DR's motion for summary judgment,
asserting two arguments: (1) that neither AIAC nor KKBIC
constituted a single employer, and (2) that they are each

entitled to the "unforeseen business circumstance" and "faltering business" exceptions. ECF No. 217 at 15-23. The Court has concluded that the single employer included AIAC and KKBIC, has rejected application of those exceptions in this case, and finds that the Koffee Kup Entities' lack of control over the closure calls for indemnification. The DR is therefore granted summary judgment on her crossclaim.

## IV.   AIAC/KKBIC Motion for Summary Judgment

AIAC and KKBIC have also moved for summary judgment. Their fundamental contention is that AIAC owned no equity or debt in Kup Co. or its subsidiaries, did not provide any loans or funds to KKBIC for its investment, and was not involved in the ownership, management, or operation of the Company. They argue that AIAC is not a proper party, that all relevant decisions were made by Kup Co., not KKBIC, and that they are both entitled to judgment as a matter of law.

Plaintiffs and the DR each oppose the summary judgment motion. Their positions are supported by a host of undisputed and disputed facts. The undisputed facts demonstrate that AIAC, through Levie, Sands, and AIAC affiliates, was very much involved in the operation of the company during the weeks up to and including the plant closures. AIAC retained Sands. AIAC brought in the new Koffee Kup leadership team. Levie and Sands controlled the Kup Co. board. A wire transfer of over $30,000

44

was made by AMTC to pay for "[t]he Board monitoring fees for Dorset Partners [Sands] from Kup Co."  ECF No. 203-13 at 2.  The invoice for that "monitoring work" included work descriptions such as "closure," "shutdown," "WARN Prep" and "WARN."  ECF No. 203-45.  AIAC and Levie hired attorneys to prepare WARN Act notices.  ECF No. 203-29 at 50-69.  The undisputed record thus shows that Sands, with AIAC/Levie's approval and support, shut down operations.  And KKBIC, as the majority owner of Kup Co., shares liability as part of the single employer.

AIAC and KKBIC argue that they cannot be held liable because the Koffee Kup Entities wrongfully withheld critical financial information from KKBIC prior to the sale.  Sands' affidavit recounts his efforts to obtain financial information from G2 Capital Advisors.  After providing copies of the 2021 budget on March 18, 2021, G2 Capital Advisors allegedly declared an information "blackout" and, according to Sands, "prohibited KKBIC from contacting Kup Co.'s management directly."  ECF No. 202-4 at 3.

The Court notes that KKBIC did not exist on March 18, 2021.  The DR submits that it is not clear what Sands means by a "blackout," and that such "blackout" did not prevent him from continuing to request financial information between mid-March and April 1, 2021.  Moreover, as discussed previously, Coles testified that Sands and AIAC had full access to the company's

sales data through the date of the closing.  In a related bankruptcy proceeding, Sands did not dispute having such access.  ECF No. 214-6 at 2-3.  Coles further testified that Sands and AIAC could have looked at that sales data and developed their own estimated P3 shortfall.  ECF No. 214-5 at 6.

Sands attests in his affidavit that after the closing, he "discovered that on March 30, 2021, nine days after P3 ended and two days before the scheduled Closing, Kup Co.'s controller, Luke Morris, prepared the P3 financials, showing deficits, which he emailed to Coles."  ECF No. 202-4 at 4-5.  Yet when Sands asked Coles for the "latest balance sheet," Coles responded "by lying to me, indicating that he did not yet have the P3 financials."  *Id.* at 5.  The DR disputes this fact, offering an email reflecting Coles' receipt of the P3 financials from Morris at 4:29 p.m. on April 1, 2021.  ECF No. 209-32.  Other emails among Koffee Kup personnel reflect internal discussions of "the balance sheet" on March 30, 2021, Sands' request for "the latest balance sheet," and Coles informing his coworkers that "I have not responded to [Sands] yet."  ECF No. 202-8.  Coles testified that when Sands asked for the P3 financials "right before the close, they were not done.  But that was in the same timetable that we always ran our financials in....  They wanted me to give them tentative estimated final numbers for Period 3 and I told

46

them I did not like giving estimated numbers." ECF No. 214-5 at 7-8.

AIAC and KKBIC also contend, without citation to record evidence, that "prior to Closing, the Sellers of the Company secretly and improperly siphoned off millions of dollars from the Company." ECF No. 202-2 at 8 (citing Sands Affidavit, ECF No. 202-4 at 12). The DR disputes this allegation as well, citing state court records. ECF No. 211 at 19. The DR further notes that the prior owners advanced over $14 million to the company, which debt was acknowledged and purchased by KKBIC through the SPA.

Even if the Court were to accept AIAC/KKBIC's allegations of fraud, that claim does not relieve AIAC and KKBIC of WARN Act liability. The motion for summary judgment argues that such fraud was an "unforeseen business circumstance," but the Court has rejected that argument for the reasons set forth above. Again, briefly, that defense is unavailable because there was no mention of fraud in the WARN Act letters, and the "circumstance" alleged was not the sort of event that qualifies for the statutory exception.

AIAC and KKBIC also move for summary judgment based on the "faltering company" exception. That defense, too, is addressed above. The summary judgment record shows that AIAC had significant resources at its disposal, and rather than investing

funds or seeking new investment, AIAC and KKBIC tried to sell the company.  Under those facts, an employer may not avail itself of the "faltering company" exception.

Finally, AIAC and KKBIC assert that Plaintiffs' claims fail because they did not include Kup Co. as a defendant.  "A plaintiff asserting a single employer claim under the WARN Act, however, may choose not to name a direct employer without foundering on Rule 19, as the Supreme Court has held that joint tortfeasors are not indispensable parties under Rule 19(a)." *Garner*, 260 F. Supp. 3d at 381 (citing *Temple v. Synthes Corp. Ltd.*, 498 U.S. 5, 8 (1990)).  Furthermore, Kup Co. was merely a holding company controlled by AIAC, Levie, and Sands, and viewing the facts in a light most favorable to the non-moving parties, there was no formal action by the Kup Co. board to order the plant closures.

AIAC and KKBIC rely on two cases, neither of which support their indispensable party argument.  The first, *Freeman v. New Acceptance Corp.*, 754 F.2d 553 (5th Cir. 1985), involved a suit against a parent company under an "alter ego" theory where the subsidiary was the actual alleged tortfeasor.  *Id.* at 559.  The second, *Rubler v. Unum Provident Corp.*, No. 04 Civ. 7102, 2007 WL 188024, at *3 (S.D.N.Y. Jan. 25, 2007), similarly centered on the parent's liability where the subsidiary was the alleged wrongdoer.  Here, AIAC and KKBIC are alleged to have violated

the WARN Act themselves, and not merely through a subsidiary such as Kup Co.  The cited cases are inapposite, and the motion for summary judgment filed by AIAC and KKBIC is denied.

## Conclusion

For the reasons set forth above, Plaintiffs' motions to strike (ECF Nos. 216, 227) are denied without prejudice, their motion for summary judgment (ECF No. 203) is granted in part and denied in part, the DR's motion for summary judgment (ECF No. 197) is granted in part and denied in part, and AIAC/KKBIC's motion for summary judgment (ECF No. 202) is denied.  Plaintiffs are granted judgment on the question of WARN Act liability, with damages to be determined in future proceedings.  While Defendants are jointly and severally liable for such damages, the Dissolution Receiver (as Receiver of the Koffee Kup Entities' assets) is entitled to indemnification by AIAC and KKBIC.

DATED at Burlington, in the District of Vermont, this 23rd day of August, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Matthew Chaney, Nadine          )
Miller and Arthur Gustafson,    )
on behalf of themselves and     )
all others similarly            )
situated,                       )
                                )
        Plaintiffs,             )
                                )
        v.                      )      Case No. 2:21-cv-120
                                )
Vermont Bread Company,          )
Superior Bakery, Inc., Koffee   )
Kup Bakery, Inc., Koffee Kup    )
Distribution LLC, KK Bakery     )
Investment Company LLC, KK      )
Bakery Holding Acquisition      )
Company, and American           )
Industrial Acquisition          )
Corporation,                    )
                                )
        Defendants,             )
                                )
and                             )
                                )
Linda Joy Sullivan, in her      )
capacity as the Dissolution     )
Receiver for Koffee Kup         )
Bakery, Inc., Vermont Bread     )
Company, Inc. and Superior      )
Bakery, Inc.,                   )
                                )
        Intervenor-Defendant-   )
        Crossclaimant,          )
                                )
        v.                      )
                                )
KK Bakery Investment Company,   )
LLC, KK Bakery Holding          )
Acquisition Company, and        )
American Industrial             )
Acquisition Corporation,        )
                                )
        Crossclaim Defendants.  )

<u>**AMENDED OPINION AND ORDER**</u>

Plaintiffs Matthew Chaney, Nadine Miller, and Arthur Gustafson, on behalf of themselves and a class of similarly-situated persons, bring this action alleging violations of the Worker Adjustment and Retraining Notification ("WARN") Act of 1988, 29 U.S.C. §§ 2101-2109, *et seq.* Plaintiffs and other class members are former employees of Koffee Kup Bakery, Inc. ("Koffee Kup"), Vermont Bread Company, Inc. ("Vermont Bread"), and/or Superior Bakery, Inc. ("Superior") (collectively the "Koffee Kup Entities"). Those Koffee Kup Entities appear in this case through the intervening, state-court-appointed Dissolution Receiver of their assets, Linda Joy Sullivan (the "DR"). Other defendants include the alleged purchasers of the Koffee Kup Entities, American Industrial Acquisition Corporation ("AIAC") and Koffee Kup Bakery Investment Company, Inc. ("KKBIC").[1] The DR has asserted a crossclaim against AIAC and KKBIC seeking indemnification.

Several motions are pending before the Court, including motions for summary judgment filed by Plaintiffs, the DR, and AIAC/KKBIC, respectively, and Plaintiffs' two motions to strike

---

[1] The case caption includes two additional parties. The Court has granted Plaintiffs' motion to dismiss their claims against KK Bakery Holding Acquisition Company without prejudice. ECF No. 232. Crossclaims against that entity are still pending. Koffee Kup Distribution LLC had not appeared in the case.

certain affidavits.  For the reasons set forth below, Plaintiffs' motions to strike are denied without prejudice; their motion for summary judgment is granted in part and denied in part; the DR's motion for summary judgment is granted in part and denied in part; and AIAC/KKBIC's motion for summary judgment is denied.

### Factual Background

On or about April 26, 2021, three bakeries – Koffee Kup, Vermont Bread, and Superior - ceased operations.  As a result, hundreds of people lost their jobs.  Plaintiffs, representing a class of those former bakery employees, allege that they were not provided advance notice of their terminations as required by the WARN Act.  If Plaintiffs succeed on their claims, including the allegation that all three bakeries were owned and operated by a single employer, the employer may be subject to civil liability in the form of back pay and benefits for up to a maximum of 60 days for each of the over 400 members of the class.  *See* 29 U.S.C. § 2104(a)(1).

The three bakeries were owned by Kup Co., a holding company.  More specifically, Vermont Bread and Superior were subsidiaries of Koffee Kup, and Koffee Kup was wholly owned by Kup Co.  ECF No. 87-8.  None of the three bakeries had their own board of directors.  ECF No. 203-11 at 27.  Kup Co. had a board of directors, and during the period in question the bakeries

3

shared the same upper management, including a single Chief Executive Officer ("CEO").

Prior to April 2021, Kup Co. was in poor financial condition and was in default to its primary lender, Key Bank. The company's forbearance agreement with Key Bank had lapsed and was not renewed. In late 2020 and the first quarter of 2021, Koffee Kup hired G2 Capital Advisors, LLC ("G2 Capital Advisors") to search for a purchaser or partner to provide the company with working capital. ECF No. 203-11 at 26. In the course of that effort, G2 Capital Advisors provided financial information to Jeffrey Sands. Sands was working with Leonard Levie and Levie's company, AIAC. ECF No. 203-18 at 2-4. Sands' company, Dorset Partners, LLC, had an engagement agreement with AIAC. ECF No. 203-5 at 3. It was Sands who brought Koffee Kup to AIAC's attention. ECF No. 203-13 at 9.

AIAC specializes in purchasing underperforming companies and working to make them profitable. ECF No. 203-23 at 3. Sands pitched AIAC as the best potential buyer for Kup Co., describing AIAC as

> a family office with no limited partners. They invest
> their own funds to build strong companies which they
> hold for the long term. AIAC is an active owner. Our
> Chairman receives daily cash, working capital and loan
> data from each company. We manage professionally and
> conservatively to build strong businesses. AIAC has
> over 8,500 employees with deep pools of talent to
> solve complex operational and financial problems.

*Id.* An email sent by Sands to G2 Capital Advisors dated December 31, 2020 outlined a new Koffee Kup management team that would "report to Leonard [Levie] at AIAC headquarters.... Leonard is the founder and sole shareholder of AIAC. He wants to buy KK, has owned other commercial bakeries and two of his most successful companies are in Vermont." ECF No. 203-27. A PowerPoint presentation offered by Sands identified "AIAC Executive Leadership for Koffee Kup" as Sands and new CEO Mark Gauthier. ECF 203-23.

Prior to the purchase of Kup Co., Sands reportedly requested financial information about Kup Co.'s sales and earnings for the third financial period of 2021 ("P3"), ending March 21, 2021. ECF No. 202-4 at 3-4. On March 18, 2021, G2 Capital Advisors sent Sands copies of Kup Co.'s 2021 budget. *Id.* at 3. Sands attests that when he inquired in late March 2021 about the company's performance during P3, Koffee Kup's Mark Coles reported that sales "were slightly off for the period while G2 Capital Advisors also indicated that there was no material change [from the budgeted projections]." *Id.* at 4.

Evidence submitted by the DR suggests that AIAC representatives were given full access to the bakeries' sales data. ECF No. 214-5 at 5. According to the testimony of Koffee Kup's Coles, on March 12, 2021, Koffee Kup gave AIAC access to and training on the company's "BIRST" system, which tracked

5

sales. *Id.* Coles testified that information from the BIRST system would have allowed AIAC to predict any net revenue shortfall in the P3 financials. *Id.* at 8-9.

The offer to purchase Kup Co. was submitted on AIAC letterhead signed by Levie as "Chairman AIAC." ECF No. 203-30. Levie authorized the formation of KKBIC on March 29, 2021. ECF No. 203-25. Levie ultimately owned 85% of KKBIC and Sands the other 15%. Pursuant to a Stock Purchase Agreement ("SPA") dated April 1, 2021, KKBIC purchased 80% of the stock of Kup Co. for a price of $1.00. ECF No. 198-10 at 6, 13. KKBIC also purchased $14,314,000 of Kup Co.'s subordinated debt for $1,000,000. *Id.* at 13, 35.[2] After KKBIC purchased the majority of Kup Co.'s shares, Levie and Sands occupied two of the three seats on Kup Co.'s board of directors.

The $1,000,000 for the purchase was provided by Alliance Manufacturing and Trading Company ("AMTC"), an AIAC affiliate. ECF No. 203-13 at 16-17. Although AIAC and KKBIC initially testified through their designated deponents that AMTC loaned the funds to KKBIC for the acquisition, each entity stated in subsequent errata sheets that no formal loan existed. ECF Nos. 203-35, 203-36. As part of the purchase agreement, KKBIC also

---

[2] Sands attests in his first affidavit that the $1 million payment was accompanied by a $2 million note. ECF No. 202-4 at 3.

6

agreed to contribute up to $2.5 million as needed.  ECF Nos. 198-10 at 13, 203-30 at 3-4.  It is unclear where that money would come from, since KKBIC had no bank account and is insolvent.  ECF Nos. 203-26 at 2, 203-6 at 10.

On April 1, 2021, Sands sent an email to Koffee Kup managerial employees stating that "AIAC has brought in their inhouse turnaround team to restructure the business, manage it through a transition and then establish a long-term strategic plan to guide the business in the decades which follow."  ECF No. 203-38 at 58.  Sands also sent employees a PowerPoint presentation that included the statement: "On April 1, 2021, AIAC made a control investment in Koffee Kup Bakery."  ECF No. 203-38 at 64.

Sands attests that within days of the purchase, he discovered Kup Co.'s financial situation was much worse than previously disclosed.  Sands states that on April 5, 2021, he learned that the company's P3 gross sales were $963,693 below budget.  ECF No. 202-4 at 4.  He further contends that the P3 financials were prepared prior the SPA closing, and were wrongfully withheld until after the sale was finalized.  *Id.* at 5.  According to Sands, a new "forecast based upon the true financials projected substantial, multi-million-dollar losses and a negative cash balance by the end of 2021."  *Id.* at 6.

7

The DR contests Sands' accusations, asserting that Sands and CEO Gauthier had access to all of the company's financials, including access to the BIRST system, prior to the SPA closing. ECF No. 198-23 at 2 (Coles Timeline, to which Coles attested in his deposition at ECF No. 203-12 at 25). Those financials reportedly showed significant losses through 2021 P2, requiring the former shareholders to advance over $14 million to keep the company operating. When asked for the P3 financials in late March 2021, Coles responded to Sands that the company did not have complete sales data at that time, and that the information would not be final until April 1. ECF No. 198-23 at 2.

The P3 financials were emailed to Coles at 4:29 p.m. on April 1. ECF No. 209-22 at 2. The DR submits that there is no evidentiary support, aside from Sands' own statement, for the claim that G2 Capital Advisors delayed those financials or misled anyone about the strength of the company. The DR further contends that if access to the P3 financials was critical for closing, the buyer could have waited a few more days before completing the deal.

In his deposition, Sands recalled that in light of the P3 data he received "a call from [newly-appointed CFO] Dave Cryer and Leonard [Levie] saying, '[t]here's no way this company is saveable.'" ECF. No. 203-18 at 25-26. Sands has also testified:

8

[O]nce the Period 3 was revealed and how bad the
company truly was, we realized somebody would need to
. . . bring in $10 million worth of improvements to
make the company viable; and the only one that could
possibly do that would be a strategic buyer, another
bakery.

So basically, that evening we told Key our opinion's
changed on this, the business is -- is dead.  It's not
something we think we can be successful with, but
somebody can be.

And pretty much from the 7th to whenever it was, the
26th, I was killing myself trying to find a strategic
buyer, talking to every other bakery I could think of
to try to get somebody to come in and - and take it
off our hands.

ECF No. 203-39 at 7.

Indeed, on April 6, 2021 KKBIC informed Key Bank of what it

had allegedly learned about the company's financial situation.

ECF No. 202-4 at 7.  On April 9, 2021, Key Bank issued a default

notice and hired an outside advisor to serve as the bank's

receiver.  *Id.*  Key Bank also reportedly informed the company

that it would not extend the forbearance agreement or fund the

company's payroll unless the company cooperated with the

appointment of a receiver and with the liquidation of the bank's

collateral.  *Id.*  The DR asserts that the notice of default was

sent after Sands told Key Bank that Levie would not be meeting

his agreed-upon obligation to provide $2.5 million in funds to

the company.  ECF No. 209-23 at 2.

In his efforts to sell the company, Sands reached out to

potential buyers.  ECF Nos. 202-4 at 7, 203-39 at 7.  Related

9

sales materials characterized AIAC's involvement in Kup Co. as: "affiliate of AIAC owns 80%, individuals own 20%; AIAC controls board."  ECF No. 203-41 at 6.  Sands attests that while two interested parties were identified, one was rejected by Key Bank and the other failed to make an offer the bank found acceptable. ECF No. 202-4 at 8.

On April 22, 2021, Key Bank issued a formal notice of default and communicated its intent to foreclose.  On Friday, April 23, 2021, Sands told Coles to inform workers that the bakeries were closing and they should not continue coming to work.  ECF No. 203-12 at 41.  Coles, the only upper management person remaining from the pre-sale Koffee Kup team, refused to sign the proposed notice of closure.  ECF No. 198-5 at 17.

Notices of the layoff were dated April 26, 2021 and signed by Sands on behalf of "Dorset Partners, LLC, agent for Koffee Kup Bakery By: Jeffrey Sands, Member."  ECF No. 198-31.[3]  The letters stated that Koffee Kup Bakery, Inc., and its respective subsidiaries (Vermont Bread in Vermont, and Superior in Connecticut) would be terminating all operations effective that date.  The notice of layoff letters also explained:

> although many promising avenues were explored that we
> were cautiously optimistic would have allowed Koffee
> Kup to survive, those efforts have now been exhausted

---

[3]  Plaintiffs assert that Sands had no engagement agreement with any of the Koffee Kup Entities, and thus was not an "agent for Koffee Kup Bakery."  ECF No. 203-2 at 13.

> without success and Koffee Kup no longer has
> sufficient capital to continue operations.  We were
> unable to provide you with this notice any earlier as
> we were uncertain of the success of the efforts that
> we have been making to continue operating.  Earlier
> notice of this unfortunate outcome would have been
> premature and would have jeopardized those very
> efforts.

ECF Nos. 198-31 at 2, 202-11 at 3.  The notices were handed out to some employees on April 27, 2021, and mailed to all employees between April 27 and April 29, 2021.  ECF Nos. 198-26 at 20; 203-8 at 3, 5; 217-7 at 12 (Kup Co. board minutes stating that notices were sent on "Tuesday," April 27, 2021).

On May 6, 2021, the Commissioner of the Vermont Department of Labor wrote to Sands and requested an explanation as to why notice was not given in accordance with Vermont's Notice of Potential Layoffs Act, 21 V.S.A. §§ 414(a)(3).  Based upon a letter received from the company's counsel, the Department of Labor's General Counsel subsequently concluded that the company's invocation of the "faltering business" and "unforeseen business circumstance" exceptions to the notice requirement were each "sufficiently justified," and no further action was taken by the State of Vermont.  ECF No. 198-33.  Plaintiffs and the DR disagree with that conclusion, noting that the Department of Labor relied solely on corporate counsel's representations and did not conduct its own investigation.  ECF No. 223 at 9.

Plaintiffs filed their Class Action Complaint on April 29, 2021, and their First Amended Class Action Complaint on June 15, 2021, alleging violations of the WARN Act.  On March 17, 2022, Linda Joy Sullivan moved to intervene as the DR for the Koffee Kup Entities.  The Court granted her unopposed motion on March 30, 2022.  The Court granted Plaintiffs' motion to certify the class on August 17, 2022.

In addition to Plaintiffs' claims, pending before the Court is the DR's crossclaim against AIAC and KKBIC for indemnification.

## Discussion

### I.   Plaintiffs' Motions to Strike

Among the motions now before the Court are Plaintiffs' motions to strike each of two Sands affidavits and an affidavit of Leonard Levie, submitted in support of the motion for summary judgment filed by AIAC and KKBIC and in opposition to the other parties' summary judgment motions.  As discussed more fully below, Plaintiffs contend that the affidavits include self-serving statements of fact that are belied by the record and are not credible.  AIAC and KKBIC argue that the affidavits merely offer disputes of fact that prevent Plaintiffs from obtaining summary judgment, and that credibility determinations are inappropriate at this stage in the case.

"Because 'a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment,' it is appropriate to consider a motion to strike prior to a motion for summary judgment." *Pugliese v. Verizon New York, Inc.*, No. 05-CV-4005, 2008 WL 2882092, *5 (S.D.N.Y. July 9, 2008) (quoting *Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, No. 00-CV-6041, 2003 WL 22327162, *2 (S.D.N.Y. Oct. 10, 2003)).  That said, the Court may choose to review the affidavits solely in the context of the summary judgment motions, addressing each statement individually.  *See Coolidge v. United States*, No. 10-CV-363S, 2015 WL 5714237, at *3 (W.D.N.Y. Sept. 29, 2015) ("Rather than strike a declaration because it contains hearsay, argument, or statements unsupported by citations to the record, courts considering a motion for summary judgment are free to disregard the improper portions, independently review the record, and consider only that which is admissible.").

The most controversial statements in the Sands and Levie affidavits pertain to the roles of AIAC and KKBIC in the purchase and subsequent management of Kup Co. and the Koffee Kup Entities.  Sands attests that AIAC was not involved with KKBIC, Kup Co., or Kup Co.'s subsidiaries.  ECF No. 202-4 at 11.  He further states that KKBIC exercised no control over, and was not involved with, the operations of the company.  *Id*.  The Levie affidavit makes similar assertions.  ECF No. 217-8.  Sands and

Levie also accuse certain persons and entities of committing fraud.  Other statements in those affidavits, including the precise terms of the SPA, are not specifically disputed.

Because the affidavits contain a mix of disputed and undisputed statements, only some of which are challenged in the motions to strike, the Court declines to strike the affidavits entirely and will instead review them in the context of the entire summary judgment record.  *See, e.g., Kozak v. CSX Transportation, Inc.*, No. 20-CV-184S, 2023 WL 2955851, at *7 (W.D.N.Y. Apr. 14, 2023) ("rather than strike these submissions in whole, this Court will independently assess their admissibility and consider only admissible evidence in resolving CSX's motion for summary judgment"); *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 231 (D. Conn. 2008) ("in the context of summary judgment, motions to strike are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion") (cleaned up).  Plaintiffs' motions to strike (ECF Nos. 216, 227) are denied without prejudice.

## II.  Plaintiffs' Motion for Summary Judgment

### A.   Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

When, as in this case, parties file cross-motions for summary judgment, the Court analyzes the motions separately "in each case construing the evidence in the light most favorable to the non-moving party." *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011).

**B.    The WARN Act**

The WARN Act prohibits employers of 100 or more employees from ordering "a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). WARN Act notice aims to "provide[ ] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a); *see also Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013). Failure to provide a WARN Act notice may subject an employer to civil liability in the form of back pay and benefits for the period of the WARN Act violation up to a maximum of 60 days. *See* 29 U.S.C. § 2104(a)(1).

**C.    Was There a Single Employer?**

A threshold question is whether the three bakeries were owned and operated by a single employer. The issue is material because the WARN Act applies only to employers of 100 or more

16

employees, and two of the three bakeries reportedly employed fewer than 100 employees at the time of the closures.  When considered together, however, the Koffee Kup Entities employed over 300 persons.

Plaintiffs argue that Kup Co.'s ownership of Koffee Kup and its subsidiaries, shared upper management, shared operations, and a single Kup Co. board of directors demonstrate that the three bakeries were owned and operated by a single entity. Plaintiffs also highlight the control that Sands and the AIAC team exerted over the three bakeries around the time of the closures.  The DR's motion for summary judgment initially contests the single employer characterization, but alternatively endorses the theory to the extent that the Court finds the single employer was AIAC/KKBIC.  AIAC and KKBIC argue that there was no single employer, and that in any event the layoffs were driven by Kup Co. and not AIAC/KKBIC.

In *Guippone*, the Second Circuit adopted a five-factor test set forth in federal Department of Labor ("DOL") regulations to determine if related entities constitute a single employer.  737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)(3)).  The DOL regulations provide that

> independent contractors and subsidiaries which are
> wholly or partially owned by a parent company are
> treated as separate employers or as part of the parent
> or contracting company depending upon the degree of
> independence from the parent.  Some of the factors to

17

be considered in making this determination are (i)
common ownership, (ii) common directors and/or
officers, (iii) de facto exercise of control, (iv)
unity of personnel policies emanating from a common
source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2).  "As in any balancing test, application
of these factors requires a fact-specific inquiry, no one factor
set out by the DOL is controlling, and all factors need not be
present for liability to attach."  *Guippone*, 737 F.3d at 226.
The Second Circuit has noted that "[t]hese factors are also
sensibly applied to determine whether WARN liability is to be
imposed on an equity investor, who may similarly exercise
control over the termination decision."  *Id.*

Prior to the purchase of Kup Co. by KKBIC, the Koffee Kup
Entities operated largely as a single organization with a sole
CEO overseeing operations.  Although the bakeries kept separate
accounting records, financial records, and payrolls, Koffee Kup
CEO Morin testified that he was hired to integrate operations,
and that the company was in the process of creating an
integrated IT system for all accounting, sales, manufacturing,
and supply chain.  ECF No. 203-11 at 5-7.  Morin's duties also
included managing staff at the three bakeries.  *Id.* at 3-4.
Coles viewed the three entities as a single enterprise.  ECF No.
203-12 at 5.  That view was echoed by the Key Bank receiver, who
testified that "the companies were generally operated as a

18

single enterprise, with substantial comingling of assets, liabilities and financial transactions." ECF No. 76-5 at 1.

At the corporate level, Vermont Bread and Superior were subsidiaries of Koffee Kup, which was wholly owned by Kup Co. After the sale to KKBIC, the three entities had a single board of directors. Two of those three board members were Levie and Sands, who were also the sole owners of KKBIC. After KKBIC's purchase of a controlling share of Kup Co., the company was again run by a single CEO and CFO, together with Sands as the Chief Restructuring Officer. Those officers were identified as part of the AIAC team, all of whom reported to Levie.

Other factors further support a single employer theory. Although the record shows that the three bakeries had their own personnel policies, it is clear that the post-sale executive team had plans to uniformly alter those policies by, for example, reducing benefits and staff numbers. ECF No. 203-38 at 69. Moreover, the decision to shut down the bakeries came from a single source and impacted all employees. This latter fact weighs heavily in favor of finding *de facto* control by a single employer, since "[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy." *Garner v. Berhman Brothers IV, LLC*, 260 F. Supp. 3d 369, 377 (S.D.N.Y. 2017) (quoting *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004)).

19

As to the final factor – dependency of operations – the record shows the bakeries needed a single influx of capital to continue operations.  Moreover, bakery operations were interwoven as, for example, Superior would bake product for the distribution networks of the two others.  ECF No. 203-12 at 5-6. The Court therefore finds that, even when viewing the facts in the light most favorable to the non-moving parties, the undisputed record establishes that there was a single employer in this case.

### D.    Who Was the Employer at the Time of the Closure?

Also material is the identity of the single employer. Plaintiffs argue that at the time of the layoffs, AIAC and KKBIC, through Levie and others, held controlling ownership and exercised *de facto* control over the company.  Plaintiffs also contend that the Koffee Kup Entities share liability jointly and severally with AIAC and KKBIC, as they were the direct employers.  The DR argues that the closure was controlled exclusively by Sands, Levie, and the AIAC team, and that the Koffee Kup Entities bear no liability.

AIAC submits that it was not involved in either the financial investment or management of the bakeries.  As Levie testified: "AIAC is a brand.  AIAC is a group.  AIAC operates through affiliates."  ECF No. 203-22 at 16.  AIAC concedes that communications from Sands promoted AIAC as being "in the best

20

position to support" revitalization of the business, but argues that "support" is not the same as managing or executing a takeover plan. ECF No. 217-2 at 3. AIAC also argues that it had nothing to do with KKBIC.

The assertions and characterizations by AIAC/KKBIC about its role in the business, including its involvement in Kup Co., are inconsistent with undisputed portions of the summary judgment record. That record includes evidence of communications, including emails and presentations by Sands himself, demonstrating the significant roles that AIAC, KKBIC, Levie, and Sands played in the ownership and operation of the Koffee Kup Entities after April 1, 2021.

As noted above, AIAC is owned exclusively by Levie and "operates through affiliates." ECF No. 203-22 at 16. When Levie uses the term "affiliates," he means "a corporate entity with common ownership." *Id*. at 15. One AIAC affiliate, KKBIC, purchased 80% of Kup Co. Another AIAC affiliate, AMTC, funded the purchase.

Kup Co. wholly owned the three bakeries. After April 1, 2021, Levie and Sands held two of the three positions on the Kup Co. board. On April 8, 2021, Levie emailed Sands and directed him to "serve as monitor to [K]up Co on behalf of KK Investment Company and its Board of Directors." ECF No. 203-38 at 87. Sands was to receive payment for that assignment from AIAC. ECF

21

No. 203-43 at 1.  The record shows that Sands was paid by AIAC affiliate AMTC.  ECF No. 203-59 at 18.[4]

AIAC ultimately replaced Morin with Gauthier as the new CEO.  Sands and Gauthier were described as "AIAC Executive Leadership for Koffee Kup," with others from AIAC listed as "Additional AIAC Leadership for Koffee Kup."  ECF 203-38 at 67-68.  AIAC offered a new employment agreement to Koffee Kup Vice President of Manufacturing Ben Richards, which agreement was signed "Sincerely, Mark Gauthier AIAC" and was presented on AIAC letterhead.  ECF 203-38 at 92.

With respect to the closures, the undisputed record shows that it was Sands who, on April 26, 2021, told Coles and human resources personnel that it was time to fire all employees.  ECF No. 203-12 at 41.  Sands also signed the WARN Act letters.  ECF No. 198-31 at 3.  With Levie signing on behalf of AIAC and as a Kup Co. board member, AIAC retained the attorneys who provided counsel regarding plant closures and WARN Act notices.  ECF No. 203-29 at 50-69.  Payments for lawyers working on matters related to KKBIC were wired from an AMTC account.  ECF No. 203-29 at 70.  In the course of this litigation, AIAC has asserted

---

[4] The Court cites to sealed portions of the record where it finds no "compelling reason" barring it from doing so.  *See Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

attorney-client privilege with regard to its communications with those attorneys.  ECF No. 210 at 54-55.

Plaintiffs highlight the fact that there was never a formal resolution adopted by the Kup Co. board to cease bakery operations.  When asked in written discovery about such board action, Levie, through counsel, answered only that a resolution was adopted to try to negotiate a voluntary foreclosure or turnover of assets to Key Bank.  ECF No. 203-40 at 5. Plaintiffs submit that such a resolution is not the same as a formal board decision on closure.  Nor was there any reference to Kup Co. or its board in the WARN Act letters.  ECF Nos. 198-31.  Plaintiffs contend that this failure to adhere to corporate formalities supports their claim that the AIAC team, including Sands, was in *de facto* control of operations.

In *Guippone*, the Second Circuit noted that the "core" of the *de facto* control factor is "whether one company was the decision-maker responsible for the employment practice giving rise to the litigation."  737 F.3d at 227 (quoting *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008)). Here, that decision-maker was the AIAC team, led by Levie and Sands as owners of KKBIC and controlling board members of Kup Co.  Consequently, AIAC and KKBIC bear responsibility for any WARN Act violations.

In making these determinations, the Court is not directly challenging the credibility of the Sands and Levie affidavits despite their inconsistencies with other evidence. Several of the statements in those affidavits assert conclusions about corporate relationships, taking a narrow view of those relationships based upon equity investments. The undisputed evidence, however, shows that those relationships must be viewed in the larger context of the people involved and their various roles. In some instances, detailed above, the affidavits' conclusions contradict prior communications, as when Sands and Levie deny AIAC's involvement in the operation of Kup Co. or the Koffee Kup Entities. Given the undisputed documentary evidence, the Court finds that no jury could reasonably credit those conclusions. *See, e.g., Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (holding that summary judgment was properly granted to defendants where plaintiff relied almost entirely on her own testimony, which was contradicted by contemporaneous letters and meeting notes).

Plaintiffs submit that the inquiry does not stop at AIAC/KKBIC, and that the Koffee Kup Entities share liability as the direct employers. Indeed, the Koffee Kup Entities played a significant role in the closure, as their employees informed workers of the layoffs, stopped assigning shifts, and stopped payroll. Liability of the Koffee Kup Entities is addressed more

24

fully below in the Court's discussion of the exceptions to WARN Act liability.  Briefly stated, the Court finds that the Koffee Kup Entities, as the direct employers, share joint and several liability with AIAC and KKBIC since a direct employer may not simply avoid all liability by passing it to a corporate parent. Nonetheless, those Entities' lack of control over the plant closures entitles them to relief on their crossclaim.

### E.   Application of WARN Act Exceptions

The WARN Act requires an employer to provide 60 days' advance written notice of a plant closing to employees, as well as notice to state and local governments.  29 U.S.C. § 2104(a)(1), (2).  There is no dispute that the closures in this case constituted a plant closing within the meaning of the statute.  Furthermore, with the single employer issue having been resolved, the number of employees impacted by the plant closures triggered WARN Act obligations.  29 U.S.C. § 2104(a)(1).

The WARN Act offers exceptions to the 60-day notice rule. Those exceptions include the "faltering company" exception, *see* 29 U.S.C. § 2102(b)(1), and the "unforeseen business circumstance" exception, *see id.* § 2102(b)(2)(A).  The "unforeseen business circumstance" exception provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is

25

caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(a). The "faltering company" exception applies if "as of the time that notice would have been required the employer was actively seeking capital or business, which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." *Id.* § 2102(b)(1). AIAC and KKBIC argue that they are entitled to application of both exceptions.

The DR contends that the Koffee Kup Entities are entitled to application of the "unforeseen business circumstance" exception because they were surprised by the closure announcement. She also claims protection under the statute's "sale-of-business" exception. The latter exception places responsibility for WARN Act compliance upon the buyer of the business if the plant closing or mass layoff took place after the effective date of the sale. 20 C.F.R. § 639.4(c). An employer relying on a WARN Act exception bears the burden of persuasion. 20 C.F.R. § 639.9.

Plaintiffs submit that no defendant is entitled to an exception because there was no advance notice of the closings. The WARN Act letters were dated April 26, 2021 – the effective

26

date of the closure – and Plaintiffs contend that they were not mailed or handed out until, at the earliest, the next day. Courts have held that although an exception may apply, at least some notice must be provided. *See, e.g., Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("it is manifest that a WARN Act employer attempting to circumvent the 60-day notice requirement must still give some notice in accord with 29 U.S.C. § 2102(b)(3). The unforeseeable business circumstances defense does not jettison this absolute requirement under the WARN Act; even where the defense is properly invoked, some notice must be given.").

The timing of a WARN Act notice must be "as much . . . as is practicable." 29 U.S.C. § 2102(b)(3). The Department of Labor regulations have interpreted that provision to include "notice after the fact." 20 C.F.R. § 639.9. Consistent with that interpretation, the Third Circuit noted in dicta that "[i]n the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated." *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 187 (3d Cir. 1999). Accordingly, there is authority for the proposition that while an employer must provide WARN Act notice, exceptional circumstances may allow for such notice to occur after a plant closure or mass layoff.

AIAC and KKBIC claim that this case presents such exceptional circumstances in the form of fraud by the selling party.  As a result of that alleged fraud, AIAC and KKBIC were reportedly surprised by the gravity of the company's financial situation.  Plaintiffs counter, in part, that this defense is unavailable because the alleged fraud was not mentioned in the WARN Act notices.  Plaintiffs further argue that the alleged fraud is unsupported by admissible evidence, and that any alleged surprise was not an "unforeseen circumstance" under the statute because it was not beyond the employer's control.

As to the substance of the notice, the WARN Act requires "a brief statement of the basis for reducing the notification period."  29 U.S.C. § 2102(b)(3).  Here, the WARN Act letters did not mention any unforeseen fraud.  The letters instead explained that Koffee Kup had been operating at a loss for some time, was in default on outstanding loans including those with its senior lender, and that the senior lender had allowed the company to continue operations pursuant to a forbearance agreement that had expired.  ECF No. 198-31 at 2.  The letters also referenced failed efforts to obtain additional financing or investors.  *Id.*  There was no reference to insufficient financial information at the time of the sale, or to any fraud by the selling party.

The Ninth Circuit has opined that "Congress' purpose in requiring a brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened." *Alarcon v. Keller Industries, Inc.*, 27 F.3d 386, 389 (9th Cir. 1994). The statement therefore "must give some indication of the factual circumstances that made an exception to the statutory notice requirement applicable, providing an adequate specific explanation to affected workers." *Id.* at 390; *see, e.g., Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1318 (D. Mont. 2001) (holding that notice was inadequate since it only stated that the company had "sustained tremendous losses" and was forced to make "some serious decisions"). The requirement also exists "to prohibit employers who have failed to provide the requisite 60-day notice from asserting litigation-convenient but factually *post hoc* justifications for their actions." *Sides*, 725 F.3d at 1285-86.

Here, with no mention of fraud or surprise in the notices of closure, employees had no opportunity to determine whether, on that basis, the absence of prior notice was reasonable. Consequently, the employer's failure to set forth the statutorily-required "brief statement of [that] basis for reducing the notification period," 29 U.S.C. § 2102(b)(3), disqualifies it from protection under the "unforeseen business

29

circumstance" exception.  *See In re Dewey & LeBoeuf LLP*, 507 B.R. 522, 533 (Bankr. S.D.N.Y. 2014) ("even under dire circumstances, employers must deliver written WARN notices containing the necessary brief statements to qualify for the WARN Exceptions").

Furthermore, the regulations make clear that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."  20 C.F.R. § 639.9(b)(1).

> A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable.  A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

*Id.*  Here, the allegedly "unforeseeable" event occurred entirely within the company, involving communications between the seller and the buyer.  There was no outside circumstance or event that could not have been foreseen.  There is no dispute that AIAC/KKBIC was given access to sales data, was told that P3 results would be "soft," and knew that it was buying a failing business.  Financial distress in excess of what was previously estimated or expected by the buyer, despite the opportunity for a due diligence review, is not the equivalent of a sudden

30

contract loss, government closure, or unexpected economic downturn.  Moreover, the company met its demise in part because AIAC/KKBIC decided not to contribute additional money, including the funds it pledged at the outset, to keep the business operating.  *See, e.g.*, ECF No. 219-5 (Kup Co. board minutes reflecting Levie's instruction to "inform the bank that neither the Company nor its shareholders had interest in providing further funding").

Also without merit is the claim that Key Bank calling its loan constituted an unforeseen circumstance.  The loan with Key Bank had been in default prior to the sale of the company, continued forbearance was in no way guaranteed, and the April 1, 2021 sale was finalized without Key Bank's approval.  ECF No. 203-3 at 50-51.  Accordingly, AIAC and KKBIC are not entitled to protection under the "unforeseen business circumstance" exception.

Given the Court's conclusion that the "unforeseen business circumstance" exception is not available to AIAC or KKBIC, it need not fully assess their factual assertions underlying the claims of fraud.  Nor does the Court need to review whether those parties exercised "commercially reasonable business judgment" in failing to accurately assess the company's financial situation.  20 C.F.R. § 639.9(2).  The Court does note, however, that KKBIC allegedly entered into the purchase

31

agreement knowing that the final P3 financials were outstanding, and closed the deal nonetheless.

AIAC and KKBIC also call for application of the "faltering company" exception. The federal regulations set forth four elements for this exception: (1) the employer must have been actively seeking capital or business at the time the 60-day notice would have been required; (2) there must have been a realistic opportunity to obtain the desired financing or business; (3) the financing or business would have been sufficient to either avoid or postpone the shutdown; and (4) as set forth in the statute, the employer reasonably and in good faith believed that giving the required notice would have precluded it from obtaining the necessary capital or business. 20 C.F.R. § 639.9(a).

AIAC and KKBIC argue that a public WARN Act notice prior to the closure would have prohibited the sale of Kup Co. as a going concern. Specifically, they argue that such a notice would have scared suppliers into restricting sales, frightened employees into leaving their jobs, and caused customers to reduce shelf space for Kup Co. products, thereby further damaging the company and making it unattractive to a potential buyer. Plaintiffs note that AIAC and Sands sought a new buyer for the company only after declining to infuse the bakeries with the promised $2.5 million investment. Plaintiffs also submit that Levie and AIAC

32

had significant funds at their disposal and, consistent with their own attestations prior to the sale, did not need to look to other sources for investment. ECF No. 203-18 at 16 (Sands deposition); ECF No. 203-30 at 8.

As stated in the federal regulations, "[t]he actions of an employer relying on the 'faltering company' exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed." 20 C.F.R. § 639.9(a)(4). Because AIAC, through its affiliates, reportedly had access to significant additional capital, its efforts to find another party to make the necessary investment do not qualify it for the faltering business exception. ECF No. 203-30 at 8 ("AIAC invests its own financial resources and does not require financing from third parties.").

Moreover, the faltering business exception applies to efforts to obtain either capital or new business, and not to efforts to sell the company. The regulations limit the exception to instances where the employer was "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially

33

reasonable method." 20 C.F.R. § 639.9. Efforts to sell the business do not qualify. *See, e.g., Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-CV-263, 2022 WL 4119367, at *15 (N.D.W. Va. Aug. 2, 2022) ("Case law makes clear that a sale of the business does not meet this definition."); *Law v. Am. Capital Strategies, Ltd*., 3:05-0836, 2007 WL 221671 at *10 (M.D. Tenn. 2007) ("This Court concludes that [the faltering company] exception is inapplicable where, as here, the closings and/or layoffs occur as a result of a failed business sale.").

Sands attests that KKBIC tried to "secure external funding or a new investor to keep the Company operational," but identifies no such investors other than the parties to whom he reached out in an effort to sell the company. ECF No. 202-4 at 7. Nor is there record evidence that the owners of Kup Co. were actively seeking capital, rather than a new owner, 60 days prior to the closure. AIAC/KKBIC's briefing concedes that "not being able to raise the necessary infusion of funds, the only feasible solution was to find a buyer with overlapping production, distribution and administrative costs." ECF No. 217 at 10. And Sands' own testimony, quoted above, makes clear that once Levie and Cryer notified him the business was not "saveable," he focused on selling the company. ECF No. 203-39 at 7.

Furthermore, in order to meet its burden, a defendant invoking the faltering business exception must show that there

34

was "a realistic opportunity to obtain the financing or business sought."  20 C.F.R. § 639.9(a)(2).  Sands offers no evidence of a "realistic opportunity," explaining only that one potential buyer failed to show up to a planned meeting and the other was rejected by Key Bank.  ECF No. 202-4 at 8.  AIAC and KKBIC have therefore failed to meet their burden with respect to this exception.

The DR contends that the Koffee Kup Entities have no liability exposure pursuant to the "sale-of-business" exception set forth at 29 U.S.C. § 2101(b)(1), since the business had been sold to AIAC/KKBIC.  As explained in the federal regulations:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale.  After the effective date of the sale of all or part of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title.

20 C.F.R. § 639.4(c).

This issue invites a closer look at the "sale-of-business" exception in the context of the sale in this case.  Both before and after the sale, Kup Co. existed as the holding company for the Koffee Kup Entities.  KKBIC took an 80% stake in Kup Co. The sellers in the transaction were those parties who sold their

35

debt and their Kup Co. shares.[5]  It is those selling parties, none of whom are named in this lawsuit, who could most clearly avail themselves of a "sale-of-business" exception.  Kup Co., and thus the Koffee Kup Entities, were not the sellers.

Plaintiffs further argue that control by a corporate entity such as Kup Co., or AIAC/KKBIC, does not insulate the Koffee Kup Entities as the direct employers.  They contend that such insulation would allow actual employers to avoid liability by pointing to ownership by a shell corporation with few or no assets.  Plaintiffs' position is facially supported by the regulations, which treat direct employers/subsidiaries "as part of the parent or contracting company depending upon the degree of independence from the parent."  *Id.* at § 639.3(a)(2); *see also Garner*, 260 F. Supp. 3d at 381 ("A direct employer, in the context of a WARN Act claim brought under a single employer theory, is such a joint tortfeasor.").

The DR also seeks application of the "unforeseeable business circumstance" exception, arguing that the plant closures came as a complete surprise.  When KKBIC took control of Kup Co., the expectation was that Levie and/or AIAC would

---

[5]  Those sellers reportedly included Bripan S.a.r.l., Socipar S.a.s.,a Martinique organization, and 9249-9557 Quebec, Inc., a Canadian corporation.  Subordinated debt holders included those parties as well as Jose Aubery, Bertrand Aubery, and Hubert Aubery.  ECF Nos. 202-1 at 4, 217-4 at 3.

36

infuse the business with up to $2.5 million.  The Sands PowerPoint slides also suggested plans for improving business operations in order to return the Koffee Kup Entities to profitability.  The DR submits that after receiving these assurances of investments and operational changes, notice of the plant closings on April 23, 2021 constituted the sort of "sudden, dramatic, and unexpected action or conditions outside the employer's control" that is protected by the statute.  20 C.F.R. § 639.9(b)(1).

Application of this exception would again require a "brief statement" of the reason for the closure.  Here, there was no discussion in the WARN Act letters of a surprise giving rise to the decision to close.  Furthermore, as discussed above with respect to AIAC and KKBIC, the circumstances cited by the DR were not the sort of external events – such as the loss of a major client contract or sudden economic downturn – that qualify for the exception.  Accordingly, the "unforeseeable business circumstance" exception does not apply to the Koffee Kup Entities, and Plaintiffs are entitled to judgment as a matter of law against all Defendants.

## F.   Back Pay and Benefits

Plaintiffs also move the Court to award damages, which they set at nearly $3.6 million.  Under the WARN Act, an employer that violates the notice requirement

37

shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for —

(A) back pay for each day of violation at a rate of compensation not less than the higher of —

(i) the average regular rate received by such employee during the last 3 years of the employee's employment;

or

(ii) the final regular rate received by such employee[.]

29 U.S.C. § 2104(a)(1).  According to an affidavit submitted by class counsel, back pay was calculated based on employee census data as of May 7, 2021, which was provided to Plaintiffs by Coles in response to a subpoena.  ECF No. 203-51 at 4.  From that census data, class counsel developed a spreadsheet that included each employee's name, hire date, employment site, and annual salary.  ECF No. 203-53.  The spreadsheet does not include the nine employees who opted out of the class action.  Using the annual salary figure for each employee, counsel then calculated the wages due for the 60-day period, with reductions for those who were employed for fewer than 120 days.  *See* 29 U.S.C. § 2104(a)(1) (limiting WARN Act liability to no more than one-half the number of days the employee was employed).

The DR objects to the back pay calculation as unsupported by admissible evidence and insufficiently individualized.  As to the question of admissibility, the DR does not dispute that the

38

data upon which the calculations are based were produced by Coles and constitute business records. *See* Fed. R. Evid. 803(6). The DR also cites no authority for its argument that Plaintiffs may not use the average rate of earnings for each employee. In fact, such averaging is what the statute appears to allow in developing a "rate" of compensation. 29 U.S.C. § 2104(a)(1)(A)(i).

AIAC and KKBIC assert that they undertook significant efforts to try to help employees find new jobs within the 60-day period, and that most, if not all, were reemployed at other facilities. ECF No. 217-4 at 7. Plaintiffs' damages do not appear to address or incorporate those mitigative efforts, and the parties have not fully briefed whether incorporation of such mitigation is appropriate under the WARN Act.[6]

The DR also contests Plaintiffs' calculation of benefits. To calculate benefits, class counsel used DOL statistics for "production" workers' average insurance and retirements benefits. ECF No. 203-51 at 4. The DR submits that national averages are not acceptable, and that payroll records show most of the bakery workers received no such benefits. Plaintiffs respond only that their efforts were reasonable, and that any

---

[6]   In their second motion to strike, Plaintiffs contend that the question of mitigation is irrelevant to WARN Act liability and is not supported by admissible evidence. ECF No. 227 at 2.

shortcomings in their approach are due to inadequate discovery responses by defendants.  Plaintiffs have not moved to compel that additional discovery, and have failed to show that the benefits calculations were individualized.  *See* 29 U.S.C. § 2104(a)(2) (providing for individualized reductions related to health and pension benefits).

The DR's final damages defense asks the Court to apply the good faith exception set forth at 29 U.S.C. § 2104(a)(4).  That exception provides:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4).  The DR submits that the Koffee Kup Entities qualify for a reduction of liability under this exception because (1) they played no role in the decision to shut down the facilities, and (2) the WARN Act notices were provided almost immediately thereafter.  The DR further argues that, at the very least, the good faith of the Koffee Kup Entities is a disputed question of material fact precluding summary judgment on the amount of liability.

The Court agrees that, assuming the facts set forth by the DR fit within the exception, and although resolution of the DR's

40

crossclaim may render the issue moot as a practical matter, questions of subjective and objective belief raised by the good faith defense are not sufficiently established to rule out disputed issues of fact.  Accordingly, and for the several reasons set forth above, the Court cannot grant Plaintiffs' motion for summary judgment with respect to damages.

**III. The Dissolution Receiver's Motion for Summary Judgment**

The DR also moves for summary judgment, based upon many of the same undisputed facts cited by Plaintiffs.  In its motion, the DR reiterates her arguments for application of the "sale-of-business" exception and the "unforeseeable business circumstance" exception.  The Court has rejected application of those exceptions for reasons set forth above.  The DR also submits that the Koffee Kup Entities have no liability because they were not involved in the decision to close the plants.

The DR cites case law for the proposition that a direct employer is, at most, a joint tortfeasor and not a necessary party.  As discussed previously, the controlling role of the corporate parents, in this case Kup Co. and KKBIC, does not necessarily relieve the direct employer from joint liability.  Indeed, under the single employer doctrine, subsidiaries are treated "as part of the parent."  *Guippone*, 737 F.3d at 226.

The DR cites *Guippone* and the Third Circuit's decision in *Pearson*, which was quoted at length in *Guippone*, for the

41

proposition that a corporate parent in *de facto* control of the company relieves the direct employer from liability.  Neither case supports that proposition.  Both *Guippone* and *Pearson* focused on the liability of the parent, and said nothing about releasing the subsidiary from joint liability.  *See, e.g.,* *Guippone*, 73 F.3d at 227 (holding that the *de facto* prong "allows the factfinder to consider whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for the litigation"); *Pearson*, 247 F.3d at 487 ("if the parent has sufficiently overwhelmed its subsidiary in taking the challenged action, such a showing is sufficient to create liability").

Turning to the DR's crossclaim, however, the Court considers the relative roles of the parent and its subsidiaries. There is no question that the Koffee Kup Entities had little control over the events that give rise to WARN Act liability. At the time of the plant closures, those entities had no directors and almost no upper management aside from the AIAC team.  With the exceptions of Coles and CEO Morin, all officers of the Koffee Kup Entities resigned as of the sale of the company.  Morin ceased being the Koffee Kup CEO in mid-April 2021.  ECF 203-38 at 82-83.  The only holdover director of Kup Co., Hubert Aubery, objected to the plant closures.  ECF No. 198-16 at 3.  Coles refused to sign the WARN Act notices.  And

42

on Friday, April 23, 2021, it was Sands who told Coles to inform workers that the bakeries were closing and they should not continue coming to work.

The DR alleges the Koffee Kup Entities' lack of control over the company entitles them to indemnification.  As this Court has held previously, under Vermont law "[a] right of indemnity will be afforded a party who, without active fault, has been compelled, by reason of some legal obligation to pay damages caused by the negligence of another."  *Loli of Vermont, Inc. v. Stefandl*, 968 F. Supp. 158, 161 (D. Vt. 1997) (citing *Viens v. Anthony Co.*, 282 F. Supp. 983, 986 (D. Vt. 1968)).  Furthermore, "the WARN Act creates a system that allocates notice responsibility between the seller of the business and the buyer of the business, and only the party actually causing employment loss due to a plant closing is required to provide WARN Act notice."  *Wilson v. Airtherm Prod., Inc.*, 436 F.3d 906, 909 (8th Cir. 2006).  Indeed, "the WARN Act takes a 'functional, common sense approach,' attempting to determine who actually effects the plant closing."  *Id.* at 912 (quoting *Smullin v. Mity Enter., Inc.*, 420 F.3d 836, 837 (8th Cir. 2005)).  Here, that party was clearly AIAC/KKBIC through Sands and the management team reporting to Levie.

AIAC and KKBIC oppose the DR's motion for summary judgment, asserting two arguments: (1) that neither AIAC nor KKBIC

43

constituted a single employer, and (2) that they are each entitled to the "unforeseen business circumstance" and "faltering business" exceptions.  ECF No. 217 at 15-23.  The Court has concluded that the single employer included AIAC and KKBIC, has rejected application of those exceptions in this case, and finds that the Koffee Kup Entities' lack of control over the closure calls for indemnification.  The DR is therefore granted summary judgment on her crossclaim.

## IV.  AIAC/KKBIC Motion for Summary Judgment

AIAC and KKBIC have also moved for summary judgment.  Their fundamental contention is that AIAC owned no equity or debt in Kup Co. or its subsidiaries, did not provide any loans or funds to KKBIC for its investment, and was not involved in the ownership, management, or operation of the Company.  They argue that AIAC is not a proper party, that all relevant decisions were made by Kup Co., not KKBIC, and that they are both entitled to judgment as a matter of law.

Plaintiffs and the DR each oppose the summary judgment motion.  Their positions are supported by a host of undisputed and disputed facts.  The undisputed facts demonstrate that AIAC, through Levie, Sands, and AIAC affiliates, was very much involved in the operation of the company during the weeks up to and including the plant closures.  AIAC retained Sands.  AIAC brought in the new Koffee Kup leadership team.  Levie and Sands

44

controlled the Kup Co. board.  A wire transfer of over $30,000 was made by AMTC to pay for "[t]he Board monitoring fees for Dorset Partners [Sands] from Kup Co."  ECF No. 203-13 at 2.  The invoice for that "monitoring work" included work descriptions such as "closure," "shutdown," "WARN Prep" and "WARN."  ECF No. 203-45.  AIAC and Levie hired attorneys to prepare WARN Act notices.  ECF No. 203-29 at 50-69.  The undisputed record thus shows that Sands, with AIAC/Levie's approval and support, shut down operations.  And KKBIC, as the majority owner of Kup Co., shares liability as part of the single employer.

AIAC and KKBIC argue that they cannot be held liable because the Koffee Kup Entities wrongfully withheld critical financial information from KKBIC prior to the sale.  Sands' first affidavit recounts his efforts to obtain financial information from G2 Capital Advisors.  After providing copies of the 2021 budget on March 18, 2021, G2 Capital Advisors allegedly declared an information "blackout" and, according to Sands, "prohibited KKBIC from contacting Kup Co.'s management directly."  ECF No. 202-4 at 3.

The Court notes that KKBIC did not exist on March 18, 2021. The DR submits that it is not clear what Sands means by a "blackout," and that such "blackout" did not prevent him from continuing to request financial information between mid-March and April 1, 2021.  Moreover, as discussed previously, Coles

testified that Sands and AIAC had full access to the company's sales data through the date of the closing.  In a related bankruptcy proceeding, Sands did not dispute having such access. ECF No. 214-6 at 2-3.  Coles further testified that Sands and AIAC could have looked at that sales data and developed their own estimated P3 shortfall.  ECF No. 214-5 at 6.

Sands attests in his affidavit that after the closing, he "discovered that on March 30, 2021, nine days after P3 ended and two days before the scheduled Closing, Kup Co.'s controller, Luke Morris, prepared the P3 financials, showing deficits, which he emailed to Coles."  ECF No. 202-4 at 4-5.  Yet when Sands asked Coles for the "latest balance sheet," Coles responded "by lying to me, indicating that he did not yet have the P3 financials."  *Id.* at 5.  The DR disputes this fact, offering an email reflecting Coles' receipt of the P3 financials from Morris at 4:29 p.m. on April 1, 2021.  ECF No. 209-32.  Other emails among Koffee Kup personnel reflect internal discussions of "the balance sheet" on March 30, 2021, Sands' request for "the latest balance sheet," and Coles informing his coworkers that "I have not responded to [Sands] yet."  ECF No. 202-8.  Coles testified that when Sands asked for the P3 financials "right before the close, they were not done.  But that was in the same timetable that we always ran our financials in....  They wanted me to give them tentative estimated final numbers for Period 3 and I told

46

them I did not like giving estimated numbers." ECF No. 214-5 at 7-8.

AIAC and KKBIC also contend, without citation to record evidence, that "prior to Closing, the Sellers of the Company secretly and improperly siphoned off millions of dollars from the Company." ECF No. 202-2 at 8 (citing Sands Affidavit, ECF No. 202-4 at 12). The DR disputes this allegation as well, citing state court records. ECF No. 211 at 19. The DR further notes that the prior owners advanced over $14 million to the company, which debt was acknowledged and purchased by KKBIC through the SPA.

Even if the Court were to accept AIAC/KKBIC's allegations of fraud, that claim does not relieve AIAC and KKBIC of WARN Act liability. The motion for summary judgment argues that such fraud was an "unforeseen business circumstance," but the Court has rejected that argument for the reasons set forth above. Again, briefly, that defense is unavailable because there was no mention of fraud in the WARN Act letters, and the "circumstance" alleged was not the sort of event that qualifies for the statutory exception.

AIAC and KKBIC also move for summary judgment based on the "faltering company" exception. That defense, too, is addressed above. The summary judgment record shows that AIAC had significant resources at its disposal, and rather than investing

47

funds or seeking new investment, AIAC and KKBIC tried to sell the company.  Under those facts, an employer may not avail itself of the "faltering company" exception.

Finally, AIAC and KKBIC assert that Plaintiffs' claims fail because they did not include Kup Co. as a defendant.  "A plaintiff asserting a single employer claim under the WARN Act, however, may choose not to name a direct employer without foundering on Rule 19, as the Supreme Court has held that joint tortfeasors are not indispensable parties under Rule 19(a)." *Garner*, 260 F. Supp. 3d at 381 (citing *Temple v. Synthes Corp. Ltd.*, 498 U.S. 5, 8 (1990)).  Furthermore, Kup Co. was merely a holding company controlled by AIAC, Levie, and Sands, and viewing the facts in a light most favorable to the non-moving parties, there was no formal action by the Kup Co. board to order the plant closures.

AIAC and KKBIC rely on two cases, neither of which support their indispensable party argument.  The first, *Freeman v. New Acceptance Corp.*, 754 F.2d 553 (5th Cir. 1985), involved a suit against a parent company under an "alter ego" theory where the subsidiary was the actual alleged tortfeasor.  *Id.* at 559.  The second, *Rubler v. Unum Provident Corp.*, No. 04 Civ. 7102, 2007 WL 188024, at *3 (S.D.N.Y. Jan. 25, 2007), similarly centered on the parent's liability where the subsidiary was the alleged wrongdoer.  Here, AIAC and KKBIC are alleged to have violated

the WARN Act themselves, and not merely through a subsidiary such as Kup Co.  The cited cases are inapposite, and the motion for summary judgment filed by AIAC and KKBIC is denied.

## Conclusion

For the reasons set forth above, Plaintiffs' motions to strike (ECF Nos. 216, 227) are denied without prejudice, their motion for summary judgment (ECF No. 203) is granted in part and denied in part, the DR's motion for summary judgment (ECF No. 197) is granted in part and denied in part, and AIAC/KKBIC's motion for summary judgment (ECF No. 202) is denied.  Plaintiffs are granted judgment on the question of WARN Act liability, with damages to be determined in future proceedings.  While Defendants are jointly and severally liable for such damages, the Dissolution Receiver (as Receiver of the Koffee Kup Entities' assets) is entitled to indemnification by AIAC and KKBIC.

DATED at Burlington, in the District of Vermont, this 24th day of August, 2023.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

```
                    UNITED STATES DISTRICT COURT
                            FOR THE
                      DISTRICT OF VERMONT

Matthew Chaney, Nadine        )
Miller and Arthur Gustafson,  )
on behalf of themselves and   )
all others similarly          )
situated,                     )
                              )
        Plaintiffs,           )
                              )
            v.                )    Case No. 2:21-cv-120
                              )
Vermont Bread Company,        )
Superior Bakery, Inc., Koffee )
Kup Bakery, Inc., Koffee Kup  )
Distribution LLC, KK Bakery   )
Investment Company LLC, KK    )
Bakery Holding Acquisition    )
Company, and American         )
Industrial Acquisition        )
Corporation,                  )
                              )
        Defendants,           )
                              )
and                           )
                              )
Linda Joy Sullivan, in her    )
capacity as the Dissolution   )
Receiver for Koffee Kup       )
Bakery, Inc., Vermont Bread   )
Company, Inc. and Superior    )
Bakery, Inc.,                 )
                              )
        Intervenor-Defendant- )
        Crossclaimant,        )
                              )
            v.                )
                              )
KK Bakery Investment Company, )
LLC, KK Bakery Holding        )
Acquisition Company, and      )
American Industrial           )
Acquisition Corporation,      )
                              )
        Crossclaim Defendants. )
```

**OPINION AND ORDER**

Pending before the Court is a motion for summary judgment and for entry of partial final judgment filed by Intervenor-Defendant-Crossclaimant Linda Joy Sullivan in her capacity as the Dissolution Receiver ("DR") for Koffee Kup Bakery, Inc., Vermont Bread Company, Inc., and Superior Bakery, Inc. (collectively the "Koffee Kup Entities"). ECF No. 255. The Court previously granted summary judgment on liability in favor of Plaintiffs Matthew Chaney, Nadine Miller, Arthur Gustafson and the class they represent; ruled that the DR was entitled to indemnification by Defendants American Industrial Acquisition Corporation and Koffee Kup Bakery Investment Company, Inc. (collectively the "AIAC Defendants"); denied the AIAC Defendants' motion for summary judgment; and denied Plaintiffs' motion for summary judgment on damages. The DR's pending motion asks the Court to determine damages and to enter partial final judgment against the AIAC Defendants.

For the reasons set forth below, the motion for summary judgment is granted in part and denied in part, and the motion for partial final judgment is denied.

**Factual Background**

The underlying facts of this case were set forth in detail in the Court's Amended Opinion and Order of August 24, 2023, and the parties' familiarity with those facts is assumed. Briefly

2

stated, this case centers on the closure of three bakeries and the resulting layoff of over 300 workers.  Plaintiffs, on behalf of themselves and a class of similarly-situated laid-off bakery employees, claim that Defendants failed to provide notice of the mass layoffs and/or closures as required by the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. §§ 2101-2109.  A WARN Act violation may subject an employer to civil liability in the form of back pay and benefits for up to a maximum of 60 days for each member of the class.  *See* 29 U.S.C. § 2104(a)(1).

As noted above, the Court granted summary judgment to Plaintiffs on their liability claims.  The Court also found the AIAC Defendants and the Koffee Kup Entities to be jointly and severally liable, and that the Koffee Kup Entities are entitled to indemnification by the AIAC Defendants.

In their motion for summary judgment, Plaintiffs sought an award of damages in the amount of nearly $3.6 million.  The Court's order summarized the facts underlying that figure:

> According to an affidavit submitted by class counsel, back pay was calculated based on employee census data as of May 7, 2021, which was provided to Plaintiffs by [Koffee Cup's Chief Financial Officer Mark] Coles in response to a subpoena.  ECF No. 203-51 at 4.  From that census data, class counsel developed a spreadsheet that included each employee's name, hire date, employment site, and annual salary.  ECF No. 203-53.  The spreadsheet does not include the nine employees who opted out of the class action.  Using the annual salary figure for each employee, counsel

3

> then calculated the wages due for the 60-day period,
> with reductions for those who were employed for fewer
> than 120 days. *See* 29 U.S.C. § 2104(a)(1) (limiting
> WARN Act liability to no more than one-half the number
> of days the employee was employed).

ECF No. 238 at 38.

The DR objected to the back pay calculation as unsupported by admissible evidence and insufficiently individualized. The DR also objected to the use of national Department of Labor statistics for calculating insurance and retirement benefits. The AIAC Defendants argued for mitigation, asserting that they undertook significant efforts to try to help employees find new jobs and that most, if not all, were reemployed soon after the layoffs.

In addition to her objections to Plaintiffs' calculations, the DR asked the Court to apply the "good faith" exception set forth at 29 U.S.C. § 2104(a)(4). The WARN Act's "good faith" exception provides that if the employer "had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of liability or penalty provided for in this section." *Id.* The DR argued that the Koffee Kup Entities were entitled to application of the exception because (1) they played no role in the decision to shut down the bakery facilities, and (2) WARN Act notices were provided almost immediately thereafter. ECF No. 208 at 12. The DR asserted her argument in the context of

4

Plaintiffs' request for damages, contending that the exception should reduce the Koffee Kup Entities' liability.  ECF No. 208 at 4, 8.

With respect to the "good faith" exception, the Court determined that "although resolution of the DR's crossclaim (for indemnification) may render the issue moot as a practical matter, questions of subjective and objective belief raised by the good faith defense are not sufficiently established to rule out disputed issues of fact."  ECF No. 238 at 41.  Based upon the various objections to Plaintiffs' submissions, including the possible application of the good faith exception, the Court denied their motion for summary judgment on damages.

The DR now submits her own motion for summary judgment on damages, which she calculates to be $2,759,502.02.  The calculation relies in part upon the spreadsheet provided by Plaintiffs in their summary judgment motion, particularly with respect to employee backpay.  The DR reports that while there were initial disagreements with Plaintiffs on several issues, those disagreements have been largely resolved and only one issue remains in dispute.[1]  That issue focuses on whether former

---

[1] The briefing discusses a second dispute pertaining to two individuals who were reportedly on leave.  The DR's reply memorandum explains that, in light of new evidence, she no longer opposes those employees' claims.  ECF No. 265 at 2.

employees who worked during the 60-day period after the shutdown, and were paid by the KeyBank Receiver, should have their claims reduced by the amounts of those payments.

The AIAC Defendants' objections to the DR's motion for a damages determination are more substantial. They first object to the use of attorney affidavits to present evidence, claiming that such affidavits lack the necessary expertise to prove damages. They also contend that the rules of professional conduct bar attorneys from testifying on contested issues. The AIAC Defendants further argue that the DR's damages calculation fails to consider AIAC/KKBIC's "good faith and successful efforts to secure new employment for the laid off Koffee Kup Entities' employees." ECF No. 262 at 6.

In addition to requesting a damages determination, the summary judgment motion asks the Court to enter partial final judgment against the AIAC Defendants on the Plaintiffs' claims and the DR's crossclaim. The DR submits that the judgment would only be partial because the Court would still have before it her "good faith" defense, which could potentially reduce her liability. Plaintiffs and the AIAC Defendants all oppose the DR's motion for partial final judgment, arguing that such a judgment would lead to piecemeal litigation and appeals on inseparable issues. Plaintiffs urge the Court to issue final judgment against all Defendants. ECF No. 263 at 8-11.

6

## Discussion

### I.   The DR's Motion for Summary Judgment

#### A.   Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A fact is material if it might affect the outcome of the suit under governing law."  *Id*.  The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

District courts may grant summary judgment as to damages for which there exist no disputed issues of material fact.  *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 740 (2d Cir. 2010) ("[C]ourts ... routinely award damages that are readily calculable based on the undisputed facts on summary judgment.") (collecting cases).

#### B.   Sufficiency of the Evidence

The AIAC Defendants object to the damages evidence presented by the DR, arguing that the spreadsheets submitted by the DR's counsel cannot be adjudicated at summary judgment and

7

instead require a hearing.  The spreadsheets are based, in part, upon an employee census of May 7, 2021 produced by Koffee Kup Chief Financial Officer Mark Coles in response to a subpoena from Plaintiffs.  ECF Nos. 203-51 at 3, ¶ 6 (Declaration of Mary E. Olsen, Esq.); 257 at 2, ¶ 1 (Declaration of Peter D. Wolfson, Esq.).  The DR also reviewed the Koffee Kup Entities' records, including data from payroll company ADP.  ECF Nos. 257 at 2-3, ¶ 3; 257-2a, 257-2b, 257-2c (sealed).  To determine employees' medical benefits, the DR analyzed "trial balances" from the Koffee Kup Entities' books.  ECF No. 257 at 3, ¶ 4.  With respect to 401K benefits, the DR applied the Koffee Kup Entities' matching percentage (3%) to each participating employee's 60-day wage amount.  The DR then reconciled her findings with the spreadsheet submitted previously by Plaintiffs' counsel.  The DR's final calculation of damages is $2,759,502.02, a reduction of $832,047 from the figure proposed in Plaintiffs' summary judgment motion.

Courts in this Circuit have held that damages may be determined based on detailed affidavits or documentary evidence. *See Chun Jie Yin v. Kim*, No. 07 CV 1236, 2008 WL 906736, at *3 (E.D.N.Y. 2008) (collecting cases).  That general practice applies in WARN Act cases, with courts frequently accepting spreadsheets from counsel setting forth information based upon payroll and other records.  *See, e.g., 1199 SEIU United*

*Healthcare Workers E. v. S. Bronx Mental Health Council, Inc.*, No. 13 CIV. 2768 JGK JCF, 2013 WL 6003731, at *4 (S.D.N.Y. Nov. 13, 2013), *report and recommendation adopted sub nom. 1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council Inc.*, No. 13 CIV. 2768 JGK, 2013 WL 6244716 (S.D.N.Y. Dec. 3, 2013) (assessing damages based upon spreadsheets with payroll information); *Assif v. Titleserv, Inc.*, No. CV113203PKCAKT, 2015 WL 13753144, at *7 (E.D.N.Y. Aug. 14, 2015) (directing counsel to submit a spreadsheet detailing the damages owed to WARN Act class members); *see also Morris v. Moon Ridge Foods, LLC*, No. 18-CV-03219-SRB, 2020 WL 2461888, at *2 (W.D. Mo. May 12, 2020) (holding that spreadsheet based on payroll records, accompanied by counsel's explanation of calculation methods, was "sufficient evidence" to show backpay and benefits damages under the WARN Act); *Alfaro v. Gali Serv. Indus., Inc.*, No. TDC-18-3705, 2021 WL 4704690, at *5 (D. Md. Oct. 8, 2021), *report and recommendation adopted*, No. CV TDC-18-3705, 2021 WL 8314951 (D. Md. Oct. 27, 2021) (allowing evidence of unpaid wages, overtime, and liquidated damages as set forth on spreadsheet with data from plaintiffs' declarations, payroll information, and interviews). As one court recently explained, the burden of proving the back pay and benefits an employee would have earned during the WARN Act notice period "is easily accomplished when the employer's payroll records are available...." *Day v.*

9

*Celadon Trucking Servs., Inc.*, No. 4:09CV00031 SWW, 2015 WL 12966204, at *2 (E.D. Ark. Feb. 4, 2015), *aff'd*, 827 F.3d 817 (8th Cir. 2016).  Accordingly, the Court finds that the submissions by counsel, based upon business records and as confirmed and agreed upon by Plaintiffs and the DR, are sufficient evidence of WARN Act damages.

The AIAC Defendants next argue that an attorney may not submit evidence on a matter that is contested.  The model code of professional conduct allows attorneys to testify to matters that are uncontested.  *See* Model Rule of Professional Conduct 3.7(a)(1).  The DR contends that the data in the spreadsheets and other supporting materials are not contested, and that the only contested questions are disputes of law.  Nothing in the AIAC Defendants' briefing suggests otherwise, as they have not challenged the accuracy of specific information presented to the Court.

While the AIAC Defendants submit that they have asked Plaintiffs for discovery related to damages, they have not articulated why the evidence presented by the DR and Plaintiffs is insufficient.  The payroll records, trial balances, and other business records speak for themselves.  The methodologies for calculating damages have been clearly explained and supported. Inclusion of certain employees in those calculations, such as those who were paid by the KeyBank receiver after the closures,

10

will be settled as a matter of law.  The Court therefore finds that counsels' declarations do not violate their ethical obligations.

The AIAC Defendants also argue that attorneys are not qualified to offer evidence of damages, and that expert testimony is instead required.  Insofar as the DR's submissions might be called into question as beyond the expertise of an attorney, her filings make clear that she prepared her spreadsheet with assistance from a Certified Public Accountant. *See* ECF No. 265-3 (Declaration of Herbert Maughan).  The accountant has also confirmed, under oath, that DR counsel's declaration in support of the summary judgment motion "accurately sets forth the basis upon which the Spreadsheet was prepared." *Id.* at 3.  As the evidence underlying the parties' damages arguments is both uncontested and adequately supported, the Court will accept the evidentiary submissions from counsel.

### C.  Mitigation

Both the DR and the AIAC Defendants argue for mitigation of damages.  The AIAC Defendants submit that they are entitled to mitigation because of efforts made to secure new employment for the laid off Koffee Kup Entities' employees.  When addressing Plaintiffs' motion for summary judgment, the Court noted that "Plaintiffs' damages do not appear to address or incorporate those mitigative efforts, and the parties have not fully briefed

11

whether incorporation of such mitigation is appropriate under the WARN Act."  ECF No. 238 at 39.  The parties have now provided such additional briefing.

For support of their mitigation claim, the AIAC Defendants cite 29 U.S.C. § 2104(a)(4), which provides:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4).  The AIAC Defendants did not argue for application of this "good faith" exception in their previous summary judgment filings, and the Court rejected their argument that WARN Act exceptions spared them from liability.[2]  They now contend that notwithstanding any WARN Act violations, the harm incurred was minimized by their efforts to find new jobs for the laid off bakery employees.  ECF No. 262 at 6.  They also submit that they acted in "good faith" because they "believed that advance notice to their employee was unnecessary, because they

---

[2]   The AIAC Defendants now submit that they are entitled to the good faith exception, in part, because of their belief that those exceptions applied.  ECF No. 267 at 3-4.  To date, AIAC has offered no record evidence to support that claim aside from a conclusory assertion at summary judgment that the exceptions applied.  ECF No. 217-4 at 8, ¶ 20.

12

would all be re-employed shortly after the facilities shutdown." ECF No. 267 at 3.

The "good faith" exception is narrowly construed, and as plainly set forth in the statute, is limited to the employer's good faith belief that its acts or omissions at the time of closure did not violate the Act. *See Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-CV-263, 2022 WL 4119367, at *16 (N.D.W. Va. Aug. 2, 2022) ("[T]he WARN Act's good faith mitigation provision has been interpreted narrowly to require proof that the employer believed at the time of the plant closing that it was giving 60 days' notice or that it fit within one of the provisions allowing shortened or no notice."). The "good faith" exception, and any resulting mitigation, does not consider post-closure facts such as whether employees were able to find other employment during the 60-day violation period. *See, e.g., Collins v. Gee W. Seattle LLC*, 631 F.3d 1001, 1007 (9th Cir. 2011) ("damages under the WARN Act are not offset by wages earned from another employer during the statutory time period").

The AIAC Defendants rely upon *Headrick v. Rockwell International Corporation*, 24 F.3d 1272 (10th Cir. 1994), which held the employer was not liable to give WARN Act notice since its former employees were immediately deemed employees of a new manager and therefore suffered no "employment loss." *Id.* at 1277, 1280. *Headrick* is distinguishable, since in this case a

13

new employment group took control of the business, terminated employees, and did not re-hire them.  *See Guippone v. BH S & B Holdings LLC*, 681 F. Supp. 2d 442, 451 (S.D.N.Y. 2010) (distinguishing *Headrick* and other cases as not involving "a purchaser [that] closed down the business it bought within the first six months of ownership").

The AIAC Defendants cite no case support for their contention that post-termination earnings by employees can mitigate WARN Act damages.  In fact, several federal circuit courts have found no basis for such mitigation.  *See Collins* 631 F.3d at 1007; *Long v. Dunlop Sports Group Americas, Inc.*, 506 F.3d 299, 201 (4th Cir. 2007) (holding that the employer's liability is reduced by "'any wages paid by the employer to the employee,' but not reduced by wages the employee may earn from a new employer"); *Saxion v. Titan-C-Mfg., Inc*., 86 F.3d 553, 560 (6th Cir. 1996) (noting with approval the Fifth Circuit's conclusion that "the WARN Act contains no provision that would allow an employer to reduce its statutory liability by the amount of its employees' outside earnings"); *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1284 n.1 (5th Cir. 1994) ("The WARN Act, however, does not include a provision that would allow an employer to deduct wages earned by an employee from other sources."); *United Steelworkers of Am., AFL-CIO-CLC v. N. Star Steel Co.*, 5 F.3d

14

39, 43 (3d Cir. 1993) ("An employer who violates WARN is entitled to reduce its liability to its aggrieved employees only by payments within the categories set forth in Section 2104(a)(2) that *it* paid to the aggrieved employees."). Consequently, as one district court recently commented, "[t]his Court applauds defendants' efforts after the notice, but this Court will not allow defendants to receive a good faith exception and reduce the amount of liability or penalty owed to plaintiffs in this case." *Reed*, 2022 WL 4119367, at *16. Because post-termination earnings by employees do not mitigate damages under the "good faith" exception, the AIAC Defendants efforts to find new jobs for employees, or belief that such jobs would be secured, do not entitle them to mitigation under 29 U.S.C. § 2104(a)(4).

The final issue with respect to damages, raised by both the DR and the AIAC Defendants, is the question of payments to 15 former bakery employees by the KeyBank receiver during the 60-day violation period.[3]  There is no dispute that those payments,

---

[3]  Plaintiffs and the DR initially disagreed about whether two employees on medical leave at the time of the closure are entitled to payment.  Such workers remain employees if they have a "reasonable expectation of recall."  20 C.F.R. § 639.3(a). Both employees have submitted sworn affidavits stating that they fully expected to be medically cleared and to return to work. ECF No. 263-2.  In light of that evidence, the DR no longer objects to their inclusion in the damages calculation.  The Court is not persuaded by the AIAC Defendants' contention that more is required of these former employees.

totaling $215,112.08, were made with Koffee Kup Entities' funds. Defendants ask the Court to apply 29 U.S.C. § 2104(a)(2), which provides that an employer's liability "shall be reduced by — (A) any wages paid by the employer to the employee for the period of the violation; ... and (C) any payment by the employer to a third party or trustee ... on behalf of and attributable to the employee for the period of the violation."  29 U.S.C. § 2104(a)(2).

When the KeyBank receiver paid laid-off bakery employees for post-closure work, it reportedly did so using an "independent contractor" form.  It also issued 1099 tax forms rather than W-2 employee tax forms to reflect workers' pay. Plaintiffs argue that because those workers were independent contractors and were paid by the prior receiver rather than the employer itself, the payments were not "wages paid by the employer to the employee for the period of the violation."  *Id.*

The Defendants' position on this issue has several flaws. First, the KeyBank receiver was never the employer.  The receiver used Koffee Kup Entities' funds to pay people to preserve the company's assets, but did not retain them as employees.  *See Estrada v. Salyer Am.*, No. C 09-05618 JW, 2010 WL 11580074, at *3 (N.D. Cal. Mar. 31, 2010) ("A receiver merely holds the custody of the property involved in the litigation."); *see also Office and Prof'l Employees Int'l Union Local 2, AFL-*

16

*CIO v. FDIC*, 138 F.R.D. 325, 327 (D.D.C. 1991) (holding that the WARN Act did not apply to the FDIC in its capacity as receiver of a closed bank because the federal government is not an employer when it is taking over and shutting down a bank).  That they formally identified those workers as "independent contractors" and issued them 1099s, while not dispositive on this question, is indicative of the relationship.

Furthermore, the KeyBank receiver was not a "third party or trustee" as contemplated by the statute.  The statute itself uses a parenthetical to explain that a "payment by the employer to a third party trustee ... on behalf of and attributable to the employee" consists of, for example, "premiums for health benefits or payments to a defined contribution plan."  29 U.S.C. § 2104(a)(2)(C).  Those examples make sense, as such payments would indeed be made "on behalf of" employees, and not to them directly, in order to pay health insurance and/or retirements benefits in their names.  Nothing in the statute suggests that this provision applies to monies paid by third parties for work performed during the period of violation.

Finally, the Fifth Circuit has noted that "[w]here, as here, the employee is *terminated*, § 2104(a)(2) is inapplicable because by definition an employee who has been terminated cannot earn any wages *during* the violation period."  *Dillard Dep't Stores, Inc.*, 15 F.3d at 1283 n.14.  That reasoning is

17

consistent with Plaintiffs' contention that the workers were not paid wages, and that Section 2104(a)(2)(C) does not apply. Absent any binding authority to the contrary, the Court finds that the DR and the AIAC Defendants are not entitled to a reduction in liability on the basis of 29 U.S.C. § 2104(a)(2)(C).

## II.  The DR's Motion for Partial Final Judgment

The DR's summary judgment motion also asks the Court to enter a partial final judgment on behalf of the Plaintiffs against the AIAC Defendants, and on behalf of the DR on her crossclaim against the AIAC Defendants.  The remaining issue in the case would be the amount owed to Plaintiffs by the DR.  The DR submits that to determine that amount, the Court will need address whether her liability is reduced by the Koffee Kup Entities' "good faith" at the time of the plant closures.  That issue has not yet been resolved.

Entry of a partial final judgment is governed by Federal Rule of Civil Procedure 54(b).  In light of the "historic federal policy against piecemeal appeals," the Second Circuit has cautioned that "[a] certification under Rule 54(b) should be granted only if there are interest[s] of sound judicial administration and efficiency to be served, or, in the infrequent harsh case," where "there exists some danger of hardship or injustice through delay which would be alleviated by

18

immediate appeal." *Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991) (internal quotation marks and citations omitted).

"Rule 54(b) authorizes a district court to enter partial final judgment 'when three requirements have been satisfied: (1) there are multiple claims or parties, (2) at least one claim or the rights and liabilities of at least one party has been finally determined, and (3) the court makes an express[ ] determin[ation] that there is no just reason for delay.'" *Linde v. Arab Bank, PLC*, 882 F.3d 314, 322-23 (2d Cir. 2018) (alterations in original) (quoting *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, 769 F.3d 135, 140 (2d Cir. 2014)). In determining whether certification of a partial final judgment is appropriate, a court should "consider such factors as whether the claims under review are separable from the others remaining to be adjudicated and whether the nature of the claims already determined is such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Novick v. AXA Network, LLC*, 642 F.3d 304, 311 (2d Cir. 2011).

Here, the facts underlying the claims against the AIAC Defendants and those against the DR are heavily intertwined. Specifically, both the AIAC Defendants and the Koffee Kup Entities were involved in the plant closures. Separate appeals

19

would require two appellate panels to wade through the same detailed record prior to resolving any legal questions at issue. That consideration alone weighs heavily against entering a partial final judgment. *See id.*

The Court also finds no hardship or injustice in issuing a single, final judgment. As Plaintiffs themselves note in the briefing, resolving the DR's "good faith" defense should not be a complicated matter as it may be accomplished in a short bench trial. Plaintiffs also anticipate a lengthy collection process against the AIAC Defendants, while the DR has funds set aside to, at least partially, fund payment to Plaintiff class members. Consequently, if Plaintiffs' assertion is correct, a partial judgment against the AIAC Defendants alone would not accelerate relief for the displaced workers. Finally, a final judgment on the DR's cross-claim would be premature, since the amount of indemnification owed by the AIAC Defendants to the DR will depend, in part, on the success or failure of the DR's "good faith" defense.

For each of these reasons, the DR's motion for entry of a partial final judgment is denied.

## Conclusion

For the reasons set forth above, the DR's motion for summary judgment (ECF No. 255) is granted in part and denied in part. The DR's motion to file certain exhibits under seal (ECF

20

No. 258) is granted.  The AIAC Defendants' motion for leave to file to a sur-reply memorandum (ECF No. 266) is also granted. Damages due to Plaintiffs total $2,987,040.60.  The Court will schedule a bench trial to determine whether the DR is entitled to a reduction in liability on the basis of good faith.

DATED at Burlington, in the District of Vermont, this 17th day of May, 2024.

/s/ William K Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Matthew Chaney, Nadine Miller and Arthur Gustafson, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 2:21-cv-120 |
| Vermont Bread Company, Superior Bakery, Inc., Koffee Kup Bakery, Inc., Koffee Kup Distribution LLC, KK Bakery Investment Company LLC, KK Bakery Holding Acquisition Company, and American Industrial Acquisition Corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| Linda Joy Sullivan, in her capacity as the Dissolution Receiver for Koffee Kup Bakery, Inc., Vermont Bread Company, Inc. and Superior Bakery, Inc., | ) ) ) ) ) ) ) | |
| Intervenor-Defendant-Crossclaimant, | ) ) ) | |
| v. | ) ) | |
| KK Bakery Investment Company, LLC, KK Bakery Holding Acquisition Company, and American Industrial Acquisition Corporation, | ) ) ) ) ) | |
| Crossclaim Defendants. | ) ) | |

## OPINION AND ORDER

Pending before the Court is a joint motion for an order requiring the payment of sanctions.  ECF No. 272.  The Court has already ordered that sanctions be paid by Defendants American Industrial Acquisition Corporation and KK Bakery Investment Company LLC (jointly the "AIAC Defendants").  ECF Nos. 236, 269.  The pending motion asks the Court to set a deadline for payment in certain amounts.  For reasons set forth below, the motion is granted in part and denied in part.

The AIAC Defendants oppose the motion, arguing that they reserve the right to appeal the sanctions award and that payment of sanctions should be stayed.  In the alternative, the AIAC Defendants ask that they be allowed to post a bond.  Movants oppose the request for a stay and the alternative request for posting of a bond, proposing instead that the sanctions be paid and held in their accounts "without further distribution pending the outcome of an appeal of the Sanctions or further order of the Court."  ECF No. 275 at 6.

The Court first finds that a stay is not warranted. Whether to stay enforcement of sanctions pending appeal lies within the Court's discretion.  *See de la Fuente v. DCI Telecommunications, Inc.*, 269 F. Supp. 2d 237, 245 (S.D.N.Y. 2003).  In deciding whether to grant a stay pending appeal, a court ordinarily considers four factors: "(1) whether the stay

2

applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). The first two factors are the most critical. *Id.* at 434.

Here, the AIAC Defendants have offered no argument as to their likelihood of success on the merits in the event of an appeal. Nor have they argued irreparable injury absent a stay. They do argue that the purpose of discovery sanctions is to deter further misconduct, and note that discovery in this case is closed. They also submit, without supporting proof or affidavits, that payment of nearly $250,000 in sanctions will burden their ability to continue this litigation. To the extent this argument is an effort to show irreparable harm, monetary loss generally does not constitute such harm. *See Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, 34 (2d Cir. 1991) ("Monetary loss alone will generally not amount to irreparable harm.").

Movants contend that they will suffer substantial injury if the sanctions payment is stayed. They also propose, however, that the payment be made and then held "without further distribution," calling into question whether a stay of payment

3

would actually cause them injury.  As to the fourth factor, there is "a public interest in resolving matters quickly." *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 235 (S.D.N.Y. 2016).  The grant or denial of a stay with respect to sanctions will not impact the pace of the remaining litigation.  Given that the first two factors weigh against granting a stay, while the remaining factors do not tip the balance significantly in favor of either party, the Court will not stay enforcement of the sanctions award.

In the absence of a stay, the AIAC Defendants will need to either make immediate payment or post a bond.  Their clear preference is the bond option, and they have suggested a bond in the amount of $250,000.  Movants express concern that allowing a bond "provides further opportunity for the AIAC Defendants to delay remedying their conduct and further prejudices the Movants."  ECF No. 275.  While movants cite the misconduct that led to the imposition of sanctions, it is not clear to the Court why the posting of a bond would lead to any further significant delay.

Movants also ask that if the Court allows a bond, the AIAC Defendants be required to identify the person or entity who paid for the bond and the specific terms of the bond.  Their concern appears to be that the AIAC Defendants have used "affiliated entities as piggybanks" in the past to fund their endeavors.

ECF No. 275 at 6 n.2.  Movants do not explain why a particular source of funding for the bond would cause them prejudice, and the Court will not speculate.  Moreover, given the movants' suggestion that a cash payment could be held essentially in escrow, the Court sees no obvious harm in allowing a bond instead.

Federal Rule of Civil Procedure 62(d) specifically provides that an appellant may post a bond pending appeal.  Fed. R. Civ. P. 62(d).  The purpose of the rule is to ensure "that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed." *In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (quoting *Cleveland Hair Clinic, Inc. v. Puig*, 104 F.3d 123, 125 (7th Cir. 1997)).  While that Rule generally applies to final judgments, the Court acknowledges the underlying principle: that posting a bond pending appeal is an adequate remedy.  This Court's Local Rules impose no special conditions on bonds, and movants have not established that such conditions are necessary.

Accordingly, it is hereby ORDERED that the motion for an order awarding sanctions (ECF No. 272) is GRANTED insofar as the AIAC Defendants must provide a bond in the amount of $250,000 to ensure payment of sanctions as previously ordered by the Court.

5

The bond shall be provided within 30 days of this Opinion and Order.  The motion is otherwise DENIED.

DATED at Burlington, in the District of Vermont, this 5th day of August, 2024.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Matthew Chaney, Nadine          )
Miller and Arthur Gustafson,    )
on behalf of themselves and     )
all others similarly            )
situated,                       )
                                )
    Plaintiffs,             )
                                )
        v.              )     Case No. 2:21-cv-120
                                )
Vermont Bread Company,          )
Superior Bakery, Inc., Koffee   )
Kup Bakery, Inc., Koffee Kup    )
Distribution LLC, KK Bakery     )
Investment Company LLC, KK      )
Bakery Holding Acquisition      )
Company, and American           )
Industrial Acquisition          )
Corporation,                    )
                                )
    Defendants,             )
                                )
and                             )
                                )
Linda Joy Sullivan, in her      )
capacity as the Dissolution     )
Receiver for Koffee Kup         )
Bakery, Inc., Vermont Bread     )
Company, Inc. and Superior      )
Bakery, Inc.,                   )
                                )
    Intervenor-Defendant-   )
    Crossclaimant,          )
                                )
        v.              )
                                )
KK Bakery Investment Company,   )
LLC, KK Bakery Holding          )
Acquisition Company, and        )
American Industrial             )
Acquisition Corporation,        )
                                )
    Crossclaim Defendants.  )

SPA-138

### OPINION AND ORDER

Plaintiffs Matthew Chaney, Nadine Miller, and Arthur Gustafson, on behalf of themselves and a class of similarly situated persons, bring this action alleging violations of the Worker Adjustment and Retraining Notification ("WARN") Act of 1988, 29 U.S.C. §§ 2101-2109, *et seq*. Plaintiffs and other class members are former employees of Koffee Kup Bakery, Inc., Vermont Bread Company, Inc., and/or Superior Bakery, Inc. (collectively the "Koffee Kup Entities"). The Koffee Kup Entities appear in this case through the intervening, state-court-appointed Dissolution Receiver of their assets, Linda Joy Sullivan (the "DR"). Other Defendants include the alleged purchasers of the Koffee Kup Entities, American Industrial Acquisition Corporation ("AIAC") and Koffee Kup Bakery Investment Company, Inc. (collectively the "AIAC Defendants"). After resolving multiple legal issues at summary judgment, including finding Defendants liable to Plaintiffs, the Court held a bench trial on May 12, 2025, to resolve the DR's assertion of a "good faith" defense. For the reasons set forth below, the Court finds in favor of the Plaintiffs on that issue.

### Factual Background

The facts of this case are discussed in the Court's Amended Opinion and Order dated August 24, 2023, and the parties' familiarity with those facts is presumed. Briefly stated, the

2

case centers on the closure of three bakeries and the resulting layoff of hundreds of workers. Plaintiffs, on behalf of themselves and a class of similarly situated laid-off bakery employees, claim that Defendants failed to provide notice of the mass layoffs and/or closures as required by the WARN Act. A WARN Act violation may subject an employer to civil liability in the form of back pay and benefits for up to a maximum of 60 days for each member of the class. *See* 29 U.S.C. § 2104(a)(1).

At summary judgment, the Court found in favor of the Plaintiffs on their WARN Act liability claims. The Court also found the AIAC Defendants and the Koffee Kup Entities to be jointly and severally liable, and that the Koffee Kup Entities are entitled to indemnification by the AIAC Defendants. The DR, as representative of the Koffee Kup Entities, now asks the Court to consider her assertion of a "good faith" defense.

Under the WARN Act, an employer's good faith belief that its actions were lawful at the time of the plant closure allows the Court, in its discretion, to reduce the amount of liability. *See* 29 U.S.C. § 2104(a)(4). The DR is seeking such a reduction because executives of the Koffee Kup Entities were not involved in the decision to close operations. Specifically, former Koffee Kup Chief Financial Officer Mark Coles – the sole Koffee Cup senior executive still employed at the time of the closures – testified at trial that he played no role in the closure

3

decision, and that he was instead informed of the closure by people affiliated with AIAC. Coles also testified that he took part in a Zoom call regarding the drafting of a WARN Act notice to employees of the Koffee Kup Entities, but that the terms of the notice were drafted by AIAC's attorneys.[1]

In his trial testimony, Coles conceded that at the time of the layoffs he did not know what was required by the WARN Act in terms of notice to employees. *See* ECF No. 306-1 at 11 ("I didn't even know the basics, so I didn't get into the fine points"). With respect to the legal sufficiency of the WARN Act notice, he relied on the AIAC attorneys. *Id.* at 17 ("Without knowing better I believed that the people drafting them were being compliant, yes."). Coles further conceded that the WARN Act notice omitted critical facts, including that AIAC had failed to follow through on its promise to infuse capital into the company. *Id.* at 23, 38-39. Also missing from the notice was AIAC's claim that it had been defrauded by the Koffee Cup Entities. *Id.* Coles testified that although he did not know whether those facts needed to be included in a WARN Act notice, he believed that "full disclosure is the best for that type of situation." *Id.* at 24.

---

[1] Coles testified that the head of human resources for the Koffee Kup Entities, Susan Leonard, also participated in the Zoom call but did not present any substantive questions or comments regarding the WARN Act notice.

Coles was not familiar with the AIAC attorneys. Nor did he believe it was his "place" to question those attorneys. *Id.* at 18. It was the AIAC executives who were communicating with, and providing factual information to, the attorneys drafting the WARN Act letters. Coles testified that although he had initially hoped those executives were trustworthy, as of the business closure he "had lost that hope." *Id.* at 41; *see also id.* at 47 ("I didn't trust them as businessmen."). In the end, Coles refused to sign the WARN Act letters, believing that as AIAC had made the decision to close the bakeries, its executives should sign the letters. *Id.* at 14-15.

At summary judgment, the Court found that the WARN Act notice provided to the laid-off workers did not comply with the statute, and that the statutory exceptions cited by Defendants did not apply. In its most recent summary judgment ruling, the Court found that Plaintiffs are entitled to nearly three million dollars in damages. The DR's "good faith" argument is the only issue pending before the Court.

### Discussion

The WARN Act "good faith" provision allows courts to reduce liability in cases where, although the employer violated the statute, specific conduct warrants a reduction. The provision states:

> If an employer which has violated this chapter proves
> to the satisfaction of the court that the act or
> omission that violated this chapter was in good faith
> and that the employer had reasonable grounds for
> believing that the act or omission was not a violation
> of this chapter the court may, in its discretion,
> reduce the amount of the liability or penalty provided
> for in this section.

29 U.S.C. § 2104(a)(4). "Courts that have considered this 'good faith' defense have interpreted it to require proof of the employer's subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act." *Frymire v. Ampex Corp.*, 61 F.3d 757, 767-68 (10th Cir. 1995). "The good faith reduction is intended for circumstances where the employer technically violates the law but shows that it did everything possible to ensure that its employees received sufficient notice that they would be laid off." *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 731 (7th Cir. 2004). As the statute makes clear, the burden of proof is on the employer. *See Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1007 (9th Cir. 2004).

Plaintiffs argue that the DR cannot satisfy either the subjective or objective prong of the statutory test. With respect to subjective intent, the DR has agreed to application of the standard set forth by the Ninth Circuit in *Childress*, which requires in part "an honest intention to ascertain and follow the dictates of the WARN Act." 357 F.3d at 1008.

6

Plaintiffs submit there is no evidence that the Koffee Kup Entities, now represented by the DR, had any such intention. *Id.* The trial testimony supports Plaintiffs' position.

The evidence presented at trial does not support a claim that Coles, or anyone else representing the Koffee Kup Entities, "ascertained" the "dictates" of the WARN Act. As noted above, Coles himself knew little about the WARN Act and its requirements. When asked by Plaintiffs' counsel whether he "took any steps to educate" himself about the WARN Act immediately prior to the distribution of the notices to employees, Coles responded: "No, I did not." ECF No. 306-1 at 36; *see also id.* at 39. He instead relied on AIAC and its attorneys for that knowledge. *Id.* at 12. On this specific issue the Court cannot find that Coles, or anyone else acting on behalf of the Koffee Kup Entities, possessed the requisite "honest intention" to understand and follow the statute. *Childress*, 357 F.3d at 1008.

The DR argues that Coles did the only thing that was reasonable for the company CFO in his position: he relied on the lawyers. The trial record shows, however, that Coles did not reach out to Koffee Kup's own lawyers. ECF No. 306-1 at 26 (Coles testifying that after the sale to AIAC, it was his understanding that Koffee Kup's legacy counsel would not be involved). Instead, he relied on AIAC's lawyers, and on the AIAC executives to provide those lawyers with the necessary facts.

7

*Id.* at 33, 36. Under the objective portion of the good faith provision, the Court must consider whether the Koffee Kup Entities had "reasonable grounds" for believing that AIAC and its lawyers were complying with the WARN Act. 29 U.S.C. § 2104(a)(4). Once again, the record favors the Plaintiffs on that question.

Coles testified that by the time the closures were being announced, he did not trust AIAC. ECF No. 306-1 at 41, 47. He believed that AIAC had promised to infuse the Koffee Kup Entities with cash and had backed out of that commitment. The failure to invest in the business was, in his opinion, the primary reason the plants were closing. *Id.* at 22-23, 32. According to Coles, the true reason for the sudden layoffs – the failure to inject capital into the bakeries – was not mentioned in the WARN Act letters. *Id.* at 38-39.

Given his mistrust of the AIAC executives, and the fact that the letters were drafted by AIAC attorneys, Coles had no reasonable basis for believing that the notice to employees would be truthful and compliant. In fact, he knew that the letters being sent to employees did not provide a full and accurate account of the reasons underlying the closures. *See id.* While Coles may have reasonably believed that understanding the WARN Act was not part of his job, and that any communications with the AIAC executives and their attorneys would have been

ignored, his actions nonetheless disqualify the DR from availing herself of the "good faith" defense.

It is the DR's burden to show that the Koffee Kup Entities honestly intended to understand and comply with the WARN Act, and that they reasonably believed such compliance was being achieved. *Childress*, 357 F.3d at 1007. The record in this case does not support either contention. The Koffee Kup Entities have not established that the "act or omission that violated" the WARN Act was undertaken in good faith, as they reportedly made no effort to understand what the WARN Act required. 29 U.S.C. § 2014(a)(4); *see Childress*, 357 F.3d at 1008 ("Mere ignorance of the WARN Act is not enough to establish the good faith exception."). Nor did they "have reasonable grounds for believing that the act or omission was not a violation" since, assuming they understood the law, they did not trust AIAC, and in fact knew that the WARN Act notices omitted important facts. 29 U.S.C. § 2014(a)(4). The DR's request for application of the "good faith" defense is therefore denied.

## Conclusion

For the reasons set forth above, the Court will not reduce the DR's liability on the basis of good faith.

DATED at Burlington, in the District of Vermont, this 24th day of October 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

# UNITED STATES DISTRICT COURT
for the
District of Vermont

MATTHEW CHANEY, NADINE MILLER, and
ARTHUR FUSTAFSON, on behalf of themselves and all
others similarly situated

    *Plaintiff(s)*

     v.

VERMONT BREAD COMPANY, et al

    *Defendant(s)*

)
)
)
)
)
)
)
)
)

Civil Action No. 2:21-cv-120

## JUDGMENT IN A CIVIL ACTION

☐ **Jury Verdict.**

☑ **Decision by Court.**

**IT IS ORDERED AND ADJUDGED** that pursuant to the court's Opinion and Order (Document 309) filed October 24, 2025, following a mini-bench trial held on May 12, 2025, the court finds the dissolution receiver Linda Joy Sullivan's request for application of reduction in liability on basis of "good faith" is DENIED. Also, pursuant to the court's Opinion and Order (Document 273) filed May 17, 2025, the dissolution receiver's Motion for Summary Judgment (Document 255) was GRANTED IN PART AND DENIED IN PART. JUDGMENT IS HEREBY entered in the amount of Two Million Nine Hundred Eighty-Seven Thousand Forty Dollars and Sixty Cents ($2,987,040.60) for plaintiffs Matthew Chaney, Nadine Miller, and Arthur Gustafson, against defendants Vermont Bread Company, Superior Baker, Inc., Koffee Kup Bakery, Inc., American Industrial Acquisition Corporation, and KK Bakery Investment Company LLC.

Previously, pursuant to the court's Amended Opinion and Order (Document 238) filed August 24, 2023, plaintiff's Motion for Summary Judgment (Document 203) and the dissolution receiver's Motion for Summary Judgment (Document 197) were GRANTED IN PART AND DENIED IN PART. Plaintiffs were granted judgment on the question of the WARN Act Liability, with damages to be determined in future proceedings. While defendants are jointly and severally liable for such damages, the dissolution receiver (as receiver of Koffee Kup Entities' assets) is entitled to indemnification by Americal Industrial Acquisition Corporation and Koffee Kup Bakery Investment Company, Inc.

The effective post-judgment interest rate is: 3.66 percent.

Date:  November 26, 2025

*JEFFREY S. EATON*
*CLERK OF COURT*

JUDGMENT ENTERED ON DOCKET
DATE ENTERED:  11/26/2025

*/s/ Lisa Wright*

*Signature of Clerk or Deputy Clerk*

SPA-148

**UNITED STATES DISTRICT COURT**

**OFFICE OF THE CLERK**

DISTRICT OF VERMONT
FEDERAL BUILDING
**BURLINGTON, VERMONT 05402-0945**

☒ P.O. BOX 945
BURLINGTON 05402-0945
(802) 951-6301

☐ P.O. BOX 607
RUTLAND 05702-0607
(802) 773-0245

**JEFFREY S. EATON**
CLERK

Civil Action: 2:21-cv-120                              Date:  November 26, 2025

Chaney v. Vermont Bread Company et al

NOTICE TO LITIGANTS

If you wish to appeal the enclosed judgment or order, you must file a Notice of Appeal within 30 days after entry of the judgment or order appealed from (or 60 days if the United States or an officer or agency of the United States is a party).  Fed. R. App. P. 4(a)(1).  The fee for filing an appeal is $605.00.

If you wish to appeal but are unable to file your Notice of Appeal within 30 days [or 60 days if applicable] after the date of entry shown on line 2 below, then you have an additional 30 days to file a Motion for Extension of Time.  The Motion for Extension of Time **must** be filed within 30 days after the date on line 3 below.  Every Motion for Extension of Time must contain an explanation which demonstrates "good cause" or "excusable neglect" for failure to file the Notice of Appeal within the time limit required. Fed. R. App. P. 4(a)(5).

**PLEASE TAKE NOTICE**

1. Judgment filed                                            November 26, 2025

2. Date of Entry of Judgment on
   the docket of this court                              November 26, 2025

3. Notice of Appeal **MUST** be
   filed on or before                                       December 26, 2025

*/s/ Lisa Wright*
*Signature of Clerk or Deputy Clerk*

SPA-149

# 29 USCS § 2101

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2101. Definitions; exclusions from definition of loss of employment

(a) **Definitions.** As used in this Act [29 USCS §§ 2101 et seq.]—

(1) the term "employer" means any business enterprise that employs—

(A) 100 or more employees, excluding part-time employees; or

(B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime);

(2) the term "plant closing" means the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees;

(3) the term "mass layoff" means a reduction in force which—

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single site of employment during any 30-day period for—

(i)

(I) at least 33 percent of the employees (excluding any part-time employees); and

(II) at least 50 employees (excluding any part-time employees); or

(ii) at least 500 employees (excluding any part-time employees);

(4) the term "representative" means an exclusive representative of employees within the meaning of section 9(a) or 8(f) of the National Labor Relations Act (29 U.S.C. 159(a), 158(f)) or section 2 of the Railway Labor Act (45 U.S.C. 152);

(5) the term "affected employees" means employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer;

(6) subject to subsection (b), the term "employment loss" means (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period;

(7) the term "unit of local government" means any general purpose political subdivision of a State which has the power to levy taxes and spend funds, as well as general corporate and police powers; and

(8) the term "part-time employee" means an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required.

(b) **Exclusions from definition of employment loss.**

(1) In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 3 of this Act [29 USCS §

SPA-150

§ 2101. Definitions; exclusions from definition of loss of employment

2102], up to and including the effective date of the sale. After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 3 of this Act [29 USCS § 2102]. Notwithstanding any other provision of this Act [29 USCS §§ 2101 et seq.], any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.

**(2)** Notwithstanding subsection (a)(6), an employee may not be considered to have experienced an employment loss if the closing or layoff is the result of the relocation or consolidation of part or all of the employer's business and, prior to the closing or layoff—

**(A)** the employer offers to transfer the employee to a different site of employment within a reasonable commuting distance with no more than a 6-month break in employment; or

**(B)** the employer offers to transfer the employee to any other site of employment regardless of distance with no more than a 6-month break in employment, and the employee accepts within 30 days of the offer or of the closing or layoff, whichever is later.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 2, 102 Stat. 890.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

# 29 USCS § 2102

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2102. Notice required before plant closings and mass layoffs

**(a) Notice to employees, state dislocated worker units, and local governments.** An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order—

**(1)** to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and

**(2)** to the the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Innovation and Opportunity Act [29 USCS § 3174(a)(2)(A)], and the chief elected official of the unit of local government within which such closing or layoff is to occur.

If there is more than one such unit, the unit of local government which the employer shall notify is the unit of local government to which the employer pays the highest taxes for the year preceding the year for which the determination is made.

**(b) Reduction of notification period.**

**(1)** An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

**(2)**

**(A)** An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

**(B)** No notice under this Act [29 USCS §§ 2101 et seq.] shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

**(3)** An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period.

**(c) Extension of layoff period.** A layoff of more than 6 months which, at its outset, was announced to be a layoff of 6 months or less, shall be treated as an employment loss under this Act [29 USCS §§ 2101 et seq.] unless—

**(1)** the extension beyond 6 months is caused by business circumstances (including unforeseeable changes in price or cost) not reasonably foreseeable at the time of the initial layoff; and

**(2)** notice is given at the time it becomes reasonably foreseeable that the extension beyond 6 months will be required.

**(d) Determinations with respect to employment loss.** For purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups

SPA-152

§ 2102. Notice required before plant closings and mass layoffs

at a single site of employment, each of which is less than the minimum number of employees specified in section 2(a)(2) or (3) [29 USCS § 2101(a)(2) or (3)] but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this Act [29 USCS §§ 2101 et seq.].

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 3, 102 Stat. 891; Oct. 21, 1998, P. L. 105-277, Div A, § 101(f) [Title VIII, Subtitle IV, § 405(d)(26), (f)(18)], 112 Stat. 2681-424, 2681-432; July 22, 2014, P. L. 113-128, Title V, Subtitle B, § 512(kk), 128 Stat. 1722.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-153

# 29 USCS § 2103

Current through Public Law 119-99, approved June 12, 2026.

***United States Code Service  >  TITLE 29. LABOR (Chs. 1 — 32)  >  CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)***

## § 2103. Exemptions

This Act [29 USCS §§ 2101 et seq.] shall not apply to a plant closing or mass layoff if—

**(1)** the closing is of a temporary facility or the closing or layoff is the result of the completion of a particular project or undertaking, and the affected employees were hired with the understanding that their employment was limited to the duration of the facility or the project or undertaking; or

**(2)** the closing or layoff constitutes a strike or constitutes a lockout not intended to evade the requirements of this Act [29 USCS §§ 2101 et seq.]. Nothing in this Act [29 USCS §§ 2101 et seq.] shall require an employer to serve written notice pursuant to section 3(a) of this Act [29 USCS § 2102(a)] when permanently replacing a person who is deemed to be an economic striker under the National Labor Relations Act: *Provided* , That nothing in this Act [29 USCS §§ 2101 et seq.] shall be deemed to validate or invalidate any judicial or administrative ruling relating to the hiring of permanent replacements for economic strikers under the National Labor Relations Act.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 4, 102 Stat 892.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-154

# 29 USCS § 2104

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service  >  TITLE 29. LABOR (Chs. 1 — 32)  >  CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2104. Administration and enforcement of requirements

(a) **Civil actions against employers.**

(1)  Any employer who orders a plant closing or mass layoff in violation of section 3 of this Act [29 USCS § 2102] shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

(A)  back pay for each day of violation at a rate of compensation not less than the higher of—

(i)  the average regular rate received by such employee during the last 3 years of the employee's employment; or

(ii)  the final regular rate received by such employee; and

(B)  benefits under an employee benefit plan described in section 3(3) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002(3)), including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.

(2)  The amount for which an employer is liable under paragraph (1) shall be reduced by—

(A)  any wages paid by the employer to the employee for the period of the violation;

(B)  any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

(C)  any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

In addition, any liability incurred under paragraph (1) with respect to a defined benefit pension plan may be reduced by crediting the employee with service for all purposes under such a plan for the period of the violation.

(3)  Any employer who violates the provisions of section 3 with respect to a unit of local government shall be subject to a civil penalty of not more than $500 for each day of such violation, except that such penalty shall not apply if the employer pays to each aggrieved employee the amount for which the employer is liable to that employee within 3 weeks from the date the employer orders the shutdown or layoff.

(4)  If an employer which has violated this Act proves to the satisfaction of the court that the act or omission that violated this Act was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Act the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

SPA-155

§ 2104. Administration and enforcement of requirements

**(5)**  A person seeking to enforce such liability, including a representative of employees or a unit of local government aggrieved under paragraph (1) or (3), may sue either for such person or for other persons similarly situated, or both, in any district court of the United States for any district in which the violation is alleged to have occurred, or in which the employer transacts business.

**(6)**  In any such suit, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

**(7)**  For purposes of this subsection, the term[,] "aggrieved employee" means an employee who has worked for the employer ordering the plant closing or mass layoff and who, as a result of the failure by the employer to comply with section 3 [29 USCS § 2102], did not receive timely notice either directly or through his or her representative as required by section 3 [29 USCS § 2102].

**(b) Exclusivity of remedies.**   The remedies provided for in this section shall be the exclusive remedies for any violation of this Act [29 USCS §§ 2101 et seq.]. Under this Act [29 USCS §§ 2101 et seq.], a Federal court shall not have authority to enjoin a plant closing or mass layoff.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 5, 102 Stat. 893.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-156

# 29 USCS § 2105

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service  >  TITLE 29. LABOR (Chs. 1 — 32)  >  CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2105. Procedures in addition to other rights of employees

The rights and remedies provided to employees by this Act [29 USCS §§ 2101 et seq.] are in addition to, and not in lieu of, any other contractual or statutory rights and remedies of the employees, and are not intended to alter or affect such rights and remedies, except that the period of notification required by this Act shall run concurrently with any period of notification required by contract or by any other statute.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 6, 102 Stat. 894.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-157

# 29 USCS § 2106

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2106. Procedures encouraged where not required

It is the sense of Congress that an employer who is not required to comply with the notice requirements of section 3 [29 USCS § 2102] should, to the extent possible, provide notice to its employees about a proposal to close a plant or permanently reduce its workforce.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 7, 102 Stat. 894.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-158

# 29 USCS § 2107

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service  >  TITLE 29. LABOR (Chs. 1 — 32)  >  CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2107. Authority to prescribe regulations

**(a)** The Secretary of Labor shall prescribe such regulations as may be necessary to carry out this Act [29 USCS §§ 2101 et seq.]. Such regulations shall, at a minimum, include interpretative regulations describing the methods by which employers may provide for appropriate service of notice as required by this Act [29 USCS §§ 2101 et seq.] .

**(b)** The mailing of notice to an employee's last known address or inclusion of notice in the employee's paycheck will be considered acceptable methods for fulfillment of the employer's obligation to give notice to each affected employee under this Act [29 USCS §§ 2101 et seq.].

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 8, 102 Stat. 894.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-159

# 29 USCS § 2108

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2108. Effect on other laws

The giving of notice pursuant to this Act [29 USCS §§ 2101 et seq.], if done in good faith compliance with this Act [29 USCS §§ 2101 et seq.], shall not constitute a violation of the National Labor Relations Act or the Railway Labor Act.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 9, 102 Stat. 894.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**

SPA-160

# 29 USCS § 2109

Current through Public Law 119-99, approved June 12, 2026.

*United States Code Service > TITLE 29. LABOR (Chs. 1 — 32) > CHAPTER 23. WORKER ADJUSTMENT AND RETRAINING NOTIFICATION (§§ 2101 — 2109)*

## § 2109. Report on employment and international competitiveness

Two years after the date of enactment of this Act [enacted Aug. 4, 1988] the Comptroller General shall submit to the Committee on Small Business of both the House and Senate, the Committee on Labor and Human Resources, and the Committee on Education and Labor a report containing a detailed and objective analysis of the effect of this Act [29 USCS §§ 2101 et seq.] on employers (especially small- and medium-sized businesses), the economy (international competitiveness), and employees (in terms of levels and conditions of employment). The Comptroller General shall assess both costs and benefits, including the effect on productivity, competitiveness, unemployment rates and compensation, and worker retraining and readjustment.

## History

**HISTORY:**

Aug. 4, 1988, P. L. 100-379, § 10, 102 Stat. 894.

United States Code Service
Copyright © 2026 All rights reserved.

**End of Document**